## NO. 22-4536

In The

# United States Court Of Appeals
## For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

**v.**

## RESHOD JAMAR EVERETT,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
AT RALIEGH**

—————————

**JOINT APPENDIX
Volume I of V
(Pages 1 - 423)**

—————————

| | |
|---|---|
| **Paul K. Sun, Jr.** | **David A. Bragdon** |
| **Kelly Margolis Dagger** | **OFFICE OF THE** |
| **ELLIS & WINTERS, LLP** | **UNITED STATES ATTORNEY** |
| **4131 Parklake Avenue** | **150 Fayetteville Street** |
| **P.O. Box 33550** | **Suite 2100** |
| **Raleigh, NC 27636** | **Raleigh, NC 27601** |
| **(919) 865-7000** | **(919) 856-4530** |
| | |
| *Counsel for Appellant* | *Counsel for Appellee* |

*Gibson*Moore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

# TABLE OF CONTENTS
## Volume I of V

Page:

Docket Entries. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA1

Defendant's Request for Discovery and for
Disclosure of All Exculpatory Evidence and
Incorporated Statement of Authority
      filed August 12, 2020. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA25

Defendant's Motion to Suppress and
Incorporated Memorandum of Law
      filed November 30, 2020. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA40

Government's Response in Opposition to
Defendant's Motion to Suppress,
With Attached Search Warrant,
      filed December 23, 2020. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA61

Transcript of Motion to Suppress Hearing
Before the Honorable James C. Dever III
      on March 4, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA91

Testimony of <u>Neil Budden</u>:

    Direct Examination by Mr. Lemmon. . . . . . . . . . . . . . . . . . . . . . . .  JA94
    Cross-Examination by Mr. Young. . . . . . . . . . . . . . . . . . . . . . . . .  JA112

Transcript of Motion to Suppress Hearing
Before the Honorable James C. Dever III
        on March 4, 2021, Continued:

        Testimony of <u>Chase Robinson</u>:

        Direct Examination by Mr. Lemmon.. . . . . . . . . . . . . . . . . . . . . . **JA128**
        Cross-Examination by Mr. Young. . . . . . . . . . . . . . . . . . . . . . . **JA144**

        <u>Government's Exhibits:</u>

        1.    Arrest Warrants
                dated July 17, 2018. . . . . . . . . . . . . . . . . . . . . . . . . . . **JA172**

        3.    Search Warrant
                dated July 17, 2018. . . . . . . . . . . . . . . . . . . . . . . . . . . **JA175**

        5.    Picture of THC Gummies. . . . . . . . . . . . . . . . . . . . . . . . **JA184**

Order
        filed March 4, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA185**

Transcript of Arraignment Hearing
Before the Honorable Robert T. Numbers II
        on April 29, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA186**

Superseding Indictment
        filed August 18, 2021.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA214**

Government's Notice of Expert Witnesses
        filed September 6, 2021. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA223**

**Government's Second Notice of Expert Witnesses**
    **filed September 14, 2021.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA228**

**Government's Motions** *in Limine*
    **filed April 26, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA233**

**Transcript of Pretrial Conference**
**Before the Honorable James C. Dever III**
    **on April 29, 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA251**

**Transcript of Jury Trial Proceedings**
**Before the Honorable James C. Dever III**
    **on May 5, 2022 (Day 1).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA270**

    **Testimony of <u>Neil Budden</u>:**

    **Direct Examination by Mr. Lemmon.** . . . . . . . . . . . . . . . . . . . . . . **JA295**
    **Cross-Examination by Mr. Young.** . . . . . . . . . . . . . . . . . . . . . . . . **JA373**
    **Redirect Examination by Mr. Lemmon.** . . . . . . . . . . . . . . . . . . . **JA397**
    **Recross Examination by Mr. Young.** . . . . . . . . . . . . . . . . . . . . . . **JA399**

    **Testimony of <u>Darren Wilson</u>:**

    **Direct Examination by Ms. Webb.** . . . . . . . . . . . . . . . . . . . . . . . . **JA400**
    **Cross-Examination by Mr. Young.** . . . . . . . . . . . . . . . . . . . . . . . . **JA412**

## **TABLE OF CONTENTS**
### **Volume II of V**

**Page:**

**Transcript of Jury Trial Proceedings**
**Before the Honorable James C. Dever III**
     **on May 6, 2022 (Day 2).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **JA424**

**Testimony of <u>Corey Bird</u>:**

**Direct Examination by Mr. Lemmon.**. . . . . . . . . . . . . . . . . . . . . . **JA430**
**Cross-Examination by Mr. Young.** . . . . . . . . . . . . . . . . . . . . . . . **JA461**
**Redirect Examination by Mr. Lemmon.**. . . . . . . . . . . . . . . . . . . **JA477**
**Recross Examination by Mr. Young.** . . . . . . . . . . . . . . . . . . . . . **JA479**

**Testimony of <u>Chad Smith</u>:**

**Direct Examination by Mr. Lemmon.**. . . . . . . . . . . . . . . . . . . . . . **JA481**

**Testimony of <u>Dustin Harding</u>:**

**Direct Examination by Mr. Lemmon.**. . . . . . . . . . . . . . . . . . . . . . **JA487**
**Cross-Examination by Mr. Young.** . . . . . . . . . . . . . . . . . . . . . . . **JA540**
**Redirect Examination by Mr. Lemmon.**. . . . . . . . . . . . . . . . . . . **JA558**

**Testimony of <u>Todd Joyce</u>:**

**Direct Examination by Mr. Lemmon.**. . . . . . . . . . . . . . . . . . . . . . **JA562**
**Cross-Examination by Mr. Young.** . . . . . . . . . . . . . . . . . . . . . . . **JA571**
**Redirect Examination by Mr. Lemmon.**. . . . . . . . . . . . . . . . . . . **JA574**
**Recross Examination by Mr. Yount.** . . . . . . . . . . . . . . . . . . . . . . **JA575**

**Transcript of Jury Trial Proceedings**
**Before the Honorable James C. Dever III**
    **on May 6, 2022 (Day 2), Continued:**

**Testimony of <u>Austin Murray</u>:**

**Direct Examination by Ms. Webb.** . . . . . . . . . . . . . . . . . . . . . . . **JA577**
**Cross-Examination by Mr. Young.** . . . . . . . . . . . . . . . . . . . . . . **JA615**
**Redirect Examination by Ms. Webb.** . . . . . . . . . . . . . . . . . . . . **JA635**
**Recross Examination by Mr. Young.** . . . . . . . . . . . . . . . . . . . . **JA637**


**Testimony of <u>Hayden Meier</u>:**

**Direct Examination by Mr. Lemmon.** . . . . . . . . . . . . . . . . . . . . . **JA639**


**Testimony of <u>Tyquon Wilson</u>:**

**Direct Examination by Ms. Webb.** . . . . . . . . . . . . . . . . . . . . . . . **JA648**
**Cross-Examination by Mr. Young.** . . . . . . . . . . . . . . . . . . . . . . **JA660**
**Redirect Examination by Ms. Webb.** . . . . . . . . . . . . . . . . . . . . **JA668**
**Recross Examination by Mr. Young.** . . . . . . . . . . . . . . . . . . . . **JA670**


**Testimony of <u>Chase Robinson</u>:**

**Direct Examination by Mr. Lemmon.** . . . . . . . . . . . . . . . . . . . . . **JA672**
**Cross-Examination by Mr. Young.** . . . . . . . . . . . . . . . . . . . . . . **JA705**


**Testimony of <u>Khristopher Godfrey</u>:**

**Direct Examination by Ms. Webb.** . . . . . . . . . . . . . . . . . . . . . . . **JA713**
**Cross-Examination by Mr. Young.** . . . . . . . . . . . . . . . . . . . . . . **JA729**
**Redirect Examination by Ms. Webb.** . . . . . . . . . . . . . . . . . . . . **JA737**
**Recross Examination by Mr. Young.** . . . . . . . . . . . . . . . . . . . . **JA738**

**Transcript of Jury Trial Proceedings**
**Before the Honorable James C. Dever III**
    **on May 6, 2022 (Day 2), Continued:**

  **Testimony of <u>Kevin Anderson</u>:**

    **Direct Examination by Mr. Lemmon...................... JA740**

**Transcript of Jury Trial Proceedings**
**Before the Honorable James C. Dever III**
    **on May 9, 2022 (Day 3)................................... JA758**

  **Testimony of <u>Kevin Anderson</u>:**

  **Continued Direct Examination by Mr. Lemmon. ........... JA766**
  **Cross-Examination by Mr. Young. ....................... JA788**
  **Redirect Examination by Mr. Lemmon..................... JA791**
  **Recross Examination by Mr. Young. ..................... JA793**

  **Testimony of <u>Timothy Lamont Byrd</u>:**

  **Direct Examination by Ms. Webb. ....................... JA795**
  **Cross-Examination by Mr. Young. ....................... JA805**

  **Testimony of <u>Jessie Mack</u>:**

  **Direct Examination by Mr. Lemmon...................... JA814**
  **Cross-Examination by Mr. Young. ....................... JA821**

**Transcript of Jury Trial Proceedings**
**Before the Honorable James C. Dever III**
**on May 9, 2022 (Day 3), Continued:**

**Testimony of <u>Tobias Johnson</u>:**

**Direct Examination by Ms. Webb.** . . . . . . . . . . . . . . . . . . . . . . . **JA823**
**Cross-Examination by Mr. Young.** . . . . . . . . . . . . . . . . . . . . . . . **JA835**

**Testimony of <u>Benjamin Wilbur</u>:**

**Direct Examination by Mr. Lemmon.** . . . . . . . . . . . . . . . . . . . . . **JA841**
**Cross-Examination by Mr. Young.** . . . . . . . . . . . . . . . . . . . . . . . **JA848**

**Testimony of <u>Roger Moore</u>:**

**Direct Examination by Ms. Webb.** . . . . . . . . . . . . . . . . . . . . . . . **JA850**
**Cross-Examination by Mr. Young.** . . . . . . . . . . . . . . . . . . . . . . . **JA914**
**Redirect Examination by Ms. Webb.** . . . . . . . . . . . . . . . . . . . . . **JA930**

**Testimony of <u>Karen Beam Browne</u>:**

**Direct Examination by Ms. Pryor.** . . . . . . . . . . . . . . . . . . . . . . . **JA934**
**Cross-Examination by Mr. Lemmon.** . . . . . . . . . . . . . . . . . . . . . **JA940**

**Testimony of <u>Shaney Eason</u>:**

**Direct Examination by Ms. Pryor.** . . . . . . . . . . . . . . . . . . . . . . . **JA942**
**Cross-Examination by Ms. Webb.** . . . . . . . . . . . . . . . . . . . . . . . **JA947**

**Transcript of Jury Trial Proceedings**
**Before the Honorable James C. Dever III**
    **on May 9, 2022 (Day 3), Continued:**

**Testimony of <u>Ricky Johnson</u>:**

**Direct Examination by Ms. Pryor**......................... **JA952**
**Cross-Examination by Mr. Lemmon.**...................... **JA957**
**Redirect Examination by Ms. Pryor**....................... **JA958**

**Testimony of <u>Michael Sheehan</u>:**

**Direct Examination by Ms. Pryor**......................... **JA960**
**Cross-Examination by Mr. Lemmon.**...................... **JA972**

**Testimony of <u>Chase Robinson</u>:**

**Direct Examination by Mr. Lemmon**...................... **JA976**
**Cross-Examination by Mr. Young.**........................ **JA980**

# TABLE OF CONTENTS
## Volume III of V

Page:

**Transcript of Jury Trial Proceedings**
**Before the Honorable James C. Dever III**
    on May 10, 2022 (Day 4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA991

**Jury Verdict Form**
    filed May 10, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1129

**Transcript of Sentencing Hearing Proceedings**
**Before the Honorable James C. Dever III**
    on August 25, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1133

    Testimony of <u>Roger Moore</u>:

    Direct Examination by Mr. Lemmon. . . . . . . . . . . . . . . . . . . . . JA1143
    Cross-Examination by Mr. Young. . . . . . . . . . . . . . . . . . . . . . . JA1148

**Judgment in a Criminal case**
    filed August 25, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1184

**Notice of Appeal**
    filed September 19, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1192

# TABLE OF CONTENTS
## Volume IV of V - Under Seal

Page:

**Presentence Investigation Report**
      **filed August 18, 2022**...................................... **JA1194**

**Government's Sentencing Memorandum and**
**Motion for Upward Departure**
      **filed August 22, 2022**...................................... **JA1214**

**Statement of Reasons**
      **filed September 9, 2022.** ................................ **JA1228**

**TABLE OF CONTENTS**
**Volume V of V - Digital Media**

**I hereby certify the following pursuant to the**
**Digital Media Requirements:**

**Government's Exhibits introduced at**
**Motion to Suppress Hearing**
**Before the Honorable James C. Dever III**
     **on March 4, 2021:**

   **2.**    **Body Camera Footage - 2018018879-14.mp4**

   **4.**    **Body Camera Footage - 2018018879-18.mp4**

**This Digital Media is compatible with Windows Media**
**Players and has been confirmed to be Virus-Free Through**
**Virus Scan: Webroot SecureAnywhere**

APPEAL,Exhibits,Jury Trial,USMJ Jones

# U.S. District Court
# EASTERN DISTRICT OF NORTH CAROLINA (Western Division)
# CRIMINAL DOCKET FOR CASE #: 5:20-cr-00333-D-1

Case title: USA v. Everett, et al

Date Filed: 07/08/2020

Date Terminated: 08/25/2022

---

Assigned to: District Judge James C. Dever, III

Appeals court case numbers: 20-4462 4CCA, 22-4536 USCA

### Defendant (1)

**Reshod Jamar Everett**
*TERMINATED: 08/25/2022*
*also known as*
Kool
*TERMINATED: 08/25/2022*
*also known as*
Kool-Aid
*TERMINATED: 08/25/2022*

represented by **Christopher M. Young**
The Young Law Firm, PLLC
700 12th Street, NW Ste 700
Washington, DC 20005
202-870-1191
Fax: 202-478-2119
Email: cyoung@theylf.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: Retained

**Curtis R. High**
5 W. Hargett St., Suite 1004
Raleigh, NC 27601
919-828-7626
Fax: 919-828-5608
Email: curtishigh@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: CJA Appointment

**Renorda E. Pryor**
Wilson Reives & Silverman
Post Office Box 1653
Sanford, NC 27331
919-775-5653
Fax: 919-774-7811
Email: rpryor@wrslawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: Retained

**Kyana K. Givens**
Federal Public Defender's Office

## JA1

150 Fayetteville Street, Suite 450
Raleigh, NC 27601
919-856-4236
Fax: 919-856-4477
Email: kyana_givens@fd.org
*TERMINATED: 08/10/2020*
*Designation: Public Defender or*
*Community Defender Appointment*

**Pending Counts**                                        **Disposition**

Conspiracy to Distribute and Possess With
the Intent to Distribute Marijuana and
Cocaine
(1)

                                                    Imprisonment: 360 months as to Count 1s,
                                                    240 months as to each Count 4s and 6s to be
                                                    served concurrently, 60 months as to Count
                                                    8s to be served concurrently, 5 years as to
                                                    each Count 5s and 7s to be served
Conspiracy to Distribute and Possess With           consecutively for a total of 480 months
the Intent to Distribute Marijuana and              imprisonment with recommendations made.
Tetrahydrocannabinol (THC) and Cocaine              Supervised Release: 5 years as to each
(1s)                                                Count 1s, 5s, and 7s to be served
                                                    concurrently; 3 years as to each Count 4s,
                                                    6s, and 8s to be served concurrently; for a
                                                    total of 5 years supervised release with
                                                    special conditions. No fine. $600 special
                                                    assessment. Order of Forfeiture.

Possess With the Intent to Distribute a
Quantity of Marijuana and a Quantity of
Cocaine; and Aiding and Abetting
(4)

                                                    Imprisonment: 360 months as to Count 1s,
                                                    240 months as to each Count 4s and 6s to be
                                                    served concurrently, 60 months as to Count
                                                    8s to be served concurrently, 5 years as to
                                                    each Count 5s and 7s to be served
Possess With the Intent to Distribute a             consecutively for a total of 480 months
Quantity of Marijuana and a Quantity of             imprisonment with recommendations made.
Cocaine; and Aiding and Abetting                    Supervised Release: 5 years as to each
(4s)                                                Count 1s, 5s, and 7s to be served
                                                    concurrently; 3 years as to each Count 4s,
                                                    6s, and 8s to be served concurrently; for a
                                                    total of 5 years supervised release with
                                                    special conditions. No fine. $600 special
                                                    assessment. Order of Forfeiture.

Possession of a Firearm in Furtherance of a
Drug Trafficking Crime; and Aiding and
Abetting
(5)

**JA2**

| | |
|---|---|
| Possession of a Firearm in Furtherance of a Drug Trafficking Crime (5s) | Imprisonment: 360 months as to Count 1s, 240 months as to each Count 4s and 6s to be served concurrently, 60 months as to Count 8s to be served concurrently, 5 years as to each Count 5s and 7s to be served consecutively for a total of 480 months imprisonment with recommendations made. Supervised Release: 5 years as to each Count 1s, 5s, and 7s to be served concurrently; 3 years as to each Count 4s, 6s, and 8s to be served concurrently; for a total of 5 years supervised release with special conditions. No fine. $600 special assessment. Order of Forfeiture. |
| Possess With the Intent to Distribute a Quantity of Tramadol; and Aiding and Abetting (6) | |
| Possess With the Intent to Distribute a Quantity of a Mixture and Substance Containing Delta-9-tetrahydrocannabinol (THC) and a Quantity of Tramadol (6s) | Imprisonment: 360 months as to Count 1s, 240 months as to each Count 4s and 6s to be served concurrently, 60 months as to Count 8s to be served concurrently, 5 years as to each Count 5s and 7s to be served consecutively for a total of 480 months imprisonment with recommendations made. Supervised Release: 5 years as to each Count 1s, 5s, and 7s to be served concurrently; 3 years as to each Count 4s, 6s, and 8s to be served concurrently; for a total of 5 years supervised release with special conditions. No fine. $600 special assessment. Order of Forfeiture. |
| Possess With the Intent to Distribute a Quantity of Marijuana; and Aiding and Abetting (7) | |
| Possession of a Firearm in Furtherance of a Drug Trafficking Crime (7s) | Imprisonment: 360 months as to Count 1s, 240 months as to each Count 4s and 6s to be served concurrently, 60 months as to Count 8s to be served concurrently, 5 years as to each Count 5s and 7s to be served consecutively for a total of 480 months imprisonment with recommendations made. Supervised Release: 5 years as to each Count 1s, 5s, and 7s to be served concurrently; 3 years as to each Count 4s, 6s, and 8s to be served concurrently; for a total of 5 years supervised release with special conditions. No fine. $600 special assessment. Order of Forfeiture. |
| Possess With the Intent to Distribute a Quantity of Marijuana; and Aiding and | Imprisonment: 360 months as to Count 1s, 240 months as to each Count 4s and 6s to be |

JA3

Abetting
(8s)

served concurrently, 60 months as to Count
8s to be served concurrently, 5 years as to
each Count 5s and 7s to be served
consecutively for a total of 480 months
imprisonment with recommendations made.
Supervised Release: 5 years as to each
Count 1s, 5s, and 7s to be served
concurrently; 3 years as to each Count 4s,
6s, and 8s to be served concurrently; for a
total of 5 years supervised release with
special conditions. No fine. $600 special
assessment. Order of Forfeiture.

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                       **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                              **Disposition**

None

---

**Plaintiff**

**USA**                                    represented by   **Caroline L. Webb**
                                                           United States Attorney's Office - EDNC
                                                           150 Fayetteville Street, Suite 2100
                                                           Raleigh, NC 27601
                                                           919-856-4086
                                                           Email: Caroline.Webb@usdoj.gov
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Scott A. Lemmon**
                                                           United States Attorney's Office - EDNC
                                                           150 Fayetteville Street, Suite 2100
                                                           Raleigh, NC 27601
                                                           919-856-4500
                                                           Email: scott.lemmon@usdoj.gov
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*
                                                           *Designation: Assistant US Attorney*

                                                           **John P Newby**
                                                           United States Attorney's Office - EDNC
                                                           150 Fayetteville Street, Suite 2100
                                                           Raleigh, NC 27601

**JA4**

1/19/23, 3:52 PM                                    CM/ECF - NCED

919-856-4167
Email: john.newby@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Matthew Lee Fesak**
United States Attorney's Office - EDNC
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
919-856-4530
Fax: 919-856-4821
Email: matthew.fesak@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/08/2020 | 1 | SEALED INDICTMENT as to Reshod Jamar Everett (1) count(s) 1, 4, 5, 6, 7, Alvin Milton Davis, III (2) count(s) 1, 2, 3. The foreperson's signature has been redacted pursuant to the E-Government Act. The unredacted version of this document has been filed under seal. (Brewer, C) (Entered: 07/10/2020) |
| 07/08/2020 | 2 | MOTION to Seal 1 Indictment (Sealed), filed by USA as to Reshod Jamar Everett, Alvin Milton Davis, III. (Brewer, C) (Entered: 07/10/2020) |
| 07/08/2020 | 3 | ORDER granting 2 Motion to Seal as to Reshod Jamar Everett (1), Alvin Milton Davis III (2). Signed by Magistrate Judge James E. Gates on 7/8/2020. (Brewer, C) (Entered: 07/10/2020) |
| 07/08/2020 | 4 | Unredacted Document 1 Indictment (Sealed), (Brewer, C) (Entered: 07/10/2020) |
| 07/08/2020 | 5 | Warrant Requested by USA as to Reshod Jamar Everett, Alvin Milton Davis, III. (Brewer, C) (Entered: 07/10/2020) |
| 07/08/2020 | 6 | Arrest Warrant Issued by Peter A. Moore, Jr., Clerk of Court in case as to Reshod Jamar Everett. Original to US Marshal's Office for service. (Brewer, C) (Entered: 07/10/2020) |
| 07/08/2020 | 8 | Penalty Sheet *(Selected Participants Only)* as to Reshod Jamar Everett, Alvin Milton Davis, III. (Brewer, C) (Entered: 07/10/2020) |
| 07/08/2020 | 10 | Notice of Related Case filed by USA. (Brewer, C) (Entered: 07/10/2020) |
| 08/03/2020 | 11 | Redacted Indictment as to Reshod Jamar Everett. (Powers, S.) (Entered: 08/03/2020) |
| 08/03/2020 | | Set Hearing as to Reshod Jamar Everett: Initial Appearance set for 8/4/2020 at 1:30 PM in Wilmington Courtroom 160 before Magistrate Judge Robert B. Jones Jr. (Powers, S.) (Entered: 08/03/2020) |
| 08/03/2020 | | Reset Hearings as to Reshod Jamar Everett: Initial Appearance reset for 8/4/2020 at 1:30 PM in Raleigh - 7th Floor - Courtroom 2 before Magistrate Judge James E. Gates. Please note this changes the location of the hearing. The hearing will now be in person. (Powers, S.) (Entered: 08/03/2020) |
| 08/03/2020 | | Reset Hearing as to Reshod Jamar Everett: Initial Appearance set for 8/4/2020 at 01:00 PM in Wilmington Courtroom 160 before Magistrate Judge Robert B. Jones Jr.. (Horton, B.) (Entered: 08/03/2020) |
| 08/03/2020 | | Arrest of Reshod Jamar Everett. (Grady, B.) (Entered: 08/04/2020) |

JA5

| 08/03/2020 | 17 | Arrest Warrant Returned Executed on 8/3/2020 as to Reshod Jamar Everett. (Lopez, R.) (Entered: 08/04/2020) |
|---|---|---|
| 08/04/2020 | | ORAL MOTION to Unseal Indictment filed by USA as to Reshod Jamar Everett only. (Grady, B.) (Entered: 08/04/2020) |
| 08/04/2020 | | ORAL Order granting Oral Motion to Unseal Indictment only as to Reshod Jamar Everett (1). Entered by US Magistrate Judge Robert B. Jones, Jr. on 8/4/2020. (Grady, B.) (Entered: 08/04/2020) |
| 08/04/2020 | 12 | CJA 23 Financial Affidavit by Reshod Jamar Everett. (Grady, B.) (Entered: 08/04/2020) |
| 08/04/2020 | 13 | ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Reshod Jamar Everett. Signed by US Magistrate Judge Robert B. Jones, Jr. on 8/4/2020. (Grady, B.) (Entered: 08/04/2020) |
| 08/04/2020 | | ORAL MOTION for Detention Pending Trial filed by USA as to Reshod Jamar Everett. (Grady, B.) (Entered: 08/04/2020) |
| 08/04/2020 | 14 | ORDER OF TEMPORARY DETENTION as to Reshod Jamar Everett. Detention Hearing set for 8/10/2020 at 10:00 AM in Raleigh - 7th Floor - Courtroom 2 before US Magistrate Judge Robert T. Numbers II. Signed by US Magistrate Judge Robert B. Jones, Jr. on 8/4/2020. (Grady, B.) (Entered: 08/04/2020) |
| 08/04/2020 | 15 | Minute Entry for proceeding held before US Magistrate Judge Robert B. Jones, Jr.: Initial Appearance as to Reshod Jamar Everett held on 8/4/2020 in Wilmington, Courtroom 160. Defendant present, with consent, by videoconference. Assistant US Attorney, present for Government, moves to unseal Indictment as to this defendant only; so ordered. Defendant requests court-appointed counsel. Court appoints Federal Public Defender. Defendant advised of rights, charges and maximum penalties. Government moves for pretrial detention. Detention Hearing set for 8/10/2020 at 10:00am in Raleigh, 7th Floor-Courtroom 2 before US Magistrate Judge Robert T. Numbers II. Defendant temporarily remanded to US Marshal custody. (Court Reporter FTR Gold) (Grady, B.) (Entered: 08/04/2020) |
| 08/04/2020 | 16 | SCHEDULING ORDER as to Reshod Jamar Everett: Arraignment set for 10/5/2020 term in Raleigh - 7th Floor - Courtroom before District Judge James C. Dever III. The attorneys are ORDERED to conduct a pre-trial conference on or before August 25, 2020. Motions due by 9/8/2020. Response to Motion due by 9/22/2020. Counsel should read the order in its entirety for additional information. Signed by Magistrate Judge Robert B. Jones, Jr on 8/4/2020. (Lopez, R.) (Entered: 08/04/2020) |
| 08/05/2020 | 18 | Notice of Attorney Appearance: Kyana K. Givens appearing for Reshod Jamar Everett . (Givens, Kyana) (Entered: 08/05/2020) |
| 08/05/2020 | 19 | Request for discovery filed by Reshod Jamar Everett . (Givens, Kyana) (Entered: 08/05/2020) |
| 08/05/2020 | | Reset Hearings as to Reshod Jamar Everett: Detention Hearing set for 8/10/2020 at 10:00 AM in Raleigh - 5th Floor Courtroom before Magistrate Judge Robert T. Numbers II. (Stone, S.) (Entered: 08/05/2020) |
| 08/06/2020 | 20 | MOTION to Withdraw as Attorney by Kyana Givens. filed by Reshod Jamar Everett. (Attachments: # 1 Text of Proposed Order) (Givens, Kyana) (Entered: 08/06/2020) |
| 08/06/2020 | | Reset Hearing (LOCATION CHANGE) as to Reshod Jamar Everett: Detention Hearing reset for 8/10/2020 at 12:30 PM in Wilmington, Courtroom 160 before US Magistrate Judge Robert B. Jones, Jr. (Grady, B.) (Entered: 08/06/2020) |

JA6

| 08/07/2020 | 21 | Pretrial Services Report filed by Wiggins as to Reshod Jamar Everett. (Prather, Ryan) (Entered: 08/07/2020) |
| 08/10/2020 | 22 | ORDER granting 20 Motion to Withdraw as Attorney. Kyana K. Givens withdrawn from case as to Reshod Jamar Everett (1). Signed by District Judge James C. Dever, III on 8/10/2020. (Lee, L.) (Entered: 08/10/2020) |
| 08/10/2020 | 23 | Minute Entry for proceeding held before US Magistrate Judge Robert B. Jones, Jr.: Docket Call as to Reshod Jamar Everett held on 8/10/2020 in Wilmington, Courtroom 160. Assistant US Attorney present for Government. Defendant present with counsel. Office of Federal Public Defender will need additional time to appoint panel counsel to represent Defendant. Court resets detention hearing, excluding intervening time period for purposes of speedy trial, for 8/13/2020 at 10:30 AM in Wilmington, Courtroom 118 before US Magistrate Judge Robert B. Jones, Jr. Defendant temporarily remanded to US Marshal custody. (Court Reporter FTR Gold) (Grady, B.) (Entered: 08/10/2020) |
| 08/10/2020 | | ORDER TO CONTINUE Detention Hearing as to Reshod Jamar Everett. It is further ordered that any delay that results from this continuance is excluded from the Speedy Trial Act computation pursuant to 18 U.S.C. § 3161(h)(7)(a) for the reason that the ends of justice served by granting this continuance outweigh the best interest of the public and defendant in a speedy trial. Entered by US Magistrate Judge Robert B. Jones, Jr. on 8/10/2020. (Grady, B.) (Entered: 08/10/2020) |
| 08/10/2020 | 24 | Notice of Attorney Appearance: Curtis R. High appearing for Reshod Jamar Everett . (High, Curtis) (Entered: 08/10/2020) |
| 08/12/2020 | 27 | Notice of Attorney Appearance: Renorda E. Pryor appearing for Reshod Jamar Everett . (Pryor, Renorda) (Entered: 08/12/2020) |
| 08/12/2020 | 28 | Request for discovery filed by Reshod Jamar Everett . (Pryor, Renorda) (Entered: 08/12/2020) |
| 08/12/2020 | 29 | Notice of Attorney Appearance: Christopher M. Young appearing for Reshod Jamar Everett . (Young, Christopher) (Entered: 08/12/2020) |
| 08/13/2020 | 33 | Minute Entry for proceeding held before US Magistrate Judge Robert B. Jones, Jr.: Detention Hearing DAY 1 as to Reshod Jamar Everett held on 8/13/2020 in Wilmington, Courtroom 118. Assistant US Attorney present for Government. Defendant present with counsel. Court hears sworn evidence from both parties; however, video conferencing will be needed to hear from Defendant's proposed third party custodian. Court to reconvene on this matter Friday, 8/14/2020 at 2:30pm in Wilmington, Courtroom 160. Defendant temporarily remanded to US Marshal custody. (Court Reporter FTR Gold) (Grady, B.) (Entered: 08/13/2020) |
| 08/13/2020 | | Reset Hearing as to Reshod Jamar Everett: Detention Hearing reset for 8/14/2020 at 2:30 PM in Wilmington, Courtroom 160 before US Magistrate Judge Robert B. Jones, Jr. (Grady, B.) (Entered: 08/13/2020) |
| 08/14/2020 | 36 | Minute Entry for proceeding held before US Magistrate Judge Robert B. Jones, Jr.: Detention Hearing DAY 2 as to Reshod Jamar Everett held on 8/14/2020 in Wilmington, Courtroom 160. Assistant US Attorney present for Government. Defendant present with counsel. After hearing sworn testimony from Defendant's proposed third party custodian, Court denies Government's motion for pretrial detention and enters an order setting conditions of release. Government moves to stay order of release; Court grants, staying order of release until noon on Monday, 8/17/2020. Written order to follow. Defendant temporarily remanded to US Marshal custody. (Court Reporter FTR Gold) (Grady, B.) (Entered: 08/14/2020) |

JA7

| 08/14/2020 | 37 | *REVERSED - SEE DE 49 ORDER* ORDER Setting Conditions of Release as to Reshod Jamar Everett. Signed by US Magistrate Judge Robert B. Jones, Jr. on 8/14/2020. (Grady, B.) Modified on 8/27/2020 (Lee, L.). (Entered: 08/14/2020) |
| --- | --- | --- |
| 08/14/2020 | | ORAL MOTION to Stay regarding 37 Order Setting Conditions of Release filed by USA as to Reshod Jamar Everett. (Grady, B.) (Entered: 08/14/2020) |
| 08/14/2020 | | ORAL ORDER granting Oral Motion to Stay as to Reshod Jamar Everett (1). Written order to follow. Entered by US Magistrate Judge Robert B. Jones, Jr. on 8/14/2020. (Grady, B.) (Entered: 08/14/2020) |
| 08/14/2020 | 38 | ORDER as to Reshod Jamar Everett. The government shall have until 12:00 p.m., August 17, 2020 to file its motion for revocation. If the government has not filed a motion for revocation by the deadline set forth herein, defendant shall be released as soon as practicable without further order of the court. Signed by US Magistrate Judge Robert B. Jones, Jr. on 8/14/2020. (Grady, B.) (Entered: 08/14/2020) |
| 08/16/2020 | 39 | Motion for revocation of pretrial release filed by USA as to Reshod Jamar Everett. (Lemmon, Scott) (Entered: 08/16/2020) |
| 08/17/2020 | | Motion Submitted to District Judge James C. Dever, III as to Reshod Jamar Everett regarding 39 Motion for revocation of pretrial release. (Lee, L.) (Entered: 08/17/2020) |
| 08/19/2020 | 43 | NOTICE OF HEARING ON MOTION as to Reshod Jamar Everett regarding 39 Motion for revocation of pretrial release: Motion Hearing set for 8/27/2020 at 10:00 AM in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III. (Lee, L.) (Entered: 08/19/2020) |
| 08/26/2020 | 44 | Consent MOTION for Protective Order filed by USA as to Reshod Jamar Everett, Alvin Milton Davis, III. (Attachments: # 1 Text of Proposed Order) (Lemmon, Scott) (Entered: 08/26/2020) |
| 08/26/2020 | 45 | MOTION To Excuse Co-Counsel filed by Reshod Jamar Everett. (Attachments: # 1 Text of Proposed Order) (Young, Christopher) (Entered: 08/26/2020) |
| 08/27/2020 | 46 | PROTECTIVE ORDER granting 44 Motion for Protective Order as to Reshod Jamar Everett (1) and Alvin Milton Davis III (2). Signed by District Judge James C. Dever, III on 8/26/2020. (Lee, L.) (Entered: 08/27/2020) |
| 08/27/2020 | | Motion Submitted to District Judge James C. Dever, III as to Reshod Jamar Everett regarding 45 MOTION To Excuse Co-Counsel. (Lee, L.) (Entered: 08/27/2020) |
| 08/27/2020 | 47 | ORDER granting 45 Motion to Excuse Appearance as to Reshod Jamar Everett (1). Signed by District Judge James C. Dever, III on 8/27/2020. (Lee, L.) (Entered: 08/27/2020) |
| 08/27/2020 | 48 | Minute Entry for proceedings held before District Judge James C. Dever, III in Raleigh: Motion Hearing as to Reshod Jamar Everett held on 8/27/2020 regarding 39 Motion for revocation of pretrial release filed by USA - Defendant present with counsel - Assistant US Attorney present for USA - Evidence presented - The court found the government has met it's burden as to the issue of danger and obstruction of justice - The court ordered the defendant be detained - Written order to follow - Defendant remanded to custody. (Court Reporter Amy Condon) (Lee, L.) (Entered: 08/27/2020) |
| 08/27/2020 | 49 | DETENTION ORDER granting 39 Motion for revocation of pretrial release as to Reshod Jamar Everett (1). Signed by District Judge James C. Dever, III on 8/27/2020. Copy to US Marshals Service and US Probation Office. (Lee, L.) (Entered: 08/27/2020) |

JA8

| 09/04/2020 | 50 | Notice of Interlocutory Appeal filed by Reshod Jamar Everett as to 49 Order on Motion for revocation of pretrial release. (Young, Christopher) (Entered: 09/04/2020) |
|---|---|---|
| 09/07/2020 | 51 | First MOTION for Extension of Time File Pre-Trial Motions until November 2, 2020, First MOTION to Continue *Arraignment* filed by Reshod Jamar Everett. (Attachments: # 1 Text of Proposed Order) (Pryor, Renorda) (Entered: 09/07/2020) |
| 09/08/2020 | 52 | Transmission of Notice of Appeal and Docket Sheet as to Reshod Jamar Everett to US Court of Appeals regarding 50 Notice of Interlocutory Appeal.NOTE: The Docketing Statement and Transcript Order Form, if you are court appointed counsel, are available on our website at website. (Foell, S.) (Entered: 09/08/2020) |
| 09/08/2020 |  | Motion Submitted to District Judge James C. Dever III as to Reshod Jamar Everett regarding 51 First MOTION for Extension of Time File Pre-Trial Motions until November 2, 2020First MOTION to Continue *Arraignment*. (Stone, S.) (Entered: 09/08/2020) |
| 09/08/2020 | 53 | US Court of Appeals Case Number 20-4462 (Kirsten Hancock, Case Manager) for defendant Reshod Jamar Everett as to 50 Notice of Interlocutory Appeal filed by Reshod Jamar Everett. (Foell, S.) Modified on 9/9/2020 (Foell, S.). (Entered: 09/09/2020) |
| 09/09/2020 | 54 | ORDER Reshod Jamar Everett (1) granting 51 Motion for Extension of Time to file pretrial motions through and including November 2, 2020; and granting 51 Motion to Continue Arraignment to the court's January 2021 term. Signed by District Judge James C. Dever, III on 9/9/2020. (Lee, L.) (Entered: 09/09/2020) |
| 09/09/2020 |  | Terminated hearing deadline for Arraignment previously set for 10/5/2020 as to Reshod Jamar Everett - Arraignment will be reset for the court's January 20201 term. (Lee, L.) (Entered: 09/09/2020) |
| 10/23/2020 | 58 | OFFICIAL TRANSCRIPT of MOTION HEARING as to Reshod Jamar Everett for dates of August 27, 2020 before Judge James C. Dever III, regarding 50 Notice of Interlocutory Appeal Court Reporter/Amy M. Condon. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Does this satisfy all appellate orders for this reporter? - Yes. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 11/16/2020. Redacted Transcript Deadline set for 11/26/2020. Release of Transcript Restriction set for 1/24/2021. (Condon, A.) (Entered: 10/23/2020) |
| 10/23/2020 |  | Notice of Filing of Official Transcript 58 Transcript - Appeal. The parties have seven calendar days from the filing of the transcript to file a Notice of Intent to Request Redaction. The parties must also serve a copy on the court reporter or transcriber. After filing the Notice of Intent to Request Redaction, a party must submit to the court reporter or transcriber, within 21 calendar days of the filing of the transcript, a written statement indicating where the personal data identifiers to be redacted appear in the transcript. (Condon, A.) (Entered: 10/23/2020) |
| 10/29/2020 | 60 | Second MOTION for Extension of Time Filing of Pretrial Motions 54 Order on Motion for Extension of Time,, Order on Motion to Continue, Terminate Deadlines and Hearings until December 2, 2020 filed by Reshod Jamar Everett. (Attachments: # 1 Text of Proposed Order) (Young, Christopher) (Entered: 10/29/2020) |
| 10/30/2020 | 62 | Amended MOTION for Extension of Time to file pre-trial motions. until December 2, 2020, Amended MOTION to Continue *Arraignment* filed by Reshod Jamar Everett. (Attachments: # 1 Text of Proposed Order) (Young, Christopher) (Entered: 10/30/2020) |

JA9

| 10/30/2020 | | Motion Submitted to District Judge James C. Dever III as to Reshod Jamar Everett regarding 62 Amended MOTION for Extension of Time to file pre-trial motions. until December 2, 2020Amended MOTION to Continue *Arraignment*. (Roy, S.) (Entered: 10/30/2020) |
|---|---|---|
| 11/02/2020 | 63 | ORDER granting 62 Motion for Extension of Time to file pretrial motions until November 30, 2020 and granting 62 Motion to Continue Arraignment to a term of court in February 2021 as to Reshod Jamar Everett (1). Signed by District Judge James C. Dever III on 11/2/2020. (Roy, S.) (Entered: 11/02/2020) |
| 11/12/2020 | | Reset Hearing as to Reshod Jamar Everett: Arraignment set for the 2/1/2021 term of court in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III. (Roy, S.) (Entered: 11/12/2020) |
| 11/16/2020 | 64 | ORDER of US Court of Appeals as to Reshod Jamar Everett regarding 50 Notice of Interlocutory Appeal. Upon review of memoranda relative to this bail appeal, the court affirms the district court's order regarding release and dismisses this appeal. (Foell, S.) (Entered: 11/16/2020) |
| 11/16/2020 | 65 | JUDGMENT of US Court of Appeals as to Reshod Jamar Everett regarding 50 Notice of Interlocutory Appeal (Foell, S.) (Entered: 11/16/2020) |
| 11/30/2020 | 66 | MOTION to Suppress *and Incorporated Memoradum of Law* filed by Reshod Jamar Everett. (Young, Christopher) (Entered: 11/30/2020) |
| 12/01/2020 | 67 | Consent MOTION for Extension of Time to File Response/Reply filed by USA as to Reshod Jamar Everett. (Attachments: # 1 Text of Proposed Order) (Lemmon, Scott) (Entered: 12/01/2020) |
| 12/01/2020 | | Motion Submitted to District Judge James C. Dever III as to Reshod Jamar Everett regarding 67 Consent MOTION for Extension of Time to File Response/Reply . (Roy, S.) (Entered: 12/01/2020) |
| 12/02/2020 | 69 | ORDER granting 67 Motion for Extension of Time to File Response/Reply as to Reshod Jamar Everett (1). Signed by District Judge James C. Dever III on 12/2/2020. (Roy, S.) (Entered: 12/02/2020) |
| 12/08/2020 | 71 | MANDATE of US Court of Appeals as to Reshod Jamar Everett regarding 50 Notice of Interlocutory Appeal filed by Reshod Jamar Everett. (Foell, S.) (Entered: 12/08/2020) |
| 12/23/2020 | 72 | RESPONSE in Opposition by USA as to Reshod Jamar Everett regarding 66 MOTION to Suppress *and Incorporated Memoradum of Law* filed by USA as to Reshod Jamar Everett. (Attachments: # 1 Exhibit A - Search Warrant) (Lemmon, Scott) (Entered: 12/23/2020) |
| 01/11/2021 | | Motion Submitted to District Judge James C. Dever III as to Reshod Jamar Everett regarding 66 MOTION to Suppress *and Incorporated Memoradum of Law*. (Roy, S.) (Entered: 01/11/2021) |
| 01/14/2021 | 73 | Notice of Hearing as to Reshod Jamar Everett: Arraignment set for 2/3/2021 at 01:30 PM in Raleigh - 5th Floor Courtroom before Magistrate Judge Robert T. Numbers II. (Roy, S.) (Entered: 01/14/2021) |
| 01/25/2021 | | Terminate transcript deadlines as to Reshod Jamar Everett (Foell, S.) (Entered: 01/25/2021) |
| 01/29/2021 | 74 | First MOTION to Continue *Arraignment and Trial* filed by Reshod Jamar Everett. (Attachments: # 1 Text of Proposed Order) (Pryor, Renorda) (Entered: 01/29/2021) |

JA10

| 01/29/2021 | | Motion Submitted to District Judge James C. Dever III as to Reshod Jamar Everett regarding 74 First MOTION to Continue *Arraignment and Trial*. (Roy, S.) (Entered: 01/29/2021) |
|---|---|---|
| 02/01/2021 | 77 | ORDER granting 74 Motion to Continue Arraignment as to Reshod Jamar Everett (1). Signed by District Judge James C. Dever III on 2/1/2021. (Roy, S.) (Entered: 02/01/2021) |
| 02/01/2021 | | Reset Hearing as to Reshod Jamar Everett: Arraignment set for the 3/1/2021 term of court in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III. (Roy, S.) (Entered: 02/01/2021) |
| 02/11/2021 | 78 | Notice of Hearing as to Reshod Jamar Everett: Arraignment set for 3/3/2021 at 01:30 PM in Raleigh - 5th Floor Courtroom before Magistrate Judge Robert T. Numbers II. (Roy, S.) (Entered: 02/11/2021) |
| 02/18/2021 | 79 | Order Setting Hearings - as to Reshod Jamar Everett. Motion Hearing regarding 66 MOTION to Suppress and Incorporated Memorandum of Law filed by Reshod Jamar Everett set for 3/4/2021 at 09:00 AM in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III. Signed by District Judge James C. Dever III on 2/18/2021. (Roy, S.) (Entered: 02/18/2021) |
| 02/23/2021 | 80 | Second MOTION to Continue *Arraignment and Trial* filed by Reshod Jamar Everett. (Attachments: # 1 Text of Proposed Order) (Pryor, Renorda) (Entered: 02/23/2021) |
| 02/24/2021 | | Motion Referred to US Magistrate Judge Robert T. Numbers, II as to Reshod Jamar Everett regarding 80 Second MOTION to Continue *Arraignment and Trial*. Motions referred to Robert T. Numbers, II. (Roy, S.) (Entered: 02/24/2021) |
| 02/24/2021 | | Motions No Longer Referred as to Reshod Jamar Everett: 80 Second MOTION to Continue *Arraignment and Trial* (Roy, S.) (Entered: 02/24/2021) |
| 02/24/2021 | | Motion Submitted to District Judge James C. Dever III as to Reshod Jamar Everett regarding 80 Second MOTION to Continue *Arraignment and Trial*. (Roy, S.) (Entered: 02/24/2021) |
| 02/25/2021 | 81 | ORDER granting 80 Motion to Continue Arraignment as to Reshod Jamar Everett (1). Signed by District Judge James C. Dever III on 2/25/2021. (Roy, S.) (Entered: 02/25/2021) |
| 02/25/2021 | | Reset Hearing as to Reshod Jamar Everett: Arraignment set for the 4/26/2021 term of court in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III. (Roy, S.) (Entered: 02/25/2021) |
| 03/04/2021 | 84 | Minute Entry for proceedings held before District Judge James C. Dever III in Raleigh. Defendant present with counsel, Assistant U.S. Attorney present for the government. Motion Hearing as to Reshod Jamar Everett held on 3/4/2021 regarding 66 MOTION to Suppress *and Incorporated Memoradum of Law* filed by Reshod Jamar Everett. Evidence presented by oral testimony. The court orders the Motion to Suppress is denied - written order to follow. Defendant remanded to the custody of the U.S. Marshal. (Court Reporter Amy Condon) (Roy, S.) (Entered: 03/04/2021) |
| 03/04/2021 | 85 | GOVERNMENT EXHIBIT LIST as to Reshod Jamar Everett - Motion to Suppress. (Roy, S.) (Entered: 03/04/2021) |
| 03/04/2021 | | ORAL ORDER denying 66 Motion to Suppress as to Reshod Jamar Everett (1). Entered by District Judge James C. Dever III on 3/4/2021. (Roy, S.) (Entered: 03/04/2021) |
| 03/04/2021 | 86 | ORDER as to Reshod Jamar Everett regarding 66 MOTION to Suppress *and Incorporated Memoradum of Law*. Follows oral order of 3/4/21. Signed by District Judge |

| | | James C. Dever III on 3/4/2021. (Roy, S.) (Entered: 03/04/2021) |
|---|---|---|
| 03/11/2021 | 87 | MOTION Meaningful Access to Defendant in Custody filed by Reshod Jamar Everett. (Pryor, Renorda) (Entered: 03/11/2021) |
| 03/15/2021 | | Motion Submitted to District Judge James C. Dever III as to Reshod Jamar Everett regarding 87 MOTION Meaningful Access to Defendant in Custody . (Roy, S.) (Entered: 03/15/2021) |
| 03/15/2021 | 88 | ORDER granting 87 Motion for Meaningful Access to Defendant in Custody as to Reshod Jamar Everett (1). Signed by District Judge James C. Dever III on 3/15/2021. (Roy, S.) (Entered: 03/15/2021) |
| 04/08/2021 | 91 | Notice of Hearing as to Reshod Jamar Everett: Arraignment set for 4/29/2021 at 01:30 PM in Raleigh - 5th Floor Courtroom before Magistrate Judge Robert T. Numbers II. (Roy, S.) (Entered: 04/08/2021) |
| 04/22/2021 | 92 | Third MOTION to Continue *Arraignment and Trial* filed by Reshod Jamar Everett. (Attachments: # 1 Text of Proposed Order) (Pryor, Renorda) Modified on 4/23/2021 - terminated per Order withdrawing Motion to Continue on 4/23/21(Roy, S.). (Entered: 04/22/2021) |
| 04/22/2021 | | Motion Referred to US Magistrate Judge Robert T. Numbers, II as to Reshod Jamar Everett regarding 92 Third MOTION to Continue *Arraignment and Trial*. Motions referred to Robert T. Numbers, II. (Roy, S.) (Entered: 04/22/2021) |
| 04/22/2021 | 93 | First MOTION to Withdraw Document Motion Referred, 92 Third MOTION to Continue *Arraignment and Trial* filed by Reshod Jamar Everett. (Attachments: # 1 Text of Proposed Order) (Young, Christopher) (Entered: 04/22/2021) |
| 04/23/2021 | | Motion Submitted to District Judge James C. Dever III as to Reshod Jamar Everett regarding 93 First MOTION to Withdraw Document Motion Referred, 92 Third MOTION to Continue *Arraignment and Trial* . (Roy, S.) (Entered: 04/23/2021) |
| 04/23/2021 | 94 | ORDER granting 93 Motion to Withdraw Document Motion to Continue Arraignment as to Reshod Jamar Everett (1). Signed by District Judge James C. Dever III on 4/23/2021. (Roy, S.) (Entered: 04/23/2021) |
| 04/29/2021 | 95 | Minute Entry for proceedings held before Magistrate Judge Robert T. Numbers, II in Raleigh - Arraignment held on 4/29/2021 as to Reshod Jamar Everett (1) regarding Counts 1,4,5,6,7 of the Indictment. Assistant US Attorney present for the Government. Defendant present with counsel. Defendant sworn. The Court finds the defendant competent to proceed. Defendant advised of rights, charges and maximum punishments by the Court. Plea entered Not Guilty on counts 1, 4, 5, 6, 7 of the indictment. Jury Trial to be set by separate order on a date and time to be determined before US District Judge James C. Dever III. The Court excludes the intervening time period pursuant to the Speedy Trial Act computation. Written order to follow. Defendant remanded to custody of the US Marshal. (Court Reporter - Risa Kramer) (Brewer, C) (Entered: 04/29/2021) |
| 05/07/2021 | 98 | Second MOTION Inmate relocation regarding 88 Order on Motion for Miscellaneous Relief filed by Reshod Jamar Everett. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Bladen County Grivance) (Young, Christopher) (Entered: 05/07/2021) |
| 05/07/2021 | | Motion Submitted to District Judge James C. Dever III as to Reshod Jamar Everett regarding 98 Second MOTION Inmate relocation regarding 88 Order on Motion for Miscellaneous Relief . (Roy, S.) (Entered: 05/07/2021) |
| 05/10/2021 | 99 | ORDER granting 98 Motion to Relocate Inmate as to Reshod Jamar Everett (1). Signed by District Judge James C. Dever III on 5/10/2021. (Roy, S.) (Entered: 05/10/2021) |

| 05/19/2021 | 101 | NOTICE OF ATTORNEY APPEARANCE Caroline L. Webb appearing for USA. (Webb, Caroline) (Entered: 05/19/2021) |
|---|---|---|
| 06/14/2021 | 105 | Order Setting Hearings - as to Reshod Jamar Everett, Alvin Milton Davis, III. Jury Selection and Jury Trial set for 9/20/2021 at 10:00 AM in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III. Signed by District Judge James C. Dever III on 6/14/2021. (Roy, S.) (Entered: 06/14/2021) |
| 07/21/2021 | 106 | OFFICIAL TRANSCRIPT of Proceedings as to Reshod Jamar Everett held on March 4, 2021, before District Judge James C. Dever III. Court Reporter/Transcriber Amy M. Condon. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 8/14/2021. Redacted Transcript Deadline set for 8/24/2021. Release of Transcript Restriction set for 10/22/2021. (Condon, A.) (Entered: 07/21/2021) |
| 07/21/2021 | | Notice of Filing of Official Transcript 106 Transcript. The parties have seven calendar days from the filing of the transcript to file a Notice of Intent to Request Redaction. The parties must also serve a copy on the court reporter or transcriber. After filing the Notice of Intent to Request Redaction, a party must submit to the court reporter or transcriber, within 21 calendar days of the filing of the transcript, a written statement indicating where the personal data identifiers to be redacted appear in the transcript. (Condon, A.) (Entered: 07/21/2021) |
| 08/18/2021 | 114 | SUPERSEDING INDICTMENT as to Reshod Jamar Everett (1) counts 1s, 4s, 5s, 6s, 7s, 8s, Alvin Milton Davis, III (2) counts 1s, 2s, 3s. The foreperson's signature has been redacted pursuant to the E-Government Act. The unredacted version of this document has been filed under seal. (Brewer, C) (Entered: 08/19/2021) |
| 08/18/2021 | 115 | Unredacted Document 114 Superseding Indictment, (Brewer, C) (Entered: 08/19/2021) |
| 08/18/2021 | 116 | Penalty Sheet *(Selected Participants Only)* as to Reshod Jamar Everett (Brewer, C) (Entered: 08/19/2021) |
| 08/20/2021 | 118 | NOTICE TO COUNSEL REGARDING WAIVER FOR INITIAL APPEARANCE ON SUPERSEDING INDICTMENT If a waiver for defendant Reshod Jamar Everett, Alvin Milton Davis, III is not filed within 10 days, an initial appearance will be scheduled. Waiver of Initial Appearance on Superseding Information due by 9/3/2021. (Sellers, N.) (Entered: 08/20/2021) |
| 08/27/2021 | 121 | Ex Parte Motion to Seal PROPOSED SEALED EX PARTE event by USA as to Reshod Jamar Everett, Alvin Milton Davis, III (Attachments: # 1 Text of Proposed Order) (Lemmon, Scott) (Entered: 08/27/2021) |
| 08/27/2021 | 122 | Waiver of Initial Appearance on Superseding Indictment by defendant Reshod Jamar Everett indicating that no initial appearance is requested on the superseding indictment . (Young, Christopher) (Entered: 08/27/2021) |
| 08/30/2021 | 125 | Order Setting Hearings - as to Reshod Jamar Everett, Alvin Milton Davis, III. Pretrial Conference set for 9/16/2021 at 09:00 AM in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III.. Signed by District Judge James C. Dever III on 8/30/2021. (Roy, S.) (Entered: 08/30/2021) |
| 09/06/2021 | 126 | Notice filed by USA as to Reshod Jamar Everett, Alvin Milton Davis, III. *Notice of Expert Witnesses* (Webb, Caroline) (Entered: 09/06/2021) |

JA13

| 09/07/2021 | 128 | OFFICIAL TRANSCRIPT of Proceedings as to Reshod Jamar Everett held on 8/13/2020, Detention Hearing - Day 1, before Magistrate Judge Robert B. Jones, Jr.. Court Transcriber/ eScribers, Telephone number 973-406-2250. Transcript may be viewed at the court public terminal or purchased through the Court Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 10/1/2021. Redacted Transcript Deadline set for 10/11/2021. Release of Transcript Restriction set for 12/9/2021. (Foell, S.) (Entered: 09/07/2021) |
| --- | --- | --- |
| 09/07/2021 | 129 | OFFICIAL TRANSCRIPT of Proceedings as to Reshod Jamar Everett held on 8/14/2020, Detention Hearing, Day 2, before Magistrate Judge Robert B. Jones, Jr.. Court Transcriber/ eScribers, Telephone number 973-406-2250. Transcript may be viewed at the court public terminal or purchased through the Court Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 10/1/2021. Redacted Transcript Deadline set for 10/11/2021. Release of Transcript Restriction set for 12/9/2021. (Foell, S.) (Entered: 09/07/2021) |
| 09/07/2021 | | Notice of Filing of Official Transcript 127 , 128 , 129 Transcript. The parties have seven calendar days from the filing of the transcript to file a Notice of Intent to Request Redaction. The parties must also serve a copy on the court reporter or transcriber. After filing the Notice of Intent to Request Redaction, a party must submit to the court reporter or transcriber, within 21 calendar days of the filing of the transcript, a written statement indicating where the personal data identifiers to be redacted appear in the transcript. (Foell, S.) (Entered: 09/07/2021) |
| 09/08/2021 | 131 | Ex Parte Motion to Seal PROPOSED SEALED EX PARTE event by USA as to Reshod Jamar Everett, Alvin Milton Davis, III (Attachments: # 1 Text of Proposed Order) (Lemmon, Scott) (Entered: 09/08/2021) |
| 09/13/2021 | 133 | Proposed Jury Instructions by USA as to Reshod Jamar Everett, Alvin Milton Davis, III (Lemmon, Scott) (Entered: 09/13/2021) |
| 09/13/2021 | 134 | Proposed Voir Dire by USA as to Reshod Jamar Everett, Alvin Milton Davis, III (Lemmon, Scott) (Entered: 09/13/2021) |
| 09/13/2021 | 135 | Proposed Verdict Form by USA as to Reshod Jamar Everett (Lemmon, Scott) (Entered: 09/13/2021) |
| 09/13/2021 | 138 | MOTION to Seal Document 137 PROPOSED SEALED MOTION by USA as to Reshod Jamar Everett, Alvin Milton Davis, III filed by USA as to Reshod Jamar Everett, Alvin Milton Davis, III. (Attachments: # 1 Text of Proposed Order) (Lemmon, Scott) (Entered: 09/13/2021) |
| 09/13/2021 | 140 | Ex Parte Motion to Seal PROPOSED SEALED EX PARTE event by USA as to Reshod Jamar Everett, Alvin Milton Davis, III (Attachments: # 1 Text of Proposed Order) (Lemmon, Scott) (Entered: 09/13/2021) |
| 09/13/2021 | 142 | ORDER granting 138 Motion to Seal Document as to Reshod Jamar Everett (1), Alvin Milton Davis III (2). Signed by District Judge James C. Dever III on 9/13/2021. (Roy, S.) (Entered: 09/13/2021) |
| 09/14/2021 | 147 | Proposed Voir Dire by Reshod Jamar Everett (Pryor, Renorda) (Entered: 09/14/2021) |
| 09/14/2021 | 148 | Proposed Jury Instructions by Reshod Jamar Everett (Pryor, Renorda) (Entered: 09/14/2021) |

JA14

| 09/14/2021 | | Reset Hearings as to Reshod Jamar Everett: Arraignment and Pretrial Conference set for 9/16/2021 at 09:30 AM in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III. (Roy, S.) (Entered: 09/14/2021) |
| --- | --- | --- |
| 09/14/2021 | [149](#) | Notice filed by USA as to Reshod Jamar Everett, Alvin Milton Davis, III. *Second Notice of Expert Witnesses* (Lemmon, Scott) (Entered: 09/14/2021) |
| 09/15/2021 | [151](#) | Ex Parte Motion to Seal PROPOSED SEALED EX PARTE event by USA as to Reshod Jamar Everett, Alvin Milton Davis, III (Attachments: # [1](#) Text of Proposed Order) (Lemmon, Scott) (Entered: 09/15/2021) |
| 09/16/2021 | [155](#) | Minute Entry for proceedings held before District Judge James C. Dever III. Defendant present via videoconference - Defense counsel present - Assistant U.S. Attorney present for the government.Pretrial Conference as to Reshod Jamar Everett held on 9/16/2021. The court reviews COVID trial procedures and continues the trial due to COVID related issues. Jury Selection and Trial to be reset by notice. (Court Reporter Amy Condon) (Roy, S.) (Entered: 09/16/2021) |
| 09/24/2021 | [157](#) | Order Setting Hearings - as to Reshod Jamar Everett. Jury Selection and Jury Trial set for 12/14/2021 at 10:00 AM in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III. Signed by District Judge James C. Dever III on 9/24/2021. (Roy, S.) (Entered: 09/24/2021) |
| 10/20/2021 | [158](#) | NOTICE OF ATTORNEY APPEARANCE Matthew Lee Fesak appearing for USA. (Fesak, Matthew) (Entered: 10/20/2021) |
| 10/22/2021 | | Terminate transcript deadlines as to Reshod Jamar Everett (Foell, S.) (Entered: 10/22/2021) |
| 11/15/2021 | [162](#) | Ex Parte Motion to Seal PROPOSED SEALED EX PARTE event by USA as to Reshod Jamar Everett (Attachments: # [1](#) Text of Proposed Order) (Lemmon, Scott) (Entered: 11/15/2021) |
| 11/15/2021 | [166](#) | Ex Parte Motion to Seal PROPOSED SEALED EX PARTE event by USA as to Reshod Jamar Everett (Attachments: # [1](#) Text of Proposed Order) (Lemmon, Scott) (Entered: 11/15/2021) |
| 11/18/2021 | [172](#) | Notice of Hearing as to Reshod Jamar Everett: Pretrial Conference set for 12/2/2021 at 10:00 AM in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III. (Roy, S.) (Entered: 11/18/2021) |
| 12/02/2021 | [177](#) | Minute Entry for proceedings held before District Judge James C. Dever III. Defendant present with counsel, Assistant U.S. Attorney present for the government. Pretrial Conference as to Reshod Jamar Everett held on 12/2/2021. The court reviews COVID procedures and preliminary matters for trial. The court makes rulings regarding 137 Governments Sealed Motion and other preliminary matters. Jury Selection and Trial set for 12/14/21 at 10:00 AM in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III. Defendant remanded to the custody of the U.S. Marshal. (Court Reporter Michelle McGirr) (Roy, S.) (Entered: 12/02/2021) |
| 12/09/2021 | | Terminate transcript deadlines as to Reshod Jamar Everett, Alvin Milton Davis, III (Foell, S.) (Entered: 12/09/2021) |
| 12/09/2021 | | Set Hearing as to Reshod Jamar Everett: Arraignment on Superseding Indictment set for 12/14/2021 at 09:45 AM in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III. (Roy, S.) (Entered: 12/09/2021) |
| 12/14/2021 | [178](#) | WITNESS LIST by Reshod Jamar Everett (Pryor, Renorda) (Entered: 12/14/2021) |

## JA15

| 12/14/2021 | [179](#) | WITNESS LIST by USA as to Reshod Jamar Everett (Lemmon, Scott) (Entered: 12/14/2021) |
|---|---|---|
| 12/14/2021 | | Jury Impaneled as to Reshod Jamar Everett. (Roy, S.) (Entered: 12/14/2021) |
| 12/14/2021 | [180](#) | Minute Entry for proceedings held before District Judge James C. Dever III in Raleigh. Defendant present with counsel, Assistant U.S. Attorney present for the government. Defendant sworn - competent - Rule 11 conducted. Defendant advised of rights, charges, and maximum penalties. Defendant enters a plea of not guilty. Jury Selection and Jury Trial (DAY 1) held on 12/14/2021 as to Reshod Jamar Everett. Jury panel enters the courtroom and jury selection begins. Jurors (48) present for service and oath administered by the clerk collectively - Jurors (14) selected for service - Jurors Impaneled - oath administered by the clerk (12 Petit Jurors and 2 Alternate Jurors). Opening statements by counsel for the government and defense - government proceeds with evidence presentation. Court excuses jurors from the courtroom and gives instructions to the 14 impaneled jurors regarding the overnight recess - jurors admonished by the court. Jury Trial to resume on 12/15/2021 at 09:00 AM in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III. Defendant remanded to the custody of the U.S. Marshal. (Court Reporter Amy Condon) (Roy, S.) (Entered: 12/14/2021) |
| 12/14/2021 | [181](#) | ORDER returning exhibits to case agent as to Reshod Jamar Everett. Signed by District Judge James C. Dever III on 12/14/2021. (Roy, S.) (Entered: 12/14/2021) |
| 12/15/2021 | | ORAL MOTION for Acquittal filed by Reshod Jamar Everett. (Roy, S.) (Entered: 12/15/2021) |
| 12/15/2021 | | ORAL ORDER denying Oral Motion for Acquittal as to Reshod Jamar Everett (1). Signed by District Judge James C. Dever III on 12/15/2021. (Roy, S.) (Entered: 12/15/2021) |
| 12/15/2021 | [182](#) | Minute Entry for proceedings held before District Judge James C. Dever III in Raleigh. Defendant present with counsel and Assistant U.S. Attorney present for USA. Jury Trial (DAY 2) as to Reshod Jamar Everett held on 12/15/2021. Jurors (14) return to the courtroom and admonished by the court. Government proceeds with evidence presentation - government rests. Defense makes Rule 29 Motion - denied by the court. Defense proceeds with evidence presentation. Court gives instructions to the 14 impaneled jurors regarding the overnight recess and excuses jurors from the courtroom - jurors admonished by the court. Court stands in recess, to reconvene for the Charge Conference, to be held on 12/16/2021 at 08:30 AM in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III, followed by the continuance of the jury trial. Defendant remanded to custody. (Court Reporter Amy Condon) (Roy, S.) (Entered: 12/15/2021) |
| 12/15/2021 | [183](#) | ORDER returning exhibits to case agent as to Reshod Jamar Everett. Signed by District Judge James C. Dever III on 12/15/2021. (Roy, S.) (Entered: 12/15/2021) |
| 12/16/2021 | [184](#) | Minute Entry for proceedings held before District Judge James C. Dever III in Raleigh. Defendant present with counsel and Assistant U.S. Attorney present for USA. Jury Trial (DAY 3) as to Reshod Jamar Everett held on 12/17/2021. Court reconvenes at 8:30 for the Charge Conference out of the presence of the jury. Jurors (14) return to the courtroom and admonished by the court. Defense proceeds with evidence presentation - defense rests. Closing arguments by USA and defense - rebuttal arguments by counsel for the government. Charge to the jury by the court. Court gives instructions to the 14 impaneled jurors regarding the overnight recess and excuses jurors from the courtroom - jurors admonished by the court. Court stands in recess, to reconvene for the continuation of the Jury Trial set for 12/17/2021 at 09:00 AM in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III. Defendant remanded to custody. (Court Reporter Amy |

| | | |
|---|---|---|
| | | Condon) (Roy, S.) Modified on 12/17/2021 - corrected filed date (Roy, S.). (Entered: 12/17/2021) |
| 12/17/2021 | [185](#) | Minute Entry for proceedings held before District Judge James C. Dever III in Raleigh. Defendant present with counsel, Assistant U.S. Attorney present for the government. Jury Trial (DAY 4) as to Reshod Jamar Everett held on 12/17/2021. Jurors (14) return to the courtroom and admonished by the court. The alternate jurors are excused from the courtroom and will remain separate from the petit jurors until a verdict is rendered - petit jurors (12) retire to deliberate. Jurors are unable to reach a verdict - jury released from service - Court declares a mistrial - defendant remanded to custody of the U.S. Marshal. (Court Reporter Amy Condon) (Roy, S.) (Entered: 12/20/2021) |
| 12/17/2021 | [187](#) | Peremptory Challenges as to Reshod Jamar Everett. (Roy, S.) (Entered: 12/20/2021) |
| 12/17/2021 | [188](#) | Jury Seating Arrangement as to Reshod Jamar Everett. Sealed Document. (Roy, S.) (Entered: 12/20/2021) |
| 12/17/2021 | [189](#) | DEFENSE EXHIBIT LIST as to Reshod Jamar Everett. (Roy, S.) (Roy, S.). (Entered: 12/20/2021) |
| 12/17/2021 | [190](#) | GOVERNMENT EXHIBIT LIST as to Reshod Jamar Everett. (Roy, S.) (Entered: 12/20/2021) |
| 01/07/2022 | [195](#) | Order Setting Hearings - as to Reshod Jamar Everett. Jury Selection and Jury Trial set for 5/9/2022 at 10:00 AM in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III. Signed by District Judge James C. Dever III on 1/7/2022. (Roy, S.) (Entered: 01/07/2022) |
| 01/13/2022 | [199](#) | Order Resetting Hearing - as to Reshod Jamar Everett. Jury Selection and Trial reset for 5/5/2022 at 10:00 AM in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III. Signed by District Judge James C. Dever III on 1/12/2022. (Roy, S.) (Entered: 01/13/2022) |
| 02/10/2022 | [207](#) | **ERROR** - SEALED OFFICIAL TRANSCRIPT of VOIR DIRE Proceedings as to Reshod Jamar Everett held on December 14, 2021, before District Judge James C. Dever III. Court Reporter/Amy M. Condon. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available at http://www.nced.uscourts.gov/PDF_Files/AttorneyTranscriptRedactionRequirements.pdf (Condon, A.) Modified on 2/11/2022 (Foell, S.). (Entered: 02/10/2022) |
| 02/10/2022 | [208](#) | OFFICIAL TRANSCRIPT of JURY TRIAL - DAY 1 as to Reshod Jamar Everett held on December 14, 2021, before District Judge James C. Dever III. Court Reporter/Amy M. Condon. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 3/6/2022. Redacted Transcript Deadline set for 3/16/2022. Release of Transcript Restriction set for 5/14/2022. (Condon, A.) (Entered: 02/10/2022) |
| 02/10/2022 | [209](#) | OFFICIAL TRANSCRIPT of JURY TRIAL - DAY 2, as to Reshod Jamar Everett held on December 15, 2021, before District Judge James C. Dever III. Court Reporter/Amy M. Condon. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 3/6/2022. Redacted Transcript Deadline set for |

JA17

| | | |
|---|---|---|
| | | 3/16/2022. Release of Transcript Restriction set for 5/14/2022. (Condon, A.) (Entered: 02/10/2022) |
| 02/10/2022 | 210 | OFFICIAL TRANSCRIPT of JURY TRIAL - DAY 3, as to Reshod Jamar Everett held on December 16, 2021, before District Judge James C. Dever III. Court Reporter/Amy M. Condon. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 3/6/2022. Redacted Transcript Deadline set for 3/16/2022. Release of Transcript Restriction set for 5/14/2022. (Condon, A.) (Entered: 02/10/2022) |
| 02/10/2022 | 211 | OFFICIAL TRANSCRIPT of JURY TRIAL - DAY 4, as to Reshod Jamar Everett held on December 17, 2021, before District Judge James C. Dever III. Court Reporter/Amy M. Condon. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 3/6/2022. Redacted Transcript Deadline set for 3/16/2022. Release of Transcript Restriction set for 5/14/2022. (Condon, A.) (Entered: 02/10/2022) |
| 02/10/2022 | | Notice of Filing of Official Transcript 209 Transcript, 210 Transcript, 211 Transcript, 208 Transcript, 207 SEALED Transcript. The parties have seven calendar days from the filing of the transcript to file a Notice of Intent to Request Redaction. The parties must also serve a copy on the court reporter or transcriber. After filing the Notice of Intent to Request Redaction, a party must submit to the court reporter or transcriber, within 21 calendar days of the filing of the transcript, a written statement indicating where the personal data identifiers to be redacted appear in the transcript. (Condon, A.) (Entered: 02/10/2022) |
| 02/11/2022 | 212 | SEALED OFFICIAL TRANSCRIPT of Proceedings as to Reshod Jamar Everett held on December 14, 2021, before District Judge James C. Dever III. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available at http://www.nced.uscourts.gov/PDF_Files/AttorneyTranscriptRedactionRequirements.pdf (Condon, A.) (Entered: 02/11/2022) |
| 02/11/2022 | | Notice of Filing of Official Transcript 212 SEALED Transcript. The parties have seven calendar days from the filing of the transcript to file a Notice of Intent to Request Redaction. The parties must also serve a copy on the court reporter or transcriber. After filing the Notice of Intent to Request Redaction, a party must submit to the court reporter or transcriber, within 21 calendar days of the filing of the transcript, a written statement indicating where the personal data identifiers to be redacted appear in the transcript. (Condon, A.) (Entered: 02/11/2022) |
| 04/14/2022 | | NOTICE OF HEARING as to Reshod Jamar Everett (1): Pretrial Conference set for 4/29/2022 at 3:00 PM in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III. (Lopez, R.) Modified to reflect notice of hearing on 4/14/2022 - NEF regenerated. (Lee, L.). (Entered: 04/14/2022) |
| 04/14/2022 | 229 | MOTION Motion To Excuse regarding Set/Reset Hearings, *Pre-Trial Conference* filed by Reshod Jamar Everett. (Attachments: # 1 Text of Proposed Order) (Pryor, Renorda) (Entered: 04/14/2022) |

| 04/14/2022 | 230 | ORDER granting 229 Motion to Excuse as to Reshod Jamar Everett (1). Signed by District Judge James C. Dever III on 4/14/2022. (Herrmann, L.) (Entered: 04/14/2022) |
| 04/26/2022 | 231 | MOTION in Limine filed by USA as to Reshod Jamar Everett. (Lemmon, Scott) (Entered: 04/26/2022) |
| 04/26/2022 | | Motion Submitted to District Judge James C. Dever III as to Reshod Jamar Everett regarding 231 MOTION in Limine. (Jennings, A.) (Entered: 04/26/2022) |
| 04/29/2022 | 236 | Order Setting Hearing as to Reshod Jamar Everett concerning what role, if any, the Federal Public Defender or any attorney in that office plans to play in connection with the upcoming trial in this case. The court expects Mr. Alan Dubois and Mr. Joseph Ross to attend. Hearing set for 5/4/2022 at 2:00 PM in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III.Signed by District Judge James C. Dever, III on 4/29/2022. Copies to US Marshal, Court Services, Alan Dubois and Joseph Ross. (Jennings, A.) (Entered: 04/29/2022) |
| 04/29/2022 | 238 | Minute Entry as to Reshod Jamar Everett for proceedings held on before District Judge James C. Dever III in Raleigh, NC: Pretrial Conference held on 04/29/2022. Defendant present with counsel. Assistant US Attorney present for USA. The court discusses details regarding the upcoming trial set for May 5, 2022. The court granted in part and denied in part the government's motion in limine. The court will set a hearing to determine any potential conflict of interest. Hearing set for May 4, 2022. Defendant remanded to custody. (Court Reporter Michelle McGirr) (Jennings, A.) Modified on 5/3/2022 (Jennings, A.). (Entered: 05/03/2022) |
| 04/29/2022 | | ORAL ORDER granting in part and denying in part 231 Motion in Limine as to Reshod Jamar Everett (1). Entered by District Judge James C. Dever III on 4/29/2022. (Jennings, A.) Modified on 5/3/2022 to correct file date. (Jennings, A.) (Entered: 05/03/2022) |
| 05/02/2022 | 237 | Notice of Hearing as to Reshod Jamar Everett: **Please note time change for hearing previously set for May 4, 2022.** Hearing is reset for 5/4/2022 at 9:00 AM in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III. (Lee, L.) (Entered: 05/02/2022) |
| 05/04/2022 | 239 | Minute Entry for proceedings held before District Judge James C. Dever, III in Raleigh, NC: Hearing as to Reshod Jamar Everett held on 5/4/2022 - Defendant present with counsel - Assistant US Attorney present for USA - Alan DuBois and Joseph Ross present at the court's request - Court heard from the Federal Public Defender's Office regarding their role, if any, at the upcoming trial - Court was satisfied with the information provided - Trial will begin at 10:00 am on Thursday, May 5, 2022 - Defendant remanded to custody. (Court Reporter Amy Condon) (Lee, L.) (Entered: 05/04/2022) |
| 05/05/2022 | 240 | WITNESS LIST by USA as to Reshod Jamar Everett (Lemmon, Scott) (Entered: 05/05/2022) |
| 05/05/2022 | 241 | WITNESS LIST by Reshod Jamar Everett (Pryor, Renorda) (Entered: 05/05/2022) |
| 05/05/2022 | 242 | ORDER. Kareem Haley is a potential defense witness in the trial of United States v. Everett. The Office of the Federal Public Defender SHALL promptly appoint counsel for Haley. Counsel SHALL consult with Haley prior to Monday, May 9, 2022. Signed by District Judge James C. Dever III on 5/5/2022. (Hayes, Lyndsay) (Entered: 05/05/2022) |
| 05/05/2022 | 243 | Minute Entry for proceedings held before District Judge James C. Dever III in Raleigh: Jury Selection, Voir Dire, and Jury Trial (Day 1) as to Reshod Jamar Everett held on 5/5/2022. Defendant present with counsel. Attorneys for government present. Court addresses forfeiture - to be determined at the time of sentencing. 39 jurors present for selection - 36 participated in voir dire - 12 jurors and 2 alternates selected - all others |

| | | |
|---|---|---|
| | | excused. Jury impaneled. Opening statements by both parties. Government's case-in-chief begins. Evidence presented by oral testimony. Exhibits tendered and admitted into evidence. Jurors excused for the evening. Jury Trial to resume 5/6/2022 at 9:00 AM in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III. Government addresses issue with a potential defense witness - Court will appoint Federal Public Defender to represent Kareem Haley. Defendant remanded to the custody of the US Marshal. (Court Reporter - Michelle McGirr) (Herrmann, L.) (Additional attachment(s) added on 5/6/2022: # 1 Jury Roster) (Herrmann, L.) Modified on 5/6/2022 to note counsel appointed for potential witness. (Entered: 05/06/2022) |
| 05/05/2022 | | Jury Impaneled as to Reshod Jamar Everett. (Herrmann, L.) (Entered: 05/06/2022) |
| 05/05/2022 | 244 | Jury Seating Arrangement with challenges as to Reshod Jamar Everett. Sealed Document. (Herrmann, L.) (Entered: 05/06/2022) |
| 05/05/2022 | 245 | Jury Seating Arrangement as to Reshod Jamar Everett. Sealed Document. (Herrmann, L.) (Entered: 05/06/2022) |
| 05/06/2022 | 246 | Minute Entry for proceedings held before District Judge James C. Dever III in Raleigh: Jury Trial (Day 2) as to Reshod Jamar Everett held on 5/6/2022. Defendant present with counsel. Attorneys for government present. A total of 14 jurors reported for trial. Government continues with presentation of evidence. Exhibits tendered and admitted into evidence. Court addresses issue with 1 juror and that juror is excused from service. Jury Trial to resume 5/9/2022 at 9:00 AM in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III. Defendant remanded to the custody of the US Marshal. (Court Reporter - Michelle McGirr) (Herrmann, L.) (Entered: 05/09/2022) |
| 05/09/2022 | 247 | Minute Entry for proceedings held before District Judge James C. Dever, III in Raleigh, NC: Jury Trial (DAY 3) as to Reshod Jamar Everett held on 5/9/2022 - Defendant present with counsel - Assistant US Attorney present for USA - 13 jurors present - Government's evidence continued - Government rested its case - Defendant's evidence presented - Defendant rested his case - Jury admonished and released for evening recess - Court will conduct charge conference at 8:30 am tomorrow morning (5/10/22) - Defendant remanded to custody. (Court Reporter Michelle McGirr) (Lee, L.) (Entered: 05/09/2022) |
| 05/10/2022 | 248 | Minute Entry for proceedings held before District Judge James C. Dever III in Raleigh: Jury Trial (Day 4) as to Reshod Jamar Everett held on 5/10/2022. Defendant present with counsel - Assistant US Attorneys present for USA - 13 jurors present - Charge conference with counsel (only) held - Closing arguments by the parties - Court charged the jury - Deliberations began with 12 jurors (alternate juror kept separate) - Verdict returned - Guilty as to all counts - Court polled jury at defendants request - Jury released - Court set sentencing for August 22, 2022 term - Defendant remanded to custody of US Marshal. (Court Reporter Michelle McGirr) (Jennings, A.) Modified on 5/11/2022 to reflect correct hearing date. (Jennings, A.) (Entered: 05/11/2022) |
| 05/10/2022 | 249 | JURY VERDICT (Redacted version) as to Reshod Jamar Everett (1): Guilty on Count 1s, 4s, 5s, 6s, 7s, and 8s. (Jennings, A.) (Entered: 05/11/2022) |
| 05/10/2022 | 250 | Unredacted Document 249 Jury Verdict. (Jennings, A.) (Entered: 05/11/2022) |
| 05/10/2022 | 251 | TRIAL EXHIBIT LIST as to Reshod Jamar Everett. (Jennings, A.) (Entered: 05/11/2022) |
| 05/10/2022 | 252 | ORDER returning trial exhibits to case agent as to Reshod Jamar Everett. Signed by District Judge James C. Dever III on 5/10/2022. (Jennings, A.) (Entered: 05/11/2022) |
| 05/10/2022 | 253 | ORDER returning trial exhibits to case agent as to Reshod Jamar Everett. Signed by District Judge James C. Dever III on 5/10/2022. (Jennings, A.) (Entered: 05/11/2022) |

USCA4 Appeal: 22-4536     Doc: 27-1     Filed: 03/16/2023     Pg: 33 of 435

| 05/10/2022 | | Set Hearing as to Reshod Jamar Everett: Sentencing set for 8/22/2022 term of court in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III. (Jennings, A.) (Entered: 05/11/2022) |
| --- | --- | --- |
| 05/12/2022 | 255 | Writ of Habeas Corpus ad Testificandum Returned Executed for Khristopher Godfrey on 5/11/2022 in case as to Reshod Jamar Everett. (Edwards, S.) (Entered: 05/12/2022) |
| 05/16/2022 | | Terminate transcript deadlines as to Reshod Jamar Everett (Foell, S.) (Entered: 05/16/2022) |
| 07/19/2022 | 256 | DRAFT PRESENTENCE INVESTIGATION REPORT (Sealed) as to Reshod Jamar Everett. (Attachments: # 1 Supplement PSR FIRST DRAFT MEMO - OBJECTIONS ARE DUE BY AUGUST 2, 2022) (Hafner, B.) (Entered: 07/19/2022) |
| 08/01/2022 | 257 | OBJECTIONS TO PRESENTENCE REPORT as to Reshod Jamar Everett regarding 256 Presentence Investigation Report -Draft (Young, Christopher) (Entered: 08/01/2022) |
| 08/02/2022 | 258 | OBJECTIONS TO PRESENTENCE REPORT as to Reshod Jamar Everett (Lemmon, Scott) (Entered: 08/02/2022) |
| 08/09/2022 | 259 | Notice of Hearing as to Reshod Jamar Everett: Final Hearing regarding Revocation of Supervised Release set for 8/25/2022 at 1:00 PM in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III. (Lopez, R.) (Entered: 08/09/2022) |
| 08/09/2022 | 260 | Notice of Hearing as to Reshod Jamar Everett: Sentencing set for 8/25/2022 at 1:00 PM in Raleigh - 7th Floor - Courtroom 1 before District Judge James C. Dever III. (Lopez, R.) (Entered: 08/09/2022) |
| 08/09/2022 | | Terminate Revocation Hearing as to Reshod Jamar Everett. Hearing set in error. (Lopez, R.) (Entered: 08/09/2022) |
| 08/17/2022 | 261 | NOTICE OF ATTORNEY APPEARANCE John P Newby appearing for USA. (Newby, John) (Entered: 08/17/2022) |
| 08/17/2022 | 262 | MOTION for Forfeiture of Property filed by USA as to Reshod Jamar Everett. (Attachments: # 1 Text of Proposed Order) (Newby, John) (Entered: 08/17/2022) |
| 08/18/2022 | 264 | PRESENTENCE INVESTIGATION REPORT (Sealed) as to Reshod Jamar Everett. (Roberson, Mary Vann) (Entered: 08/18/2022) |
| 08/22/2022 | 266 | SENTENCING MEMORANDUM by USA as to Reshod Jamar Everett (Attachments: # 1 Exhibit A - Police Department Costs) (Lemmon, Scott) (Entered: 08/22/2022) |
| 08/24/2022 | 267 | ORDER granting 262 Preliminary Order of Forfeiture as to Reshod Jamar Everett (1). Signed by District Judge James C. Dever III on 8/24/2022. (Jennings, A.) (Entered: 08/24/2022) |
| 08/25/2022 | 268 | Minute Entry for proceedings held before District Judge James C. Dever III in Raleigh, NC: Sentencing held on 8/25/2022 for Reshod Jamar Everett (1). Defendant present with counsel. Assistant US Attorney present for USA. Imprisonment: 360 months as to Count 1s, 240 months as to each Count 4s and 6s to be served concurrently, 60 months as to Count 8s to be served concurrently, 5 years as to each Count 5s and 7s to be served consecutively for a total of 480 months imprisonment with recommendations made. Supervised Release: 5 years as to each Count 1s, 5s, and 7s to be served concurrently; 3 years as to each Count 4s, 6s, and 8s to be served concurrently; for a total of 5 years supervised release with special conditions. No fine. $600 special assessment. Order of Forfeiture. Defendant advised of appeal rights and remanded to custody of USMS. (Court Reporter Amy Condon) (Jennings, A.) (Entered: 08/29/2022) |

## JA21

| | | |
|---|---|---|
| 08/25/2022 | 269 | JUDGMENT as to Reshod Jamar Everett (1): Imprisonment: 360 months as to Count 1s, 240 months as to each Count 4s and 6s to be served concurrently, 60 months as to Count 8s to be served concurrently, 5 years as to each Count 5s and 7s to be served consecutively for a total of 480 months imprisonment with recommendations made. Supervised Release: 5 years as to each Count 1s, 5s, and 7s to be served concurrently; 3 years as to each Count 4s, 6s, and 8s to be served concurrently; for a total of 5 years supervised release with special conditions. No fine. $600 special assessment. Order of Forfeiture. Signed by District Judge James C. Dever III on 8/25/2022. (Jennings, A.) (Entered: 09/09/2022) |
| 09/19/2022 | 271 | Notice of Appeal filed by Reshod Jamar Everett. (Young, Christopher) (Entered: 09/19/2022) |
| 09/19/2022 | 272 | Transmission of Notice of Appeal and Docket Sheet as to Reshod Jamar Everett to US Court of Appeals regarding 271 Notice of Appeal - Final Judgment.NOTE: The Docketing Statement and Transcript Order Form, if you are court appointed counsel, are available on our website. (Foell, S.) (Entered: 09/19/2022) |
| 09/21/2022 | 273 | US Court of Appeals Case Number 22-4536 (Cathy Poulsen, Case Manager) for defendant Reshod Jamar Everett as to 271 Notice of Appeal - Final Judgment filed by Reshod Jamar Everett. (Foell, S.) (Entered: 09/21/2022) |
| 10/07/2022 | 274 | ORDER of US Court of Appeals appointing Paul Sun as to Reshod Jamar Everett regarding 271 Notice of Appeal - Final Judgment. (Foell, S.) (Entered: 10/07/2022) |
| 11/14/2022 | 275 | OFFICIAL TRANSCRIPT as to Reshod Jamar Everett for dates of May 4, 2022, before District Judge James C. Dever III, regarding 271 Notice of Appeal - Final Judgment Court Reporter/Amy M. Condon. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Does this satisfy all appellate orders for this reporter? - No. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 12/8/2022. Redacted Transcript Deadline set for 12/18/2022. Release of Transcript Restriction set for 2/15/2023. (Condon, A.) (Entered: 11/14/2022) |
| 11/14/2022 | 276 | OFFICIAL TRANSCRIPT as to Reshod Jamar Everett for dates of August 25, 2022, before District Judge James C. Dever III, regarding 271 Notice of Appeal - Final Judgment. Court Reporter/Amy M. Condon. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Does this satisfy all appellate orders for this reporter? - Yes. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 12/8/2022. Redacted Transcript Deadline set for 12/18/2022. Release of Transcript Restriction set for 2/15/2023. (Condon, A.) (Entered: 11/14/2022) |
| 11/14/2022 | | Notice of Filing of Official Transcript 275 Transcript - Appeal, 276 Transcript - Appeal. The parties have seven calendar days from the filing of the transcript to file a Notice of Intent to Request Redaction. The parties must also serve a copy on the court reporter or transcriber. After filing the Notice of Intent to Request Redaction, a party must submit to the court reporter or transcriber, within 21 calendar days of the filing of the transcript, a written statement indicating where the personal data identifiers to be redacted appear in the transcript. (Condon, A.) (Entered: 11/14/2022) |
| 11/17/2022 | 277 | OFFICIAL TRANSCRIPT as to Reshod Jamar Everett for dates of 4/29/2021, Arraignment, before Judge Robert T. Numbers II, regarding 271 Notice of Appeal - Final Judgment Court Reporter Risa Kramer. Transcript may be viewed at the court public |

JA22

| | | |
|---|---|---|
| | | terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Does this satisfy all appellate orders for this reporter? - Yes. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 12/11/2022. Redacted Transcript Deadline set for 12/21/2022. Release of Transcript Restriction set for 2/18/2023. (Kramer, R.) (Entered: 11/17/2022) |
| 11/17/2022 | | Notice of Filing of Official Transcript 277 Transcript - Appeal. The parties have seven calendar days from the filing of the transcript to file a Notice of Intent to Request Redaction. The parties must also serve a copy on the court reporter. After filing the Notice of Intent to Request Redaction, a party must submit to the court reporter, within 21 calendar days of the filing of the transcript, a written statement indicating where the personal data identifiers to be redacted appear in the transcript. (Kramer, R.) (Entered: 11/17/2022) |
| 12/20/2022 | 279 | OFFICIAL TRANSCRIPT as to Reshod Jamar Everett for dates of 4/29/2022, Pretrial Conference, before Judge James C. Dever, III, regarding 271 Notice of Appeal - Final Judgment. Court Transcriber: Michelle McGirr, mamcg350@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Does this satisfy all appellate orders for this reporter? - No. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 1/13/2023. Redacted Transcript Deadline set for 1/23/2023. Release of Transcript Restriction set for 3/23/2023. (Foell, S.) (18 pages) (Entered: 12/20/2022) |
| 12/20/2022 | 280 | ***SEALED*** OFFICIAL TRANSCRIPT as to Reshod Jamar Everett for dates of 5/5/2022, Jury Selection, before Judge James C. Dever, III, regarding 271 Notice of Appeal - Final Judgment. Court Reporter: Michelle McGirr, mamcg350@gmail.com. Does this satisfy all appellate orders for this reporter? No - Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available at http://www.nced.uscourts.gov/cmecf/default.aspx (Foell, S.)(sealed per EDNC policy - 98 pages) (Entered: 12/20/2022) |
| 12/20/2022 | 281 | OFFICIAL TRANSCRIPT as to Reshod Jamar Everett for dates of **5/5/2022, Jury Trial - Day 1,** before Judge James C. Dever, III, regarding 271 Notice of Appeal - Final Judgment. Court Reporter/ Michelle McGirr, mamcg350@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Does this satisfy all appellate orders for this reporter? - No. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 1/13/2023. Redacted Transcript Deadline set for 1/23/2023. Release of Transcript Restriction set for 3/23/2023. (Foell, S.) (153 pages) (Entered: 12/20/2022) |
| 12/20/2022 | 282 | OFFICIAL TRANSCRIPT as to Reshod Jamar Everett for dates of **5/6/2022, Jury Trial - Day 2,** before Judge James C. Dever, III, regarding 271 Notice of Appeal - Final Judgment. Court Reporter/ Michelle McGirr, Telephone number mamcg350@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Does this satisfy all appellate orders for this reporter? - No. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 1/13/2023. Redacted Transcript Deadline set for 1/23/2023. Release of Transcript Restriction set for 3/23/2023. (Foell, S.)(333 pages) (Entered: 12/20/2022) |

JA23

| | | |
|---|---|---|
| 12/20/2022 | 283 | OFFICIAL TRANSCRIPT as to Reshod Jamar Everett for dates of **5/9/2022, Jury Trial - Day 3,** before Judge James C. Dever, III, regarding 271 Notice of Appeal - Final Judgment. Court Reporter/ Michelle McGirr, mamcg350@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Does this satisfy all appellate orders for this reporter? - No. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 1/13/2023. Redacted Transcript Deadline set for 1/23/2023. Release of Transcript Restriction set for 3/23/2023. (Foell, S.) (232 pages) (Entered: 12/20/2022) |
| 12/20/2022 | 284 | OFFICIAL TRANSCRIPT as to Reshod Jamar Everett for dates of **5/10/2022, Jury Trial - Day 4,** before Judge James C. Dever, III, regarding 271 Notice of Appeal - Final Judgment. Court Reporter/ Michelle McGirr, Telephone number mamcg350@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Does this satisfy all appellate orders for this reporter? - Yes. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 1/13/2023. Redacted Transcript Deadline set for 1/23/2023. Release of Transcript Restriction set for 3/23/2023. (Foell, S.)(pages - 137) (Entered: 12/20/2022) |
| 12/20/2022 | | Notice of Filing of Official Transcripts: 279 , 280 , 281 , 282 , 283 , 284 . The parties have seven calendar days from the filing of the transcript to file a Notice of Intent to Request Redaction. The parties must also serve a copy on the court reporter or transcriber. After filing the Notice of Intent to Request Redaction, a party must submit to the court reporter or transcriber, within 21 calendar days of the filing of the transcript, a written statement indicating where the personal data identifiers to be redacted appear in the transcript. (Foell, S.) (Entered: 12/20/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/19/2023 15:52:40 | | |
| **PACER Login:** | kdagg0001 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 5:20-cr-00333-D |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |
| **Exempt flag:** | Exempt | **Exempt reason:** | Exempt CJA |

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:20CR-00333-D-1

| | |
|---|---|
| UNITED STATES OF AMERICA | ) DEFENDANT'S REQUEST |
| | ) FOR DISCOVERY AND FOR |
| v. | ) DISCLOSURE OF ALL |
| | ) EXCULPATORY EVIDENCE |
| RESHOD JAMAR EVERETT, | ) AND INCORPORATED |
| | ) STATEMENT OF AUTHORITY |
| | ) |
| Defendant. | ) |

The above-named defendant hereby respectfully requests pursuant to Fed.R.Crim.P. 16, Local Rule 43, and the principles of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny, that counsel for the government make inquiry forthwith and disclose the following information that is either within the possession, custody, or control of the Government, or the existence of which is known or through the exercise of due diligence could become known to the Government: This request is made in order to preserve, on the record, the defendant's request for discovery. THIS REQUEST DOES NOT REQUIRE ACTION BY THE COURT. For that reason, the requirements of Local Rule 43.04 are not applicable.

1.    Reveal and disclose every transcription or recordation of any type of all statement(s) made by the defendant, or by any person whom the Government contends is an agent of the defendant. The defendant further requests that the Government reveal and disclose the substance of any oral statement made by the defendant in response to questioning by any person then known by the defendant to be a Government agent, regardless of whether the statement was made before or after arrest. With regard to the foregoing requests, the defendant specifically contends that Fed.R.Crim.P. 16(a)(1)(A) encompasses statements of the defendant that are made directly to an agent of the Government, or to a third party who then makes a statement to an agent of the Government in which the defendant's remarks are attributed and included within the third party's statement. The defendant further contends that any statement of an alleged co-

conspirator or co-defendant concerning any activity connected with the crime(s) alleged in the above-styled indictment should be disclosed under Rule 16(a)(1)(A).

2.   Reveal and disclose the nature, results and reports of any scientific tests, physical or mental examinations or tests, or measures or experiments made in connection with this case, whether completed or not, including, but not limited to, analysis of tape recordings or wiretaps, handwriting analysis, fingerprint comparisons and/or voice identifications. The defendant also requests that the defendant or the defendant's representative(s) be permitted to personally examine, inspect and photograph all pieces of physical evidence that were obtained during the Government's investigation of this case and that have been scientifically examined on behalf of the Government. The defendant further specifically reserves the right to move this Court to have a competent expert of the defendant's own choosing perform scientific testing on any of the physical evidence scientifically examined by the Government if the defendant deems it desirable or necessary, under appropriate and reasonable safeguards imposed by the Court.

3.   Permit the defendant's attorney(s) to inspect and copy or photograph <u>all</u> books, papers, documents, photographs, videotapes, motion pictures, mechanical or electronic recordings, buildings and places, crime scene(s) or tangible objects and all copies and portions thereof which are within the possession, custody or control of the Government and which are material to the preparation of the defendant's defense, or might possibly be used by the Government as evidence during the presentation of its case-in-chief or its rebuttal case or which were obtained from or belong to the defendant.

4.   Reveal and disclose a complete and exact copy of the defendant's entire criminal record, both as an adult and juvenile.

5.   Reveal and disclose whether there has been any electronic surveillance, eavesdropping, interceptions of communications, wiretapping, listening or any similar investigative techniques used in the investigation of this case. If such techniques have been used, the defendant requests that the Government afford the defendant's attorney(s) with a true, complete and correct copy of any such recordings or interceptions, together with an accurate transcript thereof, together with an accurate transcript thereof, and with any log reflecting the date that the recordings or interceptions were made, the names of

the government agents who participated in the recordings or interceptions and the identity of all speakers on the recordings or interceptions.

6.  Reveal and disclose whether any conversation entered into by the defendant has been electronically recorded. If so, the defendant specifically requests the following:

    a)  An exact and complete copy of such tape or recording;

    b)  The authority for making such interception or recording; and

    c)  The date that the recording was made and the identity of all speakers therein.

7.  Reveal and disclose the date, place, circumstances and names of all individuals involved in any identification procedures (photographic, corporeal or any other type), interrogations, searches or seizures of any type that were conducted in connection with the investigation of this case.

8.  Reveal and disclose and evidence that the Government has within its possession, custody or control, or the existence of which is known, or can become known through the exercise of due diligence, to the Government, concerning any identification procedure, interrogation search or seizure conducted by the Government, its agents or employees that tends, however slightly, to taint or make illegal the identification procedure, interrogation, search or seizure.

9.  Reveal and disclose the names, addresses, telephone numbers backgrounds and criminal records of all witnesses to be presented on the witness stand during the trial of this case by the Government.

10.  Reveal and disclose the names, addresses, telephone numbers, backgrounds and criminal records of all persons who have any knowledge whatsoever regarding this case and/or were interviewed by any governmental employee or agent in connection with this case.

11.  Reveal and disclose whether any person has been videotaped in connection with the investigation of this case.

12.  Reveal and disclose the names, addresses, background and entire criminal record of any informants, special employees, alleged co-conspirators (whether indicted or unindicted), alleged accomplices, (whether indicted or unindicted), alleged aider and abettors (whether indicted or unindicted) and special investigators used in the

investigation of this case or who may be called as witnesses by the Government during any phase of the trial of this case, and reveal and disclose the same information regarding any persons hired, directed, requested and/or paid by the Government to investigate, "snoop" or otherwise obtain information in any manner whatsoever in the investigation of this case.

13.    Produce a copy of any Federal Bureau of Investigation or other investigative agency departmental rules or regulations pursuant to which any informant, special employees, alleged co-conspirator (whether indicted or unindicted), alleged accomplice (whether indicted or unindicted), alleged aider and abettor (whether indicted or unindicted), or snoop was hired, employed or requested to participate in the investigation of this case.

14.    Disclose the total amounts of money paid out to any informant, special employee, alleged co-conspirator (whether indicted or unindicted), alleged aider and abettor (whether indicted or unindicted) tipster or snooper who was interviewed in connection with this case or who may be called as a witness by the Government during any phase of the trial of this case, together with the dates of payment, where made, to whom made and the reasons for payment of such sums. This request specifically embraces any payment made under and so-called witness protection program. The defendant further requests the disclosure of all receipts, vouchers, or other books and records concerning money expended for, to or on behalf of the above class of persons.

15.    Reveal and disclose all transcriptions of any kind, whether recorded or written, regarding any conversations with, discussions with or statements made by informants, special employees, alleged co-conspirators, (whether indicted or unindicted), alleged accomplices, (whether indicted or unindicted), alleged aider and abettors (whether indicted or unindicted), tipsters or snoops of the Government who have been involved in any manner whatsoever in the investigation of this case or who may be called as a witness during any phase of the trial of this case.

16.    State the names and classifications of any and all Federal Bureau of Investigation Agents, United State Attorneys or other Government employees who met with, talked to or who were present at any meeting, telephone conversation or discussion

held with any informants, special employees or snoops of the Government during the investigation of this case.

17. Reveal and disclose all expert conclusions and analysis concerning any records, papers, documents or physical evidence that may have been seized or obtained by the Government in connection with its investigation of this case.

18. Reveal and disclose the name, address and qualifications of any expert witness intended to be called by the Government either during its case-in-chief or its rebuttal.

19. Produce immediately all statements, memoranda, and/or documents producible under 18 U.S.C.A. § 3500 (1983).

20. Produce a copy of all original notes, statements and memoranda (whether handwritten, recorded or otherwise) that were made by any and all agents of the Government investigating this case, including any person who was acting as an informer, special employee, tipster, snoop or in an undercover capacity.

21. State and reveal whether any notes, documents or recordings relating to the investigation of this case that were made by any agents of the Government, including any person who was acting as an informer, special employee, alleged accomplice (whether indicted or unindicted), alleged co-conspirator (whether indicted or unindicted), tipster, snoop or in any undercover capacity, have been totally or partially destroyed or altered, and, if so, reveal the following with reference thereto:

    a) The substance of the note, document or recording that was destroyed;

    b) The substance of the alteration;

    c) The name, address, and telephone number of all persons involved in the destruction or alteration;

    d) The reason for the destruction or alteration;

    e) Whether the note, document or recording was destroyed or altered pursuant to an existing policy, federal regulation or for some other reason;

    f) When the destruction or alteration occurred; and

    g) Whether it is the policy and custom of such agent(s) to destroy or alter such notes and memoranda, and, if so, who initiated such policy.

22. Reveal and disclose whether any person in connection with the Government's

investigation of this case has been given a polygraph examination, and, if so, list the name of the person(s) examined; the name and address of the operator; the date of the examination; and furnish the defendant with a copy of the questions and answers posed and the results and interpretation thereof.

23.    Reveal and disclose any information or knowledge in the hands of the Government that would in any manner show that any of the Government's potential witnesses may be suffering from delusion, emotional difficulty, alcoholism, narcotics addition, the abuse or use of controlled substances of any type, psychological or psychiatric imbalance or any other physical or mental disability that might possibly affect, impair or influence the quality of competency of his or her testimony or that in any way could reasonably affect his or her credibility or memory.

24.    Reveal and disclose whether any person who has been interviewed in connection with this case has undergone hypnosis, age regression or a similar procedure, and, if so, list the name of such person; the date that he or she underwent the procedure, the name and address of the hypnotist or psychologist administering the procedure; and the results thereof.

25.    State whether any Government agent or any one acting at the direction or behest of the Government (be the designated as informant, special employee, snoop, prison inmate or otherwise) has communicated with the defendant in order to attempt to obtain any information or facts from the defendant pertaining to this case or his defense thereof, and if so, give the name, address and telephone number of such agent, informant, special employee, snoop or prison inmate, together with all of the facts and circumstances pertaining thereto.

26.    State whether the Government has paid money or the like for any piece of tangible or physical evidence that may be used in connection with this case, and, if so, state the name, address and telephone number of the person to whom payment was made; the amount thereof; the date thereof; and the tangible or physical evidence obtained.

27.    As to all persons who will testify for the Government during its case-in-chief or its rebuttal case, or whose testimony has been used before the grand jury to obtain the present indictment, or whose sworn testimony or statements may be used in this trial, or

who has been contacted with regard to the investigation of this case, the following specific and detailed information is requested:

a)  The existence, substance and manner of executioner fulfillment of any promises, agreements, understandings and arrangements, either verbal or written, between the Government and any such person or his or her attorney(s), agent(s), or representative(s) wherein the Government has agreed, either expressly or impliedly, as follows:

(i)     not to prosecute the person for any crime or crimes;
(ii)    not to prosecute a third party for any crime or crimes;
(iii)   to provide a formal grant of statutory immunity, or to provide an informal assurance that the person will not be prosecuted in connection with any testimony given by him or her;
(iv)    to recommend leniency in sentencing for any crime;
(v)     to recommend a particular sentence for any crime or crimes for which the person is convicted;
(vi)    to provide favorable treatment or consideration, that is, money or the like, to the of person or to friends or relatives of the person in return for the person's cooperation and testimony;
(vii)   to compromise or diminish, or to recommend the compromise or diminution of any federal, state or local taxes which the person or friends or relatives of the person owe or claim to owe; and
(viii)  to make any other recommendation of any benefit, however slight, or to give any other consideration to the person or friends or relatives of the person.

28.  Reveal and disclose whether the Government has made any attempt or has made any attempt or has in fact gained any information from the defendant since the return of the above-styled indictment by sending, counseling, or advising persons (whatever their classification may be) to talk with the defendant or his counsel, and, if so, describe all of such activity in detail and the authorization, if any, for such a procedure.

29.  Permit the defendant to copy any document or statement that might be arguably admissible under Fed. R. Evid. 801(d)(1)(B) to rebut an express or implied charge against any Government witness of recent fabrication or improper influence or motive. These documents or statements are required to be produced because they are evidence that the Government may attempt to introduce in this case and because they are material to the preparation of the defense as to the method of defense and as to the defendant's approach to the issue of credibility. This request includes any document that

might reasonably be foreseen for use during the Government's case-in-chief or its rebuttal case.

30.  Pursuant to Fed. R. Crim.P. 16(a)(1)(A), the defendant requests the production of the recorded testimony of any witness who appeared before the grand jury and who:

> (a) was, at the testimony, so situated as an officer or employee of the defendant as to have been able to legally bind the defendant with respect to conduct constituting the offense(s) in issue in this case, or
> (b) was, at the time of the offense(s), personally involved in the alleged conduct constituting the offense(s) and so situated as an officer or employee as to have been able to legally bind the defendant with respect to the alleged conduct in which the witness was involved.

If the testimony of any such person was not recorded, then the defendant requests the production of any notes or summaries of the testimony of the witness.

31.  Reveal and disclose any statements of any type whatsoever made by any individuals who were contacted in connection with or involved in the investigation of this case that may be inconsistent, in whole or in part, with any other statement made by the same individual; and any statements made by such individuals that are inconsistent, in whole or in part, with any statements made by other individuals who have given statements relevant to the charge(s) against the defendant or with any knowledge held by such individuals.

32.  Reveal and disclose:

> (a) The names, addresses, and telephone numbers of all witnesses appearing before the grand jury in connection with the return of the indictment;
> (b) The names, addresses, and telephone numbers of all persons whose testimony was given to the grand jury or through someone else in connection with the return of said indictment;
> (c) Copies of all documents and exhibits presented to the grand jury;
> (d) Transcripts of the testimony of all witnesses appearing before the grand jury, and, if no transcripts or minutes exist, then reveal and disclose any notes or summaries regarding the testimony.
> (e) Summaries and copies of all statements of witnesses potentially relevant to the charge(s) in issue in this case that were not presented or conveyed to the grand jury;
> (f) Copies of all documents, notes, transcripts or memoranda that are in the possession, custody or control of the Government and are potentially relevant to the charges in the indictment and which the

Government did not present to the grand jury at the time that this case was presented for grand jury consideration;

(g) A list of the names and titles of all Government employees or other persons, other than the grand jurors, who were present in the grand jury room during the taking of any testimony (other than his or her own) or who were present during any other portion, including deliberations, of the grand jury proceedings.

(h) A list of the names and titles of each Government employee or agent who, prior to the return of the indictment herein, examined out of the grand jury presence any witness, document or other item obtained by means of any grand jury subpoena;

(i) A copy of any letter or other document authorizing the examination of the grand jury materials by any of the Government employees or agents mentioned above;

(j) A list of all grand jury subpoenas issued for documents and/or testimony in this case;

(k) The existence of any orders issued pursuant to Fed. R. Crim. P. 6(e) relating to grand juries that met concerning this matter;

(l) The name of any person offering any immunity, whether legally valid or not, of any type whatsoever to any person requested to appear before the grand jury or to talk with any Government agent or representative involved in the investigation of this case.

(m) The transcript of any and all statements made to the grand jury by any United States Attorney, Assistant United States Attorney or any prosecutorial official associated with the prosecution of this case or the presentation of evidence to the grand jury in this case. This request concerns, but is not limited to, any instructions regarding the law relevant to this case or pertaining to legal advice that were given by the aforementioned class of persons; and

(n) All records and logs reflecting when any grand jury involved in the investigation of this case or in the handing down of the bill of indictment in this case met, and all records and logs reflecting the composition of each such grand jury (or grand juries).

33. Reveal and disclose all consideration or promises of consideration given to or on behalf of any witness by the Government or expected or hoped for by the witness. "Consideration" refers to absolutely anything of value or use, including, but not limited to, criminal, civil or tax immunity grants; relief from forfeiture; assistance or favorable treatment or recommendations with respect to any criminal, parole, probation, civil, administrative or other legal dispute with the Government or any other parties; payments of money or fees; witness fees and special witness fees; provisions of food, clothing, shelter, transportation or other like benefits to the witness, his or her family or other

associate; placement in a "witness protection program" or anything else that could arguably reveal an interest or bias of the witness in favor of the Government or against the defense or act as an inducement to testify or to color testimony.

34. Reveal and disclose all threats and coercive tactics of any type directed at any person interviewed by the Government in connection with this case or at any witness or potential witness for the Government in this case.

35. Reveal and disclose all threats, express or implied, made against any person interviewed by the Government in connection with this case or any potential witness for the Government in this case of criminal prosecutions or investigations relating to any probationary or deferred prosecution status or any civil, administrative or other pending or potential legal disputes or transactions with the Government.

36. Reveal and disclose the existence and identification of each occasion on which each potential witness for the Government has testified before any court, grand jury or other tribunal or body with regard to the defendant or the investigation of this case.

37. Reveal and disclose the existence and identification of each occasion in which a witness or potential witness for the Government, especially a witness who is an accomplice, co-conspirator or expert, has testified before any court, grand jury, other tribunal, stenographer or court reporter.

38. Reveal and disclose any all personnel files for any witness who may potentially be called by the Government in this case and the existence and identity of all Government files for the witness.

39. Reveal and disclose any and all records, criminal or otherwise, or information that can arguably be helpful or useful to the defense in impeaching or otherwise detracting from the probative force of any potential Government witness or of the Government's evidence, or that can arguably lead to any records to information that might be used to so impeach.

40. State whether any information, irrespective of how remote or inconsequential it may seem to be, has been obtained by the Government from the defendant, the defendant's attorney(s) or such attorney(s) agents that might arguably or potentially be in violation of the attorney/client privilege. If the answer to this inquiry is in the

affirmative, state in detail how this information was obtained, and the names, addresses, and telephone numbers of all Government representatives involved in obtaining this information.

41. State whether the Government or any of its agents or attorneys has attempted to obtain information from any potential witness arguably in violation of the attorney/client privilege in connection with the investigation of this case. If the answer to this inquiry is in the affirmative, state in detail when, where and how such attempt took place, and the names, addresses, and telephone numbers of all individuals involved in the attempt.

42. Reveal and disclose all evidence of transactions or conduct of the defendant and his or her agents or co-defendant and his or her agents or any alleged co-conspirator and his or her agents that is not the subject matter of the indictment in the instant case, but which the Government might offer as evidence on the question of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

43. Reveal and disclose all recorded, written or oral statements made by any alleged co-conspirators or co-defendants of the defendant in this case, whether incriminating or otherwise.

44. Reveal and disclose any evidence or information obtained in connection with the investigation of this case that established the defendant's good character or his lack of reputation for committing the act(s) that constitute the crime(s) in question in this case.

45. Reveal and disclose any evidence or information tending, however slightly, to link the commission of the crime(s) in question in this case.

46. Reveal and disclose any and all evidence seized or secured from the defendant or from any other individual or from any location or premises at any time that the Government may possibly attempt to introduce into evidence during any phase of the trial of this case. This request includes, but is not limited to, all evidence seized or secured from the defendant's person or any other person; all evidence seized or secured from the defendant's person or from any other individual's person or from any locations or premises during any other type of search, whether conducted pursuant to a warrant or

otherwise. This request also applies to any seizure, regardless of how temporary or permanent it may have been.

47.    Reveal and disclose any and all evidence of any type which the Government is aware of, or which the Government could become aware of by the exercise of reasonable diligence that indicates that any of the individuals whom it has interviewed, debriefed or contacted in connection with the investigation of this case or who may be called as witnesses by the Government during any phase of the trial of this has been involved, however, remotely, in any criminal conduct, at any time up to the present date, whether or not this conduct resulted in criminal charges being brought against the individual. This request applies, but is not limited to, any and all informers, special employees, alleged accomplices, (whether indicted or unindicted), alleged conspirators (whether indicted or unindicted) alleged aiders and abettors (whether indicted or unindicted), tipsters, snoops or individuals acting in any undercover capacity who may testify in this case or who possess information that is relevant or related to this case, as well as to all other individuals of any type who were involved in any manner, regardless of how remote it may be, in the investigation of this case.

48.    Reveal and disclose and allow the inspection and photocopying of any and all toll records of any type whatsoever that allegedly reflect conversations that the defendant had with any person whatsoever, including, but not being limited to, all persons who have acted in any capacity as an informant, special employee, alleged co-conspirator (whether indicted to unindicted), alleged accomplice (whether indicted or unindicted), alleged aider and abettor (whether indicted or unindicted), tipster, snoop or investigator in this case or who may be called by the Government as a witness during any phase of the trial of this case.

49.    Reveal, disclose and allow the inspection and photocopying of any and all search warrants and underlying affidavits that concern or were directed at any individual who has acted in any capacity as an informant, special employee, alleged co-conspirator (whether indicted or unindicted), alleged accomplice (whether indicted or unindicted), alleged aider and abettor (whether indicted or unindicted), tipster, snoop or investigator in this case, or who may be called as a witness by the Government during any phase of the

trial of this case. This request applies to all search warrants – whether executed or unexecuted – that have existed at any time.

50. Reveal, disclose and allow the inspection and re-recording or photocopying of any and all mechanical or electronic recordings or transcriptions thereof that involved any individual who has acted in any capacity as an informant, special employee, alleged co-conspirator (whether indicted or unindicted), alleged accomplice (whether indicted or unindicted), alleged aider and abettor (whether indicted to unindicted), tipster, snoop or investigator in this case or who may be called as a witness by the Government during any phase of the trial of this case. This request is not limited to mechanical or electronic recordings or transcripts thereof that involve the defendant, but seeks the disclosure of all recordings or transcripts or any type that involve the aforementioned class of persons.

51. Reveal and disclose any and all exculpatory evidence of any type that concerns or relates to any individual who has acted in any capacity as an informant, special employee, alleged co-conspirator (whether indicted or unindicted), alleged accomplice (whether indicted or unindicted), alleged aider and abettor (whether indicted or unindicted), tipster, snoop or investigator in this case or who may be called as a witness by the Government during the trial of this case. This request specifically includes, but is not limited to, any charges which were the subject of any plea bargains, or any prosecutorial proceedings of any nature involving the aforementioned class of persons.

52. List the date, place and the names and addresses of all persons present when any informer, special employee, alleged accomplice (whether indicted or unindicted), alleged co-conspirator (whether indicted or unindicted), alleged aider and abettor (whether indicted or unindicted), tipster, snoop or individual acting in an undercover capacity who has been involved in any capacity who has been involved in any capacity in the investigation or preparation of this case or who may be called as a witness by the Government during any phase of the trial of this case given sworn testimony (whether during a trial or during pre-trial proceedings) or has given a sworn statement of any type. These sworn statements include, but are not limited to, affidavits, tax returns, firearms, records, and loan applications.

53.     In addition to all of the items specifically mentioned and listed herein, the defendant requests that the Government furnish to the defendant's attorney(s) any and all evidence of whatever type and kind that is within its possession, custody or control or the existence of which is known or through the exercise of due diligence could become known to it, that may be materially favorable to the defendant, either directly, indirectly or in an impeaching manner, within the purview of Brady, Giglio and their progeny.

This Motion for Discovery and for the Disclosure of Exculpatory Evidence is continuing in nature.

Respectfully submitted this 12th day of August, 2020.

/s/ Renorda Pryor
RENORDA E. PRYOR
Attorney for Defendant
1207 Brentwood Street
High Point, NC 27260
Tele: 919-355-5001
Fax: 919-355-4976
Email: rpryor@herringlawcenter.net
North Carolina Bar No. 36814

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I this 12th day of August, 2020, served a copy of the foregoing Request for Discovery upon counsel in this action by electronically filing the foregoing with the Clerk of Court, using the CM/ECF system which will send notification of such filing to:

**Scott A. Lemmon**
United States Attorney's Office - EDNC
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
919-856-4500
Email: scott.lemmon@usdoj.gov

This the 12th day of August, 2020.

/s/ Renorda Pryor
RENORDA E. PRYOR
Attorney for Defendant
1207 Brentwood Street
High Point, NC 27260
Tele: 919-355-5001
Fax: 919-355-4976
Email: rpryor@herringlawcenter.net
North Carolina Bar No. 36814

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DISTRICT

No:5:20-CR-333-1D

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| V. | ) | MOTION TO SUPPRESS |
| | ) | |
| | ) | |
| RESHOD JAMAR EVERETT, | ) | |
| Defendant._____ | ) | |

COMES NOW Reshod J. Everett, Defendant in the above captioned case, by and through his undersigned attorneys, and moves the Court pursuant to the 4th, 5th, 6th, and 14th Amendments of the United States Constitution; Article I §§ 19, 20, and 23; and North Carolina General Statutes 15A-971 to suppress all the evidence found as a result of warrantless searches conducted by the Fayetteville Police Department on or about July 16-17, 2018, and any derivative statements and evidence.  In support of this motion, Defendant shows the following:

## FACTUAL BACKGROUND

On July 16, 2018, members of the Fayetteville Police Department Gang Unit followed up on information provided according to some

officers through anonymous citizen complaints and complaints of the management office at Addison Ridge Apartment Complex. According to others, from a lengthy investigation into a drug trafficking organization. And according to at least one officer, from an interview that took place with a cooperating informant (CI#1026). CI#1026 stated during an interview with former Detective Harding that he had a supplier named "Kool," a black male with dreads who drove a lifted white truck. None of the information that was given to Detective Harding was memorialized. Regardless of what prompted the surveillance, the operation was initiated at approximately 4:15pm. Detective Cook briefed the unit on information that had been retrieved from the rental office during an interrogation of the complex manager, Asia Nicole Hinnant. This information included the names of the two individuals on the lease, vehicles that each of them drove, and reports that the two male subjects had been seen carrying large duffle bags and the odor of marijuana had been detected.

At approximately 4:47pm, Alvin Davis was observed by Detective Cook leaving the apartment complex carrying a black back pack and driving a Cadillac XTS. Shortly thereafter, former Detective Bird, also

of the Gang Unit, pulled Mr. Davis over for dark tint. After some procedural questioning from former Detective Bird and Detective Budden, former Detective Harding was called to bring his K-9 to conduct an exterior sniff.

While conducting the exterior sniff, the K-9 stopped at the front passenger side door. At this point, Mr. Davis was read his rights and he was asked a series of questions. The questions included questions about what and who was located at the apartment that he had just left. There were also a number of questions regarding what his "roommate" had in the apartment. As this interrogation was taking place, former Detectives Bird and Harding were searching the vehicle. The search of the vehicle yielded several ounces of marijuana, cocaine, and a firearm. A search of Mr. Davis' person yielded two separate lumps of U.S. Currency along with other personal items. All of Mr. Davis personal items, with the exception of his keys, were secured and placed in Detective Budden's vehicle. Based on the answers that Mr. Davis gave to questions he was asked, former Detective Harding believed that there would be marijuana, cocaine, and weapons located at the residence. Based on former Detective Bird's thoughts, a "knock and

talk" was planned to attempt to gather probable cause for a warrant. If no one answered the door, the K-9 would be utilized to conduct an exterior sniff of the public area around the door.

Upon arriving to the apartment complex and approaching the door to apartment 5, an attempt to make contact was made by loudly knocking on the door. However, like Mr. Davis had previously stated, no one was in the apartment to allow the officers in. Therefore, the knock and talk would not be a viable option to ascertain a warrant. With the knock and talk not being a viable option the officers then turned to their own senses reporting that an odor of marijuana could be smelled from the threshold of the apartment. The K-9 was then utilized to conduct an exterior sniff of the breezeway. The K-9 didn't show any interest in any of the apartments until he reached the apartment where the officers had just finished knocking. None of this is memorialized by the officer's body cameras. During this time, none of the several officers present had their body camera turned on. After the K-9 hit on apartment in question, Detectives Cook and Budden returned to the Police Administration Building to type a warrant for the apartment. Without body camera footage of how the dog alerted to

the specific apartment in question it is difficult to ascertain if that action was actual a search like the Court decided in <u>Jardine</u>. In <u>Jardine,</u> the Court held that "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a "search" within the meaning of the Fourth Amendment." <u>Florida v. Jardines</u>, 133 S.Ct.1409 (2013). Based off of the body camera footage all you see is an officer walking up with folded papers, handing them to another officer, and then the officers enter the apartment. Some of the same officers who participated in the traffic stop were at the apartment. The body cameras were on for the traffic stop, but not the "unprovoked" dog sniff of the apartment.

After Detective Cook returned to the scene with what was presumably a warrant, Detectives Cook, former Detectives Harding, Bird and Central C.E.R.T. entered the apartment and conducted a security sweep. Once in the apartment the Detectives allege that there was a strong odor of marijuana. During what was reported to be the initial entrance no officer had on a body camera. Inside the apartment, they found marijuana and cocaine. They also found paperwork for a

2017 Chevrolet Silverado with the name and another address for Reshod Everett.

On July 17, 2018 detectives obtained arrest warrants for Reshod Everett for two counts of Trafficking Marijuana, two counts of Trafficking Cocaine, Maintaining a Dwelling, and two counts of Conspiracy. There was no search warrant for the home at this time. Members of the Fayetteville Police Departments Violent Criminal Apprehension Team (VCAT) set up to conduct surveillance. Surveillance began at approximately 1:00pm on July 17, 2018. During the surveillance, members of the VCAT team observed several people approach the home and leave with children. From this observation, the team members realized that there was a daycare being operated out of the home. While observing from a nearby fire station Defendant's white Chevrolet Silverado as well as Defendant and two other subjects were observed in his backyard. Approximately six and one-half hours later, after the team members concluded that all the children were gone, Detectives Cook and Locklear walked onto Defendant's property and knocked on his door to conduct a knock and talk. When the detectives approached the door, in plain clothes and knocked Reshod

answered the door, just liked they'd hoped. He offered no resistance, and was immediately pushed back into his home, arrested, and handcuffed in the entry way. At this point, a large number of officers swarmed the house and began to do a sweep. There were two females located inside the residence, Victoria Everett, who is Reshod's wife, and Latasha Sinkler. The two females were secured in the living area of the home.  While inside the home, officers report finding THC Gummies in plain view.   There is no report that describes exactly where the gummies were found. They also report finding two loaded rifles in a closet on the second floor of the house.  Those were located when Mrs. Everett was asked by one of the detectives to turn the internal cameras located in the home off.  The detective followed her to the second level of the home to assist her in assuring that the cameras were properly turned off. Subsequent to these incidents officers applied for, and obtained a search warrant.

## ARGUMENT

The Fourth Amendment of the Constitution provides: 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and

no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.' U.S.C.A. Const. Amends. 4, 14.

The [Fourth] Amendment was in large part a reaction to the general warrants and warrantless searches that had so alienated the colonist and had helped speed the movement for independence. In the scheme of the Amendment, therefore, the requirement that 'no Warrants shall issue, but upon probable cause,' plays a crucial part. *McDonald v. United States*, 335 U.S. 451, 69 S.Ct. 191. 93 L.Ed.153.

The Fourth Amendment is one of the most important constitutional rights we as American citizens possess. It protects us from unreasonable searches and seizures. It allows us a sense of peace and privacy in our vehicles and homes. The warrantless search of a home presents the highest of burdens on the government. It is well-established that the Fourth Amendment's guarantee against unreasonable searches of the home is afforded particular deference. Florida v. Jardines, 133 S.Ct 1409, 1414 (2013) ("But when it comes to the Fourth Amendment, the home is first among equals."); see also Wilson v. Arkansas, 514 U.S. 927, 931 (1995)(observing that the

common law protected "a man's house as 'his castle of defense and asylum'" (citation omitted)). Such warrantless searches are "presumptively unreasonable" because "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." <u>Payton v. New York</u>, 445 U.S. 573, 585-86 (1980) (quotation marks and citation omitted); accord <u>Welsh v. Wisconsin</u>, 466 U.S. 740, 748 (1984). Though the Fourth Amendment does not prevent searches and seizures it prevents them without a Warrant that is issued only upon probable cause. Only with certain exceptions can a search or seizure take place without a valid warrant. It is well known that warrantless searches are unreasonable under the Fourth Amendment unless an exception to the warrant requirement applies. *E.G.,Verononia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653, 115 S. Ct. 2386, 2390, 132 L.Ed. 2d 564 (1995).

In this case, the Fayetteville Police Department violated Defendant's Fourth Amendment right by searching his home before a search warrant was issued. While the department would like to use the exception of Search incident to arrest, that is clearly not the case here. The officers waited and decided when it was safe to enter Mr. Everett's

home. There was never any worry of any harm or ambush, especially after Mr. Everett was arrested and in handcuffs. The officers were also aware by this time of who Mr. Everett was, what he looked like, and the primary vehicle that he drove. So, if they wanted to conduct the arrest via a traffic stop instead of staking his house for approximately seven hours, this would have been extremely possible.

## I.    SEARCH INCIDENT TO ARREST EXCEPTION DOES NOT APPLY.

A Search Incident to Arrest is a valid exception to a warrantless search. Guidance for a valid warrantless search incident to an arrest is found in *Chimel v. California*, 395 U.S. 752 (1969). In *Chimel*, police obtained an arrest warrant for the defendant's burglary of a coin shop. They went to his home where his wife allowed the police to enter and wait for him. Upon Mr. Chimel's arrival, the police showed him the warrant and asked to search his home. Mr. Chimel refused. The police then searched the entire home, the attic, the garage, and the workshop, discovering clear evidence of burglary. The issue raised on appeal was whether the warrantless search of petitioner's entire house can be constitutionally justified as incident to arrest. The Court makes clear

the limitation: "[T]he police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure…"*ID* at 762, quoting *Terry v. Ohio*, 392 U.S. 1 at 20, 88 S.Ct. 1868 1979, 20 L.Ed. 2nd 889. The Court makes it clear that law enforcement may search the person being arrested for weapons or other items threatening the officer's safety and may search the area within that person's immediate control. *Chimel*, 395 U.S. 762-763. "There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs[.] *Id*. at 763. Such searches, in the absence of well- recognized exceptions may be made only under the authority of a search warrant. *Id*. at 763. Though Chimel has been distinguished by the Court the distinguishing cases generally deal with automobile stops and not searches involving a home.

Here, Mr. Everett was served with an arrest warrant at his home. He was arrested by Two Fayetteville Police Detectives in plain clothes without incident in the doorway of his home. Immediately upon contact with Mr. Everett, the detectives pushed him back into his home and put him in handcuffs. After Mr. Everett was apprehended and in custody, the officers were limited to searching the area under his

immediate control. Law enforcement cannot, on their own volition push an arrestee back in his home to create a search incident to arrest situation and violate a citizen's rights. This is exactly what took place in this case. In addition to forcing Mr. Everett back in his home, his home was then searched without a warrant.  The officers should have limited their search to Mr. Everett and the area within his immediate zone of control. Instead, the officers forced their way in hoping to find a smoking gun. When they couldn't, they used an empty THC gummy container that was reported to be in plain sight, and two legal firearms that were locked in an upstairs closet to gain probable cause for a warrant.

## II.    PLAIN VIEW EXCEPTION DOES NOT APPLY.

Objects falling in the "plain view" of an officer who has a right to be in the position to have that view are subject to seizure without a warrant. <u>Washington v. Chrisman</u>, 455 U.S. 1 (1982) (officer lawfully in dorm room may seize marijuana seeds and pipe in open view); In <u>Coolidge</u>, the Court states "not only must the item be in plain view; its incriminating character must also be "immediately apparent." <u>Coolidge v. New Hampshire</u>, 466, 91 S.Ct., at 2038 see also <u>Arizona v. Hicks</u>, 480

U.S., at 326-327, 107 S.Ct., at 1153. <u>Coolidge</u>, also states in part "the plain view doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges. <u>Id.</u>, at 465-466, 91 S. Ct. at 2037-2038.

When analyzing the plain view exception, the Court should look at not only if the officer has a right to be in the area where he can see an item that is in plain view, but also whether the item is immediately apparent. Here, the items that officers reported to see an empty THC gummy container located on a second floor bannister and legally registered firearms located in a second-floor closet while doing a protective sweep of the house. First, the container was not empty and not immediately apparent, secondly, THC is legal in numerous states and Mrs. Everett actual has a medically issued prescription for THC. No question regarding where the container came from nor where the contents were located were asked to Mrs. Everett. Nor were any questions asked regarding the fire arms.

## III.  EXIGENT CIRCUMSTANCES EXCEPTION DOES NOT APPLY.

13

Under the exigent circumstance exception, a warrantless search is permitted when probable cause to search exists and officers reasonably believe that contraband or other evidence may be destroyed or removed before a search warrant could be obtained. Mincey v. Arizona, 437 U.S. 385 (1978). In Terry, the Court states that a warrantless search must be "strictly circumscribed by the exigencies which justify its initiation."

In the instant case, there were no exigent circumstances that required a warrantless search. None for the apartment, nor for Mr. Everett's home. There was an arrest warrant in place and the residence had been under surveillance for several hours before attempting to serve the arrest warrant. There was more than enough time to properly apply for and receive search warrant. This was not the case, and there was no exigent circumstance in this case. The warrant was not applied for because until the illegal search there was no probable cause to apply for a valid search warrant.

## IV. THE PROTECTIVE SWEEP OF THE HOME WAS NOT REASONABLE.

The Fourth Amendment permits properly limited protective sweep in conjunction with in- home arrest when searching officer possesses

reasonable belief based on specific and articulable facts that area to be swept harbors individual posing a danger to those on arrest scene. Michigan v. Long, 463 U.S. 1032, 1049-1050, 103 S.Ct. 3469, 3480-3481, 77 L.Ed.2d 1201; Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889. Pp.1096-1100.

Here, Mr. Everett's home had been staked out for several hours. The officers knew exactly who was in the house and purposely waited until the in-home daycare closed and all of the kids and parents were off of the premises. They were aware of who was in the residence. They not only had surveillance of the front of the house, but also of the rear. In addition, Mr. Everett was confronted at his front door of his home and pushed back in the home where he was arrested. The arrest was made without incident. Mr. Everett did ask who the officers were because they walked in when he opened the door without immediately announcing themselves. After hearing the commotion, Mr. Everett's wife came down stairs. She was questioned about who was in the home. She let the officers know that other than herself, the only other people in the home were her and Mr. Everett's two small children, Ms. Latasha Sinkler, and the family dog. Ms. Sinkler was in a restroom downstairs.

The small children were upstairs with the dog. Mrs. Everett was instructed to call for Ms. Sinkler to come out of the restroom and then she was instructed to call for the children to come downstairs. She was not allowed to go up and get them. When they came down stairs they were not dressed. One officer then accompanied Ms. Sinkler, not Mrs. Everett upstairs to allow the children to dress. This was the first of three separate times that at least one officer went upstairs in the Everett home before a search warrant was issued.

After Mr. Everett had been transported away from the home by Fayetteville Police, Mrs. Everett was questioned about the security cameras in the home. She was asked where the control panel for the cameras was located and if she knew how to disable to them because some of the officer were "undercover" and neither them, nor their vehicles should not be recorded. She was told that if she did not comply, the footage would be seized anyway once a warrant was issued. Mrs. Everett let the officer know that she did not know how to disable the cameras, but that they were located in the upstairs bedroom closet. The officer then insisted, that Mrs. Everett take him to the control panel and he would show her how to disable the cameras. This was the second

time that the officers traveled to the second level of the house with no warrant. Post Mr. Everett's transport to the police station an officer asked Mrs. Everett to open the garage to ensure that no one was in the garage. Because she no longer had her keys she was forced to walk out in the rain and open it from the outside with a code. When she arrived back in the house she was soak and wet from the rain. When she asked to go change into dry clothes she was told that she could not go to her room alone and an officer went upstairs with her while she changed. That was the third time that an officer entered the second level of the home without a warrant having been issued.

In <u>Buie</u>, the Court is clear on the protective sweep standard. The Court stated "[w]e conclude that by requiring a protective sweep to be justified by probable cause to believe that a serious and demonstrable potentiality for danger existed, the Court of Appeals of Maryland applied an unnecessarily strict Fourth Amendment standard." <u>Maryland v. Buie</u>, 110 S.Ct. 1093 (1990). In this case the protective sweep did not take place until Mr. Everett was removed from the home. The officers were already aware of who was in the house and did not believe that they were in any danger. The Court goes on to say "[t]he

Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. Again, here the arrestee was immediately handcuffed, his wife immediately came down stairs where Ms. Sinkler, who had been working in the in-home daycare was located. She immediately made the officers aware that her two small children and a dog were located upstairs. Officers were in the house for several minutes, even hours before beginning what they are calling a protective sweep.

## CONCLUSION

Wherefore, for the reasons set forth above, Mr. Everett respectfully requests that the Court enter an order suppressing all evidence in this case, and any derivative statements and evidence, obtained as a result of the illegal search and seizure on July 17, 2018. In the alternative, Mr. Everett requests an evidentiary hearing.

Renorda E. Pryor
/s/Renorda E. Pryor
1821 Hillandale Road, Ste 1B-220
Durham, NC 27705
Phone:  (919) 355-5001
Fax:       (919) 355-4976
rpryor@herringlawcenter.net
N.C. State Bar No. 36814
L.R.57.1(d) Counsel


**The Young Law Firm, PLLC**
/s/ Christopher M. Young
D.C. Bar No: 1003301
700 12th Street NW, Ste 700
Washington, D.C. 20005
Phone:  (202) 870-1191
Fax:       (202) 478-2119
cyoung@theylf.com
Retained

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the following was served upon:

> Scott A. Lemmon
> Assistant U.S. Attorney
> 150 Fayetteville Street, Ste 2100
> Raleigh, NC 27601

By electronically filing the foregoing with the clerk of court using the CM/ECF system which will send notification of such filing to the above email.

This the 30th day of November, 2020.

**The Young Law Firm, PLLC**

/s/ Christopher M. Young

D.C. Bar No: 1003301

700 12th Street NW, Ste 700

Washington, D.C. 20005

Phone:  (202) 870-1191

Fax:       (202) 478-2119

cyoung@theylf.com

Retained

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

CASE NO. 5:20-CR-333-D-1

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RESHOD JAMAR EVERETT<br>a/k/a "Kool"<br>a/k/a "Kool-Aid" | **RESPONSE TO MOTION TO**<br>**SUPPRESS EVIDENCE** |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, responds in opposition to the Defendant's Motion to Suppress Evidence. (D.E. 66).

SUMMARY

The Defendant asks the Court to suppress the fruits of a search warrant at his residence on July 17, 2018. The Defendant argues that the search warrant affidavit is tainted because it includes descriptions of evidence that officers observed in plain view during a protective sweep of the residence.

The Defendant's Motion should be denied. The officers acted properly when, to ensure officer safety, they conducted a protective sweep of the residence as they arrested the Defendant pursuant to valid arrest warrants. The officers then applied for a warrant to search the residence, and the affidavit properly included descriptions of items that were seen, in plain view, during the protective sweep.

Even assuming *arguendo* that the sweep was improper, the Defendant's motion should be denied because after removing the references to the evidence that

was observed in plain view, the affidavit still would have contained probable cause to support the issuance of the warrant. And in any event, suppression would not be justified because the officers acted reasonably and in good faith, and suppression would not serve any deterrence purpose.

## PROCEDURAL BACKGROUND

On July 8, 2020, the grand jury for the Eastern District of North Carolina issued an indictment charging Reshod Everett ("the Defendant") with Conspiracy to Distribute and Possess with Intent to Distribute 1,000 Kilograms or More of Marijuana and 5 Kilograms or More of Cocaine, in violation of Title 21, United States Code § 846 (Count One); Possession with Intent to Distribute a Quantity of Marijuana and a Quantity of Cocaine, in violation of Title 21, United States Code § 841(a)(1) (Count Four); Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of Title 18, United States Code § 924(c) (Count Five); and Possession with Intent to Distribute a Quantity of Tramadol, in violation of Title 21, United States Code § 841(a)(1) (Count Six). (D.E. 1). Co-conspirator Alvin Davis was also charged in three counts. (D.E. 1).

On November 30, 2020, the Defendant filed the instant Motion to Suppress evidence. (D.E. 66).

## STATEMENT OF FACTS

Over the course of several months in 2018, members of the Fayetteville Police Department gathered evidence that the Defendant was a large-scale drug trafficker.

2

Officers also determined that the Defendant and members of his drug trafficking organization regularly possessed firearms in furtherance of those crimes.

On March 5, 2018, agents executed a search warrant at 7000 Medway Court, Fayetteville, and seized 275 pounds of marijuana, 800 grams of alprazolam, $22,727, and nine firearms. The residence belonged to a co-conspirator of the Defendant named Edmund Cyrill Grant, Jr. An individual present at that location would later become a cooperating defendant ("Cooperating Defendant 1" or "CD-1").

On June 12, 2018, agents executed a search warrant at 5179 Back Street, Fayetteville, and agents seized marijuana, $19,831, and five firearms. CD-1 was present that day as well. CD-1 stated that the Defendant was his source of supply, and that the Defendant distributed drugs from the Addison Ridge Apartments in Fayetteville (715 Middle Bridge Road).

Agents had also received multiple complaints regarding the Defendant's suspected drug activities at that apartment complex. It was determined that the Defendant was using Apartment 5 at 715 Middle Bridge Drive.

On July 16, 2018, agents saw two males carrying bags from vehicles to the apartment, and those males were believed to be the Defendant and Alvin Davis. Agents conducted a traffic stop of Davis as he drove away from that apartment. A drug canine alerted to the vehicle. Agents searched the vehicle and found a black backpack and plastic grocery bag in the passenger floorboard. In the backpack, officers seized 236 grams of suspected marijuana, 3 grams of suspected cocaine, a digital scale, and plastic baggies. In the plastic grocery bag, officers sized a loaded

.380 caliber Smith and Wesson Bodyguard handgun. In the driver's side door, officer seized two .380 caliber handgun magazines and three cellphones.

Agents then obtained a search warrant for Apartment 5 at 715 Middle Bridge Drive, which officers were able to enter using keys in Davis's possession. In the kitchen, agents seized suspected marijuana, digital scales, and vacuum sealed bags. In a safe in the Defendant's bedroom, agents seized almost half a kilogram of suspected cocaine, 37 pounds of suspected marijuana, more than $5,000 in United States currency, and a loaded 9mm CZ Scorpion firearm. Agents also seized various packaging materials and storage totes.

Officers sought and obtained arrest warrants for the Defendant for various offenses, including trafficking in cocaine, trafficking in marijuana, maintaining a dwelling for the purpose of distributing controlled substances, and conspiracy to traffic in cocaine and marijuana.

On July 17, 2018, officers began conducting surveillance of the Defendant's residence—1080 Ronald Reagan Drive, Fayetteville—in order to arrest the Defendant pursuant to the arrest warrants. Agents saw the Defendant's vehicle, a 2017 Chevrolet Silverado, parked in the back yard of the residence. Officers also observed the Defendant in the area of the house, including in the back yard.

During the surveillance, officers determined that the Defendant's wife, Victoria Everett, was also operating a daycare at the residence called "Tori's Playhouse." Children could be heard playing in the backyard of the residence, and a tall swing set could be observed in the back yard. Officers believed there were likely

4

children at the house, but it was unclear how many individuals were inside the house. Because Victoria Everett ran the daycare, officers believed she was inside the residence with the Defendant.

To ensure there were no children inside the house, the officers waited until after the daycare's hours of operation had ended. At approximately 7:31 p.m., Detective Neil Budden knocked on the front door of the residence. The Defendant answered the door and was placed under arrest. To ensure officer safety, officers conducted a brief protective sweep of the residence. During that sweep, Detective Neil Budden saw suspected tetrahydrocannabinol ("THC") gummy container in plain view, and they were consistent with THC gummy container found during the search the day before at 715-5 Middle Bridge Drive.

The label on the bottle of gummies stated, "CONTAINS MARIJUANA. KEEP OUT OF REACH OF CHI[LDREN]." It also stated, "10mg THC PER PIECE" and "100mg THC PER BOTTLE."



5

As the Defendant concedes, officers determined that the following individuals were inside the house: Victoria Everett; two small children; and Latasha Sinkler. *See* (D.E. 66 at 15).

Additionally, Detective Chase Robinson[1] had observed security cameras at various locations around the house, and he believed the cameras also posed a safety risk for officers. Specifically, based on his training and experience, Det. Robinson was aware that the Defendant was a high-level drug trafficker who posed a more serious threat than a street-level drug trafficker. Det. Robinson was concerned that co-conspirators of the Defendant might be able to view a live stream from the cameras, which would show precise locations of officers inside the house. He was also concerned that it would take several hours for Det. Budden to apply for and obtain a search warrant for the residence, providing a lengthy period when co-conspirators could make use of a live video feed. Finally, several of the officers on scene sometimes operated in an undercover capacity, and so video of those officers could compromise their safety in the future. For those reasons, Det. Robinson asked Victoria Everett to turn off the cameras. Det. Robinson and Victoria Everett went to a closet where Victoria Everett turned off the cameras, and Det. Robinson saw two firearms in that closet.

Det. Budden then applied for a warrant authorizing the search of 1080 Ronald Reagan Drive. *See* Exhibit A. The affidavit provided a detailed description of the "2

---

[1]    In 2018, Chase Robinson was a Detective in the Gang Unit of the Fayetteville Police Department. His is now a Police Specialist.

month long controlled substance investigation" into the Defendant and his co-conspirators. *Id.* at 4. The affidavit described:

- that officers had identified Apartment 5 at 715 Middle Bridge Drive as a location used by the Defendant;

- that the Defendant and Alvin Davis had been seen carrying duffle bags from their vehicles to the apartment, and that citizens had detected an odor of marijuana from that apartment and from the vehicles;

- that officers executed a search warrant of Apartment 5 on July 16, 2018, yielding the seizure of marijuana, cocaine, more than $5,000, packaging materials, digital scales, and two firearms;

- that officers had determined that the Defendant's primary residence was 1080 Ronald Reagan Drive, and that Apartment 5 of 715 Middle Bridge Drive had been only a "stash house";

- that this determination was made based on documents seized from Apartment 5, specifically, service paperwork for the Defendant's 2017 Chevrolet Silverado listing an address of 1080 Ronald Reagan Drive;

- that a query with the Public Works Commission showed that the Defendant's name was listed on the utility bill for 1080 Ronald Reagan Drive;

- that arrest warrants had been issued for the Defendant for drug trafficking offenses;

- that during surveillance on July 17, 2018, the Defendant's vehicle had been observed in the back yard of 1080 Ronald Reagan Drive, and that parking in the back yard was a "common tactic used by drug traffickers to prevent the public and the police from knowing when they're home";

- that during surveillance, the Defendant had been observed in the back yard of 1080 Ronald Reagan Drive smoking a cigarette;

- that during surveillance, officers saw that the residence had "security cameras covering all angles and sides of the residence, another tactic used by those engaged in high end drug activity";

- that the Defendant was arrested pursuant to warrants when he answered the door to the residence;

- that "[f]or the safety of everyone on scene, a security sweep was conducted at the residence to confirm no one was hiding in the residence and posed a threat";

- that during the security sweep, officers saw suspected THC gummies in plain view and two loaded rifles on a shelf in the bedroom closet in close proximity to the Defendant's bed, which Det. Budden knew to be a tactic "commonly used by those engaged in controlled substance activity for protection"; and

- that Det. Budden believed that the Defendant was a "high level dealer in a large drug trafficking organization," and that a search of 1080 Ronald Reagan Drive would yield evidence of that drug trafficking activity.

*Id.* at 4–5.

The warrant was issued. *Id.* at 1. During the search, agents seized eight loaded firearms and the THC gummy container. In a storage shed, agents seized storage totes that matched storage totes found at the apartment the prior day; tramadol; drug packaging materials; 381 grams of THC wax; marijuana residue; $65,000 in U.S. currency; and financial documents, which led to the seizure of an additional $70,000.

Agents also seized documents listing a storage unit in the name of Ms. Sinkler. Ms. Sinkler confirmed that she had a key to the storage unit, and that the Defendant had gone to the storage unit on Monday or Tuesday.

On July 18, 2018, agents executed a warrant at the storage unit and seized 67 pounds of marijuana, as well as storage totes matching the totes found at 1080 Ronald Reagan Drive and the apartment.

## ARGUMENT

The Court should deny the Defendant's motion to suppress. The officers properly encountered the Defendant at his doorway and arrested him pursuant to

8

JA68

arrest warrants. At the time of the arrest, the officers permissibly conducted a protective sweep of the residence to ensure the officers' safety.

Even assuming *arguendo* that the protective sweep was improper, the Court should deny the motion because the incriminating items would have been inevitably discovered after investigators secured the valid search warrant.

I.  <u>The Officers Properly Conducted a Protective Sweep of the Defendant's Residence While Arresting the Defendant Pursuant to Warrants.</u>

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It is a 'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.' " *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). Nonetheless, this "presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is 'reasonableness.' " *Kentucky v. King*, 563 U.S. 452 (2011) (internal quotation marks and alteration omitted).

A.  <u>The Arrest of the Defendant was Lawful.</u>

As the Defendant appears to concede, *see* (D.E. 66), officers acted lawfully when they arrested the Defendant pursuant to valid arrest warrants.

"[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980). An entry is lawful if (1) there is reason to believe that the location is the defendant's

residence, and (2) there is a "reasonable belief" that the defendant would be home. *United States v. Hill*, 649 F.3d 258, 262 (4th Cir. 2011) (citing cases). "If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law." *Maryland v. Buie*, 494 U.S. 325, 330 (1990) (*quoting Payton*, 445 U.S. at 602–603).

In this case, the Defendant does not challenge the issuance of the arrest warrants or his arrest, nor could he. Officers gathered a variety of evidence demonstrating that 1080 Reagan Drive was the Defendant's residence, including (1) documents found at 715-5 Middle Bridge Drive listing the Reagan Drive address and the Defendant's name, (2) a query showing that the utilities for 1080 Reagan Drive were in the Defendant's name, and (3) surveillance of the Defendant's truck parked in the back yard of the residence. Officers also had reason to believe that the Defendant was at 1080 Reagan Drive on July 17, 2018 because they saw him smoking a cigarette in the back yard that day. Officers knocked on the door, and when the Defendant opened the door, he was properly placed under arrest.

B.    <u>Incident to the Defendant's Arrest, the Officers Properly Conducted A
       Protective Sweep of the Residence to Ensure Their Safety</u>.

When police officers make an arrest at a home, they are entitled to perform a further "protective sweep" of the house when they have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an

10

individual posing a danger to those on the arrest scene." *United States v. Laudermilt*, 677 F.3d 605, 610 (4th Cir. 2012) (quoting *Buie*, 494 U.S. at 334).

"[A]s an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 335.

Officers are also permitted to "tak[e] steps to assure themselves that the persons with whom they were dealing were not armed with, or able to gain immediate control of, a weapon that could unexpectedly and fatally be used against them." *Id.* at 333. During an arrest at a defendant's home, officers are permitted to "assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Id.*

Notably, "the risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter." *Id.* "[U]nlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." *Id.*

The protective sweep may not be a "full search of the premises"; it may last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event

11

no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–336.

Notably, "[w]ith respect to officer safety, . . . the protection of police officers is of particular concern in cases" involving firearms and drugs. *United States v. Watson*, 703 F.3d 684, 693 (4th Cir. 2013). *See also Mora v. City of Gaithersburg*, 519 F.3d 216, 226 (4th Cir. 2008) (upholding a preventive search when officers "did not and could not fully know the dimensions of the threat they faced").

Here, at the time of the Defendant's arrest, the protective sweep was justified. Agents had received information that the Defendant was a large-scale drug trafficker. Agents had also determined that the Defendant's drug trafficking organization was armed, since the agents had seized more than a dozen firearms from co-conspirators. Additionally, agents had determined that the Defendant himself was an armed drug trafficker: on July 16, 2018, they seized cocaine, marijuana, currency, and a loaded firearm from a safe in the Defendant's bedroom.

On July 17, 2018, agents also had ample reason to believe that more than one person may have been present at the Defendant's residence. Agents had seen the Defendant at the house that day. Agents also believed there were children present at the house, and that they were being cared for at the house by Victoria Everett. Because the Defendant had a large network of co-conspirators, it was also possible that another individual could have been inside the house.

To ensure officer safety, officers conducted the brief protective sweep of the residence as they arrested the Defendant pursuant to valid warrants. During that

12

sweep, they saw the THC gummy container and the firearms. Officers then sought and obtained a warrant to search the house. The officers' actions were entirely appropriate.

The Defendant, in contrast, claims that the officers violated the Defendant's Fourth Amendment rights, and the Defendant relies heavily on *Chimel v. California*, 395 U.S. 752 (1969). *See* (D.E. 66 at 10–11). But as the *Buie* court explained, the *Chimel* case is inapposite. *Buie*, 494 U.S. at 336. *Chimel* evaluated "a full-blown search of the entire house for evidence of the crime for which the arrest was made, . . . not the more limited intrusion contemplated by a protective sweep." *Id.* Additionally, the *Chimel* case addressed the potential threat posed by the *arrestee*, "not the safety threat posed by the house, or more properly by unseen third parties in the house." *Id.* As a result, the *Buie* case controls, and it makes clear that the brief protective sweep of 1080 Reagan Drive was entirely lawful.

The Defendant also suggests that officers first encountered the Defendant outside of his house, and that as a result, officers were not permitted to conduct a protective sweep inside the house. (D.E. 66 at 12). The Defendant does not cite any cases in support of that proposition. In fact, the Fourth Circuit has reached the opposite conclusion: it has upheld protective sweeps to ensure officer safety even when the arrest of the defendant occurred outside the residence. *See, e.g.*, *Laudermilt*, 677 F.3d at 611 n.2 ("The fact that [the defendant] was arrested outside the home does not affect the protective sweep analysis.") (citing *United States v. Jones*, 667 F.3d 477, 485 n.10 (4th Cir. 2012)). Similarly, in *Jones*, the Fourth Circuit upheld a

protective sweep of a residence where the arrest occurred around the doorway of the residence, reasoning that "the protective sweep conducted in this case was permissible, even if we were to assume that Mr. Jones was outside the front door when he was arrested." *See Jones*, 667 F.3d at 485 n.10. *Laudermilt* and *Jones* are directly on point, and the protective sweep in this case was justified whether the Defendant was encountered just inside or just outside the doorway of his residence.

For these reasons, the protective sweep of the residence was proper, and the Defendant's motion to suppress should be denied.

II.   <u>The THC Gummy Container and the Firearms Were in Plain View</u>.

The Defendant also claims that the THC gummy container and the firearms do not fall under the "plain view" rule because the incriminating nature of the items was not "immediately apparent." (D.E. 66 at 13) (citing *Coolidge v. New Hampshire*, 403 U.S. 443 (1971)). In support of this claim, the Defendant states: "THC is legal in numerous states and Mrs. Everett actual [sic] has a medically issued prescription for THC." (D.E. 66 at 13). As to the firearms, the Defendant says only that no "questions [were] asked" about them. *Id.*

The Defendant misapprehends the *Coolidge* case, which he relies upon. The *Coolidge* case stands for the proposition that officers may conduct a *warrantless seizure* of contraband if (1) the contraband is in "plain view" and (2) if the incriminating nature of the contraband is "immediately apparent." *Coolidge*, 403 U.S. at 466–68.

14

But here, the officers did not seize any items without a warrant. Instead, the officers properly conducted a protective sweep, observed the THC gummy container and the firearms, and described those items in an affidavit supporting an application for a search warrant. This was entirely proper. As the Supreme Court has explained, "if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment — or at least no search independent of the initial intrusion that gave the officers their vantage point." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

Even if the Defendant's standard were the correct one, the incriminating nature of the items was "immediately apparent." Although THC gummy container may have been legal in "numerous states" on July 17, 2018, they were not legal in North Carolina or under federal law on that date, nor are they legal today. *See* N.C. Gen. Stat. § 90-94(a) (classifying marijuana and tetrahydrocannabinols as a Schedule VI controlled substance under state law). Additionally, it is illegal under North Carolina law to possess a controlled substance. *See* N.C. Gen. Stat. § 90-95(a)(3). Finally, even if Victoria Everett did possess a prescription authorizing her possession of the THC gummies, North Carolina law does not authorize prescriptions for marijuana or tetrahydrocannabinols, nor does it recognize prescriptions for marijuana or tetrahydrocannabinols that are issued by other states.

As to the firearms, it is well established that firearms are tools of the drug trade, and drug traffickers regularly possess firearms to protect their drugs and their

15

**JA75**

drug proceeds. *See United States v. Kennedy*, 32 F.3d 876, 882 (4th Cir. 1994) ("[T]he law has uniformly recognized that substantial dealers in narcotics possess firearms. . . ." (internal quotation marks omitted)). Additionally, it is a crime to possess firearms in furtherance of a drug trafficking crime. 18 U.S.C. § 924(c)(1)(A).

In summary, the THC gummies and firearms were in plain view of officers from lawful vantage points, and so these observations were not "searches" under the Fourth Amendment. *Dickerson*, 508 U.S. at 375. Additionally, the officers did not immediately seize those items, and so there was no requirement that the incriminating nature of the objects be "immediately apparent." *Coolidge*, 403 U.S. at 466–68. But if that were a requirement, the incriminating nature of the THC gummy container and the firearms was immediately apparent based on the two-month investigation into the Defendant, as well as the officers' training and experience.

III.   <u>The Evidence Should not be Suppressed Because it Would Have Been Inevitably Discovered.</u>

Even assuming *arguendo* that the protective sweep of the Defendant's residence was improper, the Court should not suppress the evidence because the officers still would have obtained the search warrant, and so the challenged evidence would have been inevitably discovered.

The Fourth Circuit has held:

> [T]he inevitable discovery rule may be applied even though the evidence validly obtained under a search warrant was previously uncovered in an illegal search. Stated otherwise, where it appears that evidence 'inevitably would have been discovered by lawful means,' the deterrence rationale of the exclusionary rule has 'so little basis' that the rule should not be applied.

16

**JA76**

*United States v. Whitehorn*, 813 F.2d 646, 650 (4th Cir. 1987) (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984). Therefore, there is no need to exclude evidence if a search warrant is partially based on evidence discovered prematurely if, "excluding the illegally obtained information, probable cause for the issuance of the warrant could still be found." *United States v. Apple*, 915 F.2d 899, 910 (4th Cir. 1990); *Whitehorn*, 813 F.2d at 649; *see also United States v. Giordano*, 416 U.S. 505, 555 (1974) ("The ultimate inquiry on a motion to suppress evidence seized pursuant to a warrant is not whether the underlying affidavit contained allegations based on illegally obtained evidence, but whether, putting aside all tainted allegations, the independent and lawful information stated in the affidavit suffices to show probable cause.") (Powell, J., dissenting in part and concurring in part).

Here, the officers sought and obtained a valid warrant to search the Defendant's residence. The affidavit did not rely solely on the items that were seen during the protective sweep of the Defendant's residence. Instead, the affidavit described: the two-month investigation into the Defendant's drug trafficking; witnesses' information regarding the Defendant's marijuana trafficking at the 715 Middle Bridge Drive apartments; the marijuana, cocaine, firearms, and currency seized during the arrest of co-conspirator Alvin Davis and the execution of a search warrant at 715-5 Middle Bridge Drive; the identification of 1080 Ronald Reagan Drive as the Defendant's primary residence based on documents found in 715-5 Middle Bridge Drive; the confirmation of that residence based on a query to a utility company; the issuance of arrest warrants against the Defendant; surveillance of the

17

Defendant's vehicle parked in the back yard of 1080 Ronald Reagan Drive, which Det. Budden knew was "a common tactic used by drug traffickers to prevent the public and the police from knowing when they're home"; and surveillance of security cameras "covering all angles and sides of the residence, another tactic used by those engaged in high end drug trafficking activity." *See* Exhibit A, 3–4.

In short, the fact that the affidavit for the search warrant referenced some items observed in plain view during the protective sweep is not fatal to the warrant's validity. *Apple*, 915 F.2d at 910. Even if the information learned during the protective sweep was removed, the affidavit would have had more than sufficient probable cause to justify the issuance of the warrant. Accordingly, even if the protective sweep was improper, the Court should deny the Defendant's motion under the inevitable discovery doctrine.

IV.    <u>Even If a Fourth Amendment Violation Occurred, Suppression Would Not Be an Appropriate Remedy.</u>

Finally, even if the protective sweep were somehow improper, blanket suppression of all items seized pursuant to the search warrant would not be an appropriate remedy because at all times, the officers acted reasonably and in good faith.

Suppression is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States v. Leon*, 486 U.S. 897, 909 (1984) (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). "[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or

18

in some circumstances recurring or systemic negligence." *Herring v. United States*, 555 U.S. 135, 144 (2009). Central to the question of suppression is "the culpability of the law enforcement conduct." *Id.* at 143. "[E]vidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.' " *Illinois v. Krull*, 480 U.S. 340, 348–49 (1987) (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975)). Suppression "applies only where it 'result[s] in appreciable deterrence.' " *Herring*, 555 U.S. at 141, 129 S.Ct. 695 (quoting *Leon*, 468 U.S. at 909).

> In *Leon*, the Supreme Court explained the limits of the good faith exception:
>
> Suppression . . . remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. The [good faith] exception . . . will also not apply in cases where the issuing magistrate wholly abandoned his judicial role. . . . Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient . . . that the executing officers cannot reasonably presume it to be valid.

468 U.S. at 923 (citations omitted). The Defendant does not allege that any of these situations is present in this case, nor could he. In fact, the officers conducted a careful, multi-month investigation; they obtained warrants prior to arresting the Defendant; they took precautions to protect the safety of the children at the Defendant's house; they conducted a protective sweep to ensure the safety of the officers; and they obtained warrants for every location that they searched in this case, including 1080 Ronald Reagan Drive. The officers should be commended for their efforts. Even

19

assuming *arguendo* that some technical violation occurred, suppression would not be an appropriate remedy in this case because it would not serve the purpose of the remedy of suppression: deterring "deliberate, reckless, or grossly negligent conduct." *Herring*, 555 U.S. at 144 (2009).

<u>CONCLUSION</u>

The officers acted appropriately in arresting the Defendant and conducting a protective sweep of the Defendant's residence to ensure officer safety. Even if the protective sweep were improper, the evidence would have been inevitably discovered during execution of the valid search warrant. In any event, suppression would be an inappropriate remedy in this case. This Court should therefore deny the Defendant's Motion.

Respectfully submitted this 23rd day of December, 2020.

ROBERT J. HIGDON, JR.
United States Attorney

BY:    /s/ Scott A. Lemmon
SCOTT A. LEMMON
Assistant United States Attorney
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
Ph. (919) 856-4530
Fax: (919) 856-4487
E-mail: scott.lemmon@usdoj.gov

20

<u>CERTIFICATE OF SERVICE</u>

This certifies that a copy of this motion has, this 23rd day of December, 2020,

been served upon the defendant by CM/ECF as follows:

Christopher M. Young
The Young Law Firm, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
202-870-1191
Fax: 202-478-2119
Email: cyoung@theylf.com

Renorda E. Pryor
Herring Law Center PLLC
1821 Hillandale Road
Suite 1B-220
Durham, NC 27705
919-355-5001
Email: rpryor@herringlawcenter.net


BY:     /s/ Scott A. Lemmon
        SCOTT A. LEMMON
        Assistant United States Attorney
        150 Fayetteville Street, Suite 2100
        Raleigh, North Carolina 27601
        Ph. (919) 856-4530
        Fax: (919) 856-4487
        E-mail: scott.lemmon@usdoj.gov

21

| | |
|---|---|
| File No. | **STATE OF NORTH CAROLINA** |

**SEARCH WARRANT**

_Cumberland_ County    In The General Court Of Justice
District/Superior Court Division

**IN THE MATTER OF**

1080 Ronald Reagan Drive Fayetteville, NC 28311

| Date Issued | Time Issued | |
|---|---|---|
| 7/17/2018 | 7:09 | ☐ AM ☒ PM |

Name Of Applicant
Detective N. Padden #219

Name Of Additional Affiant

To any officer with authority and jurisdiction to conduct the search authorized by this Search Warrant:

I, the undersigned, find that there is probable cause to believe that the property and person described in the application on the reverse side and related to the commission of a crime is located as described in the application.

You are commanded to search the premises, vehicle, person and other place or item described in the application for the property and person in question. If the property and/or person are found, make the seizure and keep the property subject to Court Order and process the person according to law.

You are directed to execute this Search Warrant within forty-eight (48) hours from the time indicated on this Warrant and make due return to the Clerk of the Issuing Court.

This Search Warrant is issued upon information furnished under oath or affirmation by the person(s) shown.

**RETURN OF SERVICE**

I certify that this Search Warrant was received and executed as follows:

| Date Received | Time Received | |
|---|---|---|
| 7/17/2018 | 9:09 | ☐ AM ☒ PM |

| Date Executed | Time Executed | |
|---|---|---|
| 7/17/2018 | 9:38 | ☐ AM ☒ PM |

☒ I made a search of 1080 Ronald Reagan Dr. Fayetteville, NC

☒ I seized the items listed on the attached _____ as commanded.

inventory.

☐ I did not seize any items.

☐ This Warrant WAS NOT executed within forty-eight (48) hours of the date and time of issuance and I hereby return it not executed.

Name Of Officer Making Return (type or print)
N. Padden

Department Of Agency Of Officer
Fayetteville Police Dept.

Incident Number
2018-018279

| Date | Time | |
|---|---|---|
| 7/17/18 | | ☐ AM ☐ PM |

Name (type or print)
M. Crenshaw

☐ Deputy CSC ☐ Assistant CSC ☐ CSC ☒ Magistrate ☐ District Ct. Judge ☐ Superior Ct. Judge

Signature
M. Crenshaw

**NOTE:** When issuing a search warrant, the issuing official must retain a copy of the warrant and warrant application and must promptly file them with the clerk. G.S. 15A-245(b).

This Search Warrant was delivered to me on the date and at the time shown below when the Office of the Clerk of Superior Court is closed for the transaction of business. By signing below, I certify that I will deliver this Search Warrant to the Office of the Clerk of Superior Court as soon as possible on the Clerk's next business day.

| Date | Time | |
|---|---|---|
| | | ☐ AM ☐ PM |

Name Of Magistrate (type or print)

Signature Of Magistrate

This Search Warrant was returned to the undersigned clerk on the date and time shown below.

| Date | Time | |
|---|---|---|
| 7-20-18 | 3:15 | ☐ AM ☒ PM |

Name Of Clerk (type or print)
Deborah K Kuhn

Signature Of Clerk
Deborah K Kuhn

☐ Dep. CSC ☐ Asst. CSC ☒ CSC

Signature Of Officer Making Return (type or print)
N. Padden

AOC-CR-119, Rev. 3/17
© 2017 Administrative Office of the Courts

Original - File.   Copy - For Search of a Person, to Person from Whom Items Taken;
     If No Such Person Present, Leave Copy Affixed Thereon
Copy - For Search of Vehicle/Premises; to Owner or Person In Apparent Control; If No Such Person Present, Leave Copy Affixed Thereon

(Over)

177

**JA82**

# APPLICATION FOR SEARCH WARRANT

I, Detective N. Budden #219, Fayetteville Police Department

*(Insert name and address; or if law enforcement officer, name, rank and agency)*

being duly sworn, request that the Court issue a warrant to search the person, place, vehicle, and other items described in this application and to find and seize the property and person described in this application. There is probable cause to believe that *(Describe property to be seized; or if search warrant is to be used for searching a place to serve an arrest warrant or other process, name person to be arrested)*

Any substance under the North Carolina Controlled Substance Act, firearms.

constitutes evidence of a crime and the identity of a person participating in a crime, *(Name, crime)* Any violation of the North Carolina Controlled substance act

and is located *(Check appropriate box(es) and fill in specified information)*

☒ in the following premises *(Give address and, if useful, describe premises)*
See attached affidavit

*(and)*
☒ on the following person(s) *(Give name(s) and, if useful, describe person(s))*
See attached affidavit

*(and)*
☒ in the following vehicle(s) *(Describe vehicle(s))*
See attached affidavit

AOC-CR-119, Side Two, Rev. 3/17
© 2017 Administrative Office of the Courts

---

*(and)* *(Name and/or describe other places or items to be searched, if applicable)*
☒ See attached affidavit

The applicant swears or affirms to the following facts to establish probable cause for the issuance of a search warrant:
☒ See attached affidavit

SWORN/AFFIRMED AND SUBSCRIBED TO BEFORE ME                     Date  07/17/2018

| Date | Name of Applicant (type or print) |
|------|------------------------------------|
| 07/17/2018 | N. Budden |

| Signature | Signature Of Applicant |
| JM Crenshaw | N. Budden  219/6747 |

☐ Magistrate  ☐ Dep. CSC  ☐ Asst. CSC  ☐ Clerk Of Superior Court  ☐ Judge

☐ In addition to the affidavit included above, this application is supported by additional affidavits, attached, made by

☐ In addition to the affidavit included above, this application is supported by sworn testimony, given by

This testimony has been *(check appropriate box)*  ☐ reduced to writing
☐ tape recorded and I have filed each with the clerk.

NOTE: *If more space is needed for any section, continue the statement on an attached sheet of paper with a notation saying "See attachment." Date the continuation and include on it the signatures of applicant and issuing official.*

JA83

```
[    STATE OF NORTH CAROLINA    ]
[                               ]
[    COUNTY OF CUMBERLAND       ]            AFFIDAVIT
[                               ]
```

CONTINUATION OF A SEARCH WARRANT APPLICATION IN THE MATTER OF THE RESIDENCE
LOCATED AT 1080 RONALD REAGAN DRIVE FAYETTEVILLE, NORTH CAROLINA 28311

**Affidavit of N. Budden, Patrol Officer, Fayetteville Police Department, Fayetteville, North Carolina, in support of a Search Warrant for 1080 Ronald Reagan Dr. Fayetteville, North Carolina 28311**

    I, Neil D. Budden Jr., being duly sworn, states that I am a Law Enforcement Officer employed with the City of Fayetteville Police Department and have been for 6 ½ years. In May of 2010 I graduated from Curry College in Milton, Massachusetts with a Bachelors of Arts Degree in Criminal Justice. In July of 2011 I attended the Basic Law Enforcement Training (BLET) at the Fayetteville Police Department Training Center. During BLET I completed over seven hundred and fifty hours of training from certified police instructors. This training included classes on controlled substance law, methods of how controlled substances are bought, sold, packaged, distributed, transported, and techniques on how to effectively enforce the North Carolina Controlled Substance Laws. Upon graduating from the police academy I completed a 14 week field training program assigned to the Cross Creek patrol division. During the field-training program, new officers receive training from experienced Police Specialists. A portion of this training includes instruction on controlled substance activity at the street level. Upon successful completion of the field-training program, I was assigned as a uniformed patrol officer. As a patrol officer I have investigated felony and misdemeanor controlled substance violations. I am currently assigned to the Fayetteville Police Departments Gang unit, a unit whose mission is to investigate gang members or those individuals' associates with gangs. From February 2018 to May 2018 I was assigned to the Cross Creek District's Community Empowerment Response Team (CERT), which has, among many other tasks, a mission to investigate violent crime, including gang activity, narcotic activity, and weapons violations. While being assigned to the patrol division as a uniformed police officer my primary duty of the patrol division unit is the enforcement of the laws of North Carolina and to patrol assigned area to ensure the overall safety of the residents of that area. I have received training and have field experience in the operations of street level controlled substance investigation. From July 2015 to January 2018 I was assigned to the Fayetteville Police K-9 Team which is part of the Patrol Operations Support Bureau. As a K-9 handler I was certified through the International Police Work Dog Association. The primary responsibility of the Fayetteville Police Departments K-9 Unit is Patrol Operations, Narcotic Detection and Cadaver Recovery. To date, I have been involved in approximately 30 search warrant executions which resulted in felony and misdemeanor arrests for controlled substance related offenses. I am familiar with many types of controlled substances to include the ways they are manufactured, packaged, transported and sold. In March 2016 I graduated from the Police Law Institute Course through Wilson Community College. In March 2018 I attended a Basic Narcotics Investigations course through the Fayetteville Technical Community College.

I will now be referred to as Affiant.

SWORN AND SUBSCRIBED BEFORE ME THIS 17TH DAY OF JULY, 2018

_M. Crenshaw_

(X)MAGISTRATE
( )DISTRICT COURT JUDGE
( )SUPERIOR COURT JUDGE

_N. Budd_

AFFIANT

PAGE / of 5

[     STATE OF NORTH CAROLINA     ]
[                                 ]
[     COUNTY OF CUMBERLAND        ]          AFFIDAVIT
[                                 ]

CONTINUATION OF A SEARCH WARRANT APPLICATION IN THE MATTER OF THE RESIDENCE
LOCATED AT 1080 RONALD REAGAN DRIVE FAYETTEVILLE, NORTH CAROLINA 28311

- · On Monday July 16, 2018 the Fayetteville Police Department Gang Unit executed a search warrant at 715-5 Middle Bridge Road Fayetteville, NC 28303 as a result of a 2 month long controlled substance investigation. The residence was rented and occupied by Reshod Everett and Alvin Davis as a keeping place for controlled substances. Information provided by anonymous complainants within the apartment complex was that Reshod Everett and Alvin Davis had been seen on many occasions carrying duffle bags from their vehicles to the apartment and citizens detected the odor of marijuana coming from the vehicles and the apartment.

- As a result of the search warrant; 38 pounds of marijuana packaged in vacuum sealed bags was seized from the residence. Along with the marijuana was a half kilo of cocaine still in the brick form as it's packaged from top tier drug manufacturers and produced for resale on the street to lower level drug dealers. In addition to this, more than five thousand dollars in U.S. currency was seized from the residence and Alvin Davis's person when he was taken into custody; THC gummies, more than 110 empty vacuum sealed bags, packaging materials, digital scales as well as two firearms were seized.

- During the course of the investigation it was discovered that Reshod Everett had a primary address of 1080 Ronald Reagan Drive and was using the apartment on Middle Bridge Road as a "stash house", a safe place for keeping his narcotics away from his primary residence. During the search we found service paperwork inside the apartment for the 2017 Chevrolet Silverado pickup truck with an address for 1080 Ronald Reagan Drive. A check with the Public Works Commission (PWC) was conducted for 1080 Ronald Reagan Drive which showed Reshod Everett as name on the utility bill.

- On Tuesday July 17, 2018 Detective Cook obtained warrants on Reshod Everett for Trafficking in Marijuana x2, Trafficking in Cocaine x2, maintaining a residence, and felony conspiracy x2.

- On Tuesday July 17, 2018 a surveillance operation was conducted which began at approximately 1300 hours at 1080 Ronald Reagan Drive. Through the course of the surveillance Everett's wife, Victoria Everett, was observed coming home in a white 2013 Audi Q7 which is registered to Reshod Everett. Victoria Everett stayed at the residence for the duration of the afternoon into the night. Reshod Everett's white Chevrolet Silverado was observed parked in the back yard from the fire department parking lot behind the residence. The white Silverado is the primary vehicle to Reshod Everett and the only vehicle he has been seen driving by several citizens within the apartment complex at 715 Middle Bridge Road. It was believed that if the truck was at the residence, Reshod Everett would be there as well. Parking the vehicle in the back yard is a common tactic used by drug traffickers to prevent the public and the police from knowing when they're home. During the surveillance Reshod Everett was observed in the

SWORN AND SUBSCRIBED BEFORE ME THIS 17TH DAY OF JULY, 2018

Jn. Crenshaw
XMAGISTRATE
( )DISTRICT COURT JUDGE
( )SUPERIOR COURT JUDGE

N. Bd
AFFIANT

PAGE 2of5

[    STATE OF NORTH CAROLINA    ]
[                               ]
[    COUNTY OF CUMBERLAND       ]                    AFFIDAVIT
[                               ]

CONTINUATION OF A SEARCH WARRANT APPLICATION IN THE MATTER OF THE RESIDENCE
LOCATED AT 1080 RONALD REAGAN DRIVE FAYETTEVILLE, NORTH CAROLINA 28311

    back yard of the residence smoking a cigarette. Detectives conducting the surveillance
made note of security cameras covering all angles and sides of the residence, another
tactic used by those engaged in high end drug trafficking activity.

- At approximately 1930 hours members of the Fayetteville Police Department Gang Unit
and the Violent Criminal Apprehension Team (VCAT) made contact with Reshod Everett
at his residence at 1080 Ronald Reagan Drive and took him into custody on the
outstanding warrants without incident as he answered the front door. For the safety of
everyone on scene, a security sweep was conducted at the residence to confirm no one
was hiding in the residence and posed a threat. During the sweep of the residence
Detectives observed THC gummies in plain view and two loaded rifles on a shelf in the
bedroom closet in close proximity to Reshod Everett's bed. This tactic is commonly used
by those engaged in controlled substance activity for protection.

- Based on the search warrant executed at 715-5 Middle Bridge Road and the observations
made at 1080 Ronald Reagan Drive the Affiant believes Reshod Everett is a high level
dealer in a large drug trafficking organization in Fayetteville and Cumberland County,
North Carolina and further evidence to corroborate will be found at 1080 Ronald Reagan
Drive.

Based on the totality of these observations the Affiant prays the Administration of Justice grants
a search warrant on 1080 Ronald Reagan Drive Fayetteville, North Carolina and that any
vehicles located at this residence to be seized for any additional evidence of controlled substance
activity and distribution.

CONTINUATION OF PREMISES TO BE SEARCHED.......

A gray stone, blue and grey vinyl siding two story single family residence with the numbers
1080 clearly marked above the garage. Black shingles on the roof and a white 6-foot privacy
fence enclosing the back yard of the residence.

CONTINUATION OF VEHICLE(S) TO BE SEARCHED........

All vehicles located at the residence or associated with residents of 1080 Ronald Reagan Drive
Fayetteville, North Carolina within the curtilage during the execution of this warrant that may
contain the evidence sought within this affidavit. To include:

White 2017 Chevrolet Silverado HV7529 / North Carolina
White 2013 Audi Q7 Prestige SUV PAA6122 / North Carolina
White 2017 Chevrolet Tahoe SUV ZZT6680 / North Carolina

SWORN AND SUBSCRIBED BEFORE ME THIS 17TH DAY OF JULY, 2018

_M. Cunshaw_                          _N. Bde_
(X)MAGISTRATE                          AFFIANT                          PAGE 3 of 5
( )DISTRICT COURT JUDGE
( )SUPERIOR COURT JUDGE

[    STATE OF NORTH CAROLINA    ]
[                                            ]
[    COUNTY OF CUMBERLAND    ]                    AFFIDAVIT
[                                            ]
CONTINUATION OF A SEARCH WARRANT APPLICATION IN THE MATTER OF THE RESIDENCE
LOCATED AT 1080 RONALD REAGAN DRIVE FAYETTEVILLE, NORTH CAROLINA 28311

CONTINUATION OF ITEMS TO BE SEIZED........

Any controlled substances, chemicals used in the manufacturing of the controlled substances, items that tend to show ownership, dominion or control of the premises, records of illegal drug activity, documents photographs, drug paraphernalia, money, pagers, cellular telephones containing electronic data, firearms, which facilitate the manufacturing, distribution, and selling of controlled substances. Along with any item that may have been stolen and traded in exchange for the controlled substance in place of currency.

CONTINUATION OF PERSONS TO BE SEARCHED.......

All persons located at the residence or associated with residents of 1080 Ronald Reagan Drive Fayetteville, North Carolina within the curtilage during the execution of this warrant that may contain the evidence sought within this affidavit. To include:

Reshod Everett B/M ███████
Victoria Everett B/F ███████

CONTINUATION OF WHAT CONSTITUTES A CRIME......

PWIS&D G.S. 90-95, MANUFACTURING G.S. 90-95, MAINTAIN A DWELLING G.S. 90-108,

SWORN AND SUBSCRIBED BEFORE ME THIS 17TH DAY OF JULY, 2018

_M. Crenshaw_
ⓧMAGISTRATE
( )DISTRICT COURT JUDGE
( )SUPERIOR COURT JUDGE

_____
AFFIANT

PAGE4 of 5

[    STATE OF NORTH CAROLINA    ]
[                               ]
[    COUNTY OF CUMBERLAND       ]                    AFFIDAVIT
[                               ]

CONTINUATION OF A SEARCH WARRANT APPLICATION IN THE MATTER OF THE RESIDENCE
LOCATED AT 1080 RONALD REAGAN DRIVE FAYETTEVILLE, NORTH CAROLINA 28311

***NOT TO SCALE***



SWORN AND SUBSCRIBED BEFORE ME THIS 17TH DAY OF JULY, 2018

M. Crenshaw
(X)MAGISTRATE                    AFFIANT                    PAGE 5 of 5
( )DISTRICT COURT JUDGE
( )SUPERIOR COURT JUDGE

## STATE OF NORTH CAROLINA

_____Cumberland_____ County

File No. _____

In The General Court Of Justice
__ District    __ Superior Court Division

### IN THE MATTER OF:

*Name*
1080 Ronald Reagan Dr Fayetteville, NC 28311

### INVENTORY OF ITEMS SEIZED PURSUANT TO SEARCH

G.S. 15A-223, -254, -257

I, the undersigned officer, executed a search of:

*Person, Premises Or Vehicle Searched*
1080 Ronald Reagan Dr Fayetteville, NC 28311
Reshod Everett, Victoria Everett

*Date Of Search*
07/17/2018

This search was made pursuant to

[X] 1. a search warrant issued by: Magistrate Crenshaw _____

[ ] 2. consent to search given by: _____

[ ] 3. other legal justification for the search: _____

The following items were seized:

$65,689 U.S. Currency
31 grams of Heroin
73 grams of marijuana
312 grams of THC wax
4 packs of brownies
5 packs of gummies
2 packs of THC lollipops
4 packs of ziploc bags
26 plastic containers
3 food saver machines
2 digital scale
Portable hard drive
DVR
8 Rifle magazines
3 hand gun magazines
5.7 Ammunition
380 ammunition
40 caliber S&W ammunition
38 special ammunition
9mm ammunition
5.56 ammunition
7.62 ammunition
44 plastic bags
paper documents
3 duffles bags
2 money bags
plastic bag containing keys
Mag Tactical MGG4 Rifle
DPMS A15 Rifle
FNH PS90 Rifle and tool
3 Smith and Wesson M&P Bodyguard handguns
Ruger p94 handgun
SKS Type 56 rifle
3 Samsung smart phones
3 Apple Iphones
2 plastic totes

Original - File
Copy - For Search by Warrant of a Person, to Person from Whom Items Taken
Copy - For Search by Warrant of Vehicle/Premises, to Owner or Person in Apparent Control; If No Such Person Present, Leave Copy Affixed Thereon
Copies - For Search by Consent, to Person Giving Consent _and_ Owner of Vehicle/Premises Searched, if Known
(Over)

AOC-CR-206, Rev. 3/16
© 2016 Administrative Office of the Courts

Items Seized Continued:

☐ 1. I left a copy of this inventory with the person named below, who is:

    ☐ a. the owner of the premises searched.

    ☐ b. the owner of the vehicle searched.

    ☐ c. the person in apparent control of the premises searched.

    ☐ d. the person in apparent control of the vehicle searched.

    ☐ e. the person from whom the items were taken.

☐ 2. As no person was present, I left a copy of this inventory:

    ☐ a. in the premises searched, identified on the reverse.

    ☐ b. in the vehicle searched, identified on the reverse.

*Name And Address Of Person To Whom A Copy Of This Inventory Was Delivered, If Any*

The law enforcement agency identified below will hold the seized property subject to court order.

| SWORN/AFFIRMED AND SUBSCRIBED TO BEFORE ME | Name Of Law Enforcement Officer (type or print)<br>N. Budden 219/0747 |
|---|---|
| *Date* 1-20-18   *Name (type or print)* Hrlando K. Knx | *Signature Of Law Enforcement Officer* N. Budd 219/0747 |
| ☐ Notary   *Signature* Orlando K. Knx | *Title Of Law Enforcement Officer* Police Officer |
| *Date My Commission Expires* | *Name And Address Of Agency* Fayetteville Police Department |
| SEAL   *County Where Notarized* | 467 Hay Street<br>Fayetteville, North Carolina 28301 |
| ☑ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court ☐ Magistrate | |

**ACKNOWLEDGMENT OF RECEIPT**

I, the undersigned, received a copy of this inventory.

| Date | Signature Of Person Receiving Inventory |
|---|---|
| | |

AOC-CR-206, Side Two, Rev. 3/16
© 2016 Administrative Office of the Courts

```
                  UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NORTH CAROLINA
                        WESTERN DIVISION
_____
                                    )
UNITED STATES OF AMERICA,           )
                                    )
                                    )   5:20-CR-333-D
              vs.                   )
                                    )
RESHOD JAMAR EVERETT,               )
              Defendant.            )
_____)


                      MARCH 4, 2021
                   MOTION TO SUPPRESS
          BEFORE THE HONORABLE JAMES C. DEVER III
                UNITED STATES DISTRICT JUDGE

APPEARANCES:

On Behalf of the Government:

SCOTT LEMMON, ASSISTANT U.S. ATTORNEY
U.S. Attorney's Office
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina  27601


On Behalf of the Defendant:

CHRISTOPHER M. YOUNG, Esq.
The Young Law Firm, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006


RENORDA E. PRYOR, Esq.
Herring Law Center PLLC
1821 Hillandale Road, Suite 1B-220
Durham, North Carolina  27705


              AMY M. CONDON, CRR, RPR, CSR
                 Official Court Reporter
               United States District Court
                   Raleigh, North Carolina
             Stenotype with computer-aided transcription
```

I N D E X

<u>GOVERNMENT'S WITNESSES</u>

NEIL BUDDEN

        Direct Examination by Mr. Lemmon            4
        Cross-Examination by Mr. Young              22

CHASE ROBINSON

        Direct Examination by Mr. Lemmon            38
        Cross-Examination by Mr. Young              54.


<u>GOVERNMENT'S EXHIBITS</u>

NUMBER                                      RECEIVED

1                                               8

2                                               12

3                                               19

4                                               49

5                                               17

```
 1            (Thursday, March 4th, 2021, commencing at 9:00 a.m)
 2                        P R O C E E D I N G S
 3            THE COURT:  Good morning, and welcome to the United
 4   States District Court for the Eastern District of North
 5   Carolina.  We're here today for a hearing on the motion to
 6   suppress that Reshod Everett filed.
 7            Good morning, Mr. Lemmon.  Is the Government ready to
 8   proceed?
 9            MR. LEMMON:  Yes, Your Honor.
10            THE COURT:  Is the defense ready?
11            MR. YOUNG:  Yes, Your Honor.
12            THE COURT:  All right.  Will there be evidence from
13   the Government?
14            MR. LEMMON:  Yes, Your Honor.
15            THE COURT:  Will there be evidence from the defense?
16            MR. YOUNG:  No, Your Honor.
17            THE COURT:  The Government may call its first
18   witness.
19            MR. LEMMON:  Thank you, Your Honor.
20            The Government calls police officer Neil Budden.
21                           NEIL BUDDEN,
22         having been duly sworn, testified as follows:
23            THE COURT:  You may examine the witness.
24            MR. LEMMON:  Thank you.
25                        DIRECT EXAMINATION
```

N. Budden - Direct Examination

1  BY MR. LEMMON:

2  Q.    Can you please state your name.

3  A.    Officer Neil Budden.

4  Q.    What is your current title?

5  A.    Police officer with the Clayton, North Carolina Police

6  Department.

7  Q.    Did you previously work at the Fayetteville Police

8  Department?

9  A.    Yes, sir, I did.

10 Q.    How long did you work at the Fayetteville Police

11 Department?

12 A.    Nine years.

13 Q.    And how long have you been at the Clayton Police

14 Department?

15 A.    Since July of 2020.

16 Q.    Have you been involved in drug investigations during your

17 time as a police officer?

18 A.    I have.

19 Q.    Have you been involved in arrest warrants and search

20 warrants at residences?

21 A.    Yes.

22 Q.    How many would you say, if you could estimate?

23 A.    Thirty plus.

24 Q.    Okay.  Were you also involved in the investigation of

25 Reshod Everett?

N. Budden - Direct Examination

```
 1   A.   I was.
 2   Q.   And I'm going to direct your attention to the earlier
 3   months of 2018 prior to July of 2018.  Are you aware -- or were
 4   you aware in July of the background of that investigation?
 5   A.   I was.
 6   Q.   Can you just generally explain to the Court what you knew
 7   about the background of the investigation?
 8   A.   The Fayetteville Police Department, we had conducted
 9   several investigations that kind of tied into one large
10   investigation.  Several individuals, over the course of that
11   time, were arrested, charged with various controlled substance
12   violations.  Numerous amounts of marijuana, cocaine, controlled
13   substances were seized.  Firearms were seized, and large
14   quantities of U.S. currency were seized as part of the whole
15   investigation.
16   Q.   Based on that larger investigation, did this appear to be
17   a large drug trafficking organization?
18   A.   It did.
19   Q.   How would you describe the scale compared to other groups
20   you've investigated?  Was this on the larger side of groups
21   that you've investigated?
22   A.   It was on the larger side.  It was a lot of people
23   connected, and they just kept kind of -- as the investigation
24   went on, saw the connection, and it kind of just climbed like a
25   ladder, so to speak.
```

N. Budden - Direct Examination

1  Q.    And firearms were seized from several residences during

2  that investigation; is that correct?

3  A.    Correct.

4  Q.    Now, let's go to July 16th, 2018.  Were you involved in

5  the investigation that day?

6  A.    Yes, sir.

7  Q.    Can you please explain what happened on July 16th.

8  A.    On July 16th, we had conducted an investigation into the

9  activities that were taking place at 715 Middle Bridge Road,

10 Apartment 5 in Fayetteville.  We had received information from

11 anonymous complaints and information from the management office

12 for the apartment complex that they suspected illegal activity

13 taking place at this residence.

14      There had been complaints that two individuals that were

15 later identified as Mr. Reshod Everett and Alvin Davis were

16 seen on several occasions carrying large duffle bags from

17 vehicles into the apartment, and several people had documented

18 or stated that they -- the odor of marijuana was present coming

19 from vehicles, the traffic coming in between the apartment and

20 the apartment.

21 Q.    Were you involved in a traffic stop on July 16th?

22 A.    Yes, sir.

23 Q.    Tell us about that.

24 A.    On the 16th of July, we were conducting surveillance on

25 the apartment.  Alvin Davis was observed leaving the residence

N. Budden - Direct Examination

1  carrying a black backpack.  He occupied a silver -- sorry, a

2  black Cadillac sedan, four-door sedan that had a window tint

3  violation.

4      As Mr. Davis left the apartment complex, a traffic stop

5  was conducted for the violation of the window tint.  As we

6  spoke to Mr. Davis, based on his demeanor and where he was

7  coming from, we had utilized a police K-9 to do an exterior

8  sniff of the vehicle which gave an alert for the presence of

9  controlled substances.

10     As a result of that, a search of the vehicle was conducted

11 which yielded several ounces of marijuana, cocaine, a firearm,

12 and U.S. currency was seized from the backpack that was on the

13 front passenger floorboard inside the vehicle.

14 Q.   Did Davis also make statements referring to a roommate of

15 his?

16 A.   I can't recall.

17 Q.   Okay.  Was there then a search warrant then for the

18 apartment at Middle Bridge Drive?

19 A.   Yes.

20 Q.   Are you aware of what was seized at that apartment?

21 A.   A large quantity of marijuana, cocaine, firearms and U.S.

22 currency.

23 Q.   Based on the traffic stop of Mr. Davis as well as the

24 search of that apartment, were arrest warrants obtained for

25 Mr. Everett?

N. Budden - Direct Examination

1   A.   They were.

2   Q.   I'm going to direct your attention to -- there's an

3   exhibit in front of you.  It's Exhibit 1.  Do you see that?

4   A.   Yes, sir.  The arrest warrant.

5   Q.   Is that the arrest warrant for Mr. Everett?

6   A.   It is.

7   Q.   And was that issued on July 17th, 2018?

8   A.   It was.

9        MR. LEMMON:  Your Honor, move to admit Exhibit 1.

10       THE COURT:  It'll be received.

11   (Government's Exhibit No. 1 was admitted into evidence.)

12   BY MR. LEMMON:

13   Q.   So now let's move to July 17th, 2018.  So after that

14   arrest warrant was issued, what happened next?

15   A.   On July 17th we had done a little background investigation

16   to try to locate Mr. Everett to serve the arrest warrants.  We

17   had gotten some information as far as utilities that his name

18   came back as the -- on the utilities for 1080 Ronald Reagan

19   Drive.  And I believe the vehicles -- some of the vehicles in

20   his name were registered to that address as well.

21       We conducted surveillance on that residence, 1080 Ronald

22   Reagan Drive, for several hours.  I believe we began

23   approximately -- in the early afternoon hours around 1:00 p.m.

24       During the course of the surveillance, we had noticed a

25   decent amount of traffic coming and going from the residence,

N. Budden - Direct Examination

1  which turned out to be people are coming, showing up and then

2  leaving with children.  When we started noticing that activity,

3  we did a little background on the residence, able to find out

4  the residence was being used as a licensed daycare.

5      With that information, knowing that we were still trying

6  to confirm Mr. Everett was at the residence, he was later

7  observed smoking a cigarette in the backyard, and then his wife

8  was observed arriving at the residence earlier in the

9  afternoon.

10     So we gave a great amount of time for -- with the hopes

11 that anybody who had a child there at the daycare would come

12 and pick them up.  I believe the closing hours for the daycare

13 was 5:30, so we tried to give it at least an hour and a half to

14 two hours to make sure -- with the hopes that every child was

15 picked up that didn't reside there.

16     At approximately 7:00 p.m., we kind of all met together to

17 formulate a plan to approach the residence, to do so safely,

18 and again, with the thought in mind that there could still be

19 children inside the residence that don't reside here.

20     A short time later, approximately 7:30, we approached the

21 residence.  Two detectives approached the residence, knocked on

22 the door and made contact with Mr. Everett who opened the door.

23 Q.  Was he placed under arrest at that time?

24 A.  He was.

25 Q.  And then shortly after he was placed under arrest pursuant

N. Budden - Direct Examination

1  to the arrest warrants, was there a time when you went into the

2  residence?

3  A.    There was a short time -- when he was first taken into

4  custody, I was standing inside the front foyer area of the

5  residence, the kitchen area.  After speaking with Sergeant

6  Durham who was on scene, the decision was made to conduct a

7  protective sweep of the residence.

8      It's a common practice of ours to render the situation

9  safe, the residence safe, make sure there's nobody else inside

10 that could jump out at us, pose a threat to us or anybody else

11 on scene.  And also the factor that there still could be kids

12 inside, that we want to make sure, one, we're safe.  And we

13 also want to have the knowledge of there may still be parents

14 showing up to pick up their kids.

15 Q.    Sure.  And based on your training and experience, is it an

16 inherently dangerous situation to execute an arrest warrant at

17 a person's house?

18 A.    Yes, sir.

19 Q.    Why is that?

20 A.    Because it's basically like a home base for them; but to

21 us, it's unknown territory.  We don't know where firearms could

22 be hidden.  People could hide.  So that's why it's common for

23 us to just conduct a protective sweep of the residence to

24 ensure that the safety of everybody is paramount.

25 Q.    And based on this investigation, had it been determined

N. Budden - Direct Examination

1   that there were other people working with Mr. Everett?

2   A.    Yes.

3   Q.    And so there were potential co-conspirators involved in

4   this drug trafficking organization, correct?

5   A.    Yes.  Based on everyone that we encountered that kind of

6   climbed the ladder in the connection with Mr. Everett to

7   Mr. Davis the day prior and him having a firearm on him on the

8   traffic stop and the firearms being seized from the apartment,

9   we knew there was a good probability that there could be more

10  people inside and more firearms.

11  Q.    And during the surveillance prior to arresting

12  Mr. Everett, was it also observed that there were surveillance

13  cameras?

14  A.    Yes.  There were surveillance cameras that appeared to

15  cover every angle on the exterior of the residence.

16  Q.    Based on your training and experience, what did that mean

17  to you?

18  A.    Typically that's used as countersurveillance for those

19  that are engaged in controlled substance violations.  Used as

20  countersurveillance to protect their home, their supply, their

21  money, their guns.

22  Q.    Would that also mean that someone who had access to that

23  video feed would know where the officers were, but you might

24  not know where they are?

25  A.    Absolutely.

N. Budden - Direct Examination

```
 1  Q.    And so that's another factor that would pose a danger?

 2  A.    Yes.

 3  Q.    Now I'm going to direct your attention to a disk in front

 4  of you that's labeled Exhibit 2.  Do you see that?

 5  A.    Yes, sir.

 6  Q.    Are your initials on that disk?

 7  A.    They are.

 8  Q.    Have you previously reviewed it?

 9  A.    Yes.

10  Q.    So what is on that disk?

11  A.    It's a body camera footage from when we conducted the

12  protective sweep of the residence.  It was myself and three

13  other detectives that had conducted a sweep of the residence

14  shortly after our arrival on scene and taking Mr. Everett in

15  custody.

16  Q.    Is this your body camera footage?

17  A.    Yes.

18  Q.    Does it fairly and accurately represent what happened that

19  day?

20  A.    Yes.

21            MR. LEMMON:  Your Honor, I move to admit Exhibit

22  No. 2.

23            THE COURT:  It'll be received.

24        (Government's Exhibit No. 2 was admitted into evidence.)

25  BY MR. LEMMON:
```

N. Budden - Direct Examination

1  Q.   So now, Officer Budden, I'm going to direct your attention
2  to the screen in front of you.  There's no sound at first for
3  the first little bit.
4              (Video played in open court.)
5  BY MR. LEMMON:
6  Q.   So where are we at this point?
7  A.   We just stepped inside the front door.  Initially, when it
8  first comes on, I'm standing outside the front door in the
9  front entryway talking to Sergeant Durham and Detective Bird.
10 Q.   And is this where y'all decided that the protective sweep
11 would be initiated?
12 A.   Yeah.  When we were speaking with Sergeant Durham, we were
13 directed to conduct a sweep just to render the situation or the
14 scene safe so we could proceed forward.
15              MR. LEMMON:  I'm hitting play.
16      (Video played in open court.)
17 BY MR. LEMMON:
18 Q.   Now, do you see any other individuals in the living room?
19 A.   Sergeant Durham was standing -- or not Durham, Sergeant
20 Ward was standing there at the base of the stairs, and I'm not
21 sure if it was Ms. Sinkler or Ms. Everett sitting on the couch
22 there, but there is a -- there was a female there sitting
23 there.
24 Q.   And so was it determined that there were other individuals
25 in the home other than Reshod Everett?

N. Budden - Direct Examination

```
 1   A.    Yes.
 2   Q.    Did those include Victoria Everett and Latasha Sinkler and
 3   the two children?
 4   A.    Correct.
 5         (Video played in open court.)
 6   BY MR. LEMMON:
 7   Q.    And around this time, are children being brought
 8   downstairs?
 9   A.    Yes.  Just here in a second you'll see two children come
10   down the stairs with -- I believe it was Ms. Everett.
11         (Video played in open court.)
12   BY MR. LEMMON:
13   Q.    Are you now beginning the protective sweep?
14   A.    Yeah.  So this was where we begin the protective sweep.  I
15   had gathered three other detectives, and we were just
16   waiting --
17             MR. LEMMON:  I apologize.  Yes, I'll turn the volume
18   off.
19             THE WITNESS:  Yes.  This is where we had begun the
20   protective sweep of the second and third story of the
21   residence.  I had gathered three other detectives, and we were
22   just waiting for Ms. Everett to come downstairs with the kids
23   before proceeding upstairs.
24   Q.    Okay.
25         (Video played in open court.)
```

N. Budden - Direct Examination

1   BY MR. LEMMON:

2   Q.    And as you're in this general area, was there something

3   you saw on the banister that you just passed?

4   A.    So on the banister -- on top of the stairs when you get to

5   the second floor, there's -- it's like a half wall, kind of

6   banister shelf thing where there was a bottle of THC gummies

7   that were sitting right there in plain view.

8   Q.    And the camera will turn in just a second towards that

9   direction, and I'll have you identify that.

10        (Video played in open court.)

11  BY MR. LEMMON:

12  Q.    Where are you at this point?  This is at the two minute

13  and 18 second mark.  Where is this?

14  A.    So we're on the second floor.  There's kind of like a --

15  there's a landing area where you have several rooms off of that

16  landing area.  I am standing in the hallway going towards two

17  bedrooms, and there was a closet on my left.

18        I had waited for a second detective to come up behind me.

19  I heard a TV on in one of the rooms, so I was just waiting for

20  someone else to be in close proximity with me before I

21  proceeded because I didn't know if there was somebody else in

22  one of the rooms watching TV.

23  Q.    So this is one of those rooms that you're trying to make

24  sure no one else was inside, correct?

25  A.    Correct.

N. Budden - Direct Examination

 1        (Video played in open court.)

 2   BY MR. LEMMON:

 3   Q.    So was this one of the children's room?

 4   A.    Yes.

 5             (Video played in open court.)

 6   BY MR. LEMMON:

 7   Q.    So during this protective sweep, were you searching inside

 8   anything?  Were you seizing any evidence?

 9   A.    Nope.  Didn't open anything.  Only thing we might have

10   opened were just closet doors, places where people could hide.

11   Q.    But you weren't opening any containers or anything like

12   that?

13   A.    Correct.

14        (Video played in open court.)

15   BY MR. LEMMON:

16   Q.    All right.  Now, I'm pausing it at the three minute and 33

17   second mark.  Do you see this area in the middle?

18   A.    Yep.  That's the half wall I was talking about there at

19   the top of the stairs.

20   Q.    I'm going to direct you to Exhibit 5, which is in front of

21   you.  Do you see that?

22   A.    Yes, sir.

23   Q.    What is that?

24   A.    It's a bottle of Americana Fruit Juice Gummies that

25   contain THC.

N. Budden - Direct Examination

1  Q.    Does that fairly and accurately represent the bottle of

2  THC gummies you were just describing?

3  A.    Yes, sir.

4           MR. LEMMON:  Your Honor, move to admit Exhibit 5.

5           THE COURT:  It'll be received.

6       (Government's Exhibit No. 5 was admitted into evidence.)

7  BY MR. LEMMON:

8  Q.    And so this was on that banister that you just described,

9  correct?

10  A.    Yes, sir.

11  Q.    And did you seize it during this protective sweep?

12  A.    No.  We left it where it was.

13  Q.    Did you recognize when you saw it what it was?

14  A.    Yeah.  I recognized it as THC gummies, and they also

15  matched a bottle that was seized a day prior from the search

16  warrant at the apartment on Middle Bridge Road.

17  Q.    And did you also recognize that it was something that was

18  not legal under North Carolina law?

19  A.    Yes.

20  Q.    Does North Carolina law permit medical marijuana

21  prescriptions for THC or marijuana?

22  A.    No.

23  Q.    So these were not legal under North Carolina law even if

24  you had, for example, a medical prescription, a medical

25  marijuana prescription from another state?

N. Budden - Direct Examination

1  A.    Correct.

2  Q.    Okay.  Is it behind that Mason jar right there?

3  A.    Yes, sir.

4        (Video played in open court.)

5  BY MR. LEMMON:

6  Q.    And now where are you going at this point?

7  A.    This is, I believe, a closet, and then there's a -- this

8  door right here is like a -- kind of like an attic space.

9        (Video played in open court.)

10 A.    Again, just poking my head in, just checking for people.

11       (Video played in open court.)

12 BY MR. LEMMON:

13 Q.    So this video is almost over.

14       When you were wrapping up this video, did you turn off

15 your body camera?

16 A.    Yes, sir.

17 Q.    And was that because at the time, you thought the

18 protective sweep had been completed?

19 A.    Completed, yes, sir.

20 Q.    Once this video ended, did you receive an additional piece

21 of information?

22 A.    Yes.  I had received information from another detective

23 that had already observed there were -- in this closet here

24 over on the corner of the master bedroom, there was loaded

25 firearms just kind of placed out on a shelf.

N. Budden - Direct Examination

1  Q.    And did you then go and look inside that closet?

2  A.    I did peek in just to have visual confirmation.  I knew

3  for the planning of a search warrant, I would be the one typing

4  the search warrant, applying for it, so I just wanted to have

5  visual observation for myself so I can say that, yes, I saw

6  them on the shelf.

7  Q.    And so what did you see when you looked into that closet?

8  A.    I saw two loaded rifles up on the top shelf up by the

9  receiver and the screen for the surveillance cameras.

10 Q.    So after you had conducted this protective sweep, based on

11 the entire investigation, did you and other officers decide to

12 apply for a search warrant?

13 A.    We did.

14 Q.    Were you the affiant for that warrant?

15 A.    I was.

16 Q.    If I can direct your attention to Exhibit 3 in front of

17 you.  What is that?

18 A.    This is a search warrant for 1080 Ronald Reagan Drive.

19 Q.    This is the one where you were the affiant, correct?

20 A.    Correct.

21           MR. LEMMON:  Your Honor, move to admit Exhibit 3.

22           THE COURT:  It'll be received.

23       (Government's Exhibit No. 3 was admitted into evidence.)

24 BY MR. LEMMON:

25 Q.    So in your affidavit for this search warrant, did you

N. Budden - Direct Examination

1  describe the scope of the investigation?

2  A.    Yes.    That's how I began kind of describing the background

3  of the investigation, how we got to where we were at that time.

4  Q.    So you explained that it had been a multi-month

5  investigation, correct?

6  A.    Correct.

7  Q.    And you described marijuana trafficking that had been --

8  evidence had been found at the Middle Bridge Drive apartments,

9  correct?

10  A.    Correct.

11  Q.    As well as seizures and the vehicle stop and at Middle

12  Bridge Drive itself, correct?

13  A.    Correct.

14  Q.    Also the identification of Mr. Everett's residence, 1080

15  Ronald Reagan Drive?

16  A.    Correct.

17  Q.    As well as confirmation that the residence was

18  Mr. Everett's based on a search of a utility company?

19  A.    Yes, sir.

20  Q.    As well as the magistrate's decision to issue arrest

21  warrants against Mr. Everett?

22  A.    Correct.

23  Q.    And as well as the surveillance of Mr. Everett's vehicle

24  behind the residence?

25  A.    Correct.

N. Budden - Direct Examination

```
 1   Q.   And the surveillance of security cameras around the
 2   exterior of the house?
 3   A.   Yes, sir.
 4   Q.   Did you also mention that during that protective sweep,
 5   you had seen the THC gummies as well as the firearms?
 6   A.   Yes.
 7   Q.   And was that warrant later issued by a judge?
 8   A.   Yes.
 9   Q.   Was the search warrant executed?
10   A.   It was.
11   Q.   And what items -- you don't have to describe each item
12   individually, but what types of things were seized from Ronald
13   Reagan Drive?
14   A.   Controlled substances, firearms, U.S. currency, THC
15   gummies, other edible-type items that contained THC in them.
16   Q.   Were those in that closet where you had looked in during
17   your sweep, were there firearms found?
18   A.   Yes.
19   Q.   And were they loaded?
20   A.   Yes.
21            MR. LEMMON:  Your Honor, nothing further.
22            THE COURT:  Cross-examination.
23            MR. YOUNG:  Thank you, Your Honor.
24
25                    CROSS-EXAMINATION
```

N. Budden - Cross-Examination

1  BY MR. YOUNG:

2  Q.    Good morning, Officer Budden.

3  A.    Good morning, sir.

4  Q.    I just got a couple of questions for you.

5        Now, you're with Clayton Police Department now.

6  A.    Correct.

7  Q.    When did you leave Fayetteville?

8  A.    July of 2020.

9  Q.    Okay.  So you said that at the apartment complex, there

10 had been complaints of Mr. Everett, who's right here beside me,

11 and Mr. Davis carrying in duffle bags?

12 A.    There was, yes, complaints of two individuals carrying

13 large duffle bags from vehicles inside the residence.

14 Q.    Just random complaints, or did you guys go ask them?

15 A.    They were --

16 Q.    I'm sorry?

17 A.    At this -- I can't recall that.

18 Q.    Because I'm asking when it started, because you're saying

19 this is when it started with this -- are you familiar with

20 Detective Harding?

21 A.    Yes.

22 Q.    Or former Detective Harding?

23 A.    Yes.

24 Q.    And are you familiar with his informant?

25 A.    Yes.

N. Budden - Cross-Examination

 1  Q.    Okay.  Are you familiar that in some of the statements,
 2  they say that it started with his informant in April because
 3  there's -- there's about five different versions of how this
 4  investigation started.
 5        So if you're saying it started at the apartment complex,
 6  did somebody just call Fayetteville Police Department and say:
 7  Hey, there's a guy with dreads and another guy, and they're
 8  carrying in duffle bags into their own apartment, and we smell
 9  marijuana.
10        Is that what you're saying started the entire
11  investigation?
12  A.    So, yes, we had -- Detective Harding had the information
13  from his source, and then we also had the information that we
14  corroborated through the apartment complex.
15  Q.    What source came first?
16  A.    The Detective Harding.
17  Q.    Okay.  So would it be fair to say the investigation
18  started with Detective Harding?
19  A.    Yes, I -- I mean --
20  Q.    Is it common for somebody to say:  Hey, I live in this
21  apartment complex.  I see two black guys carrying big duffle
22  bags, and I smell some marijuana.  Could you guys come and
23  investigate?  It's large scale drugs.
24        Could you get a warrant off of that?
25  A.    We didn't just do it based off of that information.  We

N. Budden - Cross-Examination

1  spoke with the management of the apartment complex.

2  Q.   Okay.

3  A.   They had received complaints from people that lived within

4  the complex.  And with that information, we continued on with

5  physical surveillance of the apartment and observed Alvin Davis

6  leave from the apartment, and he was -- a traffic stop was

7  conducted on him, which led to the seizure of controlled

8  substances.

9       MR. LEMMON:  Your Honor, if the witness could be

10  allowed to answer the questions.

11       THE COURT:  He just did.  That's fine.

12       Next question.

13  BY MR. YOUNG:

14  Q.   Is it not true that Detective Harding -- I'm sorry, former

15  Detective Harding, his informant informed you guys that this

16  was his informant's supplier, right, and that they lived at 715

17  Middle Bridge, and that was their stash house?

18  A.   I don't have the exact information that was provided to

19  Detective Harding.  I know we have received information of a

20  supplier living there, and then we also had information,

21  separate information from the management complex that -- of the

22  activity that was taking place where people carrying duffle

23  bags into the apartment complex, into the apartment, which

24  presented a large -- a strong odor of marijuana.

25  Q.   Okay.  So you're not aware that Mr. Everett was a target.

N. Budden - Cross-Examination

```
 1   He was a target because he was looked at as a large-scale drug
 2   supplier.  You've testified he was in a large-scale drug
 3   organization.  So are you saying that you guys got that
 4   information just from bags and weed -- marijuana?
 5   A.   We had to do some background information to identify who
 6   he was.
 7   Q.   Okay.
 8   A.   We weren't given a name specifically to identify him.  We
 9   had to do the background information.  We just had two pieces
10   of information that kind of ran together and they corroborated,
11   and we had to do some -- the background, the legwork to
12   identify who they were, who is living there, whose name was on
13   the leases for the apartment.
14   Q.   Okay.  But you were tipped off by the informant that
15   Detective Harding talked to -- arrested in April, April of
16   2018, and I think he -- in June of 2018, and I think he had
17   about 50 or $60,000 and several tons of marijuana.  That's who
18   said Reshod Everett was his supplier.
19   A.   Like I said, from my knowledge and my recollection, the
20   name Reshod Everett was not provided at that time.  We were
21   given the location and an apartment complex, and then we had to
22   do the background investigation to identify Mr. Everett as one
23   of the primary subjects that reside or come and go from the
24   apartment.
25   Q.   You may know.  I think they called him "Kool" or
```

N. Budden - Cross-Examination

1  "Kool-Aid" or something of that nature.  Okay.  And just trying
2  to clear it up because in different statements, some officers
3  say:  Hey, it came right from the apartment complex.  Then
4  Detective Harding says:  Hey, it comes from my source who's
5  reliable, who's another large-scale marijuana dealer.  I think
6  Task Force Agent Moore testified that he never heard of Mr.
7  Everett who was a large-scale drug dealer until close to when
8  the warrant was signed, so just --
9  A.   Okay.
10 Q.   Okay.  I'll move on.
11      So we don't need to go back to the body camera footage.
12 So you're saying when you were standing on the porch, that's
13 when Sergeant Durham said you could go ahead and do a
14 protective sweep?
15 A.   Correct.
16 Q.   Now, on that body cam footage while you were on the porch,
17 there were about seven or eight officers already in the house.
18 It looked like there'd be a few back towards the kitchen.
19 There was somebody hanging on the banister, and there were
20 officers just roaming around the house.  Is that -- I mean, Mr.
21 Everett was already in handcuffs at that time, right?
22 A.   Correct.
23 Q.   So he came in -- you came in, you guys came in, two plain
24 clothed officers came in, arrested him without incident?
25 A.    He did provide a little resistance when he tried to pull

N. Budden - Cross-Examination

1  back and step into the residence.

2  Q.   Okay.  So he did provide some resistance.  First time I

3  heard that, but okay.

4  A.   He didn't fight, but there was some resistance where he

5  stepped backwards into the residence only a few feet, which

6  appeared to be he was trying to separate himself from the two

7  detectives who identified themselves as Fayetteville police

8  officers.

9  Q.   But they were plain clothes?

10 A.   Correct.

11 Q.   So he was arrested in cuffs, and it looks like he was

12 being questioned right off to the side of the foyer area, just

13 maybe five feet from where he was arrested.

14      Is it Fayetteville police -- is it the way you guys do

15 things that there would be five or six other officers just

16 roaming around his home at that point, or were you --

17 A.   We were standing inside.  We're on the first floor.  As

18 you saw in the video, there was a sergeant that was standing at

19 the base of the stairs there on the first floor.  Knowing that

20 Ms. Everett was upstairs with the kids, he was standing there

21 to give visual observation when they came downstairs to make

22 sure they didn't pose as a threat.  But it's not uncommon for

23 us to stand inside the doorway, stand in a kitchen.

24 Q.   Was he hanging on a banister?

25 A.   I mean, I don't know if he puts his hand on the banister

N. Budden - Cross-Examination

 1  or not.  I don't know if that's --
 2  Q.   Okay.  So now, you do -- legally you guys can, under the
 3  Fourth Amendment, when you arrest him, you can search the
 4  adjoining area, immediately adjoining area.  I would venture to
 5  say the kitchen and the den and all those areas are a little
 6  far.  But the question is:  How long had you been surveilling
 7  the house?
 8  A.   Several hours.  I think we began at approximately 1:00
 9  o'clock in the afternoon.
10  Q.   So from 1:00 o'clock in the afternoon, you guys pretty
11  much knew who was in that house, right?  You knew there were
12  kids and -- you said you waited until the kids were gone, and
13  then you were going to execute the arrest warrant, right?
14  A.   We give enough time in hopes that there would be --
15  every -- all the children would be gone, but there's no way for
16  us to know.  I mean, somebody could have called and said:  Hey,
17  I'm getting off work late.  I'm not going to be there on time
18  at 5:30 to pick them up.  Different circumstances could arise.
19       We don't know exactly who's in the house.  We've never
20  been inside the house, other than we saw Mr. Everett in the
21  backyard smoking a cigarette, and we saw Ms. Everett arrive.
22  We never saw Ms. Sinkler, and she ended up being inside the
23  house, so there's no way for us to know exactly who's inside
24  the house at any given time.
25  Q.   But Ms. Everett told you immediately, right?  She

N. Budden - Cross-Examination

1  immediately said:  Hey, my friend's right here in the bathroom.
2  I got two kids upstairs.  She even told you about the dog.  I
3  got two kids, I got a dog upstairs, I got a friend in the
4  bathroom, and this is us.  And you got my husband standing
5  right here, handcuffs.  You got two women, two kids and a dog.
6  Can I at least go get my kids and get them down so they don't
7  have to see their dad handcuffed here?

8         So you guys allowed her to do that.

9         So after -- why 7:00 o'clock?  If you had waited seven
10  hours and you still weren't sure, was it just:  Hey, okay.
11  Enough is enough.  We're going.

12         Or, I mean, did you guys feel reasonably assured that:
13  Hey, there's nobody else in the house.  No strange cars out?
14  A.   The main goal of waiting that time period was because we
15  knew this was an active daycare, and there could be kids in the
16  house.  Aside from Mr. Everett's kids, there could be kids that
17  don't reside there and shouldn't have any place or business
18  being involved in any type of police action where Mr. Everett
19  is the target.

20         The reason why we waited two hours to approach the
21  residence was in hopes that all children would be picked up,
22  otherwise -- but there still could have been other people,
23  acquaintance of Mr. Everett.

24         Like I said, we had been -- this was an ongoing
25  investigation that started several months prior and just kept

N. Budden - Cross-Examination

1  climbing a ladder.  Each person led to another one, then
2  another one, another one.  And Mr. Everett was -- ended up
3  being at a high level on that ladder.
4      Knowing the day prior we had executed a search warrant
5  that he was affiliated with, with a gentleman that was arrested
6  that he is an associate with who had controlled substances and
7  firearms on him in the vehicle he was driving and inside the
8  apartment he left from, we knew that there could be a
9  possibility that there's more people inside the residence that
10  could potentially pose a threat to safety of everybody on
11  scene, which is a common -- it's very common in law enforcement
12  to conduct those sweeps, to preserve the scene and, you know,
13  effectively make sure everyone is safe.
14  Q.   How much surveillance did you have on the house?
15  A.   Like I said, we started at approximately 1:00 o'clock in
16  the afternoon, and we approached the residence at, I believe,
17  7:30 p.m.
18  Q.   I mean, like where?  I know you were in the back at some
19  fire station, but how many officers were watching this house?
20  A.   I don't know exactly how many.  We had two units working
21  together conducting surveillance.  I don't know the exact
22  number of the detectives that were conducting surveillance.
23  Q.   Okay.  Okay.  So because -- going back to the video, the
24  six to seven, eight officers that were roaming around, they
25  didn't look like it was -- you know, they were looking for

N. Budden - Cross-Examination

1    somebody.  They were just kind of walking around, seeing what

2    you could see, which, I guess, that may have been part of the

3    protective sweep downstairs because you went straight upstairs.

4    You didn't sweep downstairs at all.

5        Why didn't you go to the kitchen, the immediately

6    accessible areas where somebody could have came out?  It didn't

7    look like you guys even opened the garage door where somebody

8    could have came out and shot everybody.  You guys were just

9    walking around, but you went straight upstairs, straight to the

10   bedroom area is where you -- and you had your body cam on,

11   which I commend you for that, because in a lot of the

12   discovery, the body cams go on and off.  You have had it on for

13   five minutes straight.

14       So why did you go straight upstairs?  Why not look

15   downstairs first?  Because the point of the protective sweep is

16   to make sure that nobody jumps out and can harm you guys.  You

17   got eight of your colleagues standing downstairs, but you go

18   straight upstairs where she just brought two children from.

19   Why did you go straight upstairs?  Why not sweep the downstairs

20   area?

21   A.   With the number of officers that were on the first floor,

22   I felt comfortable that that area was safe and controlled.

23   There wasn't many areas for people to jump out.

24       One room was used, I assume, as the daycare.  There was a

25   lot of toys and stuff in it.  Then there was the kitchen and

N. Budden - Cross-Examination

 1   the living room.

 2        So I felt with the number of officers that were on that

 3   first floor, that they had felt it was reasonably safe to where

 4   we could proceed to the second floor where myself and three

 5   others went upstairs while there was still other detectives

 6   still on the first floor.

 7   Q.   Okay.  And as you went up the stairway, on the banister

 8   you saw -- I guess you saw what was a THC gummy container?

 9   A.   Correct.

10   Q.   But you didn't touch it yet because you didn't have a

11   warrant, right?

12   A.   Correct.

13   Q.   And I guess Mr. Lemmon said it was behind a Mason jar?  It

14   was kind of fuzzy so we couldn't see it.

15   A.   There was a glass Mason jar directly next to the ball of

16   THC gummies.

17   Q.   Okay.  Now, tell me, were you around when Ms. Everett,

18   who's here today, when she was asked to go upstairs and turn

19   off her cameras, the security cameras?

20   A.   I was not present for that.

21   Q.   You weren't present for that?

22   A.   No, sir.

23   Q.   About the security cameras.

24        Now, you guys watched the residence for about seven hours,

25   and you figured out it was a daycare, right?  And you still

N. Budden - Cross-Examination

1  found the cameras to be kind of outside of the ordinary even
2  for a daycare?  I mean, most daycares and schools do have
3  cameras to see who's coming and going.  So you still found it
4  to be a part of drug trafficking activity?
5  A.   It absolutely could be, yes.
6  Q.   Okay.  Are you aware who asked her to go upstairs and cut
7  off the cameras?
8  A.   I believe Detective Chase Robinson talked to her about
9  that.
10 Q.   And is that a common practice for you guys, not to just
11 wait until you have a warrant to tell her, you know, let's go
12 ahead and go upstairs now because we're going to get the
13 footage anyway and because we don't feel safe because you have
14 cameras?
15 A.   It's not uncommon to ask, which he did.  And she said yes,
16 said that was okay, and she did it herself.
17 Q.   Okay.  Probably didn't coerce her or ask her.
18         MR. YOUNG:  Give me one second, Your Honor.
19     (Pause in the proceeding.)
20 BY MR. YOUNG:
21 Q.   During that time, did you guys have Ms. Everett do
22 anything else even after Mr. Everett had been transported away
23 from the home?  Did she need to go out and open the garage or
24 anything like that?  The garage, which is the area immediately
25 adjacent to where he was arrested, was like almost the last

N. Budden - Cross-Examination

```
 1  thing searched.
 2  A.    I don't recall the garage door ever being opened, but
 3  that's just my recollection.  I don't recall.
 4  Q.    Were you there the entire time?
 5  A.    Not the entire time because I was the one that typed the
 6  search warrant, so I had to leave to go type the search warrant
 7  and then go swear to the search warrant.  So I was gone for a
 8  good -- probably close to two hours to do that.
 9  Q.    Okay.  Now, two officers who were not mentioned right now
10  but were heavily involved, Detective Harding and Detective Bird
11  are no longer with Fayetteville Police Department, correct?
12  A.    Correct.
13  Q.    Do you know why?
14        MR. LEMMON:  Objection, Your Honor.  Outside the
15  scope.
16        THE COURT:  Sustained.
17     (Pause in the proceeding.)
18        MR. YOUNG:  So -- I'm wrapping up here, Your Honor.
19  BY MR. YOUNG:
20  Q.    So you guys surveil for seven hours, and you still thought
21  that somebody else may be in the home?  Do you know what the --
22  to conduct the protective sweep legally, do you know what
23  should be happening or why you would want to do that?
24  A.    To render the scene safe.
25  Q.    Right.  But there needs to be like a reasonable inference
```

N. Budden - Cross-Examination

1   that there is somebody, an individual in the home that is

2   posing a threat to you guys.  So you had a reasonable inference

3   that somebody was upstairs in that home; that -- where

4   Ms. Everett just went up and got her two young children, that

5   there was somebody up there waiting on you guys to ambush you

6   or --

7   A.   Sir, anything is possible.  In this line of work, people

8   don't always tell you the truth and they're not always honest

9   with you in any type of encounter with law enforcement, so we

10  use our best practices to make sure that we're safe, everybody

11  else on scene is safe, to include Ms. Everett, the kids,

12  Ms. Sinkler, who was inside the house that we had no knowledge

13  of.

14       And like I said before, also trying to make sure that

15  there were no children left inside the house that could --

16  where parents could potentially be coming to pick them up.

17  Q.   Okay.  I understand that.  And I appreciate your service

18  as a police officer.

19       But he has rights as well.  And there has to be some

20  articulable facts, not just "anything can happen."  It has to

21  be some articulable facts that make you guys say there could be

22  somebody upstairs.  We need to run a protective sweep.  There's

23  a Fourth Amendment, and it covers us all, so it has to be

24  articulable.

25       What you just said, "anything can happen," anything can

N. Budden - Cross-Examination

1   happen any time.  We know.  So not anything can happen, but:

2   Hey, I heard something upstairs.  Hey, when she went up there,

3   she looked this way and she looked that way.  Hey, something.

4        You just -- and I don't know if this is a Fayetteville

5   thing, but you cannot just go in somebody's house and say:

6   We're going to search it, and then we're going to get a warrant

7   and it's going to work.

8   A.   Protective sweep for people, for the safety of those on

9   scene is not considered a search as far as searching for

10  evidence of a crime.  We weren't searching for evidence of a

11  crime.

12       Yes, we did observe something that was in plain view that

13  was not touched, that was not seized.  And like I said before,

14  this whole -- everything that led up to it and culminated to

15  this point, there was some link from everybody.  And like I

16  said before, there's large quantities of controlled substances,

17  a large amount of firearms that were seized.

18       Everybody, like I said, going up the ladder had a link to

19  the next person.  And you just don't know in this situation

20  when -- who else could be upstairs.  And with the amount of

21  firearms that we had seized over the several months and the

22  accessibility of firearms, we felt it was reasonable to conduct

23  a protective sweep to confirm nobody else was inside and had

24  access to firearms.

25       And there was access to firearms because, as I said

N. Budden - Cross-Examination

1  before, there was loaded firearms just scattered on the shelf.
2  We found one on the floor in the bedroom.
3      So we felt it was reasonable to conduct a protective sweep
4  of the residence, confirming there was no people inside that
5  could be hiding that could pose a threat to anybody at the
6  house at that time.
7  Q.  So you talked about the -- talked about the investigation,
8  and it goes up and up until you get to him, Mr. Everett, who
9  has no record and who is in a daycare, not a trap house, not
10 a -- not something that somebody's renting in somebody else's
11 name.  He's in a daycare owned by him and his wife, and he has
12 no record.
13     So you get to him.  And I guess this is the top of the
14 food chain.  But then you say -- and I'm not trying to put
15 words in your mouth, but it sounds like you're saying:  When we
16 serve an arrest warrant, this is what we do because anything
17 can happen.
18     But you can't do that.  You can't do a protective sweep
19 based off the fact that anything can happen.  There's rights.
20     So to do a protective sweep, you have to have articulable
21 facts that something could have happened.  You know those guns
22 he had?  They were all legal because he had no record.  He's
23 not a felon.
24         THE COURT:  Mr. Young, I'm going to hear argument
25 when it's time for argument.  This is the time for questions.

C. Robinson - Direct Examination

```
 1          MR. YOUNG:  I'm sorry, Your Honor.  I'm sorry, Your
 2   Honor.
 3          THE COURT:  This is the time for questions.  That's
 4   not a question.  That's an argument, and that's not proper.  So
 5   if there are no more questions, then the witness can step down.
 6   If you have a question, ask the question.
 7          MR. YOUNG:  No more questions, Your Honor.
 8          THE COURT:  Anything else, Mr. Lemmon?
 9          MR. LEMMON:  No, Your Honor.
10          THE COURT:  Thank you, Officer.  Watch your step
11   stepping down.
12          Any other evidence from the United States?
13          MR. LEMMON:  Your Honor, we would call Police
14   Specialist Chase Robinson.
15                      CHASE ROBINSON,
16          having been duly sworn, testified as follows:
17          THE COURT:  You may examine the witness.
18          MR. LEMMON:  Thank you, Your Honor.
19                    DIRECT EXAMINATION
20   BY MR. LEMMON:
21   Q.   Can you please state your name.
22   A.   Chase Robinson.
23   Q.   What is your current title?
24   A.   I'm a police specialist with the city of Fayetteville,
25   North Carolina, Police Department.
```

C. Robinson - Direct Examination

1  Q.    How long have you been with the Fayetteville Police
2  Department?
3  A.    June of this year will be 12 years.
4  Q.    Do you have experience with drug investigations?
5  A.    I do.
6  Q.    Have you been involved with arrests and search warrants at
7  residences?
8  A.    I have.
9  Q.    How many times would you say you've been involved in those
10 situations?
11 A.    Dozens of search warrants and arrest warrants with
12 residences.
13 Q.    Were you also involved in the investigation of Reshod
14 Everett?
15 A.    I was.
16 Q.    And were you -- you know, based on what you knew in July
17 of 2018, at that time were you aware of the background of the
18 investigation?
19 A.    I was.
20 Q.    Can you generally summarize what you knew about the
21 background of that investigation?
22 A.    Beginning in early 2018, there had been a number of drug
23 and gun arrests that the Fayetteville Police Department's gang
24 unit, which I was assigned to at the time, had been a part of.
25 There were several controlled substances and guns seized from

C. Robinson - Direct Examination

 1  traffic stops, search warrants on residences; and along the
 2  way, there were several people that were connected.
 3  Q.   And did one of the individuals who was investigated give
 4  information that Reshod Everett was supplying large amounts of
 5  drugs?
 6  A.   Yes.
 7  Q.   And I believe you said this, but just to make sure we're
 8  clear:  Were there multiple seizures of drugs, firearms, large
 9  amounts of currency?
10  A.   Yes.
11  Q.   And these were all individuals who were connected in some
12  way with this organization?
13  A.   Correct.
14  Q.   And so was this a larger investigation or a larger
15  organization?
16  A.   At the time it was.  From my personal and professional
17  experience, it was one of the larger organized groups that I
18  had personally dealt with.
19  Q.   And, in fact, did the gang unit receive an award because
20  of this investigation and its size and complexity?
21  A.   We did.
22  Q.   What award was that?
23  A.   The North Carolina Gang Investigative Association selected
24  us as gang unit of the year for 2018.  We were awarded that in
25  2019.

C. Robinson - Direct Examination

1  Q.   Now, you weren't involved on July 16th, 2018; is that

2  correct?

3  A.   Say again?

4  Q.   Were you involved personally on July 16th, 2018, in the

5  Middle Bridge Drive?

6  A.   No, I was not.  I was off that day, out of town.

7  Q.   Were you aware of what happened that day?

8  A.   I was.

9  Q.   And what do you know?  What did you learn happened that

10  day?

11  A.   I know that in the evening, members of the gang unit had

12  been following up on some complaints and information that had

13  developed over the course of the months and weeks leading up to

14  July that there was some suspected controlled substance sales

15  being conducted at the apartments in Middle Bridge, which is

16  Addison Ridge, and they had stopped a vehicle leaving one of

17  the suspected apartments.

18  Q.   Do you know what was found in that vehicle?

19  A.   I know there was a quantity of cocaine and a firearm.  But

20  I also believe there was marijuana in the car.

21  Q.   Do you know what was found in the apartment?

22  A.   A follow-on search warrant revealed a seizure of multiple

23  pounds of marijuana and several firearms and a large amount of

24  currency.

25  Q.   Now let's move to July 17th, 2018.  Were you involved that

C. Robinson - Direct Examination

1  day?

2  A.    I was.

3  Q.    And were arrest warrants obtained for Mr. Everett before

4  you got involved that day?

5  A.    Yes.  The arrest warrants that were obtained for Mr.

6  Everett were in connection to the items that had been seized on

7  Middle Bridge the day before.

8  Q.    Did you and other officers initiate an apprehension

9  operation?

10 A.    We did.

11 Q.    Based on your training and your experience, what you knew

12 about this investigation, what kinds of things are you and the

13 other officers thinking about when you're planning to execute

14 an arrest warrant at a home like this?

15 A.    I have a special operations and SWAT background.  Tactical

16 considerations was kind of one of the things that I thought a

17 lot about with regards to any kind of specialized operation,

18 whether it be an arrest, search warrant, surveillance; you

19 know, whatever operation we were doing for the day.

20       I was also worried about the safety of not only the

21 officers that were involved, but also the public we may come in

22 contact with and the defendants we may access during that time.

23 Q.    Is it dangerous to execute an arrest warrant at a home?

24 A.    I believe so, yes, sir.

25 Q.    Why is that?

C. Robinson - Direct Examination

1  A.   Well, the best way I know to equate it is the home court
2  advantage.  At the end of the day when we're serving an arrest
3  warrant, there's been a judicial process that has led us to
4  those charges and that order being issued by a judicial
5  official, so there's some level of credence given to the
6  criminal act that person is accused of at that time.
7       I think it's a safe inference that the person we're
8  getting those charges on is aware of their criminal activity.
9  We're aware of their criminal activity.  Now we're going to
10 what is their domain that they know every square inch of and
11 know where things like guns, knives, weapons, booby traps, you
12 know, anything along countersurveillance measures, any of those
13 things give them a tactical advantage in that situation.
14 Q.   Is it particularly dangerous when the investigation
15 involves drug trafficking and firearms?
16 A.   Yes.
17 Q.   Now, what was your role on that day?
18 A.   So my assignment for this particular operation, I had what
19 we call a covert surveillance position, means I was hidden.  I
20 was in plain clothes.  I was far away from the actual
21 objective, which is where we believed Mr. Everett to be.
22      Specifically, I was located on or around the property of
23 the fire state -- Fayetteville fire station that was directly
24 behind 1080 Ronald Reagan Drive.
25 Q.   What did you observe during your surveillance?

C. Robinson - Direct Examination

A.    So from my -- I was in an elevated position.  I could see

most of the backyard.  The backyard does have a privacy fence,

but I could see a white Chevrolet Silverado that we knew

Mr. Everett was using at the time as one of his primary sources

of transportation.  And at one point, I did see Mr. Everett in

the backyard.

Q.    What did you know, based on your training and experience,

regarding individuals parking vehicles behind the house or in

the backyard?

A.    It's a lot of -- my personal experience of it, it's a lot

of extra work to park your car you drive every single day in

the backyard, going -- there was a gate, like I said, a privacy

fence around this house.  And it is common that people who may

not want police, other associates, other people to easily

identify where they may be at any given time, they park their

car in a concealed manner, which in this case, it would have

been within the enclosed privacy fence behind the large house.

Q.    During your surveillance, did you also see individuals

coming and going from the house?

A.    So the only one that I saw was Mr. Everett in the

backyard, but I did hear radio traffic of several adults and

juveniles exiting from the front of the residence.

Q.    What was determined as far as why those people were coming

and going?

A.    Through our investigation, we had learned that there was a

C. Robinson - Direct Examination

1    home daycare, child care center being operated from the
2    residence, and it appeared that the traffic leaving the
3    residence was consistent with that.  There were small children
4    accompanied by one or two adults, and they would get into a
5    vehicle and actually leave the area.
6    Q.   And did that situation, in your mind, pose any additional
7    risks?
8    A.   Yeah.  I mean, any time you put more people into a
9    situation, the risk goes up.  And then when those people are
10   minors or even young children, that elevates our -- our level
11   of concern just continues to go up.
12   Q.   Did you and the team feel like you knew exactly who was
13   inside the house?
14   A.   No.
15   Q.   Now, after -- did you become aware that Mr. Everett was
16   arrested?
17   A.   Right.  I did.
18   Q.   What happened next?  What did you do next?
19   A.   Again, from my surveillance position, I want to say it was
20   around 1930 hours that night, radio traffic came across that
21   they were going to initiate contact at the front door.  Shortly
22   thereafter, somebody came across the radio and advised that he
23   was in custody.
24   Q.   One more thing.  Did you notice any surveillance cameras
25   around the outside of the house?

C. Robinson - Direct Examination

1  A.   On the rear of the house, there was an elevated

2  surveillance camera.  It was a multi-story house.  It was

3  primarily two levels, but there was a smaller third level.  And

4  the surveillance cameras were -- appeared to be positioned in a

5  manner where they could cover each side and area of the home,

6  the exterior.

7  Q.   Did you have any experience with drug traffickers using

8  surveillance cameras?

9  A.   Yes.

10 Q.   And why would they use them?

11 A.   Well, much for the same reasons you and I might would put

12 security cameras on our house or there's cameras in this

13 courtroom.  It's a document of what happens.

14      But also in modern times, we have the ability to live

15 monitor and get live notifications via wireless devices,

16 phones, tablets, of activity:  Motion detection, a dog, people

17 in your backyard.

18      So most people that I've associated with or investigated

19 or otherwise learned about these kind of security cameras is,

20 it's mainly so they have a constant live update of the

21 conditions surrounding their home or wherever they have these

22 cameras.

23 Q.   And using the internet, can other individuals also access

24 those live feeds?

25 A.   Yes.

C. Robinson - Direct Examination

1  Q.   Does that pose any additional safety concern?

2  A.   Absolutely.

3  Q.   Why is that?

4  A.   The more organized a group of people may be, whether it be

5  a criminal organization or a corporate business, the more

6  organized they are, the more levels there are to people who

7  actually have a stake and control into what goes on.

8      In regards to drug trafficking organizations, it's been my

9  experience that there's been several layers.  There's no one

10 person that just oversees absolutely everything all the time or

11 has just exclusive control over -- especially this amount of,

12 you know, marijuana that we have been dealing with.

13     So I felt that it was a reasonable concern that a

14 co-conspirator, associate may have access to these live video

15 feeds and being able to live monitor what was going on at the

16 time.

17 Q.   Now, did you become aware that Officer Budden was going to

18 go apply for a search warrant?

19 A.   I did.

20 Q.   Did you go inside the house while he was going to get that

21 warrant?

22 A.   My role while he was going to get the warrant was to

23 maintain security over two females that were occupants of the

24 home at the time the protective sweep was conducted.  And for

25 the intent of the search warrant, they were going to be

C. Robinson - Direct Examination

1    detained throughout the -- that process, meaning that they

2    weren't free to leave; they weren't free to just move about the

3    house, you know, as they pleased unescorted, but they also

4    weren't in handcuffs in the back of a police car.

5         It was Ms. Victoria Everett and Ms. Latasha Sinkler.  They

6    had been courteous and polite and hadn't really given us any

7    kind of pre-assaultive indicators or any reason to restrain

8    them with handcuffs behind their back or anything like that, so

9    I sat with the two of them in the living room while they were

10   on the couch.

11   Q.   And during the long surveillance you did, did you know

12   that Ms. Sinkler was inside the house?

13   A.   No.  I had no idea.

14   Q.   And so was that an example of what could be unknown

15   persons inside a house during one of these operations?

16   A.   Absolutely.

17   Q.   Now, I'm going to direct your attention in front of you.

18   Do you see a disk marked Exhibit 4?

19   A.   Yes, I do.

20   Q.   Does that have your initials on it?

21   A.   It does.

22   Q.   Is that a disk that contains body camera footage from your

23   body camera that day?

24   A.   It does.

25             MR. LEMMON:  Your Honor, move to admit Exhibit 4.

C. Robinson - Direct Examination

1              THE COURT:  It'll be received.

2        (Government's Exhibit No. 4 was admitted into evidence.)

3    BY MR. LEMMON:

4    Q.   I'm going to direct your attention to the screen in front

5    of you.  I'm going to play just a portion, just a couple of

6    minutes from this, starting at the five minute and six second

7    mark.

8        (Video played in open court.)

9    BY MR. LEMMON:

10   Q.   I'm going to pause it there.

11       What was that little conversation?

12   A.   Ms. Everett's demeanor was, again, cordial, polite.  She

13   was -- it appeared to me that she was trying to expedite the

14   process, which I can fully understand.  So she was trying to

15   give us consent to search the premises in lieu of waiting on

16   Detective Budden to return with a signed search warrant.

17   Q.   Were you explaining that she could not consent to a search

18   of a safe if it belonged to Mr. Everett?

19   A.   Correct.

20   Q.   I'm going to start again.

21       (Video played in open court.)

22   BY MR. LEMMON:

23   Q.   Can you explain what just happened there?

24   A.   Yeah.  That was purely from the safety standpoint of

25   eliminating the possibility for any outside actor who we didn't

C. Robinson - Direct Examination

1   have security over that could show up armed, assaultive or in

2   large numbers.  That was purely from a point of interrupting

3   that outside communication or even the potential of it, just to

4   make that -- the scene that much more secure.  Because I do

5   have a responsibility to secure the scene pending the search

6   warrant arrival.

7       And, I mean, there's a number of reasons people would want

8   to use the video footage to come and either hurt the cops that

9   are on scene, take the product that they know or the money that

10  they know may be there.  The possibilities were endless at that

11  point.  And the most reasonable solution to that safety risk

12  was just to interrupt the communication flow out by

13  disconnecting the power from the security system.

14  Q.   Did Ms. Everett ask you if you were requiring her to turn

15  it off?

16  A.   She did ask.

17  Q.   What did you tell her?

18  A.   I was not ordering her to do it.  I wasn't saying she had

19  to.  I wasn't saying she had no choice in the matter.  The

20  reason I told her I would be doing that as soon as the search

21  warrant got here is I did not want to give the opinion that I

22  was just freely roaming throughout the house, moving and doing

23  things.  I purely left it up to her.  She could do it now, or I

24  would do it once I did have lawful control to start searching

25  and moving things.

C. Robinson - Direct Examination

1  Q.   And did she agree to turn it off at that time?

2  A.   She did.  It appeared that she understood where I was

3  coming from.

4  Q.   And I'm going to turn the volume off, and I'm just going

5  to play.  This is at the six minute and twenty-six-second mark.

6       (Video played in open court.)

7  BY MR. LEMMON:

8  Q.   So where are you going now?

9  A.   This is moving from the first floor of the home to the

10 second floor of the home.

11 Q.   And why are you escorting her?

12 A.   Again, she's detained for purposes of this investigation.

13 She's not free to just move about the house, and there's two

14 primary concerns there.

15      Number one would be inputting any safety concern.  She

16 could retrieve a gun, a knife, let a big dog loose; you know,

17 anything that could elevate the safety risks at the time.  But

18 then also there could be the removal or destruction of evidence

19 if she's allowed to just freely roam around the house

20 unescorted.

21 Q.   I'm going to start again with the sound at the six minute

22 and forty-nine-second mark.

23      (Video played in open court.)

24 BY MR. LEMMON:

25 Q.   I'm pausing at the six minute, fifty-six-second mark.

C. Robinson - Direct Examination

1      What do you see here?

2  A.   I see a security screen monitor with the DVR box

3  underneath it.  And immediately to the right of it on the wire

4  shelf in the top of the closet, I see what I can clearly

5  recognize as a pistol grip of at least one AR-15-style rifle

6  and two magazines.

7  Q.   Those have not been seized at this point, correct?

8  A.   Correct.

9  Q.   So when Officer Budden had gone through previously, he had

10 not seized them or moved them from where they were in that

11 closet, correct?

12 A.   Correct.

13 Q.   Based on your knowledge of firearms, your training and

14 experience, do those guns pose a safety risk?

15 A.   They do.

16 Q.   What do you decide to do?

17 A.   In this particular encounter, again, going back to

18 tactical considerations, I chose to -- in our verbal

19 communication with Ms. Everett, I chose to ignore them, acted

20 like I never even saw them, didn't even mention them.  I didn't

21 want to initiate a startled or a fight-or-flight type response.

22 I didn't want to instigate an adversarial or violent encounter

23 in the closet, mainly for two reasons.

24      Number one, that's a lot more fire power than I had on my

25 hip; and number two, if we did decide to get in -- if we did

C. Robinson - Direct Examination

```
1  become engaged in a -- more or less a gun fight in the closet,
2  the likelihood of rounds penetrating through the walls, hitting
3  other houses or going downward and hitting Ms. Sinkler, who was
4  sitting on the couch, or any other officers that were in the
5  house at the time, in that particular instance, I felt the most
6  reasonable course of action -- she had been calm.  There was no
7  reason for me to change that.  I was prepared for her to make a
8  move toward the gun; but because she never did, I never had to
9  say anything about it.
10 Q.   And did she then turn off the DVR, and then you guys both
11 went back downstairs?
12 A.   That's correct.
13 Q.   And once the search warrant was obtained and executed,
14 were these guns seized at that time?
15 A.   They were.
16 Q.   What do you know about the status or the -- how could you
17 describe these guns when they were actually seized?
18 A.   So both the AR-15 style weapons that were up there had
19 loaded magazines inserted in the weapons.  There was a live
20 round in the chamber.  One of the rifles was -- the selector
21 switch had been used from safe to fire, so it could not have
22 been in any more condition to be used.
23 Q.   So this was a locked, loaded, you know, ready-to-fire gun
24 if someone had grabbed it and pulled the trigger, correct?
25 A.   Correct.
```

C. Robinson - Cross-Examination

1  Q.   And so again, this is a dangerous situation.  All right.

2       I'm going to just play a few more seconds.  This video is

3  almost over.

4       (Video played in open court.)

5  BY MR. LEMMON:

6  Q.   This is at the seven-minute mark.  Is Ms. Everett

7  disconnecting the DVR?

8  A.   Yes.  She unplugged it.

9  Q.   Where are you going now?

10 A.   Walking through what I believe is the master bedroom, and

11 then we're going back down the stairs to the living room where

12 we started.

13 Q.   All right.

14          MR. LEMMON:  No further questions, Your Honor.

15          THE COURT:  Cross-examination.

16                    CROSS-EXAMINATION

17 BY MR. YOUNG:

18 Q.   Good morning, Mr. Robinson.

19 A.   Good morning.

20 Q.   Just a couple questions for you.

21       Now, you were talking to us about all the risks of when

22 you guys serve an arrest warrant at the home.  Why did you

23 serve the warrant at the home?

24 A.   So the decision on where and when to serve the arrest

25 warrant was not mine; that came from a supervisory standpoint.

C. Robinson - Cross-Examination

1    There were several -- to the best of my recollection, there
2    were several locations that we had identified as being possible
3    residence for Mr. Everett on that particular day.  And I think
4    the reason that we chose to take him into custody there was
5    that was the first place we had visibly seen him.  We knew he
6    was there when I saw him in the backyard.
7         So at that point, we had the arrest warrant in hand; and
8    by North Carolina statute, we're obligated to serve that
9    warrant at that point.
10   Q.   Okay.  Now, with the video we just saw, when you asked
11   Ms. Everett to go upstairs and turn off the cameras, had you
12   spoken to Officer Budden at that point?
13   A.   I mean, yeah.  We had spoken several times before he left
14   for the search warrant, yes.
15   Q.   Okay.  So did he tell you that there were guns up in that
16   closet?
17   A.   No.  I ended up telling him about the guns.
18   Q.   Because he just testified that he -- another officer saw
19   the guns and yelled out to him.
20   A.   I don't doubt that that happened, but there was -- there's
21   a lot of square footage, so we communicated -- there was a lot
22   of overlapping communications about a lot of things.
23   Q.   So you're worried about safety, and another officer allows
24   you to go to a closet with a loaded AR-15 on the shelf and
25   doesn't tell you?

C. Robinson - Cross-Examination

1  A.   Again, my tactical considerations aren't necessarily

2  always going to be the same as the next guy.

3  Q.   So he didn't tell anybody that there are two loaded guns

4  on the shelf?

5          THE COURT:  "He" is who?

6  BY MR. YOUNG:

7  Q.   Officer Budden.  I'm sorry.

8  A.   I don't know who he told.  I don't understand what you're

9  asking.

10 Q.   Officer Budden testified that he first saw -- somebody saw

11 the guns first and alerted him that there were guns in the

12 master bedroom in the closet.

13 A.   Okay.

14 Q.   And then after that, you go to the closet, and you allow

15 her to go with no handcuffs where there's a loaded AR-15 to put

16 yourself in what could be danger.

17 A.   Sir, at the time I escorted her to where the DVR was, I

18 had no idea where the DVR was.  I didn't know we were going to

19 the master bedroom closet when we started up the stairs.  I

20 didn't know that's where we were going.

21 Q.   Okay.  And you wanted to undo the cameras so that some

22 possible footage couldn't be outside the home and people

23 ambushed?

24 A.   Yeah.  I wanted to prevent anyone from having a live view

25 of what was going on in the house to plan an ambush style,

C. Robinson - Cross-Examination

1  whether it be assault on us or interdiction of our evidence.

2  Q.    Was there officers outside the home?

3  A.    Yes.

4  Q.    And it looked like there were two sitting there in the

5  same area as you.  Who were those two officers?

6  A.    Detective Dustin Harding and Detective Chris Kemp

7  (phonetic).

8  Q.    Okay.  So when you asked her to go upstairs, and she asked

9  you:  Do I have to, and you tell her:  Well, you don't have to;

10 but if you don't -- and at this point, she's not in custody,

11 right?

12 A.    She's not under arrest, no.

13 Q.    But she's not free to move about the house?

14 A.    Correct.

15 Q.    Okay.  Okay.  And I'm just going to ask you one more

16 question.  So in this investigation where you guys are

17 worried -- you're doing a protective sweep because there's some

18 kind of reasonable assertion that there may be some harm that

19 could come to you guys, right?

20 A.    Harm and unaccounted for individuals.

21 Q.    And another officer, who at that time had been an officer

22 about six-and-a-half years, does not tell you:  Officer

23 Robinson, there are guns upstairs that we haven't touched yet.

24 Nobody says that?

25 A.    Not directly that I recall, no.

```
 1   Q.    Okay.
 2             MR. YOUNG:  No further questions.
 3             THE COURT:  Thank you.
 4             Mr. Lemmon?
 5             MR. LEMMON:  No redirect, Your Honor.
 6             THE COURT:  Thank you.
 7             Thank you, Agent.  Please watch your step stepping
 8   down.
 9             Any other witnesses for the Government or evidence?
10             MR. LEMMON:  No further evidence, Your Honor.
11             THE COURT:  Anything from the defense, Mr. Young?
12             MR. YOUNG:  No, Your Honor.
13             THE COURT:  I'll hear argument, and then I anticipate
14   taking a break and see where we are.
15             MR. LEMMON:  Thank you, Your Honor.
16             The defendant's motion to suppress should be denied.
17   First, the defendant in his motion claims that this was a
18   search of a house following an arrest or incident to arrest in
19   violation of the Chimel case, but that case is an apposite, and
20   this is not a case matching the facts there.
21             In that case officers arrested a defendant and did a
22   full search of the house, and the Court concluded that was
23   improper.  But here, as Your Honor has seen in videos and heard
24   through testimony, this was a protective sweep of the
25   defendant's home to ensure the safety of the officers and
```

```
 1   others present on the scene.  There was no search that was
 2   conducted.  There was no -- unlike the Chimel case, officers
 3   were not going through drawers, opening containers.  It was not
 4   a full search.  It was a brief, limited protective sweep to
 5   ensure safety.
 6           And that situation is controlled by the Buie case.
 7   And the Supreme Court has held in that case when executing an
 8   arrest warrant in a home, officers are permitted to conduct a
 9   brief sweep of the house to ensure safety of the officers.  The
10   Buie case says that officers don't have to have information
11   rising to the level of probable cause or reasonable suspicion.
12   They need only articulable facts and rational inferences that
13   others could be present and could pose a danger.  Doesn't have
14   to be a probable cause belief that there is another person who
15   would pose a danger, just articulable facts and rational
16   inferences that others could be present and could pose a
17   danger.
18           The Court in Buie recognizes that arrests in a home
19   could be more dangerous than encounters on the street.  It is
20   the defendant's home turf, as the Court said, and an ambush is
21   a real possibility.
22           I'm sure that this Court is aware that in recent
23   weeks, two FBI agents were killed while attempting to execute a
24   search warrant at a home in Florida.  This is a very dangerous
25   situation every time it happens.
```

1          Since the *Buie* case, the Fourth Circuit has stated:
2     It is inherently dangerous for officers to execute an arrest
3     warrant at a defendant's home, particularly when drugs and guns
4     are involved.  That was the *Watson* case in 2013.
5          Now, of course, there can't be a full search of the
6     premises.  It should only be long enough to dispel the threat
7     or the potential for a threat.
8          And the defendant also argues that the location of
9     where the defendant was arrested in this case should have
10    limited the ability to do a protective sweep.  But the Fourth
11    Circuit has held in the *Laudermilt* case -- that's 677 F.3d 611.
12    It's a 2012 case the Fourth Circuit decided, and also the *Jones*
13    case, which is a 2012 case, that a protective sweep is
14    justified even if the arrest occurs just outside of the home or
15    at the entryway, which is what happened here, there is still a
16    potential for an ambush, still a potential need to dispel the
17    potential threat of others in the house.
18         Regarding the plain view issue, here the officers
19    were -- because of the need for a protective sweep, they were
20    lawfully present at the locations where you heard Officer
21    Budden testify that he saw the THC container.  He knew what it
22    was.  He described it accurately in the affidavit.  He did not
23    seize it, so it was not contraband that was immediately being
24    seized under the *Coolidge* case, which was cited by the
25    defendant.

```
 1          Additionally, Officer Budden testified that he saw
 2   those firearms at the end of his protective sweep and before he
 3   went to apply for the warrant, and he mentioned those in his
 4   warrant.
 5          We also heard Specialist Chase Robinson say that he
 6   also saw those firearms prior to the warrant being applied for.
 7   But I do believe it was Officer Budden's own view of those guns
 8   during the initial protective sweep that he relied on in his
 9   own affidavit.
10          The exigent circumstances rule was cited by the
11   defendant, but that does not apply here.  This wasn't a
12   situation where there was an immediate danger or an exigency
13   requiring the officers to go in without a warrant.  They had an
14   arrest warrant.  They did what they were supposed to do.
15          There's also a suggestion this protective sweep was
16   somehow not reasonable.  But as Your Honor saw, it lasted only
17   a few minutes.  It was brief.  The officers only did what was
18   necessary to ensure there were no other individuals who could
19   pose a danger.
20          The defendant also has suggested that the
21   surveillance should have been enough to dispel any concerns.
22   But as Your Honor heard, Ms. Sinkler was present inside the
23   house.  No one had seen her when they were doing surveillance.
24   There was a daycare operating.  There were two children inside.
25   I think for the safety of the officers as well as the safety of
```

1  children or others who could be inside, including people like

2  Ms. Sinkler, the protective sweep was justified and necessary.

3        Even if the protective sweep was somehow improper,

4  the remainder of the warrant still had more than sufficient

5  probable cause to support the issuance of the warrant.  That

6  included the two-month investigation into the defendant's drug

7  trafficking, witness' information about the defendant's

8  marijuana trafficking at the Middle Bridge Drive apartment, the

9  seizures at the Middle Bridge Drive apartment, the traffic stop

10  of Alvin Davis, the identification of 1080 Ronald Reagan Drive,

11  the surveillance showing that there were surveillance cameras

12  all around the outside, the fact that the defendant was parking

13  his vehicle in a manner that appeared to be -- attempted to

14  hide his vehicle behind the house.  All of that, even without

15  the mention of the THC bottle and the guns, would have been

16  sufficient for the judge to issue the warrant in this case.

17        And then finally, even if the warrant somehow was

18  improper, suppression would not be the appropriate remedy.  As

19  Your Honor knows, the touchstone of the Fourth Amendment is

20  reasonableness.  The exclusionary rule is meant to deter

21  deliberate or reckless or grossly negligent behavior by

22  officers, and exclusion should only be done if an officer knew

23  or should have known that the search was unconstitutional.

24        Here they took appropriate steps to protect

25  themselves, others on the scene, children in the house.  They

```
 1   took a situation that could have been dangerous and deadly, and
 2   they successfully diffused it.  Everyone left at the end of the
 3   day safely, and they should be commended.  And so suppression
 4   should not be the remedy chosen if there was some kind of a
 5   technical violation.
 6             For all these reasons, Your Honor, we would ask that
 7   the defendant's motion be denied.  Thank you.
 8             THE COURT:  Thank you.
 9             Mr. Young.
10             MR. YOUNG:  Thank you, Your Honor.
11             I'll be brief, Your Honor.  We cannot simply put a
12   blanket over the Fourth Amendment.  If that was the case, then
13   there should be a safety sweep on every arrest warrant that's
14   dealing with somebody who's accused of drugs and guns, which
15   normally go hand in hand.  If there's a drug case, there's
16   normally guns involved with it.
17             Detective Budden testified to, "A lot of times we
18   just felt, we knew."  So you can't do that.  To say that we're
19   worried about safety and to have one officer, a veteran officer
20   see guns that -- we weren't able to hear that part of the video
21   to say that somebody called out that there's guns in the
22   bedroom.  And then to allow another police specialist to go
23   upstairs where the guns are with the defendant's wife and
24   there's a loaded AR-15 in the closet, he's saying that he
25   didn't even know that the guns were upstairs, and he goes
```

1  upstairs?  How worried are they about safety?  There's a clear

2  standard in *Buie*.  And, yeah, the immediate area, you can

3  search that.  You can search the immediate area without the

4  reasonable suspicion.  But there are supposed to be articulable

5  facts and rational inferences when you want to do a protective

6  sweep.

7        There was a seven-hour surveillance.  And, you know,

8  prosecution says they didn't know that Ms. Sinkler was in

9  there.  Ms. Everett immediately told them:  Hey, she's here.  I

10  got two kids upstairs and also have a dog upstairs.

11        There was absolutely no reason to do a protective

12  sweep upstairs where they didn't even -- well, we didn't see it

13  on camera -- search the immediate area where he was arrested.

14  He's already in custody.  He's in custody, as Specialist

15  Robinson testified, almost immediately.  He's in custody.  He's

16  then taken away from the home, and it's the wife and

17  Ms. Sinkler.

18        And for some reason, they go back upstairs, which

19  would have been the second time, where there's loaded guns.

20  And nobody has communicated to anybody else that:  Hey, there's

21  guns upstairs.  Whether this is a search warrant or not,

22  whether you're seizing the guns or not, there's loaded guns

23  upstairs, and you're going upstairs with the party that is not

24  restrained at all.  That does not seem feasible to me.  Officer

25  Budden is no longer here, so we can't ask him why wouldn't you

```
 1  have said:  Hey, there's gun upstairs.

 2          You have several officers roaming the property.  You

 3  have two who are just sitting there almost right in front of

 4  the TV.  So if you're concerned about the cameras, why don't we

 5  have officers in front of the neighborhood, officers outside,

 6  officers in the front, the back.  There were at least eight

 7  officers there that we saw.

 8          Your Honor, this case is -- it's a case that came

 9  from the State level.  It came from Fayetteville.  There's

10  clearly something going on in Fayetteville.  And I don't know

11  that they expected this case to end up in this courtroom, but

12  it came from Fayetteville; something is going on there.  And,

13  Your Honor, I just think that a lot of this stuff does not add

14  up, and the motion to suppress should be granted.

15          THE COURT:  Thank you.

16          All right.  Let's take a recess until 10:40.

17      (The proceedings were recessed at 10:20 a.m. and

18  reconvened at 10:40 a.m.)

19          THE COURT:  In connection with the defense motion to

20  suppress, which is at Docket Entry 66, the Court has considered

21  the motion as well as the Government's response at Docket

22  Entry 72.  The Court has reviewed all of the exhibits that have

23  been submitted and the attachments to the various motions.  The

24  Court also has considered the testimony of Officer Budden and

25  Officer Chase Robinson and finds their testimony to be
```

1  credible.

2         The Court makes the following findings of fact and

3  conclusions of law in connection with the motion to suppress.

4  I'll then enter a short order incorporating by reference these

5  findings and conclusions in connection with the defendant's

6  motion:

7         The search warrant affidavit at Exhibit 3, which is

8  also attached to the Government's response in which Officer

9  Budden recounted much of sort of background facts, not only on

10 his training and experience, but on the events leading to the

11 arrest of the defendant, Mr. Everett, at the Ronald Reagan

12 Drive house where the search took place are set forth in that

13 affidavit.

14        As Officer Budden testified, on Monday, July 16th,

15 2018, the Fayetteville Police Department, the gang unit,

16 executed a search warrant at 715-5 Middle Bridge Road,

17 Fayetteville, North Carolina, as a result of an approximately

18 two-month long controlled substance investigation.  The

19 residence was rented and occupied by Reshod Everett and Alvin

20 Davis as a place where apparently controlled substances were

21 stored.

22        The officers had obtained information from anonymous

23 complainants within the apartment complex and then had verified

24 it through management about other complaints that Reshod

25 Everett and Alvin Davis had been seen on many occasions

1  carrying duffle bags from their vehicles to the apartments, and

2  citizens detected the odor of marijuana coming from the

3  vehicles and the apartment.

4        As a result, there was a search warrant executed

5  there, revealing a large amount of marijuana packaged in vacuum

6  sealed bags, and it was seized from the residence, as well as

7  $5,000 in U.S. currency.

8        That search, as I understand it, took place after

9  the -- on July 16th, 2018, and the affidavit recounts

10  information obtained in that search warrant.  The officers had

11  also arrested Alvin Davis, and he had narcotics in his car as

12  well as a firearm and a large amount of currency.

13        During the course of the investigation, Reshod

14  Everett, officers learned, had a primary residence at 1080

15  Ronald Reagan as well as using the Middle Bridge Road place to

16  store narcotics.  Officers verified through a variety of means,

17  including paperwork inside the apartment, for the 2017

18  Chevrolet Silverado pickup truck with an address registration

19  to Mr. Everett of 1080 Ronald Reagan Drive, a check, a utility

20  bill associated with Reshod Everett at Ronald Reagan Drive.

21        On July 17th, Fayetteville police obtained a warrant

22  on Reshod Everett for trafficking in marijuana and trafficking

23  in cocaine, maintaining a residence and felony conspiracy.  A

24  surveillance operation was conducted on July 17th, 2018.  That

25  began at approximately 1:00 p.m. at 1080 Ronald Reagan Drive.

```
 1              As Officer Budden testified and Officer Robinson
 2    testified, during the course of that surveillance, officers
 3    were able to observe Everett's wife, Victoria Everett, coming
 4    into the residence.  She was in the residence.  It also
 5    appeared to officers that she operated a daycare there out of
 6    the residence.
 7              Officers observed Reshod Everett's white Chevrolet
 8    Silverado in the backyard.  Officers identified the Silverado
 9    as the primary vehicle Reshod Everett used and had been
10    driving.  He was also observed smoking in the backyard of the
11    residence.
12              Officers also observed the security cameras covering
13    all angles and sides of the residence, which they believe,
14    based on their training and experience, to be consistent with
15    high-end drug trafficking.
16              The officers delayed conducting or executing the
17    arrest warrants that they'd obtained to arrest Mr. Everett
18    until they at least thought that any children had been picked
19    up who may have been at the daycare.  At approximately 1930
20    hours, Fayetteville police made contact with Mr. Everett at his
21    front door of his residence at 1080 Ronald Reagan Drive.  He
22    initially sort of pulled back a little, but they took him into
23    custody basically without incident.
24              The officers then conducted a security sweep at the
25    residence to confirm no one was hiding in the residence.  They
```

```
 1   located in the residence a person they didn't know was there,
 2   Ms. Sinkler, along with a person they did know, Mr. Everett's
 3   wife, and then two of the Everett children.
 4            During this sweep, officers observed THC gummies in
 5   plain view and two loaded rifles on a shelf in a bedroom
 6   closet.  Detective Budden then went and got a search warrant.
 7   Again, Exhibit 3 is the search warrant affidavit where in the
 8   search warrant affidavit he recounts this investigation, the
 9   events at 715-5 Middle Bridge Road, the results of the search
10   there, the results of the arrest of Mr. Davis.  And then the
11   magistrate issued a warrant to search the residence and any
12   vehicles located at the residence.
13            And in the motion to suppress, the defense seeks to
14   have all the evidence seized, any statements made suppressed.
15            So in terms of the law, of course, the Fourth
16   Amendment protects the rights of people to be secure in their
17   persons, houses, papers and effects against unreasonable
18   searches and seizures.  Searches and seizures inside a home
19   without a warrant are presumptively unreasonable.  The Supreme
20   Court has made that point in a number of cases to include
21   Brigham City versus Stuart, 547 U.S. 398, 403 (2006).
22   Nevertheless, this presumption can be overcome, and the
23   ultimate touchstone under the Fourth Amendment is
24   reasonableness.
25            Here, at least with respect to the initial
```

interaction, the officers had a valid arrest warrant for the
defendant, Mr. Everett, and that arrest warrant was founded on
probable cause.  And an arrest warrant founded on probable
cause implicitly carries with it the limited authority to enter
a dwelling in which the suspects live or there's reason to
believe the suspect is within as discussed in *Payton v. New
York*, 445 U.S. 573, 603 (1980).

Here, as mentioned, officers delayed executing the
arrest warrants out of concern associated with other children
from the daycare operations still being inside.  They did have
eyes on Mr. Everett during the course of the day.  When they
finally went to execute the arrest warrant, the defendant
answered the door.  He retreated somewhat; but as Officer
Budden said, he was then placed under arrest essentially
without incident.

Under the Fourth Amendment and as described by the
Supreme Court in *Maryland v. Buie*, 494 U.S. 325 (1990), the
Supreme Court recognized that as an incident to an arrest, the
officers could, as a precautionary matter and without probable
cause or reasonable suspicion, look in closets and other spaces
immediately adjoining the place of arrest from which an attack
could be immediately launched.

However, the Supreme Court also made clear that there
must be articulable facts which, taken together with the
rational inferences from those facts, would warrant a

1  reasonably prudent officer in believing that the area to be

2  swept harbors an individual posing a danger to those on the

3  arrest scene.

4          The Supreme Court made that statement, which I just

5  quoted, in Buie at 494 U.S. at page 334.  The Fourth Circuit

6  has quoted that statement in cases to include *United States v.*

7  *Laudermilt*, 667 F.3d 605, 610 (4th Cir. 2012).

8          The Supreme Court recognized in *Buie* that the risk of

9  danger in the context of an arrest in a home is as great, if

10 not greater, than an on-the-street or roadside investigatory

11 encounter.  Unlike an encounter on the street or along a

12 highway, an in-home arrest puts the officers at the

13 disadvantage of being on the adversary's turf.  An ambush in a

14 confined setting of unknown configuration is more to be feared

15 than it is in the open, more familiar surroundings.  This is

16 *Buie*, 494 U.S. 335.

17         As Mr. Lemmon mentioned in his argument, sadly, in

18 this country recently, two FBI agents were killed when they

19 were going to execute a search warrant at a home where a person

20 inside fired through the door, and so confirming kind of what

21 the Supreme Court observed in *Buie*.

22         Again, the protective sweep may not be a full search

23 of the premises.  It may last, "no longer than is necessary to

24 dispel the reasonable suspicion of danger; and in any event, no

25 longer than it takes to complete the arrest and depart the

1  premises."

2        The Fourth Circuit has repeatedly recognized that

3  with respect to officer safety, the protection of police

4  officers is of particular concern in cases involving firearms

5  and drugs.  See *United States v. Watson*, 703 F.3d 684, 693 (4th

6  Cir. 2016), and *Mora v. City of Gaithersburg*, 519 F.3d 216,

7  216, 226 (4th Cir. 2008).

8        Here, the Court finds based on the evidence presented

9  that the officers did have articulable facts which, taken

10  together with the rational inferences from those facts, would

11  warrant a reasonably prudent officer in believing that the area

12  to be swept harbors an individual posing a danger to those on

13  the arrest scene.  Again, I'm quoting the *Buie* case, 494 U.S.

14  at 334.

15        On July 17th, 2018, agents had seen the defendant at

16  the residence that day smoking outside.  They also believe

17  there were children present and that were being cared for.  But

18  with respect to the standard in *Buie*, the officers at the time

19  of the protective sweep had probable cause to believe and did

20  believe, based on the arrest warrants that they had and the

21  information they learned in the investigation, that the

22  defendant was a large-scale drug trafficker; that the part of

23  the drug trafficking organization involved numerous firearms.

24  Officers had seized firearms, including at the stash house

25  location, as well as from Alvin Davis in the days immediately

1  preceding the execution of the arrest warrants at the residence

2  of Mr. Everett.

3            And, again, in connection with the search on

4  July 16th at the stash house, they had seized cocaine,

5  marijuana, currency, and a loaded firearm from a residence that

6  defendant was using with Mr. Davis.

7            Certainly, all of that information, they couldn't --

8  they didn't have eyes on inside the house.  And, in fact, as it

9  turned out, there was a woman, Ms. Sinkler, who officers were

10  not aware was present.  Now, of course, Ms. Everett told them

11  that she was there.  And the defense says:  Well, the *Buie*

12  standard isn't met to do a protective sweep.

13            Sadly, in situations like this, the adage "Trust but

14  verify" is a reasonably prudent approach by an officer.

15  Sometimes people actually will lie to officers, even inside a

16  residence in terms of saying who was there.

17            And based on all of this other information that I had

18  mentioned, including that the investigation showing that the

19  defendant was a large-scale drug trafficker, that the drug

20  trafficking organization involved armed individuals, including

21  the defendant; that there had been a seizure of a large amount

22  of drugs and currency and firearms from Alvin Davis and at the

23  apartment that he -- that Davis and Everett shared in the days

24  immediately preceding this, and that officers did not have eyes

25  on inside the house, they certainly had articulable facts,

1   taken together with rational inference that would warrant a
2   reasonably prudent officer in believing that the area to be
3   swept harbored an individual posing a danger to those on the
4   arrest scene.
5          And as the body cam showed and consistent with *Buie*,
6   494 U.S. at page 335, the officers did not conduct a full
7   search of the premises, but only a cursory inspection of those
8   spaces where a person may be found.  As the body cam showed,
9   they didn't open containers.  They were looking in closets.  As
10  Officer Budden credibly testified, the sweep lasted no longer
11  than necessary to dispel the reasonable suspicion of danger as
12  set forth in the *Buie* case.
13         In opposition, the defense relies heavily on *Chimel*
14  *v. California*, 395 U.S. 752.  But as the *Buie* court explained
15  in distinguishing *Chimel*, *Chimel* involved a full-blown search
16  of an entire house for evidence of a crime for which the arrest
17  had been made and not the more limited intrusion contemplated
18  by a protective sweep.  And additionally, *Chimel* focused not on
19  the safety of the threat posed by the house or those of
20  potential third parties.
21         So I do think on the record and in light of the
22  facts, that I found that *Buie* controls.
23         Alternatively, to the extent that the defense
24  suggests that because the alleged arrest took place outside the
25  house, there was no right at all to do a protective sweep.  The

1  Fourth Circuit in the *Laudermilt* case, 677 F.3d 611 n.2, noted
2  that the fact that the defendant was arrested outside the home
3  does not affect the protective sweep analysis.  They talked
4  about this in *United States v. Jones*, 667 F.3d 477, 485 n.10
5  (4th Cir. 2012).

6           In *Jones*, the Fourth Circuit upheld a protective
7  sweep where the arrest occurred around the doorway of the
8  residence.  And, again, here, I think *Laudermilt* and *Jones* are
9  directly on point based on the record about the location,
10  whether Mr. Everett was just inside the doorway, whether he
11  retreated a little bit inside, or whether he was just at the
12  entrance of the doorway when he opened the door; that the place
13  of where he arrested doesn't warrant suppressing the evidence.

14          With respect to the plain view doctrine, the Court --
15  obviously the evidence showed that officers, when they were
16  doing the protective sweep, observed the THC gummy container as
17  well as the firearms.  The THC gummy containers are not legal
18  in North Carolina or under federal law, as articulated by
19  Officer Budden.

20          As far as the firearms, I mean, Mr. Everett was not a
21  felon at the time, but the officers certainly could draw a
22  rational inference between the connection between a narcotics
23  dealer and narcotics and firearms.  And it is a crime to
24  possess a firearm in furtherance of a drug trafficking crime.
25          The evidence in connection with this topic of what

was observed during the protect sweep, obviously Officer Budden
did recount some of that or those two items in kind of the last
bullet on -- or the second to last bullet point on Exhibit 3.
It's Bates page, I think, 181 of the discovery where he makes a
reference to that.

But I do think as an alternative holding that even if
my analysis under *Buie* is incorrect, the inevitable discovery
doctrine would apply in terms of not suppressing the evidence
found in the search of the residence; that even if I put aside,
as the Court talked about in *United States v. Giordano*, 416
U.S. 505, 555 (1974), the ultimate inquiry on a motion to
suppress seized pursuant to a warrant is not whether the
underlying affidavit contained allegations based on illegally
obtained evidence, but whether putting aside all tainted
allegations, the independent and lawful information stated in
the affidavit suffices to show probable cause.

The Fourth Circuit has talked about that principle as
well in cases to include *U.S. v. Apple*, 915 F.2d 899, 910 (4th
Cir. 1990).

It's useful to remember the probable cause standard.
The Supreme Court talked about it most recently in *District of
Columbia versus Wesby*, 138 Supreme Court 577, 586.  In
evaluating the topic of probable cause, in there the Supreme
Court was talking about probable cause in the context of an
arrest, but the discussion applies more generally to the topic

```
 1   of probable cause.  The Court noted, "To determine whether an
 2   officer had probable cause for an arrest, we examine the events
 3   leading up to the arrest and then decide whether these
 4   historical facts, viewed from the standpoint of an objectively
 5   reasonable police officer, amount to probable cause.  Because
 6   probable cause deals with probabilities, it depends on the
 7   totality of the circumstances.  It is a fluid concept that is
 8   not readily or even usefully reduced to a neat set of legal
 9   rules.  It requires only a probability or substantial chance of
10   criminal activity, not an actual showing of such activity.
11   Probable cause is not a high bar."  That's the Supreme Court in
12   Wesby, 138 Supreme Court at 586.
13           Here, the officers sought and obtained a valid
14   warrant to search the defendant's residence.  The affidavit, as
15   reflected in Exhibit 3 of Officer Budden, did not rely solely
16   on the items that were seen during the protective sweep.
17   Indeed, excluding those items, the affidavit recounts the
18   two-month investigation into the defendant's drug trafficking,
19   witness information regarding defendant's marijuana trafficking
20   at the 715 Middle Bridge Road apartments, the marijuana,
21   cocaine, firearms, and currency seized during the arrest of
22   co-conspirator Alvin Davis, and the execution of a search
23   warrant at 715-5 Middle Bridge Drive in the time period
24   immediately preceding -- immediately preceding the search
25   warrant -- I mean the arrest warrant being executed, and then
```

```
 1  the search warrant being obtained with respect to the Ronald
 2  Reagan Drive house, the identification of 1080 Ronald Reagan
 3  Drive as the defendant's primary residence, the confirmation
 4  that the residence was his, the issuance of arrest warrants
 5  concerning the defendants, the surveillance of his vehicle
 6  there, where the vehicle was parked, the observation of
 7  security cameras and the other information recounted.
 8           In short, even if the Court were to exclude the
 9  reference to the THC gummies and the firearms observed, the
10  affidavit did provide probable cause to justify issuance of the
11  warrant.
12           Alternatively, the Supreme Court's case of *United
13  States v. Leon*, 468 U.S. 897, 909 teaches that suppression
14  would not be the proper remedy in any event.  In *Leon*, the
15  Supreme Court discussed the good faith exception and explained
16  the limits to that.
17           The Court observed in *Leon* that suppression is a
18  judicially created remedy designed to safeguard Fourth
19  Amendment rights generally through its deterrent effect rather
20  than a personal constitutional right of the party aggrieved.
21  Evidence should be suppressed only if it can be said that the
22  law enforcement officers had knowledge or may be properly
23  charged with knowledge that the search was unconstitutional
24  under the Fourth Amendment.
25           In *Leon* the Supreme Court recognized the good faith
```

```
 1  exception and then also the limits.  Suppression can remain an
 2  appropriate remedy if the magistrate judge issuing a warrant
 3  was misled by information in the affidavit that the affiant
 4  knew was false or would have known was false, except for his
 5  reckless disregard of the truth.  The good faith exception will
 6  not apply in cases where the issuing magistrate wholly
 7  abandoned its judicial role, nor would an officer manifest
 8  objective good faith in relying on a warrant based on an
 9  affidavit so lacking in indicia of probable cause as to render
10  official belief in its existence entirely unreasonable.
11  Finally, depending on the circumstances of the particular case,
12  a warrant may be so facially deficient that the executing
13  officer cannot reasonably presume it to be valid.  This is
14  Leon, 468 U.S. 923.
15          The defense doesn't really argue that about the
16  warrant.  Here, again, the warrant recounts a careful
17  multiple-month investigation, describes events associated with
18  Mr. Everett being tied and being involved in large-scale drug
19  trafficking in Fayetteville, recounts items found and seized at
20  the apartment that's mentioned in the affidavit.  So I do think
21  that even if all is said and done, Leon teaches that
22  suppression wouldn't be the appropriate remedy.
23          So the defense motion at Docket Entry 66 is denied.
24          I do thank counsel for their briefing and their work
25  and their presentations here today.
```

1          I will enter a short order incorporating by reference
2  my findings and conclusions in connection with the motion to
3  suppress, and all the exhibits submitted will be made part of
4  the record of the case.
5          So with that, we'll be in recess until 9:00 a.m.
6  tomorrow.
7                          *       *       *
8          (The proceedings concluded at 11:09 a.m.)

```
 1                    UNITED STATE DISTRICT COURT

 2                 EASTERN DISTRICT OF NORTH CAROLINA

 3

 4

 5                 CERTIFICATE OF OFFICIAL REPORTER

 6

 7            I, Amy M. Condon, CRR, RPR, CSR, Federal Official

 8    Court Reporter, in and for the United States District Court for

 9    the Eastern District of North Carolina, do hereby certify that

10    pursuant to Section 753, Title 28, United States Code, that the

11    foregoing is a true and correct transcript of the

12    stenographically reported proceedings held in the

13    above-entitled matter and that the transcript page format is in

14    conformance with the regulations of the Judicial Conference of

15    the United States.

16

17

18    Dated this 21st day of July, 2021.

19

20                                    _____

21                                    /s/ Amy M. Condon
                                      Amy M. Condon, CRR, CSR, RPR
22                                    U.S. Official Court Reporter

23

24

25
```

| File No. | 18CR 059213 | Law Enforcement Case No. | 2018-018879 | LID No. | SID No. | FBI No. |
|---|---|---|---|---|---|---|

| | |
|---|---|
| **WARRANT FOR ARREST** | FAYETTEVILLE POLICE DEPARTMENT |

**STATE OF NORTH CAROLINA**

In The General Court Of Justice
District Court Division

CUMBERLAND _____ County

*Offense*
I F-TRAFFICKING IN MARIJUANA
II F-TRAFFICKING IN MARIJUANA
III F-MAINTN VEH/DWELL/PLACE CS (F)

**THE STATE OF NORTH CAROLINA VS.**

*Name And Address Of Defendant*
RESHOD EVERETT
LD RA
FAYETTEVILLE          NC   28303
CUMBERLAND

| Race | Sex | Date Of Birth | Age |
|---|---|---|---|
| B | M | | |

| Social Security No./Tax ID No. | Drivers License No. & State |
|---|---|

*Name Of Defendant's Employer*

| Offense Code(s) | Offense In Violation Of G.S. |
|---|---|
| 13523 | I 90-95(H)(1) |
| 15528 | II 90-95(H)(1) |
| III 9968 | III 90-108(A)(7) |

*Date Of Offense*
07/16/2018          through          07/16/2018

*Date Of Arrest & Check Digit No. (As Shown On Fingerprint Card)*

*Complainant (Name, Address Or Department)*
SAMUEL COOK
FAYETTEVILLE POLICE DEPARTMENT
467 HAY ST
FAYETTEVILLE          NC   28301
CUMBERLAND          (910) 433-1856
*Name & Addresses Of Witnesses (Including Counties & Telephone Nos.)*

☒ *Misdemeanor Offense Which Requires*   *Date Issued*
☒ *Fingerprinting Per Fingerprint Plan*          07/17/2018

AOC-CR-1(     )w, 12/17
© 2017 Adm          stive Office of the Courts

To any officer with authority and jurisdiction to execute a warrant for arrest for the offense(s) charged below. I, the undersigned, find that there is probable cause to believe that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully and feloniously did possess MORE THAN 10 POUNDS BUT LESS THAN 50 POUNDS of marijuana.

I, the undersigned, find that there is probable cause to believe that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully and feloniously did manufacture MORE THAN 10 POUNDS BUT LESS THAN 50 POUNDS of marijuana.

I, the undersigned, find that there is probable cause to believe that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully and feloniously did knowingly and intentionally keep and maintain a dwelling house, 715-5 MIDDLE BRIDGE DRIVE FAYETTEVILLE NC that was used for keeping and selling controlled substance, COCAINE AND MARIJUANA, in violation of the North Carolina Controlled Substances Act.

This act(s) was in violation of the law(s) referred to in this Warrant. This Warrant is issued upon information furnished under oath by the complainant listed. You are DIRECTED to arrest the defendant and bring the defendant before a judicial official without unnecessary delay to answer the charge(s) above.

| Signature | | Location Of Court | Court Date |
|---|---|---|---|
| J L STAFFORD | | Cumberland Co. Detn; DETN | |
| ☒ Magistrate   ☐ Deputy CSC | | 204 GILLESPIE ST | Court Time   ☐ AM  ☐ PM |
| ☐ Assistant CSC   ☐ Clerk Of Superior Court | | FAYETTEVILLE,NC 28301 | |
| | (over) | | |

**OTHER AGENCY ON**   **NOT FOR SERVICE**

255

Government
Exhibit
1
5:20-CR-333-D-1

JA172

| File No. | 18CR 059214 | | Law Enforcement Case No. | 2018-018879 | LID No. | SID No. | FBI No. |
|---|---|---|---|---|---|---|---|
| | | | FAYETTEVILLE POLICE DEPARTMENT | | | | |

## WARRANT FOR ARREST

### STATE OF NORTH CAROLINA

In The General Court Of Justice
District Court Division

CUMBERLAND _____ County

**Offense**
I F-TRAFFICKING IN COCAINE
II F-TRAFFICKING IN COCAINE

**THE STATE OF NORTH CAROLINA VS.**

*Name And Address Of Defendant*
RESHOD EVERETT

FAYETTEVILLE        NC    28303
CUMBERLAND

| Race | Sex | Date Of Birth | Age |
|---|---|---|---|
| B | M | | |

| Social Security No./Tax ID No. | Drivers License No. & State |
|---|---|

*Name Of Defendant's Employer*

| Offense Code(s) | Offense In Violation Of G.S. |
|---|---|
| I 3530 | I 90-95(H)(3) |
| II 3530 | II 90-95(H)(3) |

*Date Of Offense*
07/16/2018    through    07/16/2018

*Date Of Arrest & Check Digit No. (As Shown On Fingerprint Card)*

*Complainant (Name, Address Or Department)*
SAMUEL COOK
FAYETTEVILLE POLICE DEPARTMENT
467 HAY ST
FAYETTEVILLE        NC    28301
CUMBERLAND        (910) 433-1856
*Names & Addresses Of Witnesses (Including Counties & Telephone Nos.)*

To any officer with authority and jurisdiction to execute a warrant for arrest for the offense(s) charged below:
I, the undersigned, find that there is probable cause to believe that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully and feloniously did possess MORE THAN 400 GRAMS of Cocaine.

I, the undersigned, find that there is probable cause to believe that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully and feloniously did manufacture MORE THAN 400 GRAMS of Cocaine.

This act(s) was in violation of the law(s) referred to in this Warrant. This Warrant is issued upon information furnished under oath by the complainant listed. You are DIRECTED to arrest the defendant and bring the defendant before a judicial official without unnecessary delay to answer the charge(s) above.

| Signature | Location Of Court | Court Date |
|---|---|---|
| J L STAFFORD | Cumberland Co. Detn; DETN | |
| ☒ Magistrate ☐ Deputy CSC | 204 GILLESPIE ST | Court Time |
| ☐ Assistant CSC ☐ Clerk Of Superior Court | FAYETTEVILLE,NC 28301 | ☐ AM ☐ PM |
| *(over)* | | |

**OTHER AGENCY COPY - NOT FOR SERVICE**

| Date Issued |
|---|
| 07/17/2018 |

☒ Misdemeanor Offense Which Requires
Fingerprinting Per Fingerprint Plan

AOC-CR-10    v. 12/17
© 2017 Adm.        ative Office of the Courts

256

**JA173**

| File No. | 18CR 059215 |
| --- | --- |

**WARRANT FOR ARREST**

Offense
I F-FELONY CONSPIRACY
II F-FELONY CONSPIRACY

**THE STATE OF NORTH CAROLINA VS.**

Name And Address Of Defendant
RESHOD EVERETT

FAYETTEVILLE          NC  28303
CUMBERLAND

| Race | Sex | Date Of Birth | Age |
| --- | --- | --- | --- |
| B | M | | |

Social Security No./Tax ID No.        Drivers License No. & State
                                      NC

Name Of Defendant's Employer

| Offense Code(s) | Offense In Violation Of G.S. |
| --- | --- |
| I 9918 | I 14-2.4(A) |
| II 9918 | II 14-2.4(A) |

Date Of Offense
07/16/2018    through    07/16/2018

Date Of Arrest & Check Digit No. (As Shown On Fingerprint Card)

Complainant (Name, Address Or Department)
SAMUEL COOK
FAYETTEVILLE POLICE DEPARTMENT
467 HAY ST
FAYETTEVILLE          NC  28301
CUMBERLAND           (910) 433-1856

Names & Addresses Of Witnesses (Including Counties & Telephone Nos.)

☒ Misdemeanor Offense Which Requires    Date Issued
  Fingerprinting Per Fingerprint Plan     07/17/2018

AOC-CR-10^      , 12/17
© 2017 Adm          tive Office of the Courts

---

Law Enforcement Case No.    2018-018879
FAYETTEVILLE POLICE DEPARTMENT

| LID No. | SID No. | FBI No. |
| --- | --- | --- |

**STATE OF NORTH CAROLINA**

In The General Court Of Justice
District Court Division

CUMBERLAND          County

To any officer with authority and jurisdiction to execute a warrant for arrest for the offense(s) charged below.
I, the undersigned, find that there is probable cause to believe that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully and feloniously did conspire with ALVIN MILTON DAVIS III to commit the felony of TRAFFICKING IN COCAINE against STATE OF NORTH CAROLINA.

I, the undersigned, find that there is probable cause to believe that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully and feloniously did conspire with ALVIN MILTON DAVIS III to commit the felony of TRAFFICKING IN MARIJUANA against STATE OF NORTH CAROLINA.

This act(s) was in violation of the law(s) referred to in this Warrant. This Warrant is issued upon information furnished under oath by the complainant listed. You are DIRECTED to arrest the defendant and bring the defendant before a judicial official without unnecessary delay to answer the charge(s) above.

Signature
J L STAFFORD

☒ Magistrate          ☐ Deputy CSC
☐ Assistant CSC      ☐ Clerk Of Superior Court
                     (over)

Location Of Court
Cumberland Co. Detn; DETN
204 GILLESPIE ST
FAYETTEVILLE,NC 28301

| Court Date | |
| --- | --- |
| Court Time | ☐ AM ☐ PM |

**OTHER AGENCY CO~~ - NOT FOR SERVICE**

257

**STATE OF NORTH CAROLINA**

Cumberland _____ County

In-The-General Court Of Justice
District/Superior-Court Division

## SEARCH WARRANT

### IN THE MATTER OF

1080 Ronald Reagan Drive Fayetteville, NC 28311

Date Issued: 7/17/2016   Time Issued: 9:03  ☐ AM  ☒ PM

Name Of Applicant: Detective N. Budden #219

Name Of Additional Affiant:

To any officer with authority and jurisdiction to conduct the search authorized by this Search Warrant:

I, the undersigned, find that there is probable cause to believe that the property and person described in the application on the reverse side and related to the commission of a crime is located as described in the application.

You are commanded to search the premises, vehicle, person and other place or item described in the application for the property and person in question. If the property and/or person are found, make the seizure and keep the property subject to Court Order and process the person according to law.

You are directed to execute this Search Warrant within forty-eight (48) hours from the time indicated on this Warrant and make due return to the Clerk of the Issuing Court.

This Search Warrant is issued upon information furnished under oath or affirmation by the person(s) shown.

### RETURN OF SERVICE

I certify that this Search Warrant was received and executed as follows:

Date Received: 7/17/2016   Time Received: 9:09  ☐ AM  ☒ PM
Date Executed: 7/17/2016   Time Executed: 9:58  ☐ AM  ☒ PM

☒ I made a search of 1080 Ronald Reagan Dr Fayetteville, NC as commanded.

☒ I seized the items listed on the attached inventory.

☐ I did not seize any items.

☐ This Warrant WAS NOT executed within forty-eight (48) hours of the date and time of issuance and I hereby return it not executed.

Name Of Officer Making Return (type or print): N. Budden

Signature Of Officer Making Return: N. Budd

Department Or Agency Of Officer: Fayetteville Police Dept.

Incident Number: 2018-018279

| Date | Name Of Issuing Official (type or print) | Signature |
|---|---|---|
| 7/17/16 | M. Crenshaw | M. Crenshaw |

☐ Deputy CSC  ☐ Assistant CSC  ☐ CSC  ☒ Magistrate  ☐ District Ct. Judge  ☐ Superior Ct. Judge

NOTE: When issuing a search warrant, the issuing official must retain a copy of the warrant and warrant application, and must promptly file them with the clerk. G.S. 15A-245(b).

This Search Warrant was delivered to me on the date and at the time shown below when the Office of the Clerk of Superior-Court is closed for the transaction of business. By signing below, I certify that I will deliver this Search Warrant to the Office of the Clerk of the Superior Court as soon as possible on the Clerk's next business day.

| Date | Time | ☐ AM ☐ PM | Name Of Magistrate (type or print) | Signature Of Magistrate |
|---|---|---|---|---|

This Search Warrant was returned to the undersigned clerk on the date and time shown below.

| Date | Time | ☐ AM ☐ PM | Name Of Clerk (type or print) | Signature Of Clerk | ☐ Dep. CSC ☐ Asst. CSC ☐ CSC |
|---|---|---|---|---|---|
| 7-20-18 | 345 | | Deborah K King | Deborah K King | |

Original - File.  Copy - For Search of a Person, to Person from Whom Items Taken
(If Premises) to Owner Therein In Absent Control; If No Such Person Present, Leave Copy Affixed Therein
(Over)

Copy - For Search of Vehicle

AOC-CR-119, Rev. 3/17
© 2017 Administrative Office of the Courts

Case 5:20-cr-00333-D    Document 177-1    Filed 12/23/20    Page 1 of 9

**Government
Exhibit
3
5:20-CR-333-D-1**

JA175

## APPLICATION FOR SEARCH WARRANT

I, Detective N. Budden #219, Fayetteville Police Department

*(Insert name and address; or if law enforcement officer, name, rank and agency)*

being duly sworn, request that the Court issue a warrant to search the person, place, vehicle, and other items described in this application and to find and seize the property and person described in this application. There is probable cause to believe that *(Describe property to be seized; or if search warrant is to be used for searching a place to serve an arrest warrant or other process, name person to be arrested)* Any substance under the North Carolina Controlled Substance Act, firearms.

constitutes evidence of a crime and the identity of a person participating in a crime, *(Name crime)* Any violation of the North Carolina Controlled substance act

and is located *(Check appropriate box(es) and fill in specified information)*

☒ In the following premises *(Give address and, if useful, describe premises)*
See attached affidavit

*(and)*
☒ on the following person(s) *(Give name(s) and, if useful, describe person(s))*
See attached affidavit

*(and)*
☒ In the following vehicle(s) *(Describe vehicle(s))*
See attached affidavit

AOC-CR-119, Side Two, Rev. 3/17
© 2017 Administrative Office of the Courts

*(and)*
☒ *(Name and/or describe other places or items to be searched, if applicable)*
See attached affidavit

The applicant swears or affirms to the following facts to establish probable cause for the issuance of a search warrant:
☒ See attached affidavit

| | Date | Name Of Applicant (type or print) |
|---|---|---|
| SWORN/AFFIRMED AND SUBSCRIBED TO BEFORE ME | 07/17/2018 | N. Budden |
| Date | | Signature Of Applicant |
| 07/17/2018 | | |
| Signature | | Signature Of Superior Court |
| M. Crenshaw | | |
| ☒ Magistrate ☐ Dep. CSC ☐ Asst. CSC ☐ Clerk Of Superior Court ☐ Judge |

☐ In addition to the affidavit included above, this application is supported by additional affidavits, attached inside by

☐ In addition to the affidavit included above, this application is supported by sworn testimony, given by

This testimony has been *(check appropriate box)* ☐ reduced to writing
☐ tape recorded and I have filed each with the clerk.

NOTE: If more space is needed for any section, continue the statement on an attached sheet of paper with a notation saying "See attachment." Date the continuation and include on it the signatures of applicant and issuing official.

**JA176**

```
[   STATE OF NORTH CAROLINA    ]
[                              ]
[   COUNTY OF CUMBERLAND        ]              AFFIDAVIT
[                              ]
```

CONTINUATION OF A SEARCH WARRANT APPLICATION IN THE MATTER OF THE RESIDENCE LOCATED AT 1080 RONALD REAGAN DRIVE FAYETTEVILLE, NORTH CAROLINA 28311

**Affidavit of N. Budden, Patrol Officer, Fayetteville Police Department, Fayetteville, North Carolina, in support of a Search Warrant for 1080 Ronald Reagan Dr. Fayetteville, North Carolina 28311**

I, Neil D. Budden Jr., being duly sworn, states that I am a Law Enforcement Officer employed with the City of Fayetteville Police Department and have been for 6 ½ years. In May of 2010 I graduated from Curry College in Milton, Massachusetts with a Bachelors of Arts Degree in Criminal Justice. In July of 2011 I attended the Basic Law Enforcement Training (BLET) at the Fayetteville Police Department Training Center. During BLET I completed over seven hundred and fifty hours of training from certified police instructors. This training included classes on controlled substance law, methods of how controlled substances are bought, sold, packaged, distributed, transported, and techniques on how to effectively enforce the North Carolina Controlled Substance Laws. Upon graduating from the police academy I completed a 14 week field training program assigned to the Cross Creek patrol division. During the field-training program, new officers receive training from experienced Police Specialists. A portion of this training includes instruction on controlled substance activity at the street level. Upon successful completion of the field-training program, I was assigned as a uniformed patrol officer. As a patrol officer I have investigated felony and misdemeanor controlled substance violations. I am currently assigned to the Fayetteville Police Departments Gang unit, a unit whose mission is to investigate gang members or those individuals' associates with gangs. From February 2018 to May 2018 I was assigned to the Cross Creek District's Community Empowerment Response Team (CERT), which has, among many other tasks, a mission to investigate violent crime, including gang activity, narcotic activity, and weapons violations. While being assigned to the patrol division as a uniformed police officer my primary duty of the patrol division unit is the enforcement of the laws of North Carolina and to patrol assigned area to ensure the overall safety of the residents of that area. I have received training and have field experience in the operations of street level controlled substance investigation. From July 2015 to January 2018 I was assigned to the Fayetteville Police K-9 Team which is part of the Patrol Operations Support Bureau. As a K-9 handler I was certified through the International Police Work Dog Association. The primary responsibility of the Fayetteville Police Departments K-9 Unit is Patrol Operations, Narcotic Detection and Cadaver Recovery. To date, I have been involved in approximately 30 search warrant executions which resulted in felony and misdemeanor arrests for controlled substance related offenses. I am familiar with many types of controlled substances to include the ways they are manufactured, packaged, transported and sold. In March 2016 I graduated from the Police Law Institute Course through Wilson Community College. In March 2018 I attended a Basic Narcotics Investigations course through the Fayetteville Technical Community College.

I will now be referred to as Affiant.

SWORN AND SUBSCRIBED BEFORE ME THIS 17TH DAY OF JULY, 2018

_M. Crenshaw_
(X)MAGISTRATE
( )DISTRICT COURT JUDGE
( )SUPERIOR COURT JUDGE

_N. Budden_
AFFIANT

PAGE/ of 5

```
[   STATE OF NORTH CAROLINA    ]
[                              ]
[   COUNTY OF CUMBERLAND       ]              AFFIDAVIT
[                              ]
```

CONTINUATION OF A SEARCH WARRANT APPLICATION IN THE MATTER OF THE RESIDENCE
LOCATED AT 1080 RONALD REAGAN DRIVE FAYETTEVILLE, NORTH CAROLINA 28311

- On Monday July 16, 2018 the Fayetteville Police Department Gang Unit executed a search warrant at 715-5 Middle Bridge Road Fayetteville, NC 28303 as a result of a 2 month long controlled substance investigation. The residence was rented and occupied by Reshod Everett and Alvin Davis as a keeping place for controlled substances. Information provided by anonymous complainants within the apartment complex was that Reshod Everett and Alvin Davis had been seen on many occasions carrying duffle bags from their vehicles to the apartment and citizens detected the odor of marijuana coming from the vehicles and the apartment.

- As a result of the search warrant; 38 pounds of marijuana packaged in vacuum sealed bags was seized from the residence. Along with the marijuana was a half kilo of cocaine still in the brick form as it's packaged from top tier drug manufacturers and produced for resale on the street to lower level drug dealers. In addition to this, more than five thousand dollars in U.S. currency was seized from the residence and Alvin Davis's person when he was taken into custody; THC gummies, more than 110 empty vacuum sealed bags, packaging materials, digital scales as well as two firearms were seized.

- During the course of the investigation it was discovered that Reshod Everett had a primary address of 1080 Ronald Reagan Drive and was using the apartment on Middle Bridge Road as a "stash house", a safe place for keeping his narcotics away from his primary residence. During the search we found service paperwork inside the apartment for the 2017 Chevrolet Silverado pickup truck with an address for 1080 Ronald Reagan Drive. A check with the Public Works Commission (PWC) was conducted for 1080 Ronald Reagan Drive which showed Reshod Everett as name on the utility bill.

- On Tuesday July 17, 2018 Detective Cook obtained warrants on Reshod Everett for Trafficking in Marijuana x2, Trafficking in Cocaine x2, maintaining a residence, and felony conspiracy x2.

- On Tuesday July 17, 2018 a surveillance operation was conducted which began at approximately 1300 hours at 1080 Ronald Reagan Drive. Through the course of the surveillance Everett's wife, Victoria Everett, was observed coming home in a white 2013 Audi Q7 which is registered to Reshod Everett. Victoria Everett stayed at the residence for the duration of the afternoon into the night. Reshod Everett's white Chevrolet Silverado was observed parked in the back yard from the fire department parking lot behind the residence. The white Silverado is the primary vehicle to Reshod Everett and the only vehicle he has been seen driving by several citizens within the apartment complex at 715 Middle Bridge Road. It was believed that if the truck was at the residence, Reshod Everett would be there as well. Parking the vehicle in the back yard is a common tactic used by drug traffickers to prevent the public and the police from knowing when they're home. During the surveillance Reshod Everett was observed in the

SWORN AND SUBSCRIBED BEFORE ME THIS 17TH DAY OF JULY, 2018

_M. Crenshaw_       _N. B.t._       PAGE _2of5_

(X)MAGISTRATE       AFFIANT
( )DISTRICT COURT JUDGE
( )SUPERIOR COURT JUDGE

[     STATE OF NORTH CAROLINA     ]
[                                          ]
[     COUNTY OF CUMBERLAND     ]                    AFFIDAVIT
[                                          ]

CONTINUATION OF A SEARCH WARRANT APPLICATION IN THE MATTER OF THE RESIDENCE
LOCATED AT 1080 RONALD REAGAN DRIVE FAYETTEVILLE, NORTH CAROLINA 28311

back yard of the residence smoking a cigarette. Detectives conducting the surveillance
made note of security cameras covering all angles and sides of the residence, another
tactic used by those engaged in high end drug trafficking activity.

- At approximately 1930 hours members of the Fayetteville Police Department Gang Unit
  and the Violent Criminal Apprehension Team (VCAT) made contact with Reshod Everett
  at his residence at 1080 Ronald Reagan Drive and took him into custody on the
  outstanding warrants without incident as he answered the front door. For the safety of
  everyone on scene, a security sweep was conducted at the residence to confirm no one
  was hiding in the residence and posed a threat. During the sweep of the residence
  Detectives observed THC gummies in plain view and two loaded rifles on a shelf in the
  bedroom closet in close proximity to Reshod Everett's bed. This tactic is commonly used
  by those engaged in controlled substance activity for protection.
- Based on the search warrant executed at 715-5 Middle Bridge Road and the observations
  made at 1080 Ronald Reagan Drive the Affiant believes Reshod Everett is a high level
  dealer in a large drug trafficking organization in Fayetteville and Cumberland County,
  North Carolina and further evidence to corroborate will be found at 1080 Ronald Reagan
  Drive.

Based on the totality of these observations the Affiant prays the Administration of Justice grants
a search warrant on 1080 Ronald Reagan Drive Fayetteville, North Carolina and that any
vehicles located at this residence to be seized for any additional evidence of controlled substance
activity and distribution.

CONTINUATION OF PREMISES TO BE SEARCHED.......

A gray stone, blue and grey vinyl siding two story single family residence with the numbers
1080 clearly marked above the garage. Black shingles on the roof and a white 6-foot privacy
fence enclosing the back yard of the residence.

CONTINUATION OF VEHICLE(S) TO BE SEARCHED........

All vehicles located at the residence or associated with residents of 1080 Ronald Reagan Drive
Fayetteville, North Carolina within the curtilage during the execution of this warrant that may
contain the evidence sought within this affidavit. To include:

White 2017 Chevrolet Silverado HV7529 / North Carolina
White 2013 Audi Q7 Prestige SUV PAA6122 / North Carolina
White 2017 Chevrolet Tahoe SUV ZZT6680 / North Carolina

SWORN AND SUBSCRIBED BEFORE ME THIS 17TH DAY OF JULY, 2018

_M. Crinshaw_                    _N. Bd___                    PAGE 3 of 5

(X)MAGISTRATE                    AFFIANT
( )DISTRICT COURT JUDGE
( )SUPERIOR COURT JUDGE

```
[    STATE OF NORTH CAROLINA    ]
[                               ]
[    COUNTY OF CUMBERLAND       ]              AFFIDAVIT
[                               ]
```

CONTINUATION OF A SEARCH WARRANT APPLICATION IN THE MATTER OF THE RESIDENCE
LOCATED AT 1080 RONALD REAGAN DRIVE FAYETTEVILLE, NORTH CAROLINA 28311

CONTINUATION OF ITEMS TO BE SEIZED........

Any controlled substances, chemicals used in the manufacturing of the controlled
substances, items that tend to show ownership, dominion or control of the premises, records of
illegal drug activity, documents photographs, drug paraphernalia, money, pagers, cellular
telephones containing electronic data, firearms, which facilitate the manufacturing, distribution,
and selling of controlled substances. Along with any item that may have been stolen and traded
in exchange for the controlled substance in place of currency.

CONTINUATION OF PERSONS TO BE SEARCHED.......

All persons located at the residence or associated with residents of 1080 Ronald Reagan Drive
Fayetteville, North Carolina within the curtilage during the execution of this warrant that may
contain the evidence sought within this affidavit. To include:

Reshod Everett B/M ▉▉▉▉
Victoria Everett B/F ▉▉▉▉

CONTINUATION OF WHAT CONSTITUTES A CRIME......

PWIS&D G.S. 90-95, MANUFACTURING G.S. 90-95, MAINTAIN A DWELLING G.S. 90-
108,

SWORN AND SUBSCRIBED BEFORE ME THIS 17TH DAY OF JULY, 2018

_____        _____        _____
(X)MAGISTRATE                  AFFIANT                          PAGE 4 of 5
( )DISTRICT COURT JUDGE
( )SUPERIOR COURT JUDGE

[     STATE OF NORTH CAROLINA     ]
[                                 ]
[     COUNTY OF CUMBERLAND        ]                    AFFIDAVIT
[                                 ]

CONTINUATION OF A SEARCH WARRANT APPLICATION IN THE MATTER OF THE RESIDENCE
LOCATED AT 1080 RONALD REAGAN DRIVE FAYETTEVILLE, NORTH CAROLINA 28311

***NOT TO SCALE***



SWORN AND SUBSCRIBED BEFORE ME THIS 17TH DAY OF JULY, 2018

_____        _____        _____
(X)MAGISTRATE                       AFFIANT                            PAGE 5 of 5
( )DISTRICT COURT JUDGE
( )SUPERIOR COURT JUDGE

**STATE OF NORTH CAROLINA**

File No. _____

Cumberland _____ County

In The General Court Of Justice
___ District ___ Superior Court Division

IN THE MATTER OF:

Name

1080 Ronald Reagan Dr Fayetteville, NC 28311

**INVENTORY OF ITEMS SEIZED
PURSUANT TO SEARCH**

G.S. 15A-223, -254, -257

I, the undersigned officer, executed a search of:

Person, Premises Or Vehicle Searched

1080 Ronald Reagan Dr Fayetteville, NC 28311
Reshod Everett, Victoria Everett

Date Of Search

07/17/2018

This search was made pursuant to

☒ 1. a search warrant issued by: Magistrate Crenshaw _____

☐ 2. consent to search given by: _____

☐ 3. other legal justification for the search: _____

The following items were seized:

$65,689 U.S. Currency
31 grams of Heroin
73 grams of marijuana
312 grams of THC wax
4 packs of brownies
5 packs of gummies
2 packs of THC lollipops
4 packs of ziploc bags
26 plastic containers
3 food saver machines
2 digital scale
Portable hard drive
DVR
8 Rifle magazines
3 hand gun magazines
5.7 Ammunition
380 ammunition
40 caliber S&W ammunition
38 special ammunition
9mm ammunition
5.56 ammunition
7.62 ammunition
44 plastic bags
paper documents
3 duffles bags
2 money bags
plastic bag containing keys
Mag Tactical MGG4 Rifle
DPMS A15 Rifle
FNH PS90 Rifle and tool
3 Smith and Wesson M&P Bodyguard handguns
Ruger p94 handgun
SKS Type 56 rifle
3 Samsung smart phones
3 Apple Iphones
2 plastic totes

Original - File
Copy - For Search by Warrant of a Person, to Person from Whom Items Taken
Copy - For Search by Warrant of Vehicle/Premises, to Owner or Person in Apparent Control; If No Such Person Present, Leave Copy Affixed Thereon
Copies - For Search by Consent, to Person Giving Consent and Owner of Vehicle/Premises Searched, If Known

AOC-CR-206, Rev. 3/16
© 2016 Administrative Office of the Courts

(Over)

Items Seized Continued:

☐ 1. I left a copy of this inventory with the person named below, who is:

  ☐ a. the owner of the premises searched.

  ☐ b. the owner of the vehicle searched.

  ☐ c. the person in apparent control of the premises searched.

  ☐ d. the person in apparent control of the vehicle searched.

  ☐ e. the person from whom the items were taken.

☐ 2. As no person was present, I left a copy of this inventory:

  ☐ a. in the premises searched, identified on the reverse.

  ☐ b. in the vehicle searched, identified on the reverse.

  Name And Address Of Person To Whom A Copy Of This Inventory Was Delivered, If Any

The law enforcement agency identified below will hold the seized property subject to court order.

| SWORN/AFFIRMED AND SUBSCRIBED TO BEFORE ME | Name Of Law Enforcement Officer (type or print)<br>N. Budden 219/0747 |
|---|---|
| Date<br>1-20-18 | Name (type or print)<br>Hrondo K. Knx | Signature Of Law Enforcement Officer<br>N. Bd    219/0747 |
| ☐ Notary | Signature,<br>Lonardo K. Knox | Title Of Law Enforcement Officer<br>Police Officer |
| SEAL | Date My Commission Expires<br><br>County Where Notarized | Name And Address Of Agency<br>Fayetteville Police Department<br>467 Hay Street<br>Fayetteville, North Carolina 28301 |

☑ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court   ☐ Magistrate

| ACKNOWLEDGMENT OF RECEIPT |
|---|
| I, the undersigned, received a copy of this inventory. |

| Date | Signature Of Person Receiving Inventory |
|---|---|

AOC-CR-206, Side Two, Rev. 3/16
© 2016 Administrative Office of the Courts



Ex. 5

**JA184**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CR-333-D

UNITED STATES OF AMERICA        )
                                )
v.                              )          **ORDER**
                                )
RESHOD JAMAR EVERETT,           )
                                )
                    Defendant.  )

On March 4, 2021, the court held a hearing concerning defendant's motion to suppress

[D.E. 66]. At the end of the hearing, the court announced its findings of fact and conclusions of

law. As discussed in open court, the court DENIES defendant's motion to suppress [D.E. 66].

SO ORDERED. This $\underline{4}$ day of March 2021.

JAMES C. DEVER III
United States District Judge

```
                 UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NORTH CAROLINA
                       WESTERN DIVISION

     ----------------------------------------------------------

     UNITED STATES OF AMERICA,

                      Plaintiff,

          -vs-                        Case No. 5:20-CR-333-D-1


     RESHOD JAMAR EVERETT,

                      Defendant.

     ----------------------------------------------------------

                         ARRAIGNMENT
                       APRIL 29, 2021
               THE HONORABLE ROBERT T. NUMBERS II
                  UNITED STATES MAGISTRATE JUDGE



     A P P E A R A N C E S


     On Behalf of the Government

     SCOTT A. LEMMON
     United States Attorney's Office - EDNC
     150 Fayetteville Street, Suite 2100
     Raleigh, North Carolina 27601


     On Behalf of the Defendant

     CHRISTOPHER M. YOUNG
     The Young Law Firm, PLLC
     700 12th Street, NW Suite 700
     Washington, D.C. 20005



                    Risa Kramer, RMR, CRR
                     Official Court Reporter
                  United States District Court
                   Wilmington, North Carolina
```

**JA186**

2

```
 1                    TRANSCRIPT OF PROCEEDINGS
 2              (Proceedings commenced at 1:44 p.m.)
 3          THE COURT:  Good afternoon, everyone.
 4          We are here in the United States District
 5  Court for the Eastern District of North Carolina sitting
 6  in Raleigh for arraignments in felony criminal cases.
 7  In a moment the Court will call the calendar to
 8  determine whether all defendants and their attorneys are
 9  present.  When a defendant's name is called, defense
10  counsel should identify themselves, state whether their
11  client is in the courtroom, and how they anticipate
12  their client will plead today.
13          If a defendant does not have an attorney, or
14  if the defendant's attorney is not present, the
15  defendant should answer when his or her name is called.
16          After the Court calls the calendar, the
17  defendants and their attorneys shall remain in the
18  courtroom so that the Court may explain to each
19  defendant their right to a jury trial and the
20  consequences of pleading guilty.
21          The Court will ask each defendant if they
22  understand their rights under the Constitution and laws
23  of the United States.  If they do not, the Court will
24  explain those rights to them again.  The Court will then
25  place each defendant under oath and question them
```

**JA187**

3

```
 1   individually before accepting their plea.  Defendants
 2   may confer with their attorneys before answering any of
 3   the Court's questions.
 4              At this time, I'd ask the clerk to please
 5   call the calendar.
 6              (Other cases addressed by the Court.)
 7              THE CLERK:  United States versus Reshod
 8   Jamar Everett.
 9              MR. YOUNG:  Good afternoon, Your Honor.
10   Christopher Young for Mr. Everett.  He's present.  We
11   anticipate entering a plea of not guilty.
12              THE COURT:  Thank you.
13              (Other cases addressed by the Court.)
14              THE COURT:  At this time, I'm going to
15   advise the defendants as a group of certain rights they
16   have under the Constitution and laws of the United
17   States, as well as the process for proceeding today and
18   the consequences of entering a guilty plea.  Each
19   defendant should pay close attention to what the Court
20   is about to tell them because it is an important part of
21   your case, and I will ask you if you've heard and
22   understood everything I've said today.  I now advise
23   each defendant as follows.
24              If you are accused of a felony, you have the
25   constitutional right to be charged in an indictment by a
```

**JA188**

4

```
 1   grand jury.  A grand jury consists of 16 to 23 people,
 2   and at least 12 grand jurors must find that there is
 3   probable cause to believe that a defendant has committed
 4   a crime before they may be indicted.  Unless you waive
 5   indictment, you may not be charged in federal court with
 6   a felony.  You may waive the right to grand jury
 7   indictment and consent to being charged by an
 8   information filed by the United States Attorney.  If you
 9   waive grand jury indictment, the case will proceed
10   against you based on that information just as though you
11   had been indicted.
12            If you do not waive indictment, the United
13   States may present the case to a grand jury and ask the
14   grand jury to indict you.  The grand jury may or may not
15   do so.
16            Along with the right to be charged in an
17   indictment, the Constitution and laws of the United
18   States give you the right to plead not guilty to every
19   charge against you and to have a jury trial.  In that
20   regard, you should consider the following:  At trial,
21   you would be presumed innocent.  The United States would
22   have to prove you guilty beyond a reasonable doubt using
23   competent evidence.  You would not have to prove that
24   you were innocent.
25            At trial, the United States would have to
```

5

1  bring any witnesses it wishes to rely on to court, and

2  those witnesses would have to testify before you.  Your

3  attorney would be able to cross-examine those witnesses,

4  object to evidence offered by the United States, and

5  offer evidence on your behalf.  You would have the

6  ability to use the subpoena power of the Court to

7  require witnesses to appear in court and testify,

8  whether they wanted to do so or not.

9           At trial, you would also have the right to

10  testify if you chose to do so.  You also have the right

11  not to testify if you do not want to do so.  If you

12  would choose not to testify, the judge would instruct

13  the jury that they cannot draw any inference or

14  suggestion of guilt from your failure to testify.

15           You have the right to be represented by an

16  attorney at every stage of your criminal proceeding,

17  including trial, and if you cannot afford an attorney,

18  you have the right to ask the Court to appoint one for

19  you.

20           Your choice of whether you plead guilty or

21  not guilty has no impact on your right to have an

22  attorney represent you or the right to have one

23  appointed for you.  But if you wish to plead guilty, you

24  will be waiving your right to a jury trial and the

25  related rights I've just discussed, other than the right

**JA190**

6

1  to be represented by an attorney.  If you plead guilty,

2  instead of a trial, the Court will find you guilty of

3  the offenses you plead guilty to.  The Court will then

4  sentence you based on your guilty plea.

5           Cases in which guilty pleas are tendered and

6  accepted today will be set for sentencing before Judge

7  Dever during the July 19th, 2021, term here in Raleigh.

8  In determining your sentence, the Court will calculate

9  the advisory guideline range established by the federal

10 sentencing guidelines.  It is important that you

11 understand that regardless of the advisory guideline

12 range ultimately found to be appropriate to your case,

13 you may not withdraw a plea that is tendered -- a guilty

14 plea that is tendered and accepted today.

15          The Court will then consider the advisory

16 guideline range along with any departures or variance

17 motions; the factors listed in 18 U.S.C. Section 3553;

18 all arguments of counsel; all statements made by you,

19 the attorney for the United States, and any victims.

20          You should be aware that if you plead

21 guilty, the Court may still impose the same punishment

22 on you as if you entered a not guilty plea and a jury

23 convicted you.  If you have reached a plea agreement

24 with the United States, you should also realize that the

25 Court is not a party to the plea agreement.  Plea

7

1   agreements are negotiated solely between you, your

2   attorney, and the attorneys for the government.

3            The Court advises you that any stipulations

4   in your plea agreement are not binding on the Court.

5   Rather, the Court will independently determine your

6   sentence based upon the factors I discussed earlier.

7            The Court will carefully examine your plea

8   agreement to be sure that it conforms to the objectives

9   of sentencing.  These objectives include imposing a

10  sentence within the parameters of your statute of

11  conviction that is appropriate based upon the

12  seriousness of your actual offense behavior and your

13  past criminal conduct.

14           The Court will evaluate that behavior and

15  conduct only after it receives a detailed written

16  presentence report from the probation office.  The

17  probation office will prepare that report between now

18  and your sentencing date.  It is important that the

19  presentence report be complete and accurate.  The

20  presentence report will be an important tool to aid the

21  Court in determining your sentence.  You and your

22  attorney may provide information for the report.  You

23  and your attorney will also receive a copy of the

24  report.  You should review it, and if you believe that

25  there are any issues in it that you wish to raise with

8

```
1   the Court, you must file a -- I'm sorry -- you must
2   provide a written objection to the probation officer
3   within 15 days after receiving the report.
4           The Court will not consider any dispute
5   which has not been the subject of such a written
6   communication.  Furthermore, the Court will consider and
7   resolve only issues related to disputed sentencing
8   factors previously stated in writing and brought to the
9   Court's attention by you or your attorney on your
10  sentencing date.  At sentencing, you should advise the
11  Court orally if you have any objection to any matter
12  contained in or omitted from the presentence report that
13  your attorney has failed to raise.  Contentions not
14  raised by you or your attorney will be deemed abandoned.
15          Your failure to challenge the validity of
16  any prior conviction before imposition of your sentence
17  will bar you from contesting those convictions later.
18          In short, if you do not contest the facts
19  set forth in the presentence report, the Court may
20  accept those facts, including any prior convictions, as
21  correct and rely on them in determining your sentence.
22          You or your attorney on your behalf may
23  submit written memoranda, motions, or other materials,
24  such as character letters, to the Court before the
25  sentencing hearing.  The United States may submit
```

**JA193**

1   written materials as well.  Either party must submit any

2   written materials they would like the Court to consider

3   at least seven days before your sentencing date.

4           After the Court sentences you, the United

5   States is limited in most instances to one year within

6   which to move for reduction in your sentence under Rule

7   35(b) because of assistance you have rendered to the

8   United States.  United States is not required to return

9   to court with a Rule 35(b) motion, and it is completely

10  within the United States's discretion whether to do so.

11  If the United States decides not to make a Rule 35(b)

12  motion, you are entitled to relief from the Court in

13  only very few exceptional circumstances.

14          At sentencing, you should advise the Court

15  whether the United States has made any representations

16  to you or your attorney that your future cooperation may

17  lead to a Rule 35(b) motion.  If the United States does

18  make a Rule 35(b) motion to seek a reduction in your

19  sentence, that motion does not extend, toll, or modify

20  the one-year time for filing a postconviction section

21  2255 motion to vacate, set aside, or correct your

22  sentence.

23          Furthermore, the United States Attorney

24  cannot promise you that the Court will grant a Rule

25  35(b) motion nor can the United States Attorney promise

**JA194**

```
 1   you that law enforcement officers will accept or act on
 2   any offers of cooperation that you may make.
 3           A plea of guilty has several other
 4   consequences you should be aware of.  The Constitution
 5   gives you the right to remain silent, and any statements
 6   you make can be used against you.  If you wish to plead
 7   guilty, you will need to waive your right to remain
 8   silent because I cannot accept your guilty plea unless
 9   you admit in open court your guilt as to the particular
10   offense or offenses you are pleading guilty to.
11           If you are on probation or parole in another
12   case, whether in this or another court, your guilty plea
13   in this case may result in the revocation of your
14   probation or parole in that other case.  As a result,
15   you may have to serve time in that other case in
16   addition to any sentence imposed here.
17           Along with any sentence this Court imposes,
18   your plea of guilty to a felony may deprive you of
19   valuable civil rights such as the right to vote, the
20   right to hold public office, the right to serve on a
21   jury, and the right to possess any kind of firearm.  If
22   you are not a citizen of the United States and you are
23   convicted in federal court, you may be removed from the
24   United States, denied citizenship, and denied future
25   admission to the United States.  Any deportation would
```

1  follow your term of imprisonment.

2          If you're pleading guilty to a sex offense,

3  your guilty plea will likely result in substantial

4  future restrictions on where you can live or work, with

5  whom you may associate, whether you can use a computer,

6  and an ongoing obligation to register with a sexual

7  offender registry.

8          Unless otherwise advised, each defendant

9  will be assessed a per count sum of not less than $100

10 for each count to which they plead guilty, and any fine

11 imposed by the Court will bear interest.

12         In some cases, the Court may impose

13 obligations on top of a sentence of imprisonment, a

14 fine, and special assessment.  For example, the Court

15 may order you to pay restitution to the victims of your

16 offenses.  If your offense involves fraud, you may be

17 required to notify the victims of your offense about

18 your conviction.  And if there's a forfeiture notice in

19 your indictment or information, you may have to forfeit

20 certain property to the United States.

21         Additionally, in most cases, defendants will

22 receive a term of supervised release along with a term

23 of imprisonment.  The term of supervised release follows

24 imprisonment, and you may not commit another federal,

25 state, or local crime while on supervised release.

1            The Court may impose additional conditions

2    on you, if appropriate.

3            If you violate any of the conditions of your

4    supervised release, you may be sent back to prison.

5            If you are convicted, whether by a jury or

6    as a result of a guilty plea, you can appeal your

7    conviction if you believe that it was somehow unlawful

8    or if there was some other fundamental defect in your

9    proceeding that was not waived by your guilty plea.  You

10   also have a statutory right to appeal your sentence in

11   certain circumstances, particularly if you think the

12   sentence is contrary to law.  With few exceptions, any

13   notice of appeal must be filed within 14 days of the

14   judgment being entered in your case.  If you are unable

15   to pay the cost of an appeal, you can ask the Court to

16   waive those costs.  If you do so, the Clerk of Court

17   will prepare and file a notice of appeal on your behalf.

18           You should be aware that you may agree to

19   waive certain rights to appeal or otherwise challenge

20   your conviction and sentence in your plea agreement.

21   We'll go over any such waiver language if it is

22   contained in your plea agreement.  These waivers are

23   generally enforceable, but if you believe the waiver is

24   unenforceable or inapplicable, you can present that

25   theory to the appellate court.

**JA197**

1          I'm now going to ask all the defendants as a

2    group certain questions.  Please listen carefully

3    because these questions and your answers will constitute

4    a part of the record of your plea.  Defense counsel are

5    admonished to take note of their client's answers to my

6    questions.  If a defendant or an attorney wishes to

7    answer "yes" to any of my questions, please raise your

8    hand and address the Court orally.

9          Is there any defendant who does not

10   understand his or her right to indictment by the grand

11   jury?

12         Is there any defendant who intends to plead

13   guilty to a criminal information who has not discussed

14   waiving his or her right to indictment by the grand jury

15   with their attorney?

16         Is there any defendant who is agreeing to

17   waive indictment because of any threat or promise?

18         Is there any attorney representing a

19   defendant who intends to plead guilty to an information

20   who sees any reason why their client should not waive

21   indictment?

22         As to all defendants, is there any defendant

23   who has taken any drugs, medicine, pills, or consumed

24   any alcoholic beverages in the last 48 hours?

25         Is there any defendant who does not

```
 1   understand what is taking place here today?
 2              Is there any defendant who has not received
 3   a copy of his or her indictment or information?
 4              Is there any defendant who needs or wishes
 5   to have their indictment or information read to them for
 6   any reason?
 7              Is there any defendant who has not discussed
 8   his or her case with their attorney?
 9              Is there any defendant who is not completely
10   and fully satisfied with his or her attorney's legal
11   services?
12              Is there any attorney representing a
13   defendant who has any doubt or question about their
14   client's competence to enter a plea today?
15              U.S. MARSHAL:  Your Honor.
16              THE COURT:  Yes, ma'am.
17              U.S. MARSHAL:  He has a concern.
18              DEFENDANT EVERETT:  You want me to stand?
19              THE COURT:  Yes, please.
20              DEFENDANT EVERETT:  Your Honor, it's not
21   that I'm having a problem with my counsel.  I'm having a
22   problem with the facility that I'm at.  I'm on 22-hour
23   lockdown.  And I filed grievances and other things where
24   I'm trying to get able to -- able to get more time to
25   give to my counsel, and they're not allowing me to have
```

```
1   phone calls outside of the 22 hours.  So I'm at a
2   constant state of lockdown which, by me wanting to go to
3   trial, I'm feeling that it may hinder the fairness of me
4   and my counsel.
5              THE COURT:  All right.  Well, I appreciate
6   you raising that with me.  We can discuss that when your
7   case comes up in more detail.  I just want to make sure
8   you're comfortable, though, with your attorney and the
9   conversations you do have with your attorney, you're
10  comfortable with the representation --
11             DEFENDANT EVERETT:  I'm comfortable with the
12  attorney but -- he's doing the best he can but he's, you
13  know, it's strained.
14             THE COURT:  Okay.  We'll be sure to talk
15  about that.
16             DEFENDANT EVERETT:  Okay.  Thank you.
17             THE COURT:  Thank you.
18             Is there any defendant who has any questions
19  about their rights to a jury trial, the rights related
20  to a jury trial, or the other rights I've discussed
21  today along with consequences of pleading guilty?
22             I've now concluded explaining to each
23  defendant their right to a jury trial, the rights
24  related to a jury trial, and the consequences of
25  pleading guilty and will now move on to consider each
```

1    case on the calendar today.

2          We obviously have a substantial number of

3    individuals in the courtroom today.  If we are not

4    dealing with your particular case, you are free to wait

5    out in the hallway.  And we'll make sure that when we

6    move on to other cases, that someone alerts the folks

7    out in the hallway of that fact.

8          We're going to begin with the case of the

9    United States of America versus James Timothy Kelly,

10   5:21-cr-150.

11               (The foregoing concluded at 2:05 p.m.)

12               (The following commenced at 2:18 p.m.)

13          THE COURT:  Next matter will be United

14   States of America versus Reshod Jamar Everett, case

15   number 5:20-cr-333.  I'd like to ask counsel to identify

16   themselves for the record, beginning with counsel for

17   the United States.

18          MR. LEMMON:  Scott Lemmon for the

19   government.

20          MR. YOUNG:  Christopher Young for

21   Mr. Everett.

22          THE COURT:  Good afternoon, counsel.

23          Mr. Young, it's my understanding that the

24   defendant's gonna enter a not guilty plea to the charges

25   against him.  Is that correct?

```
1              MR. YOUNG:  Yes, Your Honor.
2              THE COURT:  Okay.  All right.  Madam Clerk,
3   would you please place the defendant under oath.
4              THE CLERK:  If you'll stand and raise your
5   right hand.
6              (The defendant was placed under oath.)
7              THE COURT:  Mr. Everett, do you understand
8   that you are now under oath and if you answer any of my
9   questions falsely, you may be prosecuted for perjury or
10  making a false statement?
11             THE DEFENDANT:  Yes, sir.
12             THE COURT:  Would you please state your full
13  name for the record.
14             THE DEFENDANT:  Reshod Jamar Everett.
15             THE COURT:  How old are you, sir?
16             THE DEFENDANT:  35.
17             THE COURT:  And how far did you go in
18  school?
19             THE DEFENDANT:  Twelfth grade.
20             THE COURT:  And you're able to speak and
21  understand English?
22             THE DEFENDANT:  Yes, sir.
23             THE COURT:  I have before me this form
24  labeled "Consent to Proceed Before a United States
25  Magistrate Judge."  It appears to bear your signature.
```

18

```
1    Did you, in fact, sign this form?
2                  THE DEFENDANT:  Yes, sir.
3                  THE COURT:  The form reflects you wish to
4    waive your right to have today's proceeding conducted by
5    a U.S. District Judge and instead consent to have it
6    conducted by me, a United States Magistrate Judge.  Is
7    that correct?
8                  THE DEFENDANT:  Yes, sir.
9                  THE COURT:  All right.  Court finds the
10   defendant is knowingly and voluntarily consented to have
11   today's proceeding conducted by a United States
12   Magistrate Judge.
13                  Mr. Everett, did you hear and understand my
14   explanation of your right to a jury trial, the
15   sentencing process, and the other rights you have under
16   the Constitution and laws of the United States?
17                  THE DEFENDANT:  Yes, sir.
18                  THE COURT:  And did you hear and understand
19   the questions that I asked to the defendants as a group?
20                  THE DEFENDANT:  Yes, sir.
21                  THE COURT:  Mr. Young, any concerns about
22   your client's competence?
23                  MR. YOUNG:  No, Your Honor.
24                  THE COURT:  Mr. Lemmon, any concerns for the
25   United States?
```

**JA203**

```
 1                   MR. LEMMON:  No, Your Honor.
 2                   THE COURT:  Are there any crime victims
 3   here?
 4                   MR. LEMMON:  No, Your Honor.
 5                   THE COURT:  Mr. Everett, you have the right
 6   to a full reading of the indictment by the Court.  Do
 7   you wish to have the indictment read to you or do you
 8   waive reading of the indictment?
 9                   THE DEFENDANT:  I waive it.
10                   THE COURT:  Although the defendant's waived
11   reading of the indictment, I do want to briefly review
12   the nature of the offenses against him -- charged
13   against him and the associated penalties.
14                   Mr. Everett, in count 1, you are charged
15   with conspiracy to distribute and possess with the
16   intent to distribute 1,000 kilograms or more of
17   marijuana, a Schedule I controlled substance, and 5
18   kilograms or more of cocaine, a Schedule II controlled
19   substance.
20                   If convicted of that offense, you face not
21   less than 10 years in prison and up to life in prison; a
22   fine of up to $10 million; not less than five years of
23   supervised release and up to life supervised release;
24   upon revocation of supervised release, up to five
25   additional years in prison; a 100-dollar special
```

**JA204**

1  assessment; and restitution, if applicable.

2           Do you understand the nature of count 1 and

3  the associated penalties?

4           THE DEFENDANT:  Yes, sir.

5           THE COURT:  Count 4 charges you with

6  possession with the intent to distribute a quantity of

7  marijuana, a Schedule I controlled substance, and a

8  quantity of cocaine, a Schedule II controlled substance,

9  and aiding and abetting.  If convicted of that offense,

10  you face up to 20 years in prison; up to a $1 million

11  fine; at least three years of supervised release and up

12  to life supervised release; upon revocation of

13  supervised release, up to two additional years of

14  imprisonment; a 100-dollar special assessment; and

15  restitution, if applicable.

16           Do you understand the nature of count 4 and

17  the associated penalties?

18           THE DEFENDANT:  Yes, sir.

19           THE COURT:  Count 5 charges you with

20  possession of a firearm in furtherance of a drug

21  trafficking crime and aiding and abetting.  If convicted

22  of that offense, you face at least five years in prison

23  and up to life in prison, consecutive to any other

24  sentence the Court may impose; if the violation of this

25  law occurred after a prior violation under the same

**JA205**

```
 1   subsection had become final, the penalty would be not
 2   less than 25 years in prison and up to life in prison to
 3   run consecutive to any other term of imprisonment
 4   imposed; a fine of up to $250,000; up to five years of
 5   supervised release; up to five years imprisonment upon
 6   revocation of supervised release; a 100-dollar special
 7   assessment; and restitution, if applicable.
 8             Do you understand the nature of count 5 and
 9   the associated penalties?
10             THE DEFENDANT:  Yes, sir.
11             THE COURT:  Count 6 charges you with
12   possession with intent to distribute a quantity of
13   Tramadol, a Schedule IV controlled substance, and aiding
14   and abetting.  If convicted of that offense, you face up
15   to five years in prison; up to a $250,000 fine; at least
16   one year of supervised release and up to three years
17   supervised release; up to two years in prison upon
18   revocation of supervised release; a 100-dollar special
19   assessment; and restitution, if applicable.
20             Do you understand the nature of count 6 and
21   the associated penalties?
22             THE DEFENDANT:  Yes, sir.
23             THE COURT:  Count 7 charges you with
24   possession with the intent to distribute a quantity of
25   marijuana, a Schedule I controlled substance, and aiding
```

**JA206**

1  and abetting.  If convicted of that offense, you face up

2  to five years in prison; up to a $250,000 fine; at least

3  two years of supervised release and up to three years of

4  supervised release; up to two years in prison upon

5  revocation of supervised release; a 100-dollar special

6  assessment; and restitution, if applicable.

7           Sir, do you understand the nature of count 7

8  and the associated penalties?

9           THE DEFENDANT:  Yes, sir.

10          THE COURT:  Mr. Young, were all plea offers

11 from the United States communicated to the defendant?

12          MR. YOUNG:  Yes, Your Honor.

13          THE COURT:  I presume he's declined to enter

14 into those plea agreements.

15          MR. YOUNG:  Yes, Your Honor, he has.

16          THE COURT:  Mr. Everett, I want to confirm

17 that you understand that any estimate by your attorney

18 or anyone else about what your sentence may be if you

19 are convicted is only an estimate, and that is not

20 binding on the Court.

21          THE DEFENDANT:  Can you repeat that?

22          THE COURT:  Certainly.  In the event that

23 the jury would convict you, I want to make sure you're

24 aware that any estimate your attorney or anyone else may

25 have given you about what your sentence may be is only

1    an estimate, and that estimate is not binding on the

2    Court.

3                 THE DEFENDANT:  Yes, sir.

4                 THE COURT:  And do you understand that

5    regardless of what your attorney has told you, if a jury

6    convicts you, the judge can still sentence you to the

7    maximum sentence allowed by law?

8                 THE DEFENDANT:  Yes, sir.

9                 THE COURT:  Given the potential to be

10   sentenced to the maximum sentence allowed by law if you

11   are convicted at trial, would you like to take any

12   additional time to discuss a potential plea agreement

13   with the United States?

14                THE DEFENDANT:  Repeat?

15                THE COURT:  Sure.  Given the potential that

16   you could be sentenced to the maximum sentence allowed

17   by law if you are convicted at trial, would you like to

18   take any additional time to discuss a potential plea

19   agreement with the United States?

20                THE DEFENDANT:  Would that be, like, me

21   continuing today?

22                THE COURT:  If you wanted to.

23                THE DEFENDANT:  No, sir.

24                THE COURT:  Okay.  Mr. Everett, with respect

25   to count 1 -- at this time I'm gonna ask you how you

24

1    plead to these charges.

2              With respect to count 1 charging you with

3    conspiracy to distribute and possess with the intent to

4    distribute 1,000 kilograms or more of marijuana, a

5    Schedule I controlled substance, and 5 kilograms or more

6    of cocaine, a Schedule II controlled substance, how do

7    you plead?

8              THE DEFENDANT:  Not guilty.

9              THE COURT:  With respect to count 4 charging

10   you with possession with the intent to distribute a

11   quantity of marijuana, a Schedule I controlled

12   substance, and a quantity of cocaine, a Schedule II

13   controlled substance, and aiding and abetting, how do

14   you plead?

15             THE DEFENDANT:  Not guilty.

16             THE COURT:  With respect to count 5,

17   possession of a firearm in furtherance of a drug

18   trafficking crime and aiding and abetting, how do you

19   plead?

20             THE DEFENDANT:  Not guilty.

21             THE COURT:  With respect to count 6,

22   possession with the intent to distribute a quantity of

23   Tramadol, a Schedule IV controlled substance, and aiding

24   and abetting, how do you plead?

25             THE DEFENDANT:  Not guilty.

```
 1              THE COURT:  With respect to count 7,
 2    possession with the intent to distribute a quantity of
 3    marijuana, a Schedule I controlled substance, and aiding
 4    and abetting, how do you plead?
 5              THE DEFENDANT:  Not guilty.
 6              THE COURT:  The defendant's not guilty pleas
 7    are accepted by the Court.  Judge Dever will set this
 8    matter for trial by separate order.
 9              Any delay resulting between today and the
10    date of trial should be excluded from the Speedy Trial
11    Act computation under 18 U.S.C. Section 3161(h)(7)(A)
12    because the ends of justice served by granting a
13    continuance outweigh the best interest of the public and
14    the defendant in a speedy trial.  Denying delay between
15    today and the trial date would deny counsel the
16    reasonable time necessary considering the exercise of
17    due diligence, effective preparation for trial.
18    Additionally, the complications posed by the COVID-19
19    epidemic also justify this delay.
20              Mr. Young, anything further regarding
21    Mr. Everett?
22              MR. YOUNG:  Your Honor, we did want to speak
23    on his housing, Your Honor.
24              THE COURT:  That's right.  Yes.
25              MR. YOUNG:  There's been an order entered by
```

**JA210**

1  Judge Dever, I think a couple of months ago, about

2  moving him somewhere that has Jurislink.  Bladen does

3  have Jurislink but the issue is the 22-hour lockdown,

4  which -- he's filed a grievance, and the response to the

5  grievance was, "You can do whatever you want to do on

6  your two hours out."  But he -- unless I go see him

7  physically -- the Jurislink is only allowed on weekends

8  or nights, and I've been before where the guard who is

9  there on weekends did not know how to set the Jurislink

10  up.  So I have very limited access to him.  He's usually

11  out, I think, between 9:00 and 10:00, and normally I'm

12  in court, and sometimes 2:00 to 3:00, sometimes 6:00 to

13  7:00.  So some days I don't get to speak to him at all.

14          I've called.  I've talked to numerous people

15  who say, "Oh, we'll let him out anytime," and then when

16  I reached out to the chief of the jail, said, "No, he

17  doesn't come out anytime.  He comes out at his preferred

18  time and he can make calls then.  If you're not

19  available, sorry."

20          THE COURT:  What's the reason behind the

21  limitation on his ability to get out of his cell?

22          MR. YOUNG:  That's just their policy right

23  now.  They're on 22 and 2.  They've been on it -- he's

24  been there since August, and I think they've been on it

25  for years?

27

```
1           THE DEFENDANT:  Yeah.  It's been on it for
2   three years.
3           MR. YOUNG:  I do have a copy of the
4   grievance and the response from the captain of the jail
5   which reads:  "Mr. Everett, Bladen County Detention
6   Center is by no way denying you any legal calls.  The
7   jail rec schedule is one hour out on break in the
8   morning and one hour out on break in the evening.  How
9   you spend your time out of the cell while on break is up
10  to you, sir."  And that's from Captain David M. Shaw --
11  D.M. Shaw.  I'm sorry.
12          THE COURT:  Well, I know Judge Dever has
13  already entered one order on this topic.  What I
14  recommend, particularly because he's gonna be in charge
15  of setting the trial date, is filing another motion and
16  asking for additional relief.  I will let his chambers
17  know to be on the lookout for that motion so that he can
18  address it.  Obviously, it's gonna depend on -- the
19  exact relief will depend on when the trial is set and
20  those sort of matters, so it's probably better to leave
21  him to decide that.  But again, I will bring it to his
22  chambers' attention so that they know that you'll be
23  filing that.
24          MR. YOUNG:  Okay.  Thank you, Your Honor.
25          THE COURT:  Thank you.  Anything further
```

**JA212**

```
1   from the United States?

2           MR. LEMMON:  No.  Thank you, Your Honor.

3           THE COURT:  That concludes the proceedings

4   for Mr. Everett.  He's remanded to the custody of the

5   U.S. Marshals.

6           (Proceedings concluded at 2:29 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18                 C E R T I F I C A T E

19

20      I certify that the foregoing is a correct

21   transcript from the record of proceedings in the

22   above-entitled matter.

23

24   /s/Risa A. Kramer                    11/17/2022

25   Risa A. Kramer, RMR, CRR                  Date
```

**JA213**

FILED IN OPEN COURT
ON 8|16|2021 CB
Peter A. Moore, Jr., Clerk
US District Court
Eastern District of NC

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CR-333-D-1
NO. 5:20-CR-333-D-2

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | SUPERSEDING INDICTMENT |
| | ) | |
| RESHOD JAMAR EVERETT, | ) | |
| a/k/a "Kool" | ) | |
| a/k/a "Kool-Aid" | ) | |
| ALVIN MILTON DAVIS III | ) | |

The Grand Jury charges that:

## COUNT ONE

Beginning in or about 2016, the exact date being unknown to the Grand Jury, and continuing up to and including in or about July 2018, in the Eastern District of North Carolina, and elsewhere, RESHOD JAMAR EVERETT, also known as "Kool" and "Kool-Aid," and ALVIN MILTON DAVIS III, defendants herein, did knowingly and intentionally combine, conspire, confederate, agree and have a tacit understanding with each other and other persons, known and unknown to the Grand Jury, to knowingly and intentionally distribute and possess with the intent to distribute marijuana and tetrahydrocannabinol (THC), Schedule I controlled substances, and cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

**JA214**

<u>Quantity of Controlled Substances Involved in the Conspiracy</u>

As to RESHOD JAMAR EVERETT, also known as "Kool" and "Kool-Aid," the amount involved in the conspiracy attributable to him as a result of his own conduct, and the conduct of other conspirators reasonably foreseeable to him, is one thousand (1,000) kilograms or more of a mixture and substance containing a detectable amount of marijuana, a quantity of tetrahydrocannabinol (THC), and five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine.

As to ALVIN MILTON DAVIS III, the amount involved in the conspiracy attributable to him as a result of his own conduct, and the conduct of other conspirators reasonably foreseeable to him, is fifty (50) kilograms or more of marijuana and a quantity of cocaine.

All in violation of Title 21, United States Code, Section 846.

<u>COUNT TWO</u>

On or about July 16, 2018, in the Eastern District of North Carolina, ALVIN MILTON DAVIS III, defendant herein, aiding and abetting another, did knowingly and intentionally possess with the intent to distribute a quantity of marijuana, a Schedule I controlled substance, and a quantity of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

2

**JA215**

## COUNT THREE

On or about July 16, 2018, in the Eastern District of North Carolina, ALVIN MILTON DAVIS III, defendant herein, aiding and abetting another, did knowingly and intentionally use and carry a firearm during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, as alleged in Counts One and Two of this Superseding Indictment, and did possess such firearm in furtherance of the drug trafficking crime; all in violation of Title 18, United States Code, Sections 924(c)(1)(A) and 2.

## COUNT FOUR

On or about July 16, 2018, in the Eastern District of North Carolina, RESHOD JAMAR EVERETT, also known as "Kool" and "Kool-Aid," defendant herein, aiding and abetting another, did knowingly and intentionally possess with the intent to distribute a quantity of marijuana, a Schedule I controlled substance, and a quantity of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

3

**JA216**

## COUNT FIVE

On or about July 16, 2018, in the Eastern District of North Carolina, RESHOD JAMAR EVERETT, also known as "Kool" and "Kool-Aid," defendant herein, did knowingly and intentionally possess a firearm in furtherance of a drug trafficking crime for which he may be prosecuted in a court of the United States, as alleged in Counts One and Four of this Superseding Indictment; all in violation of Title 18, United States Code, Section 924(c)(1)(A).

## COUNT SIX

On or about July 17, 2018, in the Eastern District of North Carolina, RESHOD JAMAR EVERETT, also known as "Kool" and "Kool-Aid," defendant herein, did knowingly and intentionally possess with the intent to distribute a quantity of a mixture and substance containing delta-9-tetrahydrocannabinol (THC), a Schedule I controlled substance, and a quantity of tramadol, a Schedule IV controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

4

### COUNT SEVEN

On or about July 17, 2018, in the Eastern District of North Carolina, RESHOD JAMAR EVERETT, also known as "Kool" and "Kool-Aid," defendant herein, did knowingly and intentionally possess a firearm in furtherance of a drug trafficking crime for which he may be prosecuted in a court of the United States, as alleged in Counts One and Six of this Superseding Indictment; all in violation of Title 18, United States Code, Section 924(c)(1)(A).

### COUNT EIGHT

On or about July 18, 2018, in the Eastern District of North Carolina, RESHOD JAMAR EVERETT, also known as "Kool" and "Kool-Aid," defendant herein, aiding, abetting, counseling, and commanding another, did knowingly and intentionally possess with the intent to distribute a quantity of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

5

JA218

<u>FORFEITURE NOTICE</u>

Notice is hereby given that all right, title and interest in the property described herein is subject to forfeiture.

Upon conviction of any felony violation of the Controlled Substances Act charged herein, the defendant shall forfeit to the United States, pursuant to 21 U.S.C. § 853(a), any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the said offense, and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the said offense.

Upon conviction of any violation of the Gun Control Act, the National Firearms Act, or any other offense charged herein that involved or was perpetrated in whole or in part by the use of firearms or ammunition, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 924(d) and/or 26 U.S.C. § 5872, as made applicable by 28 U.S.C. § 2461(c), any and all firearms and ammunition that were involved in or used in a knowing or willful commission of the offense, or, pursuant to 18 U.S.C. § 3665, that were found in the possession or under the immediate control of the defendant at the time of arrest.

The forfeitable property includes, but is not limited to, the following:

<u>Forfeiture Money Judgment:</u>

a) A sum of money representing the gross proceeds of the offense(s) charged herein against RESHOD JAMAR EVERETT, in the amount of at least $4,000,000.

6

Personal Property:

b) Approximately $639 in United States Currency seized on July 16, 2018 from a 2014 Cadillac sedan driven by Alvin Milton Davis III.

c) Approximately $5,105 in United States Currency seized on July 16, 2018 from 715-5 Middle Bridge Drive, Fayetteville, NC.

d) Approximately $65,689 in United States Currency seized on July 17, 2018 from 1080 Ronald Reagan Drive, Fayetteville, North Carolina.

e) One CZ Scorpion EVO 3S1, bearing serial number C027092, seized on July 16, 2018 from 715-5 Middle Bridge Road, Fayetteville, NC, and any and all associated ammunition.

f) One Mag Tactical Systems, MG-G4, .223 caliber rifle, bearing serial number MTS07535, seized on July 17, 2018, from 1080 Ronald Reagan Drive, Fayetteville, NC, and any and all associated ammunition.

g) One Tapco USA, SKS, 7.62 x 39 caliber rifle, bearing serial number 409847, seized on July 17, 2018, from 1080 Ronald Reagan Drive, Fayetteville, NC, and any and all associated ammunition.

h) One DPMS, AR-15, .223 caliber rifle, bearing serial number L4021576, seized on July 17, 2018, from 1080 Ronald Reagan Drive, Fayetteville, NC, and any and all associated ammunition.

i) One FN PS90, 5.7X28 caliber rifle, bearing serial number FN113347, seized on July 17, 2018, from 1080 Ronald Reagan Drive, Fayetteville, NC, and any and all associated ammunition.

7

j) One Ruger P94 .40 caliber handgun, bearing serial number 340-86024, seized on July 17, 2018, from 1080 Ronald Reagan Drive, Fayetteville, NC, and any and all associated ammunition.

k) One M&P Bodyguard .380 caliber handgun, bearing serial number KEL3854, seized on July 17, 2018, from 1080 Ronald Reagan Drive, Fayetteville, NC, and any and all associated ammunition.

l) One M&P Bodyguard .380 caliber handgun, bearing serial number KEK5961, seized on July 17, 2018, from 1080 Ronald Reagan Drive, Fayetteville, NC, and any and all associated ammunition.

m) One M&P Bodyguard .380 caliber handgun, bearing serial number KBA0571, seized on July 17, 2018, from 1080 Ronald Reagan Drive, Fayetteville, NC, and any and all associated ammunition.

If any of the above-described forfeitable property, as a result of any act or omission of a defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

8

JA221

853(p), to seek forfeiture of any other property of said defendant up to the value of

the forfeitable property described above.

A TRUE BILL:

**REDACTED VERSION**
Pursuant to the E-Government Act and the
federal rules, the unredacted version of
this document has been filed under seal.

FOREPERSON

DATE: 8-17-2021

G. NORMAN ACKER, III
Acting United States Attorney

BY: SCOTT A. LEMMON
Assistant United States Attorney

BY: CAROLINE L. WEBB
Assistant United States Attorney

9

**JA222**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CR-333-D-1
NO. 5:20-CR-333-D-2

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | UNITED STATES' NOTICE |
| | ) | OF EXPERT WITNESSES |
| RESHOD JAMAR EVERETT | ) | |
|   a/k/a "Kool" | ) | |
|   a/k/a "Kool-Aid" | ) | |
| ALVIN MILTON DAVIS III | ) | |

NOW COMES the United States, by and through the United States Attorney for the Eastern District of North Carolina, pursuant to Fed. R. Crim Pr. 16(a)(1)(G), and hereby provides notice to the defendants and to the Court of expert opinion testimony and qualifications of the following individuals in the above-referenced matter.

**1. Corenthia Mills**

Corenthia Mills is a Forensic Scientist in the Drug Chemistry section of the North Carolina State Crime Lab in Raleigh, North Carolina. Pursuant to her responsibilities, she analyzed controlled substances seized in connection with Defendant Everett and Defendant Davis in July 2018. She will be qualified as an expert in the field of drug analysis and controlled substances. She will testify to the analysis, both chemical composition and the weight, of the controlled substances obtained in connection with Defendant Everett and Defendant Davis. The lab reports

and her Curriculum Vitae have been previously provided in discovery to Defendants Everett and Davis at Bates Numbers 1200-1269.

### 2. Caroline Mackay

Caroline Mackay is a Forensic Chemist at NMS Labs in Willow Grove, Pennsylvania. Pursuant to her responsibilities, she analyzed controlled substances seized in connection with Defendant Everett and Defendant Davis in July 2018. She will be qualified as an expert in the field of drug analysis and controlled substances. She will testify to the analysis, both chemical composition and the weight, of the controlled substances obtained in connection with Defendant Everett and Defendant Davis.  The lab reports and her curriculum vitae have been previously provided in discovery to Defendant Everett at Bates Numbers 2798-3610 and 3702-3704.  The lab reports and her curriculum vitae have been previously provided in discovery to Defendant Davis at Bates Numbers 2623-3435 and 3527-3529.

### 3. Trina Do

Trina Do is a Forensic Chemist at the Southeast Laboratory of the Drug Enforcement Administration in Miami, Florida. Pursuant to her responsibilities, she analyzed controlled substances seized in connection with Defendant Everett and Defendant Davis in July 2018. She will be qualified as an expert in the field of drug analysis and controlled substances. She will testify to the analysis, both chemical composition and the weight, of the controlled substances obtained in connection with Defendant Everett and Defendant Davis.  Her Curriculum Vitae has been previously provided in discovery to Defendant Everett at Bates Numbers 3700-3701 and

Defendant Davis at Bates Numbers 3525-3526. Her lab report will be provided to the defendants upon publication by the Southeast Laboratory.

### 4. Elizabeth Adkins

Elizabeth Adkins is a Senior Forensic Chemist at the Southeast Laboratory of the Drug Enforcement Administration in Miami, Florida. Pursuant to her responsibilities, she analyzed controlled substances seized in connection with Defendant Everett and Defendant Davis in July 2018. She will be qualified as an expert in the field of drug analysis and controlled substances. She will testify to the analysis, both chemical composition and the weight, of the controlled substances obtained in connection with Defendant Everett and Defendant Davis.   Her Curriculum Vitae has been previously provided in discovery to Defendant Everett at Bates Numbers 3698-3699 and to Defendant Davis at Bates Numbers 3523-3524. Her lab report will be provided to the defendants upon publication by the Southeast Laboratory.

Respectfully submitted, this 6th day of September, 2021.

G. NORMAN ACKER, III
Acting United States Attorney

BY:    */s/* Scott A. Lemmon
SCOTT A. LEMMON
Assistant U.S. Attorney
Criminal Division
United States Attorney's Office
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone: (919) 856-4530
Email: scott.lemmon@usdoj.gov

/s/ Caroline L. Webb
CAROLINE L. WEBB
Assistant U.S. Attorney

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this 6th day of September, 2021, served a copy of

the foregoing Notice upon counsel for the defendant in this action by electronically

filing the foregoing with the Clerk of Court using the CM/ECF system which will send

notification of such filing to:

Christopher M. Young
The Young Law Firm, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
202-870-1191
Fax: 202-478-2119
Email: cyoung@theylf.com

Renorda E. Pryor
Herring Law Center PLLC
1821 Hillandale Road
Suite 1B-220
Durham, NC 27705
919-355-5001
Email: rpryor@herringlawcenter.net

Christian Emerson Dysart
Dysart Willis Houchin & Hubbard
530 Hillsborough Street, Suite 200
Raleigh, NC 27603
919-747-8380
Fax: 919-882-1222
Email: christian@dysartwillis.com

Geoffrey Ryan Willis
Dysart Willis Houchin & Hubbard
530 Hillsborough Street, Suite 200
Raleigh, NC 27603
919-747-8380
Fax: 919-882-1222
Email: ryan@dysartwillis.com

4

**JA226**

Meredith Pace Brewer
Dysart Willis Houchin & Hubbard
530 Hillsborough Street, Suite 200
Raleigh, NC 27603
919-747-8380
Fax: 919-882-1222
Email: brewer@dysartwillis.com


        G. NORMAN ACKER, III
        Acting United States Attorney

BY:   /s/ Scott A. Lemmon
        SCOTT A. LEMMON
        Assistant United States Attorney
        Criminal Division
        150 Fayetteville Street, Suite 2100
        Raleigh, North Carolina 27601
        Telephone: 919-856-4500
        Fax: 919-856-4487
        Email: Scott.Lemmon@usdoj.gov


BY:   /s/ Caroline L. Webb
        CAROLINE L. WEBB
        Assistant United States Attorney
        Criminal Division
        Email: caroline.webb@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CR-333-D-1
NO. 5:20-CR-333-D-2

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | UNITED STATES' NOTICE |
| | ) | OF EXPERT WITNESSES |
| RESHOD JAMAR EVERETT | ) | |
|   a/k/a "Kool" | ) | |
|   a/k/a "Kool-Aid" | ) | |
| ALVIN MILTON DAVIS III | ) | |

NOW COMES the United States, by and through the United States Attorney for the Eastern District of North Carolina, pursuant to Fed. R. Crim Pr. 16(a)(1)(G), and hereby provides notice to the defendants and to the Court of expert opinion testimony and qualifications of the following individuals in the above-referenced matter.

**1. Krystal Byrd**

Krystal Byrd is a Forensic Chemist at NMS Labs in Willow Grove, Pennsylvania. Pursuant to her responsibilities, she analyzed controlled substances seized in connection with Defendant Everett and Defendant Davis in July 2018. She will be qualified as an expert in the field of drug analysis and controlled substances. She will testify to the analysis, both chemical composition and the weight, of the controlled substances obtained in connection with Defendant Everett and Defendant Davis. Her curriculum vitae has been provided in discovery to Defendants Everett and Davis by electronic mail. The lab reports have been previously provided in

discovery to Defendant Everett at Bates Numbers 2798-3610. The lab reports have been previously provided in discovery to Defendant Davis at Bates Numbers 2623-3435.

**2. Matthew Hewes**

Matthew Hewes is a Forensic Chemist at NMS Labs in Willow Grove, Pennsylvania. Pursuant to his responsibilities, he analyzed controlled substances seized in connection with Defendant Everett and Defendant Davis in July 2018. He will be qualified as an expert in the field of drug analysis and controlled substances. He will testify to the analysis, both chemical composition and the weight, of the controlled substances obtained in connection with Defendant Everett and Defendant Davis. His curriculum vitae has been provided in discovery to Defendants Everett and Davis by electronic mail. The lab reports have been previously provided in discovery to Defendant Everett at Bates Numbers 2798-3610.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

The lab reports have been previously provided in discovery to Defendant Davis at Bates Numbers 2623-3435.

Respectfully submitted, this 14th day of September, 2021.

G. NORMAN ACKER, III
Acting United States Attorney

BY:     */s/* Scott A. Lemmon
SCOTT A. LEMMON
Assistant U.S. Attorney
Criminal Division
United States Attorney's Office
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone: (919) 856-4530
Email: scott.lemmon@usdoj.gov

/s/ Caroline L. Webb
CAROLINE L. WEBB
Assistant U.S. Attorney
Criminal Division
United States Attorney's Office
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone: (919) 856-4530
Email: caroline.webb@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this 14th day of September, 2021, served a copy of the foregoing Notice upon counsel for the defendant in this action by electronically filing the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to:

Christopher M. Young
The Young Law Firm, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
202-870-1191
Fax: 202-478-2119
Email: cyoung@theylf.com

Renorda E. Pryor
Herring Law Center PLLC
1821 Hillandale Road
Suite 1B-220
Durham, NC 27705
919-355-5001
Email: rpryor@herringlawcenter.net

Christian Emerson Dysart
Dysart Willis Houchin & Hubbard
530 Hillsborough Street, Suite 200
Raleigh, NC 27603
919-747-8380
Fax: 919-882-1222
Email: christian@dysartwillis.com

Geoffrey Ryan Willis
Dysart Willis Houchin & Hubbard
530 Hillsborough Street, Suite 200
Raleigh, NC 27603
919-747-8380
Fax: 919-882-1222
Email: ryan@dysartwillis.com

4

**JA231**

Meredith Pace Brewer
Dysart Willis Houchin & Hubbard
530 Hillsborough Street, Suite 200
Raleigh, NC 27603
919-747-8380
Fax: 919-882-1222
Email: brewer@dysartwillis.com

G. NORMAN ACKER, III
Acting United States Attorney

BY: /s/ Scott A. Lemmon
SCOTT A. LEMMON
Assistant United States Attorney
Criminal Division
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
Telephone: 919-856-4500
Fax: 919-856-4487
Email: Scott.Lemmon@usdoj.gov

BY: /s/ Caroline L. Webb
CAROLINE L. WEBB
Assistant U.S. Attorney
Criminal Division
United States Attorney's Office
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone: (919) 856-4530
Email: caroline.webb@usdoj.gov

5

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CR-333-D-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | **GOVERNMENT'S** |
| RESHOD JAMAR EVERETT, | ) | **MOTIONS IN LIMINE** |
|    a/k/a "Kool" | ) | |
|    a/k/a "Kool-Aid" | ) | |
| | ) | |

In advance of the re-trial of Reshod Everett ("the Defendant"), the United States, by and through the United States Attorney for the Eastern District of North Carolina, moves *in limine* for the exclusion of certain evidence and arguments.

### A. The Defendant Should Be Prohibited from Referring to His Time Away From His Family During His Testimony.

During the first trial in this case, the Defendant chose to testify. Defense counsel and the Defendant then made several references to the Defendant's children and the Defendant's time in custody.

For example, defense counsel asked, "At this point, how long have you been away from your children?" (D.E. 210 at 49). The Defendant answered, "I've been away from my kids for 16 months now." *Id.*

Defense counsel then asked, "Have you had the opportunity to see your 16 month old?" *Id.* The Government objected, and the Court sustained that objection.

Similarly, defense counsel asked, "If you remember, what was your bond?" The Defendant responded, "My bond was outrageous at first. It was $690,000." (D.E.

210 at 72). The Court sustained an objection to that testimony as well.

References to the Defendant's time away from children, as well as references to his bond, should be excluded under Fed. R. Evid. 401. That information is not relevant to the issue at hand: whether the Defendant committed the offenses with which he is charged. Even if there is some minor probative value, it is substantially outweighed by the unfair prejudice it would cause to the Government under Fed. R. Evid. 403.

### B. The Defendant Should Be Prohibited from Showing Photographs of his Children During His Testimony.

Additionally, at the end of the Defendant's testimony, he described a supposed conversation with cooperating witness Austin Murray. The Defendant then pulled out a photograph of his daughter, published it to the jury, and said: "I had this picture on me. I carry this picture around with me. I said: This little girl right here, you got me in here over this little girl, and I haven't been able to see my little girl yet." (D.E. 210 at 95). The photograph had not been admitted into evidence, nor was it later admitted into evidence.

The Government respectfully requests that the Defendant be instructed not to publish photographs or other items to the jury unless they have been admitted into evidence.

Additionally, the Government moves to exclude the photograph of the Defendant's daughter under Fed. R. Evid. 401 because it is not relevant, and under Fed. R. Evid. 403 because any probative value is substantially outweighed by the danger of unfair prejudice.

2

### C. The Defendant Should Be Prohibited from Attempting to Communicate with Members of the Jury.

Also in the first trial, during the Government's closing arguments and as the Court read jury instructions, a law enforcement officer saw the Defendant holding his hands in a "praying" pose in front of his face while looking across the courtroom at a particular juror. The law enforcement officer then saw the Defendant appearing to make efforts to communicate with at least one juror.

The following morning, the Government described these observations to the Court:

> [Police Specialist Chase Robinson] saw Mr. Everett mouthing the words "not mine" while staring at a particular juror while [the Government] was describing certain evidence. He then also described that during the jury instructions, he observed Mr. Everett making prayer hands, holding his hands in front of his face while staring intently at that same juror. He also saw Mr. Everett continuing to stare at that particular juror and shaking his head back and forth during those jury instructions.

(D.E. 211 at 2). The Court concluded that "any such conduct by the Defendant would be improper." *Id.* at 4.

The Government respectfully requests that the Court remind the Defendant not to attempt to communicate with members of the jury at any point during the trial.

### D. Defense Counsel Should Be Prohibited from Implying that the Arrest of the Defendant or the Search of Everett's Home Were Unconstitutional.

During the first trial in this case, defense counsel implied that law enforcement violated the Defendant's constitutional rights. As a result, the Court *sua sponte* reminded the jury that the searches in this case were determined to be

3

valid and legal. *See* (D.E. 210 at 70) ("Ladies and gentlemen, it's for the Court alone to determine the validity and legality of any search in a case, and the Court has already determined that the search is legal.")

Allegations of constitutional violations are unfounded and should be excluded from trial under Fed. R. Evid. 401 because they are not relevant. Even if they had some relevance, they should be excluded under Fed. R. Evid. 403 because the probative value of these claims is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, and wasting time. For this reason, the Government requests that defense counsel and the Defendant be instructed not to make improper arguments regarding the constitutionality or legality of the Defendant's arrest or the various searches that occurred pursuant to warrants.

### E. Defense Counsel and the Defendant Should Be Prohibited from Referencing Supposed Gang Membership of Witnesses.

On several occasions during the first trial, defense counsel and the Defendant made references to supposed gang membership of Government witnesses, including Kristopher Godfrey and Austin Murray.

- Defense counsel, referencing a photograph of evidence seized from 7000 Medway Court: "And at the top of that picture, there was a blue bandana, correct? . . . That blue bandana indicates that that's a gang member." (D.E. 209 at 44).

- Defense counsel, cross-examining Austin Murray: "So the photo from 7000 Medway, that blue bandana, that's not yours?" (D.E. 209 at 111).

- Defense counsel, cross-examining Kristopher Godfrey: "How about this blue bandana? . . . And that would mean that you're a gang member, correct?" (D.E. 209 at 192). Godfrey denied that he was a gang member.

4

- Defense counsel, cross-examining Austin Murray: "Now, you're a gang member, right?" (D.E. 209 at 110). Murray denied that he was a gang member.

- Reshod Everett: "[Austin Murray] and his best friend, Kris Godfrey, they started threatening me, making very aggressive acts towards me. They are both Crip gang members." (D.E. 210 at 83).

  o At this point, the Court sustained an objection by the Government. *Id.*

- Defense counsel, during closing argument: "Are you talking about Austin who's facing all of this time with the feds? Austin, the Crip?" (D.E. 210 at 211).

The Court should prohibit references to witnesses' supposed gang membership under both Fed. R. Evid. 401 and 403, because it is unclear what probative value these allegations have. This is particularly true where the Defendant has never offered any actual evidence that either Murray or Godfrey is a member of a gang, relying instead on references to a supposed blue bandana at 7000 Medway Court and bald assertions by the Defendant.

Moreover, courts have concluded that there is a "'substantial risk of unfair prejudice attached to gang affiliation evidence,' for '[g]angs generally arouse negative connotations and often invoke images of criminal activity and deviant behavior.'" *United States v. Irvin*, 87 F.3d 860, 864–65 (7th Cir. 1996).

Even if there is some minimal relevance to the Defendant's unsubstantiated claims of gang membership, the likelihood of unfair prejudice and misleading the jury substantially outweighs any probative value of the references to Murray's and Godfrey's supposed gang membership. The references to gang membership should therefore also be excluded under Fed. R. Evid. 403.

5

Additionally, during the cross-examination of Godfrey, defense counsel improperly published a document that had not been authenticated or admitted into evidence, and which contained hearsay regarding Austin Murray's supposed gang membership. *See* (D.E. 209 at 196). When publishing the document, defense counsel asked, "Is this Austin Murray?" and pointed to a photograph of Murray that was on the page. *Id.*

The Government objected to the publication of the document. Notably, defense counsel then left the document on the screen through two additional questions; those questions were not related to the document. *Id.* at 196–197. The Court then instructed defense counsel to remove the document. *Id.* ("Mr. Young, you can take the document down because you said you just wanted him to see the picture to see if that was who it was.")

The Government respectfully requests that defense counsel be instructed not to publish any document—including this document, which contains irrelevant and unfairly prejudicial hearsay—to the jury unless and until it has been admitted into evidence. And if the Defendant does wish to show a photograph to a witness, the Government requests that defense counsel use only a photograph, and not a document containing inadmissible hearsay.

### F. The Government Requests Clarification on Proper Cross-Examination of Character Witnesses.

The Government also seeks clarification regarding the proper cross-examination of character witnesses. In the first trial, the Defendant called four character witnesses: Arnetta Jackson-Gooden, Karen Beam-Brown, Shaney Eason,

6

and Ricky Johnson. During the Government's cross examination of two witnesses, the Government sought to ask questions regarding specific instances of conduct by the Defendant under Fed. R. Crim. P. 405(a) ("On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct").

Defense counsel raised objections during that cross examination, which the Court sustained. *See, e.g.*, (D.E. 210 at 23); (D.E. 210 at 30–33). At the pretrial conference, the Government would like to briefly confirm the reason those objections were sustained to ensure that the Government does not ask improper questions during the re-trial.

### G. The Parties Should Refer to "Prior Testimony," Not the Prior Trial.

The Government also respectfully requests a ruling that the parties should not inform the jury that a trial previously occurred in this case, or that a jury was deadlocked on all counts. Introducing these issues would needlessly confuse or mislead the jury.

Instead, the Government requests a ruling from the Court that the parties should refer only to "prior testimony" about the events in question.

### H. If the Defendant Argues that the Government Should Have Called Additional Witnesses, the Government Seeks Permission to Note that the Defendant Also Has Subpoena Power.

In the first trial, the Defendant made arguments regarding various witnesses who had not been called by the Government. *See, e.g.* (D.E. 210 at 216) ("Nobody saw Officer Cook. Nobody saw Officer Durham.")

If the Defendant makes that argument in the re-trial, the Government seeks permission to inform the jury that both the Government and the Defendant have the authority to issue subpoenas. *See, e.g.*, *United States v. Hernandez*, 145 F.3d 1433, 1439 (11th Cir. 1998) ("[I]t is not improper for a prosecutor to note that the defendant has the same subpoena powers as the government.")[1]

Additionally, if the Defendant makes this argument, the Government respectfully requests that the Court give a jury instruction regarding the fact that both parties have the ability to issue subpoenas, while reiterating that the burden of proof rests with the Government. *See id.* (affirming conviction after concluding that "[a]lthough the district court instructed the jury that both parties could call witnesses at trial, the district court's instructions also made clear the burden of proof rested only with the Government.")

## I. The Defendant and Defense Counsel Should Not be Permitted to Argue That Everett's Decisions to Go to Trial or to Speak with Media Are Evidence of Innocence.

Defense counsel also made several arguments during the December trial regarding how rarely federal defendants exercise their right to plead not guilty and go to trial. Defense counsel implied that this was evidence that the Defendant was

---

[1]    *See also United States v. Adams*, 305 F.3d 30, 38 (1st Cir. 2002) (noting that in "[m]ost circuits, and (in an analogous case) the Supreme Court shares our view" that a prosecutor may reply to a defendant's suggestion that the government could have called a witness favorable to the defendant by pointing out that such evidence could have been secured by the defendant); *United States v. Aldaco*, 201 F.3d 979, 987–88 (7th Cir. 2000) ("[I]t was not improper for the prosecutor to make clear to the jury that the defendant, like the government, had the power to subpoena any witness or witnesses relevant to the case after [defendant's] counsel had opened the door to this reply by the prosecution" by pointing out that the government did not call three other witnesses).

8

in fact innocent.

For example, when cross-examining Dustin Harding, defense counsel asked: "How many times have you testified in Federal Court in a trial where somebody is saying that they didn't do what they were accused of? Not often, correct?" (D.E. 209 at 66). The Government objected, and the Court sustained the objection. *Id.*

Defense counsel also contrasted Everett's decision to go to trial with Alvin Davis's decision to plead guilty. *See* (D.E. 210 at 203) ("Alvin took a plea. Take a plea, you did something; you're guilty. You took a plea. That's what Alvin did.").

Similarly, defense counsel argued that the Defendant's decision to speak to the media about his case showed that he was innocent:

> But then Reshod Everett decided to go to trial . . . . Reshod Everett said: Hey, I'm going to trial because Reshod Everett has been saying that since June, July of 2018. He's been saying that. He went to the media. He went to WRAL, said: Hey, you guys printed a story one time about the day care guy selling drugs. I want to let you know what's really going on. I'm fighting this case.

*See* (D.E. 210 at 210).

Under Fed. R. Evid. 401 and 403, the Government respectfully requests that these lines of argument by defense counsel and testimony by the Defendant be excluded. While the Defendant certainly has a right to go to trial and put the Government to its burden of proof, it is improper and unfairly prejudicial to suggest that the Defendant's decision to go to trial, or his decision to speak to the media, is evidence of innocence.

### J.  References to Alvin Davis's Guilty Plea Should be Excluded.

In the first trial, defense counsel repeatedly referenced the guilty plea of Alvin Davis, implying that Davis was the truly guilty defendant and that Davis had

9

admitted to being responsible for the drugs in the Middle Bridge apartment. *See, e.g.*, (D.E. 210 at 203) ("Alvin took a plea. Take a plea, you did something; you're guilty. You took a plea. That's what Alvin did."). These references and arguments should be excluded in the second trial.

"[A]ny mention of guilty pleas of nontestifying co-defendants should be avoided at trial wherever possible." *United States v. Blevins*, 960 F.2d 1252, 1260–61 (4th Cir. 1992) (analyzing two references by prosecutors and one reference by the trial judge). The Fourth Circuit noted that discussions of a co-defendant's decision to plead guilty could cause a jury to convict a defendant "based upon the disposition of the charges against the co-defendants, rather than upon an individual assessment of the remaining defendant's personal culpability." *Id.* at 1260. Additionally, the co-defendant cannot be questioned, and so it is impossible to "probe the motivations for entry of the plea." *Id.*

If defense counsel refers to Davis's guilty plea in a way that implies Davis took responsibility for the drugs at Addison Ridge Apartment Complex, the Government requests permission to disclose all of the charges to which Alvin Davis pleaded guilty, including the charge of conspiring to traffic drugs with Reshod Everett. The Government would also request "a limiting instruction to jurors stating that the evidence of such guilty pleas is not to be taken as substantive evidence of guilt of the remaining defendants." *Blevins*, 960 F.2d at 1260.

The best approach is to prohibit all references to Davis's guilty plea. But if defense counsel again makes partially true—but misleading—statements regarding Alvin Davis's guilty plea, the Government should be permitted to provide

10

an accurate account to the jury.

### K. Notice of Apparent Conflict and Request for Hearing.

During jury deliberations in the first trial, the Government learned that Assistant Federal Public Defender Joseph Ross had been working as a consultant for the defense. (D.E. 211 at 19). The Government is unaware of any formal or contractual agreement regarding those services; the Government assumes that it is an informal agreement.

Neither Mr. Ross nor any other member of the Federal Public Defender's Office ("FPDO") is counsel of record in the case. The FPDO had previously represented the Defendant but moved to withdraw because "a conflict of interest would arise if it continued to represent Mr. Everett." *See* (D.E. 211 at 19); (D.E. 20) (Motion to Withdraw); (D.E. 22) (August 10, 2020 Order Granting Motion to Withdraw) (finding that "a conflict of interest would arise if the Office of the Federal Public Defender continued to represent the Defendant [Mr. Everett] in this matter[.]").

When the Government learned that the FPDO was continuing to work on the Defendant's case, notwithstanding the previously-disclosed conflict, the Government advised the Court of that fact.

> [A]fter our office disclosed to [AFPD Kyana Givens] that we believed that there was a conflict with regard to the public defender's representation of another defendant, she then moved to withdraw. . . . To the extent that they are strategizing or discussing anything related to this case, this is, again, the first time I'm learning of it. And I do believe that there is a conflict and that we have previously informed the Public Defender's Office of that, so I just wanted to put that on the record.

(D.E. 211 at 18–19). The Court did not take any action regarding the conflict at that

11

time. *Id.* at 19.

Defense counsel has advised that Mr. Ross is likely to continue assisting during the retrial of Mr. Everett.

In addition to the previously identified conflict that caused the FPDO's initial withdrawal from the Everett matter, the Government also wishes to advise the Court and defense counsel that, in the retrial of the Defendant, the Government may call a new witness who, until last month, was represented by the FPDO ("Former FPD Client").

Specifically, earlier this year, Former FPD Client—*while represented by the FPDO*—was interviewed and provided new information about Reshod Everett and, presumably, shared confidences protected by the attorney-client privilege with the FPDO. A few days after that interview, the Assistant Federal Public Defender moved to withdraw from representing that defendant due to a conflict.

If Former FPD Client is called during the re-trial of Mr. Everett, the Former FPD Client will be subject to cross-examination by counsel for Mr. Everett. The Government believes that this may present an additional conflict if AFPD Ross continues to assist on this case. Even if AFPD Ross does not personally cross-examine the Former FPD Client, the potential conflict could impact the broader defense team. At the very least, the Government believes that this situation may create the appearance of a conflict.

Under the Sixth Amendment, the right to counsel assures that a defendant will be given the effective assistance of counsel, and effectiveness is measured against a standard of reasonable competence. *Strickland v. Washington*, 466 U.S.

12

668, 687 (1984). Representation is ineffective when counsel's performance has "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

"The effective performance of counsel requires meaningful compliance with the duty of loyalty and the duty to avoid conflicts of interest, and a breach of these basic duties can lead to ineffective representation." *United States v. Tatum*, 943 F.2d 370, 375 (4th Cir. 1991).

"When counsel for a defendant in a criminal case has an actual conflict of interest when representing the defendant and the conflict adversely affects counsel's performance in the defense of the defendant, prejudice to the defense is presumed and a new trial must be ordered." *Id.* (citing *Cuyler v. Sullivan*, 446 U.S. 335, 348–50 (1980)) (emphasis in original). "In these circumstances, no prejudice need be shown because the conflict of interest is assumed to be harmful. Legal representation which is adversely affected by actual conflicts of interest is never considered harmless error." *Id.*

The Fourth Circuit reiterated that there are two requirements for a court to determine that the Sixth Amendment is implicated: "an actual conflict of interest resulting in an adverse effect on counsel's performance." *Id.* For example, if defense counsel is required to cross-examine a *prior* client in order to effectively represent a *current* client, then an actual conflict exists. *Id.* at 376 ("the failure of defense counsel to cross-examine a prosecution witness whose testimony is material or the failure to resist the presentation of arguably inadmissible evidence can be considered to be actual lapses in the defense.").

Rule 1.9 of the North Carolina Rules of Professional Conduct is entitled "Duties to Former Clients":

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client

(1) whose interests are materially adverse to that person; and

(2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client gives informed consent, confirmed in writing.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

N. C. R. Prof'l Conduct 1.9. [2]

---

[2]    Understandably, the North Carolina State Bar has confirmed in published ethics opinions that cross examination of prior clients is highly likely to create a conflict between the attorney's continuing duties of confidentiality and loyalty to the former client and the attorney's duty to effectively represent the current client. *See* 2003 Formal Ethics Opinion 14 ("Given the high probability that the lawyer will delve into facts . . . that are not public record and are, therefore, subject to the confidentiality rule or, in foregoing such questions, fail adequately to represent the lawyer's current client, it must be concluded that the lawyer is prohibited from

14

Additionally, under Rule 1.7 of the North Carolina Rules of Professional Conduct, a lawyer is prohibited from representing a client "if the representation involves a concurrent conflict of interest," in which "the representation of one client will be directly adverse to another" or "the representation of one or more clients may be materially limited by the lawyer's responsibilities to another client, *a former client*, or a third person. . . ." (emphasis added).

The Government respectfully requests a hearing to determine whether there is a direct conflict or the appearance of a conflict in order to avoid a potential issue that could cause a mistrial or a subsequent claim of ineffective assistance of counsel.

If the Court determines that the conflict is one that could be waived, the Government requests that the Defendant be advised of the potential conflict so that he can decide whether to waive it, either in writing or in court. But "where a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver." *Wheat v. United States*, 486 U.S. 153, 162 (1988). District courts have "substantial latitude" in refusing conflict waivers, even where only the potential for conflict has been identified. *Id.* at 163.

Given the pretrial uncertainty "in determining whether to disqualify counsel for conflict of interest, the trial court is not to weigh the circumstances 'with hair-splitting nicety' but, in the proper exercise of its supervisory power over members

---

representing the current client due to a conflict of interest.") (available at https://www.ncbar.gov/for-lawyers/ethics/adopted-opinions/2003-formal-ethics-opinion-14/).

of the bar and with a view to preventing 'the appearance of impropriety,' it is to resolve all doubts in favor of disqualification." *United States. v. Clarkson*, 567 F.2d 270, 283 n. 3 (4th Cir.1977) (citation omitted).

Here, the Federal Public Defender's Office continues to have a duty of loyalty to the Former FPD Client, and the interests of Mr. Everett are directly adverse to the interests of the Former FPD Client. If, for example, AFPD Ross provides advice regarding the cross-examination of the Former FPD Client, then Rules 1.7 and 1.9 of the North Carolina Rules of Professional Conduct could be implicated. At the very least, the appearance of a conflict could provide a basis for a later motion for ineffective assistance of counsel.

For the reasons outlined in *Wheat* and *Clarkson*, courts in this district have previously declined to accept waivers of actual conflicts of interest. *See, e.g.*, *United States v. Valladares*, 7:14–CR–78, 2014 WL 4961120 (E.D.N.C. Oct. 2, 2014) (noting the need to avoid "the appearance of impropriety" and "to resolve all doubts in favor of disqualification").

For these reasons, the Government requests a hearing to discuss whether there is a conflict of interest or the appearance of a conflict of interest; whether the conflict could be waived, and whether that waiver would be accepted by the Court; and if so, to determine whether Reshod Everett and/or Former FPD Client need to be advised of, and waive, their rights to conflict-free representation.

**L.  The Government Moves for Sequestration of Witnesses.**

The Government requests that potential witnesses be excluded from the courtroom pursuant to Fed. R. Evid. 615.

## **CONCLUSION**

For the above reasons, the Government respectfully moves for the exclusion of certain evidence and arguments, as outlined above, as well as other miscellaneous relief described above.

Respectfully submitted this 26th day of April, 2022.

MICHAEL F. EASLEY, JR.
United States Attorney

BY:    /s/ Scott A. Lemmon
SCOTT A. LEMMON
Assistant United States Attorney
Criminal Division
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
Telephone: 919-856-4500
Email: Scott.Lemmon@usdoj.gov

/s/ Caroline L. Webb
CAROLINE L. WEBB
Assistant United States Attorney
Criminal Division
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
Telephone: 919-856-4530
Fax:   919-856-4487
Emile: caroline.webb@usdoj.gov

17

## CERTIFICATE OF SERVICE

This is to certify that the foregoing document was served upon the following

counsel for the defendant by CM/ECF filing on April 26, 2022.

Christopher M. Young
The Young Law Firm, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
202-870-1191
Fax: 202-478-2119
Email: cyoung@theylf.com

Renorda E. Pryor
Herring Law Center PLLC
1821 Hillandale Road
Suite 1B-220
Durham, NC 27705
919-355-5001
Email: rpryor@herringlawcenter.net

MICHAEL F. EASLEY, JR.
United States Attorney

BY:    /s/ Scott A. Lemmon
SCOTT A. LEMMON
Assistant United States Attorney
Criminal Division
U.S. Attorney's Office
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
Telephone: 919-856-4530
E-mail: scott.lemmon@usdoj.gov

BY:    /s/ Caroline L. Webb
CAROLINE L. WEBB
Special Assistant United States Attorney
Criminal Division
U.S. Attorney's Office
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
Telephone: 919-856-4530
Email: caroline.webb@usdoj.gov

18

**JA250**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

```
_____  )
                                  )
UNITED STATES OF AMERICA,         )
                                  )
              vs.                 )    CASE NO. 5:20-CR-333-D1
                                  )
                                  )
RESHOD JAMAR EVERETT,             )
                                  )
              Defendant.          )
_____  )
```

**FRIDAY, APRIL 29, 2022**
**PRETRIAL CONFERENCE**
**HELD IN RALEIGH, NORTH CAROLINA**
**BEFORE THE HONORABLE JAMES C. DEVER III**
**UNITED STATES DISTRICT COURT**

APPEARANCES:

On Behalf of the Government:

**SCOTT A. LEMMON, Assistant U.S. Attorney**
**CAROLINE L. WEBB, Assistant U.S. Attorney**
**U.S. Attorney's Office**
**150 Fayetteville Street, Suite 2100**
**Raleigh, North Carolina  27601**

On Behalf of the Defendant:

**CHRISTOPHER M. YOUNG, Esquire**
**The Young Law Firm, PLLC**
**1629 K Street NW, Suite 300**
**Washington, DC, 20006**

**RENORDA E. PRYOR, Esquire**
**1502 Woodland Avenue**
**Sanford, North Carolina  27330**

**MICHELLE A. McGIRR, RMR, CRR, CRC**
**Official Court Reporter**
**United States District Court**
**Raleigh, North Carolina**

2

```
 1                    (Friday, April 29, 2022)
 2                  P R O C E E D I N G S
 3
 4     (The defendant, Reshod Jamar Everett, escorted into the courtroom
 5                       at 2:53 p.m.)
 6                  (Open Court at 2:58 p.m.)
 7          THE COURT:  Good afternoon and welcome to the United
 8    States District Court for the Eastern District of North Carolina.
 9               We're here today for the pretrial conference in Reshod
10    Everett's case.  United States of America v. Everett.
11    5:20-CR-333-D.
12               We'll get to the Government's motion in a moment, but I
13    wanted to just run through some logistics and, again, it's just to
14    help me with instructions.
15               Are there going to be stipulations in this trial?
16          MR. LEMMON:  Yes, your Honor.
17          THE COURT:  Okay.  And then the Government's anticipated
18    length of evidence?
19          MR. LEMMON:  I think three -- into the third day or maybe
20    into the fourth.  I think into the 9th or 10th of May.
21          THE COURT:  And then the defense?
22          MR. YOUNG:  Not more than one day, your Honor.
23          THE COURT:  Okay.  Okay.  And, again, I just try and let
24    the jury know how long the evidence is going to take and then -- for
25    purposes of jury selection.
```

3

```
1              For purposes of seating, we're actually going to -- I'm
2      going to remove this front row.  We're going to have them sit just
3      like we always used to.  And so the Government will be sitting at
4      the table where they're sitting and the defense will be sitting at
5      the table where it's sitting and we'll remove this front row.
6              We'll leave the box the way it is in terms of -- we have
7      this extension on the side.  I anticipate we'll probably pick two
8      alternates so that we'll have 14, but 14 can fit comfortably in
9      there.
10             We'll probably use, during jury selection, those seats on
11     the outside, Number 6 and Number 15.  We'll actually have these
12     numbers removed, too, before next week.
13             And the -- again, I mean, I'll mention to them the issue
14     with respect to masks.  Obviously if somebody wants to wear a mask,
15     they certainly can.  They're not required to.
16             Witnesses don't wear masks.  I don't wear a mask.  I'd
17     ask the lawyers not to, especially when you're questioning a
18     witness.  If you want to wear it otherwise -- I'm a mask
19     Libertarian.
20             Again, just to remind you, if we do go with alternates is
21     what I anticipate, under the rules, the defense gets ten strikes,
22     the Government gets six.  Once we get to the alternates, we're not
23     going to carry over.
24             I will continue to follow the process once -- like when
25     we go through the first round of jury selection, and let's say
```

```
 1    there's seven people left in the box or six people left in the box,
 2    they'll all be taken out to a jury room and then we'll refill the
 3    entire box.
 4            And then if in that next round we get to, you know, six
 5    or whatever, those six would be taken out and then we would just be
 6    picking the two alternates.  So I'm going to continue that process,
 7    which is unlike the old days, but I think it's actually more
 8    efficient to do it that way.
 9            Again, I would ask you -- even though we're not going to
10    have this front row, that just for purposes of closings and openings
11    if you just -- I still want them to kind of have that comfort zone
12    of -- I don't put a piece of tape on the floor, but where y'all did
13    last time, you know, you'd stay on this side of the well for your
14    openings or your closings.
15            You can certainly move around in that area but -- and,
16    again, just our custom obviously is y'all are seated during
17    questioning, but if you need to -- if you want the witness to see an
18    exhibit or something, to the extent you can pre-stage them, it just
19    is more efficient, but I'd ask you not to -- unless it's like one
20    question, if you're up there, it's fine -- but I'd like you to have
21    exhibits and then go back to your seat and ask them so you're just,
22    again, not kind of close to the jury.
23            And, again, that's sort of consistent with how we've
24    always done it.
25            Are there going to be any charts, do you anticipate?
```

5

```
 1                MR. LEMMON:  I don't believe so.
 2                THE COURT:  Okay.  Okay.  And I -- and last time each
 3      side wanted Rule 615 invoked.  I gather y'all want that again.
 4                MR. LEMMON:  Yes.
 5                THE COURT:  Okay.  So that -- again, that'll be invoked.
 6      And consistent with U.S. v. Rhynes, which is the Fourth Circuit en
 7      banc case, that does not affect lawyers prepping witnesses.
 8                MR. LEMMON:  Your Honor, I had one question regarding
 9      that issue.  If we had -- we have one potential government witness
10      who had testified during the Government's case in chief.  Would it
11      be possible for that witness to then be able to sit in the gallery
12      during the defense presentation in case there is a need for a
13      rebuttal witness regarding the defense's case?
14                THE COURT:  What do you think?
15                MR. YOUNG:  Your Honor, we would probably object to
16      having a witness sitting in the gallery.
17                THE COURT:  So give me the scenario.
18                MR. LEMMON:  The scenario would be potential -- a
19      specific government witness, who we would anticipate -- specifically
20      an IRS Special Agent, Kevin Anderson.  We anticipated -- last time
21      there was a lot of testimony about finances and things like that --
22                THE COURT:  Right.
23                MR. LEMMON:  -- and so for that person to potentially be
24      a rebuttal witness, we thought it would be more efficient if he
25      could hear the testimony directly to respond to as opposed to us
```

```
1    having to go outside, explain what the testimony was or use
2    hypotheticals --
3                    THE COURT:  And is he testifying as a potential expert?
4                    MR. LEMMON:  No.  He would not be an expert, he would
5    just be part of the Government's case in chief.  And then if it was
6    necessary -- it may not be -- but if it was necessary to call him as
7    a rebuttal witness, I thought it would be more efficient if he could
8    hear any testimony by the defendant for potential rebuttal.
9                    THE COURT:  Well, I'll -- I mean, right now my
10   inclination is to say he needs to just be out.
11                   MR. LEMMON:  Okay.  That's fine.
12                   THE COURT:  But if you want to revisit that with me as
13   the trial develops, that's fine.
14                   Any other -- any preliminary or logistical matters,
15   before we get to the Government's motion, from the Government?
16                   MR. LEMMON:  No, your Honor.
17                   THE COURT:  Or the defense?
18                   MR. YOUNG:  No, your Honor.
19                   THE COURT:  Okay.  All right.  All right.
20                   So just kind of moving through the Government's motion at
21   Docket Entry 2318, and we'll just kind of run through these.
22                   I agree that any reference to time away from family or
23   reference to the state bond, it's both not relevant and it's a waste
24   of time under Rule 403 so -- I mean, I grant that motion in limine.
25                   I also grant the motion in limine -- I mean, I sustain
```

1    the objection, but the defendant is not to show a photo of his

2    family or anything during his testimony.  That's also not relevant

3    under 401 or 403.

4            Defendant is not to communicate or attempt to communicate

5    with the jury except through his own testimony, of course.

6            Again, I'm going to instruct the jury, as I did last

7    time, about the -- that it's up to the Court to determine the

8    constitutionality of the search.  And that there's not going to be

9    argument or implication that their arrest or search was

10   unconstitutional.  So I sustain that.

11           The gang issue, I actually don't agree with the

12   Government.  My memory of the testimony was there was a foundation

13   laid through the examination of the officer who put the bandana with

14   the contraband -- because the officer, as I understood the

15   testimony -- I can't remember if the Government brought it out or if

16   it was brought out on cross, but it doesn't matter -- that it was

17   the officer who put it there, and so that's a foundation.

18           And then there was -- then there was a good faith basis

19   then for Mr. Young to ask Godfrey and Murray -- I mean, they both

20   denied it, but there's a good faith basis to ask and then the jury

21   gets to decide.

22           So, again, assuming there's that foundation laid, I deny

23   that aspect of the Government's motion.

24           I mean, with respect to the Government's request about

25   clarification, the cross of character witnesses, the Fourth

1  Circuit's clear about you can't ask a character witness

2  guilt-assuming hypotheticals.  So, I mean, the classic one -- the

3  leading case from the Fourth Circuit on that deals with, you know,

4  would it change your opinion to a character witness if you knew that

5  the defendant was a drug dealer.  You can't ask that.  You didn't

6  ask that in the questions that you've asked about.

7        It's -- you know, again, there's -- my memory is with

8  respect to one of the witnesses, it was somebody operating a day

9  care and, you know, there were some questions that ultimately got to

10  be cumulative about firearms that the person had when she said she

11  didn't have any in her day care.  And so you know, 403 helps keep

12  things moving along.

13        And, again, with respect to sort of THC or something in a

14  day care -- I mean, the foundation about her operating a day care

15  seemed to me opened the door to some of that, but you absolutely

16  can't get into, would it change your opinion if you knew the person

17  was a drug dealer.  That's absolutely prohibited under the law.

18        So hopefully that clarifies in a way that's helpful.  And

19  again, if you have some questions as we -- you know, we've had this

20  case, we've had other cases before -- I'm happy to revisit issues in

21  the morning or whatever.  If you think there's some issue with

22  somebody or some legal issue that you want to talk about beforehand,

23  I'm happy to do that.

24        I agree that in terms of a reference to prior testimony,

25  it will be to prior testimony or prior sworn statement as opposed to

1    a prior trial.  So that it's like, isn't it true -- just the way
2    it's, you know, done typically actually even with Grand Jury
3    testimony, it's -- you previously gave a statement under oath in
4    which you said thus and so.  Isn't that true?  And then if the
5    witness says they don't remember, you can come up and refresh
6    recollection.

7             There are a number of cases the Government cites and then
8    there are others that -- again, to the extent that there's some
9    opening of the door -- you know, the Government is permitted to
10   respond in argument in essence that a defendant has subpoena power,
11   too.  To the extent that there's an argument about, you know, some
12   witness not being present or something, but obviously the burden of
13   proof remains with the Government.  But that is a permissible
14   response in accordance with the cases cited in the Government's
15   papers and other cases that I've read.

16            With respect to an argument about -- that a defendant's
17   decision to go to trial or to speak to the media reflects innocence,
18   I will sustain that.  That's improper for a number of reasons.

19            One, I mean, it opens the door then to a potential
20   response of the number of people that get convicted at trial, right?
21   I mean, it just is so far afield and such a waste of time.  It
22   doesn't reflect that a person is -- a person has an absolute right
23   under the Constitution to just say, prove it, to the government.
24   Even if they rob a bank with no mask and they're on video and their
25   mother identifies them as the bank robber, that person has the

1  ability to say, prove it.  And that's the Constitution and that's

2  our system.

3          But the fact that somebody decides to go to trial or to

4  speak to the media is just not probative of innocence and it just

5  opens the door to sort of a waste of time.  So I sustain that.

6          The Davis guilty plea issue -- I mean, the Fourth

7  Circuit's opinion in *U.S. v. Blevins*, 960 F.2d 1252, 1260-61

8  (4th Cir. 1992), and *U.S. v. Veney* is a most recent unpublished sort

9  of applying at 790 F.App'x 506 (4th Cir. 2009), just talks about the

10 general rule of excluding a guilty plea.

11         Neither side objected last time and so I kind of -- if

12 neither side objects to things, generally I'm -- lawyers have

13 tactical reasons for that, but to the extent that the Government

14 asks for that to be excluded, I mean, the issue for the jury is

15 whether the Government can prove beyond a reasonable doubt that Mr.

16 Everett committed what he's charged with committing.  And so I

17 sustain that -- the request to exclude a reference to Davis' guilty

18 plea.

19         And it's no different -- I mean, in a case where there's

20 actually kind of classic *Bruton* evidence, it's just -- we're here

21 for the trial of this defendant and that's -- what is happening with

22 others is just not at issue.

23         Mr. Ross is not here today.  I have read the materials --

24 and I guess I would ask each side -- I mean, I did review -- I mean,

25 the Federal Public Defender, at Docket Entry 20, did move to

```
 1   withdraw.  They at one time -- that office represented Mr. Everett
 2   and then I granted the motion at Docket Entry 22 on August 10, 2020.
 3            And then the Government references that it might call a
 4   former FPD client as a witness who was apparently represented by the
 5   FPD as recently as this year or within the last year and the
 6   Government wants a hearing.
 7            And, again, it's my understanding that Mr. Young is --
 8   and Ms. Pryor are retained.  So I'll hear from Mr. Young.  I mean,
 9   if Mr. Ross isn't consulting with you, then we don't need to do
10   anything.  If he is, then I need to sort of probably do something.
11            MR. YOUNG:  He's not, your Honor.
12            THE COURT:  Okay.
13            MR. YOUNG:  He's not consulting with me.  I have not
14   discussed any facts of this case, as I told the prosecution.  Only
15   -- he told me about my voice or maybe you should keep your voice up
16   or trial tactics like that, only when he came in and watched.  And
17   I'm not sure that he even came in every day last time.
18            But he is a friend of mine, but I have not discussed this
19   case or violated anything ethically with Mr. Ross.
20            THE COURT:  Mr. Lemmon.
21            MR. LEMMON:  Your Honor, if I may respond.  I just spoke
22   with Mr. Young yesterday and he said that he does believe that Mr.
23   Ross will continue to have a role in this case through the retrial,
24   including advising Mr. Young about -- and this is tough for me
25   because I don't know exactly what conversations are happening.  And
```

1    for me, the appearance of impropriety is as big of an issue and the

2    potential for ineffectiveness claims in the future if there is a

3    conviction.

4            That's really where I am concerned.  It is not that I

5    have any doubts about the ethics of Mr. Ross or Mr. Young, but I do

6    think that -- and here, there's also a new issue that arises in this

7    trial that did not arise in December, which is that I think that

8    potentially both Mr. Everett and the other former FPD client would

9    potentially need to be advised of this issue to waive any

10   representation by conflict-free counsel.

11           I wouldn't want there to be any allegations down the road

12   by either Mr. Everett or by this other witness that they had not had

13   fully effective counsel and they didn't have an ability to be

14   advised of it and waive it.

15           Or, at the end of the day, as we cited in our brief, the

16   Court gets to decide, in its discretion, whether to accept that

17   waiver or not.

18           And here I do think that based on what happened in the

19   December trial, which Mr. Ross was present for multiple days of the

20   trial.  He was watching witness testimony.  He was, I believe,

21   consulting with Mr. Young in a conference room during breaks.  I

22   don't know what they discussed.

23           He was here, as your Honor remembers, during the jury

24   deliberation phase and there were -- there was a portion where Ms.

25   Pryor asked him for advice on an issue.  It seemed to me like Mr.

1  Ross was consulting.  And so far, I have been advised as of

2  yesterday by Mr. Young, that Mr. Ross is going to continue to

3  consult and play a role.

4           And with me not knowing exactly what that role is, I do

5  think that it raises potential problems down the road.

6           THE COURT:  Mr. Young.

7           MR. YOUNG:  Your Honor, if I may respond.

8           Scott, I did not tell you he would continue to consult.

9  I said he's a friend, he'll continue to come.  He's never consulted.

10 We talked about that in December and we've talked about it before

11 and you even put in your motion that I said he would continue to

12 help.  He hasn't helped.  I've had this case since August of 2020

13 and --

14          MR. LEMMON:  I'm not trying to get into semantics

15 about --

16          MR. YOUNG:  No, you're --

17          THE COURT:  No, no -- gentlemen, gentlemen --

18          MR. YOUNG:  You can't do that --

19          THE COURT:  Gentlemen --

20          MR. YOUNG:  -- I've given him everything else --

21          THE COURT:  Gentlemen, you're both better than this.

22 You're both better than this.  Let's lower the temperature here.

23          I'll set a hearing and hear from Mr. Ross and Mr. Dubois

24 because under _Wheat_, I completely -- and other cases, some -- the

25 one case that involved Mr. Wright that Judge Boyle wrote.  I'm very

```
 1   familiar with Wheat, and the issues of folks saying things down the
 2   road and -- so I will set something and ask Mr. Ross and Mr. Dubois
 3   to be here to address what role, if any, the FPD intends to play,
 4   formally or informally, particularly in light of the issues
 5   referenced in the motion.
 6            Again, not -- and I'm not questioning at all the ethics
 7   of Mr. Young or Mr. Ross.  It's just an issue -- I deal with a lot
 8   of 2255s in my life and it's a way to prevent problems down the
 9   road.
10            And so I will set something for either Tuesday or
11   Wednesday.  I'll look at my calendar.  I know I have sentencings and
12   other things -- and you'll be back in town, Mr. Young?  Would
13   Wednesday be better for you --
14            MR. YOUNG:  Any day, your Honor.  I'll be here throughout
15   trial.
16            THE COURT:  And you'll be here?
17            MR. YOUNG:  Yes, your Honor.
18            THE COURT:  I'll look --
19            And Mr. Lemmon, is there any day that -- does it matter
20   for you?
21            MR. LEMMON:  We have various witness prep scheduled.  I
22   think Wednesday would be slightly better.
23            THE COURT:  I'll look -- we'll do it sometime Wednesday.
24            And again, it's -- it all goes away if it's -- if it's --
25   I mean, obviously it's a public trial, anybody can come watch the
```

```
 1    trial, but where you have an office -- and it's not about the
 2    specific lawyer, but it's treated as a collective law firm.
 3    Especially with somebody that's in a firm, it's different in my
 4    mind.
 5              And I'll say this again to -- and I know Mr. Ross is -- I
 6    can't remember what the new title is, but it's some title -- and it
 7    would be -- apply to somebody that was a more -- that had some title
 8    in the U.S. Attorney's Office.  If they wanted to come watch a trial
 9    and then later kind of teach trial advocacy to the people in their
10    office and what they learned at a trial, of course they're free to
11    watch.
12              But it's different than if you're then talking with
13    people who are participating in the trial when your office is
14    conflicted out.
15              So I'll set that for hearing.  And I would -- and I'll
16    reference the Government's motion so that they'll know what I want
17    to talk about with them.
18              I think those were the only issues that were in the
19    motion.
20              Is there anything else on that, Mr. Lemmon?
21              MR. LEMMON:  No, your Honor.  Thank you.
22              THE COURT:  And Mr. Young, anything else?
23              I know Ms. Pryor had a conflict today but she's going to
24    be --
25              MR. YOUNG:  Yes, your Honor, she's here.
```

```
 1              THE COURT:  Okay.  And, again, just a reminder, Mr.
 2    Young, in the well of this courtroom, you're not a visitor to the
 3    outside so you can take your badge off when you're in here.
 4              MR. YOUNG:  Sorry, your Honor.
 5              THE COURT:  No, no, but particularly in front of the
 6    jury.  Outside, the CSOs, they can get a little grumbly if you don't
 7    have a visitor's badge on, if you're not in the building, but you're
 8    not a visitor to me.
 9              MR. YOUNG:  Thank you, your Honor.
10              THE COURT:  Anything else from the Government today?
11              MR. LEMMON:  No, your Honor.  Thank you.
12              THE COURT:  Anything else from the defense?
13              MR. YOUNG:  No, your Honor.  Thank you.
14              THE COURT:  And, again, I just remind you that if
15    something -- we're obviously going to get back together at some
16    point on Wednesday, but if there are any other issues that come up,
17    like especially during the course of the trial, happy to work early,
18    happy to work through lunch, happy to work late.
19              Mr. Lemmon, you have something else?
20              MR. LEMMON:  One very brief thing.
21              We anticipate disclosing the name of the former Federal
22    PD client this afternoon and so I would just -- I'm not sure the
23    best way to handle this, but maybe a statement on the record that
24    I'm sure there won't be any discussion between the FPD's office and
25    Mr. Young between now and Wednesday regarding strategy or tactics or
```

1    other things regarding that.

2           THE COURT:  Well, you know, I take Mr. Young at his word

3    that he's -- I mean, to me, it's -- again, this is more of a

4    prophylactic hearing.  I anticipate what I think the answer is going

5    to be from both Mr. Dubois and Mr. Ross about all of this, but, you

6    know, they -- obviously there's a very recent former client and they

7    also, as an office, got out of the case of representing Mr. Everett

8    because of an issue associated with a conflict and so I don't think

9    I need to do anything more about that today.

10           MR. LEMMON:  That's fine.  Thank you.

11           THE COURT:  But I will set it and I will cross-reference

12    the Government's motion and then we'll see everybody on Wednesday.

13           MR. YOUNG:  Your Honor, if I could just for the record.

14           THE COURT:  Sure.

15           MR. YOUNG:  I've been practicing law over ten years.

16    I've never had an ethical complaint and I feel attacked by Mr.

17    Lemmon.  We've been working together for months.

18           Everything you've asked for, I've given you.  Stuff I

19    didn't have to give you.  I've given you everything.  And you come

20    in and attack me.  And then you just say I'm going to reveal to

21    Joseph Ross a witness that you're going to reveal this afternoon.

22    It's just unprofessional and it's just really not fair based off the

23    relationship that we've had.

24           I mean, just five minutes ago we were talking about

25    stipulations and you come and attack me.  I've told you I've never

```
 1   done these things.  And you said it twice now in a memo and you put
 2   it on the record that I told you that I was consulting with
 3   somebody?  I don't need to consult, Scott.
 4                THE COURT:  Mr. Young.  Mr. Young.
 5                We'll be in recess in this case until Wednesday and I'll
 6   pick a time.
 7                And I appreciate the professionalism of the lawyers and I
 8   expect to continue to see that and I look forward to trying the case
 9   with y'all.
10                We'll be in recess.
11
12
13                    (Hearing concluding at 3:25 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

19

```
 1                 UNITED STATES DISTRICT COURT

 2               EASTERN DISTRICT OF NORTH CAROLINA

 3

 4               CERTIFICATE OF OFFICIAL REPORTER

 5

 6            I, Michelle A. McGirr, RMR, CRR, CRC, Federal

 7   Official Court Reporter, in and for the United States District Court

 8   for the Eastern District of North Carolina, do hereby certify that

 9   pursuant to Section 753, Title 28, United States Code, that the

10   foregoing is a true and accurate transcript of my stenographically

11   reported proceedings held in the above-entitled matter and that the

12   transcript page format is in conformance with the regulations of the

13   Judicial Conference of the United States.

14

15   Dated this 19th day of December, 2022

16

17                               /s/ Michelle A. McGirr
                                 MICHELLE A. McGIRR
18                               RMR, CRR, CRC
                                 U.S. Official Court Reporter
19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

```
_____  )
                                 )
UNITED STATES OF AMERICA,        )
                                 )
              vs.                )    CASE NO. 5:20-CR-333-D1
                                 )
                                 )
RESHOD JAMAR EVERETT,            )
                                 )
              Defendant.         )
_____  )
```

**THURSDAY, MAY 5, 2022**
**JURY TRIAL/DAY 1**
**HELD IN RALEIGH, NORTH CAROLINA**
**BEFORE THE HONORABLE JAMES C. DEVER III**
**UNITED STATES DISTRICT COURT**

APPEARANCES:

On Behalf of the Government:

**SCOTT A. LEMMON, Assistant U.S. Attorney**
**CAROLINE L. WEBB, Assistant U.S. Attorney**
**U.S. Attorney's Office**
**150 Fayetteville Street, Suite 2100**
**Raleigh, North Carolina  27601**

On Behalf of the Defendant:

**CHRISTOPHER M. YOUNG, Esquire**
**The Young Law Firm, PLLC**
**1629 K Street NW, Suite 300**
**Washington, DC, 20006**

**RENORDA E. PRYOR, Esquire**
**1502 Woodland Avenue**
**Sanford, North Carolina  27330**

**MICHELLE A. McGIRR, RMR, CRR**
**Official Court Reporter**
**United States District Court**
**Eastern District of North Carolina**
**Raleigh, North Carolina**

<u>I N D E X</u>

Colloquy on the record at page 5


Preliminary Instructions by the Court at page 7


**OPENING STATEMENTS:**


              By Ms. Webb at page 14
              By Ms. Pryor at page 21


**WITNESS:**


              Officer Neil Budden


**EXAMINATION:**                                          **PAGE**


              Direct Examination by Mr. Lemmon          26
              Cross-Examination by Mr. Young            104
              Redirect Examination by Mr. Lemmon        128
              Recross-Examination by Mr. Young          130



**WITNESS:**


              Darren Wilson


**EXAMINATION:**


              Direct Examination by Ms. Webb           131
              Cross-Examination by Mr. Young           143



                       (Continuing...)

```
                        I-N-D-E-X
                      (Continued...)
GOVERNMENT'S EXHIBITS:
No.                                              In Evid.
153                                                   29
154                                                   31
57                                                    32
58                                                    35
59, 60                                                36
112 through 121 and 128                               38
126                                                   38
137, 137A, 138, 138A, 176, 176A, 178, 178A            41
61 through 80                                          41
89 through 106                                         42
107 through 110                                        42
83 through 88                                          42
124                                                   44
1 and 1A                                              48
2, 2A, 12, 12A, 13, and 13A                           48
14, 14A                                               49
53, 53A, 53B, 54, 54A, 54B, 55, 55A and 55B           50
82                                                    52
123                                                   58
4, 4A                                                 61
5, 5A, 6, 6A,                                         61
7, 7A, 8, 8A                                          62
9, 9A, 10, 10A, 11, and 11A                           63
41                                                    63
37, 37A                                               64
37B, 37C                                              64
36, 36A                                               65
34                                                    65
152                                                   69
33, 33A, 38, 38A                                      76
44                                                    75
151                                                   77
45                                                    83
45A and 45B                                           83
46, 46A and 46B, 47, 47A, 47B                         84
48, 48A and 48B                                       85
49,                                                   85
49A and 49B                                           86
```

                      (Continuing...)

```
                         I-N-D-E-X
                        (Continued...)


GOVERNMENT'S EXHIBITS:

No.                                                  In Evid.

50                                                      86
50A and 50B                                             86
52                                                      86
52A and 52B                                             87
127                                                     87
129                                                     90
130                                                     91
141                                                     92
142 through 145                                         92
131 through 133                                         93
34B through 34Z                                         93
180                                                     95
159 through 162                                        138



                         *   *   *
```

(Thursday, May 5, 2022)
3                        **P R O C E E D I N G S**

4

5   (The defendant, Reshod Jamar Everett, escorted into the courtroom at

6                           9:55 a.m.)

7                    (Open Court at 10:01 a.m.)

8                      (No jury present)

9           THE COURT:  Good morning and welcome to the United States

10  District Court for the Eastern District of North Carolina.

11          We're here today for the trial in United States of

12  America v. Reshod Everett.  Case 5:20-CR-333-D.

13          Mr. Young, I did want to just confirm -- I know before

14  the last trial, my memory was that you had advised me if we got to

15  the issue of forfeiture, that would be a sentencing issue as opposed

16  to an issue for the jury.  Is that still the case?

17          MR. YOUNG:  Yes, your Honor.

18          THE COURT:  Okay.  Thank you.

19          Anything before we bring the protective jurors in from

20  the Government?

21          MR. LEMMON:  No, your Honor.

22          THE COURT:  From the defense?

23          MR. YOUNG:  Your Honor, I had one thing.  We didn't

24  address it in the motion in limine for this new trial.

25          Wanting to know, is Agent Moore going to be sitting

1  through the entire trial again helping with exhibits?

2              MR. LEMMON:  Yes.  He is the case agent and we have

3  designated him as our case agent for this.

4              THE COURT:  Yes.

5              MR. YOUNG:  Would he be able to testify first as opposed

6  to hearing all the testimony and then testify?

7              THE COURT:  Well, I mean, under Rule 615, they get the

8  one case agent.  So if that's their case agent, they can decide when

9  to call him.

10              MR. YOUNG:  Okay.  Thank you, your Honor.

11              THE COURT:  Thank you.

12              Okay.  Let's bring the prospective jurors in.

13      (Prospective jurors escorted into the courtroom at 10:03 a.m.)

14    (Jury Selection transcribed and filed under separate sealed docket

15                                entry)

16              (Luncheon Recess commencing at 12:35 p.m.)

17  (The defendant, Reshod Jamar Everett, escorted into the courtroom at

18                            1:30 p.m.)

19              (Luncheon Recess concluding at 1:42 p.m.)

20                    (Open Court at 1:42 p.m.)

21                      (No Jury Present)

22              THE COURT:  Just remind everyone, Rule 615 has been

23  invoked.  So after opening statements, anybody other than the

24  designated case agent or Mr. Everett, anyone else who's a potential

25  witness has to leave after that.

7

1          So let's bring the jury in.

2                      (Jury in at 1:43 p.m.)

3          THE COURT:  Welcome back, ladies and gentlemen.  I hope

4    y'all enjoyed your lunch.

5          I need to confirm you followed my instruction during the

6    luncheon recess.

7          All right.  Members of the jury, now that you've been

8    sworn, I'll give you some preliminary instructions to guide you in

9    your participation in the trial.

10         It will be your duty to find from the evidence what the

11   facts are.  You and you alone will be the judges of the facts.  You

12   will then have to apply to those facts the law as the Court will

13   give it to you.  You must follow the law whether you agree with the

14   law or not.

15         Nothing the Court may say or do during the course of the

16   trial is intended to indicate or should be taken by you as

17   indicating what your verdict should be.

18         The evidence from which you will find the facts will

19   consist of the testimony of the witnesses, documents and other

20   things received into the record as exhibits and any facts that the

21   lawyers agree to or stipulate to or that the Court may instruct you

22   to find.

23         Certain things are not evidence and must not be

24   considered to be evidence by you.  I will list those things that are

25   not evidence for you now.  Statements, arguments and questions by

 1   lawyers are not evidence.  Objections to questions are not evidence.

 2   Lawyers have an obligation to their clients to make objections when

 3   they believe evidence being offered is improper under the Rules of

 4   Evidence.

 5            You should not be influenced by the objection or by the

 6   Court's ruling on it.  If the objection is sustained, ignore the

 7   question.  If it is overruled, treat the answer like any other.

 8            If you are instructed that some item of evidence is

 9   received for a limited purpose only, you must follow that

10   instruction.

11            Testimony that the Court has excluded or told you to

12   disregard is not evidence and must not be considered.

13            Anything you may have seen or heard outside the courtroom

14   is not evidence and must be disregarded.  You are to decide this

15   case, as I've told you many times, based solely on the evidence you

16   see and hear together in this courtroom.

17            There are two kinds of evidence that are presented during

18   a trial.  Direct evidence and circumstantial or indirect evidence.

19            Direct evidence is direct proof of a fact such as from

20   the testimony of an eyewitness.

21            Circumstantial evidence is proof of facts from which you

22   may infer or conclude that other facts exist.  I will give you more

23   instructions on these as well as other matters at the end of the

24   case, but keep in mind that you may consider both kinds of evidence.

25   Direct evidence and indirect or circumstantial evidence.

9

```
1            It will be up to you to decide which witnesses to
2    believe, which witnesses not to believe and whether to believe all
3    of what a witness tells you, some of what a witness tells you or
4    none of what a witness tells you.  I will give you more instructions
5    at the end of the case to help you determine the credibility or the
6    believability of witnesses.
7            As you know, this is a criminal case and there are three
8    basic rules about a criminal case that you must keep in mind.
9            First, the defendant is presumed innocent until proven
10   guilty beyond a reasonable doubt.
11           The indictment brought by the Government against the
12   defendant is only an accusation, nothing more.  It is not proof of
13   guilt or anything else.  The defendant starts out with a clean
14   slate.
15           Second, the burden of proof is on the Government
16   throughout the whole case.  The defendant has no burden to prove his
17   innocence or to present any evidence or to testify.  Because the
18   defendant has the right to remain silent, the law prohibits you from
19   arriving at your verdict by considering that the defendant may not
20   have testified.
21           Third, the Government must prove the defendant's guilt
22   beyond a reasonable doubt.
23           I will give you more instructions on this point later,
24   but bear in mind that in this respect, a criminal case is different
25   than a civil case.
```

1          Now, a few words about your conduct as jurors.

2          First, again, I instruct you that during the trial you

3    are not to discuss or communicate about the case with anyone or

4    permit anyone to discuss or communicate about the case with you,

5    including your fellow jurors.

6          Until you retire to the jury room at the end of the case

7    to deliberate on your verdict, you simply are not to talk or

8    communicate about the case with anyone.

9          This prohibition on communication involves all forms.  No

10   tweeting, texting, Instagramming, Facebooking and all the rest of

11   that stuff that I know y'all know a lot more about than I do.

12         Second, do not read or listen to anything touching on the

13   case in any way.  If anyone does try to communicate with you in any

14   way, please bring it to my attention immediately.

15         Third, do not do any research of any kind.  I explained

16   to you why we have that rule and why we follow that rule during a

17   trial.

18         Do not form any opinion until all the evidence is in.

19   Keep an open mind until all the evidence has been presented, all the

20   arguments have been made, all of my instructions on the law have

21   been given to you.

22         You may see the lawyers or other trial participants at a

23   break, leaving in the morning -- or coming in in the morning or

24   leaving in the evening, riding the elevator or something.  They may

25   not so much as even nod or smile or say hello.

```
 1          They're not rude.  They're trying to make sure you don't
 2   feel like they're somehow trying to communicate with you.  So if you
 3   happen to see a trial participant and they don't say good morning,
 4   they're not trying to be rude to you.  They just want to make sure
 5   you don't feel like they're somehow trying to communicate with you
 6   about the case.
 7          A word about note-taking.  If you want to take notes, you
 8   can.  If you don't want to take notes, you don't have to.  It's
 9   completely up to you.  Notes are simply an aid for the note taker's
10   memory about what evidence is being presented.
11          Whether you're a note taker or not, each of you has an
12   obligation to pay attention throughout the whole trial.  You can't
13   delegate that to a member of the jury who happens to be taking
14   notes.  You can't say, well, the person next to me is taking a lot
15   of notes.  I'll kind of zone out here for awhile and catch up during
16   deliberation.  That's not how a trial works.  That's not how your
17   obligation as a juror works.  Each of you has an independent duty to
18   pay attention.  The notes that a juror takes are simply an aid for
19   that juror's memory.
20          Even though we have a court reporter here, you won't have
21   a copy of the transcript with you when it's time to deliberate.
22   Each of you has an independent duty to pay attention throughout the
23   whole case and then to recall the evidence when it's time to
24   deliberate.
25          If you are a note taker, I would just remind you that
```

1    it's important not to get so busy taking notes that you spend the

2    whole trial with your nose looking down at the note pad and you

3    forget to actually look up at the witnesses.

4         Because when I instruct you on credibility or

5    believability, one of the things that you're going to be able to

6    consider is make an assessment based on your experience about

7    whether to believe all of what some witness said, some of what some

8    witness said or none of what some witness said.  And what's going to

9    help you are your observations of that witness when that witness is

10   testifying.

11        So, again, if you're a note taker, don't get so busy

12   taking notes that you forget to look up at the witness and listen to

13   the testimony as it comes in during the course of the trial.

14        The trial will now begin.  First, the attorney for the

15   Government, the Assistant U.S. Attorney, will make an opening

16   statement, which is simply an outline to help you understand the

17   evidence as it comes in.  What the Government believes the evidence

18   will show.  Defense counsel may then give an opening statement.

19        Opening statements are not arguments.  They're simply an

20   outline of what the lawyer believes the evidence -- what evidence

21   will be presented during the course of the trial.

22        The Government will then present its witnesses.  And

23   counsel for the defense may cross-examine those witnesses.

24        Following the government's presentation of its witnesses,

25   the defense has an opportunity to call witnesses if the defense

1    wishes to call witnesses.  If the defense does call witnesses, the
2    Government's counsel will then have an opportunity to cross-examine
3    those witnesses.

4              There also is an opportunity, because the Government has
5    the burden of proof, if they want to put on what's called a rebuttal
6    case, they may call a witness or two in rebuttal if they want.

7              And, again, if they were to call a witness, then they
8    would examine that witness and then it will be cross-examination by
9    the defense.

10             And then after all the evidence presentation is
11   completed, the evidence closes and then it's time for the lawyers to
12   argue to you what the lawyers believe the evidence has shown or not
13   shown.

14             And because the United States has the burden of proof,
15   counsel for the United States argues first.  Defense counsel then
16   argues and then counsel for the United States has the last word in
17   an argument.

18             And then after those arguments, then I read the
19   instructions on the law to you.  And then after that, it's time for
20   y'all to deliberate.

21             So that's where we are.  That's where we're going
22   together during the course of this trial.

23             So at this time, the Court recognizes counsel for the
24   United States to give an open statement on behalf of the United
25   States.

```
 1            MS. WEBB:  Thank you, your Honor.

 2                        OPENING STATEMENT

 3                          (by Ms. Webb)

 4            Money.  It doesn't change you.  It exposes you.  It shows

 5    us who you really are.

 6            Ladies and gentlemen, my name is Caroline Webb and I,

 7    along with Scott Lemmon, represent the United States of America in

 8    this prosecution against the defendant, Reshod Everett.

 9            This case will take us back to 2018.  You'll hear that in

10    2018 Mr. Reshod Everett was living large.  He had a 3000-square foot

11    house in a nice neighborhood in Fayetteville.  He had nice cars, a

12    $72,000 tricked out Chevrolet Silverado truck.  He had a Tahoe.  He

13    had an Audi SUV.  He and his family took nice expensive vacations.

14    He was flying and renting cars all the time.  He had a boat.  Making

15    purchases frequently.

16            But the Fayetteville Police Department in 2018, began an

17    investigation that showed us who Reshod Everett really is.  Not a

18    legitimate businessman, but an armed drug trafficker.

19            Now, in the spring of 2018, detectives with the

20    Fayetteville Police Department began an investigation into a drug

21    trafficking organization that was selling marijuana, cocaine and

22    other controlled substances.  This organization also frequently had

23    access to various firearms and weapons.

24            As they conducted this investigation, they did various

25    activities that police officers do.  They did traffic stops, they
```

1    executed search warrants of residences, they did interviews.

2              And at the culmination of this investigation, they

3    learned that the person in Fayetteville that was at the top of that

4    pyramid was Reshod Everett.

5              Now, in the summer of 2018 after this had been ongoing

6    for some time, officers receive information that Reshod Everett and

7    co-defendant, Alvin Davis, had leased an apartment located at the

8    Addison Ridge apartment complex in Fayetteville, the address being

9    715 Middle Bridge Road, Apartment 5.

10             You'll hear testimony that Reshod Everett physically took

11   out that lease.  He signed his name on the dotted line as the person

12   that was responsible for that apartment, and he listed his

13   co-defendant, Alvin Davis, as somebody that was also authorized to

14   be there.

15             You'll hear that the Fayetteville police detectives on

16   this case got information that that Addison Ridge apartment was a

17   hub for drug trafficking activity.

18             So on July 16th, 2018, detectives conduct surveillance

19   outside that apartment.  They see Alvin Davis leave from the

20   apartment building carrying a backpack.  And they later conduct a

21   traffic stop on his vehicle for having an illegal window tint.

22             Officers will tell you that when they made contact with

23   Mr. Davis, they developed probable cause to search his vehicle with

24   a drug canine who's trained to detect the presence of drugs actually

25   alerted on that vehicle.  They searched Mr. Davis' vehicle and they

1  located cocaine, marijuana and a loaded gun.

2          Based on what happened at this traffic stop, officers

3  sought a Judge's permission, they got a search warrant, to go back

4  to that apartment located at 715, Apartment 5, Middle Bridge,

5  Addison Ridge.  And with that Judge's permission they searched the

6  apartment.

7          You'll hear what they found.  They'll tell you about

8  finding documents with Reshod Everett's name on them, including a

9  document for that nice 2017 Silverado truck.  They'll tell you in a

10 bedroom with one of those documents, they found a gun safe.  And

11 that gun safe contained 37 pounds of marijuana, over 300 grams or

12 close to a pound of cocaine and a loaded CZ Scorpion firearm.

13         The closet where that gun safe was also contained another

14 duffel bag with vacuum sealed bags, empty vacuum sealed bags.

15 Vacuum sealed bags that are used to store pound amounts of

16 marijuana.

17         They'll tell you as they searched the rest of the

18 apartment, they found other items there that are used to package

19 drugs for sale.  They found digital scales, which are used to weigh

20 drugs out.  They saw vacuum sealers and heat guns, which are used to

21 seal those same vacuum sealed bags that they found in the gun safe

22 and in Reshod Everett's closet.

23         Now, after they searched the apartment, after they found

24 all that marijuana, that cocaine, that weapon, that other indicia of

25 drug trafficking, they got an arrest warrant.  Again, a judicial

1    official found that there was probable cause that Reshod Everett was

2    trafficking drugs.

3                So they secured an arrest warrant for him.  They charged

4    him with what they found in the apartment.  And the next day,

5    July 17th, 2018, they go to serve that warrant.

6                They find Reshod Everett is living or residing at 1080,

7    Ronald Reagan Drive.  That apartment was a stash house or a trap

8    house, as it's commonly called, where people sell and keep drugs.

9    But at his residence, 1080 Ronald Reagan Drive, was where he was on

10   a full time basis.

11               They go to Ronald Reagan Drive to serve this arrest

12   warrant on Mr. Everett and as they're doing surveillance trying to

13   determine whether or not he's there, they realize that 1080 Ronald

14   Reagan Drive is also used as a day care.

15               So because they came to this realization, they took

16   expert precautions.  They waited in the July heat in the hot sun to

17   make sure that the customers of the day care had picked up their

18   children, that there was nobody there who would have been in danger

19   by police presence.

20               And finally, after several hours of waiting, they're

21   confident that nobody that's not involved in this case was there and

22   they go in to serve the arrest warrant.

23               As they approach the residence, they immediately make

24   contact with Mr. Everett at the front door of the house.  They serve

25   him with that warrant and they proceed to do a protective sweep of

1    the residence to make sure there's no other people or things in the

2    residence that could cause them harm.

3            And while doing that, they again notice items -- THC

4    gummies and other items that lead them to ask a judge's permission

5    for a search warrant to search the house and the judge grants it.

6            So with the judge's permission, they search 1080 Ronald

7    Reagan Drive and they find at that residence, THC or

8    tetrahydrocannabinol wax, which is illegal in the State of North

9    Carolina and under Federal Law.  They find THC edibles, also illegal

10   in the State of North Carolina and under Federal law.  They find

11   Tramadol.  They find containers that are identical to containers

12   that they found at the apartment the previous a day that they were

13   used to store marijuana and cocaine.  And they also find eight

14   firearms throughout the residence.  Several of these were

15   assault-style rifles.  Several of them were loaded.  One of them had

16   the selector switch set not on safe, but on fire.  They were ready

17   to go in case any intruders came.

18           Several of those firearms were also located next to a

19   security system that was installed so the occupants of that house

20   could see whether police or intruders were coming into that

21   residence to take drugs and drug proceeds.

22           In the same closet as these weapons and that $65,000 --

23   of the weapons and that security system, there was also a backpack

24   containing over $65,000 in cash, all in this house.

25           As they searched 1080 Ronald Reagan Drive, officers

19

```
1    gained further evidence.  They noticed there's documents during the

2    search that indicate that Mr. Everett has access to storage units at

3    a nearby storage unit complex.  They find the keys to the storage

4    units inside the 1080 Ronald Reagan Drive residence.

5              So, again, they get a judge's permission and obtain a

6    search warrant to go check out that storage unit.

7              And when they get to the storage unit, what did they

8    find?  More drugs.  They find 67 pounds of marijuana in

9    vacuum-sealed bags that are contained inside of duffle bags in

10   various plastic Tupperware bins.

11             Now, the investigation didn't stop there.  After law

12   enforcement executed these search warrants, with a judge's

13   permission, they did other things to corroborate the fact that Mr.

14   Everett was an armed drug trafficker.

15             They reviewed his publicly available social media

16   accounts.  They listened to recorded jail calls that he placed after

17   he was taken to the Cumberland County jail in Fayetteville on state

18   court warrants related to what was found.  They reviewed the

19   contents of the cell phone that he had with him on the day of that

20   search warrant.

21             And that cell phone revealed that Mr. Everett was making

22   frequent trips to places where marijuana suppliers live.  That he

23   was buying things that are used for marijuana trafficking, to

24   include the safe at the apartment where the marijuana, the cocaine

25   and the gun were found.
```

1          His phone also revealed that he was spending lots and

2    lots of money.  Investigators got access to Mr. Everett and his

3    wife's tax returns.  Those tax returns revealed questions about the

4    income he was reporting and how that reported gross income matched

5    up with the lifestyle that was on display.

6          Investigators also interviewed other members of the drug

7    trafficking conspiracy.  And those other members of the conspiracy

8    shed light on how much marijuana and how much cocaine that Mr.

9    Everett was responsible for selling during the course of this

10   conspiracy.

11         Now, you'll also hear, in addition to all these steps

12   that investigators took, about efforts that Everett himself used to

13   try to distract from the investigation.  You'll hear that Everett

14   made some unsubstantiated claims about the officers that were

15   involved in his investigation.

16         You'll hear that Everett took efforts to intimidate

17   witnesses or to coerce people to change their story.  You'll also

18   hear that on a prior occasion, Everett gave a sworn statement trying

19   to explain away a lot of what investigators found.  You'll hear that

20   that sworn statement is not supported by independently gathered

21   data.

22         Now, at the end of this investigation, Mr. Everett was

23   indicted in Federal Court with conspiring with Alvin Davis to

24   distribute a thousand kilograms or more of marijuana, 5 kilograms or

25   more of cocaine.

```
 1            You'll hear that he's charged with multiple counts of
 2   possession with intent to distribute various controlled substances,
 3   including marijuana, cocaine and tetrahydrocannabinol.
 4            You'll also hear that he's charged with multiple counts
 5   of possession of firearms in furtherance of drug trafficking.
 6            Ladies and gentlemen, the investigation into Reshod
 7   Everett by the Fayetteville Police Department shows who he really
 8   is.  Not a legitimate businessman, not somebody who's law abiding
 9   and living on the straight and narrow, but an armed drug trafficker.
10            At the end of this trial, my co-counsel, Scott Lemmon,
11   will come before you.  He'll ask you to look past any distractions
12   and to return a verdict that reflects who Reshod Everett really is.
13   A verdict of guilty on all counts.
14            Thank you.
15            THE COURT:  Thank you, Ms. Webb.
16            At this time the Court recognizes counsel for the defense
17   to give an opening statement.
18                       **OPENING STATEMENT**
19                        **(by Ms. Pryor)**
20            Reshod Jamar Everett is innocent.
21            So about two years ago, my daughter bought me this
22   Pandora bracelet.  And for those that have had an opportunity to
23   have charm bracelets -- or maybe you bought it for your partner or
24   your spouse or someone of that nature -- and it's Mother's Day
25   weekend, so we all know one of the gifts that most people buy is
```

1    maybe a charm that includes -- or has the ability to share the

2    journey during holidays.  Like I said Mother's Day, any other

3    special occasion, you get these wonderful charms that mark this

4    journey.

5              But what I will tell you is I know that Pandora, the line

6    is going to be out the door, but one of the things -- when you do

7    get a chance to go into Pandora, one of the most expensive pieces is

8    the link.  And that link is the most expensive because it puts all

9    the journey together.  It clasps together so that everything can

10   stick together and be all as one.  But when it's damaged or when

11   it's broken, all of that journey falls to the ground.

12             Reshod is a husband, a father, an entrepreneur and he's

13   an investor.

14             The Government began in 2018.  I'm going to take you just

15   a little further back with Reshod's journey.  Reshod, in 2004, was

16   hired by the Government working at the United States Postal Service

17   as a delivery driver.

18             While working for the United States Postal Service, he

19   had -- he got promoted to a government contract where he went across

20   seas to Kuwait as one of the managers over logistics.

21             So for those that know, he's now getting BAH, which means

22   that he now gets reimbursed for his -- where he sleeps as well as

23   his travel as well as his food.

24             So he does what responsible people would do if they're

25   making six figures on a government contract -- he saves it -- as he

1   prepares to travel back to the United States.

2           While he's in Kuwait, he meets his beautiful wife,

3   Victoria.  And she's a disabled Army veteran.

4           After about two years of working this government

5   contract, he comes back to the United States.  He now uses the

6   savings that he has and he's ready to invest and he does just that.

7           When he gets back, they first move to California.  Him

8   and his wife, they move to California.  That's where her family is

9   from.  They stay there for awhile and then they move to where now

10  they reside in Fayetteville.

11          Once in Fayetteville, they have two little boys, a little

12  girl and, of course, a dog.  In that -- as a husband and as now a

13  father, he realizes that the money that he saved, the disability

14  checks that the wife is bringing in, they need to now take that to

15  the next step and build legacy.

16          So they buy seven homes.  Some of those homes are for

17  private residences where they lease them to private individuals and

18  private families and then some came through subsidized living.

19          So now some of them, they're receiving more government

20  money in order to help those who are less fortunate as a part of

21  building up his community.

22          He also has the ability, while working at the United

23  States Postal Service, has seven homes, now he can also purchase

24  cars.  So he's buying salvage cars.  He's hired a mechanic and that

25  mechanic fixed those cars and then he leases those or he sells those

1    to individuals as well.  Finding opportunity after opportunity.

2              Then he also has a landscaping business.  He hired

3    different contractors to work on landscaping.

4              And just continuing business after business after

5    business, all while he's a full-time employee at the United States

6    Postal Service.  And he has time to be an assistant little league

7    coach for his sons, one for baseball and one for football.

8              Now, the Government is challenging all of that today or

9    throughout this week, as we've heard.  We'll hear testimony from

10   witnesses and even we'll see all of the evidence that they will

11   bring before you to challenge all of this.  But we ask that you take

12   heed to all of the evidence that you will hear.

13             One of the things that you will not hear -- or maybe

14   let's wait and see -- the storage unit that they talked about

15   earlier has surveillance cameras.  When you get ready to lease a

16   storage unit, you got to go put it in your name.  He had seven

17   homes.  All of those homes are in his name.  All of his contact

18   information -- when you go to purchase a home, you go into a bank,

19   you have to give all of your information.  Your credit has to be at

20   a certain level.

21             Not only that, you heard that where they stayed, that

22   there was a day care in their home.  In their home, they had in-home

23   day care.  They had just received a $70,000 loan from State

24   Employees Credit Union in order to extend, so they can be able to

25   continue to do that service and have more room for the kids that

 1   were in that day care.  You have to have credit for that.  You have
 2   to establish credit for that.
 3          And they were -- and even with the at-home day care, I
 4   believe you heard them say that the storage unit, again,
 5   surveillance.  Let's wait to see if they bring the cameras or maybe
 6   they'll bring the employee in here who will tell you that he's the
 7   one that came and paid cash every month or maybe he's the one that
 8   they saw in the surveillance cameras.  Let's wait to see.
 9          They talk about all of the evidence.  Let's wait to see
10   if they bring the fingerprints from all the evidence.  Remember we
11   talked about that link that pulls all this together.
12          After you've heard all the witnesses, after you've had
13   the opportunity to review all of the evidence, my counsel -- my
14   co-counsel, Attorney Young, is going to ask you to find Reshod Jamar
15   Everett not guilty.
16          THE COURT:  Thank you, Ms. Pryor.
17          United States may call its first witness.
18          MR. LEMMON:  Thank you, your Honor.
19          The Government calls Neil Budden.
20          THE CLERK:  Please state your name for the Court.
21          THE WITNESS:  Neil Budden.
22                    **DETECTIVE NEIL BUDDEN**
23          having been duly sworn, testified as follows:
24          THE WITNESS:  I do.
25          THE COURT:  Good afternoon, Mr. Budden.  Mr. Lemmon at

## BUDDEN - DIRECT

```
 1    this table is going to have some questions for you, then either Mr.
 2    Young or Ms. Pryor at this table is going to have some questions for
 3    you.
 4              If the lawyer who's not asking you questions objects to
 5    the other lawyer's question, don't say anything until I rule on the
 6    objection.
 7              Please try and keep your voice up so the ladies and
 8    gentlemen of the jury can hear what you have to say.
 9              The black device between the Bible and the computer
10    screen is actually a microphone that will help the jury hear you.
11              You may examine the witness.
12              MR. LEMMON:  Thank you, your Honor.
13                         DIRECT EXAMINATION
14    BY MR. LEMMON:
15         Q.    Can you please state your name.
16         A.    Detective Neil Budden.
17         Q.    And where do you currently work?
18         A.    The Clayton Police Department.
19         Q.    And you said you were a detective; is that right?
20         A.    That's correct.
21         Q.    Where did you work prior to the Clayton Police
22    Department?
23         A.    Fayetteville Police Department.
24         Q.    How long did you work at the Fayetteville PD?
25         A.    Approximately nine years, from July 2011 to July 2020.
```

## BUDDEN - DIRECT

```
 1        Q.    In your experience, have you participated in drug
 2   investigations?
 3        A.    Yes.
 4        Q.    Approximately how many felony drug investigations?
 5        A.    Approximately 40 or 50.
 6        Q.    Have you also participated in firearms' investigations?
 7        A.    Yes, I have.
 8        Q.    And in your experience, have some cases involved both
 9   drug dealings and firearms?
10        A.    Yes.
11        Q.    And what is the connection between drugs and guns?
12        A.    The connection between drugs and guns is that the firearm
13   is used to protect supply or money or the drug dealer them self.
14        Q.    Are drug dealers sometimes targeted for robberies?
15        A.    Yes.
16        Q.    And do guns also help to deter robberies or other types
17   of attempts to steal drugs or money?
18        A.    They certainly can.
19        Q.    Now, were you involved in the investigation of Reshod
20   Everett and Alvin Davis and others?
21        A.    Yes.
22        Q.    Are you also aware of the background of the
23   investigation?
24        A.    Yes.
25        Q.    And are you aware of the investigation into other
```

**JA296**

# BUDDEN - DIRECT

1    co-conspirators?

2         A.    Yes.

3         Q.    So if I can direct your attention to 7000 Medway Court.

4    What happened and when in the investigation regarding 7000 Medway

5    Court?

6         A.    Medway Court was in March of 2018.  A search warrant was

7    applied for pertaining to this residence where two individuals were

8    present or involved.  They were Austin Murray and Christopher

9    Godfrey.

10              As a result of that search warrant, more than 275 pounds

11   of marijuana, several thousand dollars in U.S. currency, several

12   prescription pills and several firearms were seized as a result of

13   the search warrant.

14        Q.    And just to make sure the jury got that, were those names

15   Austin Murray and Christopher Godfrey?

16        A.    That's correct.

17        Q.    If we can show Exhibit 153 on your screen.  What is this?

18        A.    So this here, we're looking at the marijuana I just

19   mentioned.  It's approximately 275 pounds of marijuana.

20              MR. LEMMON:  And pause right there.

21              Your Honor, move to admit Exhibit 153.

22              THE COURT:  It will be received and it may be published.

23              Ladies and gentlemen, at the end of the case, you'll

24   actually get all the exhibits that get admitted.  Although -- and

25   you'll have them with you in the jury room except the things we

# BUDDEN - DIRECT

 1  don't send back to the jury room, we don't send firearms, we don't

 2  send ammunition and we don't send narcotics to the jury room.

 3          If you want to see those, to the extent those get

 4  admitted during the course of the trial, you just have to see those

 5  items of evidence out here in the jury box.

 6          But all the other evidence that gets admitted during the

 7  trial -- photographs, things like that -- you'll have with you

 8  during deliberations.

 9          So to the extent -- as we go through the trial, if you're

10  wondering, well, will I get a chance to look at this photo or

11  document or study it in some way, you will during deliberations.

12          And, again, hopefully our technology will work.  Raise

13  your hand if it doesn't.  If you can't see -- once something gets

14  admitted, we'll try and show it to you on the computer screen

15  because that saves time instead of trying to hand things through the

16  jury box.

17          You may proceed.

18          It will be received and it may be published.

19          **(Government's Exhibit No. 153 received into evidence)**

20          MR. LEMMON:  Thank you, your Honor.

21      Q.   (By Mr. Lemmon)  And so now that this is on the jury's

22  monitor, can you describe what we're looking at.

23      A.   As mentioned, several individual packaged, vacuum-sealed

24  bags of marijuana.  There was approximately 275 pounds.  Several

25  firearms are laid out on the floor there with the magazines that go

## BUDDEN - DIRECT

 1    along with them and then individual bullet rounds on the floor next
 2    to them that were loaded in the chamber of the firearm.
 3         Q.    Based on your experience, was this a relatively large
 4    seizure?
 5         A.    Yes.
 6         Q.    How would you compare this to other seizures in your
 7    career?
 8         A.    Definitely one of the biggest ones I've seen or heard of.
 9         Q.    Okay.  Now, let's move to June of 2018.  What happened in
10    June of 2018?
11         A.    In June of 2018, we had conducted a -- we had received
12    some information that Austin Murray, who was part of the Medway
13    Court search warrant, he was out on bond and he continued selling
14    marijuana.  He was living at an address on Back Street, which -- he
15    was living there with his family, his mom and stepdad.
16               We approached the residence and conducted a knock and
17    talk.  Knock and talk is typically used to make contact with an
18    individual to obtain some information.  Kind of develop an
19    investigation.
20               When we conducted the knock and talk, Mr. Murray was
21    home.  The odor of marijuana was present coming from the residence
22    straight through the front door as we stood there and talked with
23    him.
24               At that point, the residence was seized, which means we
25    locked down the residence.  No one -- anybody there, stays there.

## BUDDEN - DIRECT

```
 1   They're not free to leave.  And no one else is free to come in while
 2   we apply for a search warrant of the residence.
 3        Q.   And did you receive a search warrant?
 4        A.   Yes, sir.
 5        Q.   I'm going to show you Exhibit 154.  Is this a fair and
 6   accurate depiction of what was seized?
 7        A.   Yes.
 8             MR. LEMMON:  Move to admit 154.
 9             THE COURT:  It will be received and it may be published.
10        (Government's Exhibit No. 154 received into evidence)
11             MR. LEMMON:  All right.  If we can publish that on the
12   jury's screen.  It looks like it's up.
13        Q.   (By Mr. Lemmon)  So can you describe to the jury what
14   we're seeing here.
15        A.   Again, several individual vacuum-sealed packages of
16   marijuana.  Approximately one pound or more in each package.
17   Several firearms and several thousand dollars in U.S. currency.
18        Q.   And do some of those bags appear to have like a black
19   backing to the packaging?
20        A.   Yes.
21        Q.   And is this a relatively large amount of currency that
22   was seized as well?
23        A.   Yes.  Several thousand dollars.
24        Q.   And did you receive any additional information about who
25   was the supplier or where this was being supplied from?
```

**JA300**

## BUDDEN - DIRECT

1    A.    So the -- Mr. Murray was interviewed at the tail end of

2   this investigation on Back Street.  And he provided some information

3   of an individual that was living in an apartment complex at Addison

4   Ridge, which is in Fayetteville, North Carolina, of a subject that

5   went by the name "Kool or "Kool-Aid."

6              MR. LEMMON:  And if we can show Exhibit 57.

7    Q.    (By Mr. Lemmon)  Is this a fair and accurate depiction of

8   the exterior of the Addison Ridge apartment complex?

9    A.    Yes.

10             MR. LEMMON:  Move to admit Exhibit 57.

11             THE COURT:  It will be received and it may be published.

12       **(Government's Exhibit No. 57 admitted into evidence)**

13    Q.    (By Mr. Lemmon)  All right.  So what are we looking at

14   here?

15    A.    This is the front entrance to the Addison Ridge

16   Apartment complex.  There's one way in and one way out.

17    Q.    Is this a relatively nice apartment complex?

18    A.    It is.

19    Q.    Now, did you and other agents also receive other

20   information regarding drug trafficking at the Addison Ridge

21   apartment?

22    A.    We had.

23    Q.    And what was that information?

24    A.    We had received complaints and information about

25   individuals observed -- two individuals coming and going from 715

## BUDDEN - DIRECT

```
 1    Middle Bridge Road [sic], Apartment 5.  These two individuals were
 2    seen on multiple occasions carrying large duffle bags from vehicles
 3    to the apartment and the odor of marijuana being present during that
 4    transport.
 5         Q.   And when you say Middle Bridge Drive or Middle Bridge
 6    Road, was that in the Addison Ridge apartment complex?
 7         A.   Yes.
 8         Q.   So that's just one of the street names inside Addison
 9    Ridge?
10         A.   That's correct.
11         Q.   And you said 715 Middle Bridge Drive, Apartment 5?
12         A.   Correct.
13         Q.   Now, what were the sources of information from Addison
14    Ridge?
15         A.   We had the management office and also Detective Darren
16    Wilson who was a resident of the apartment complex.
17         Q.   So a Fayetteville police detective named Darren Wilson?
18         A.   Correct.
19         Q.   So he was someone who was providing information about
20    what he was seeing?
21         A.   Yes, sir.
22         Q.   Was there also a vehicle that was described?
23         A.   Yes, sir.  It was a white Chevy Silverado 2500 pickup
24    truck.  Had big rims and tires and it was lifted beyond factory
25    measurements.
```

## JA302

## BUDDEN - DIRECT

```
 1        Q.    And also from, I believe, either the management office or

 2   Detective Wilson, was there information about Saran Wrap and an

 3   incident involving that truck?

 4        A.    Yeah.  This information came through the management

 5   office and the maintenance workers.  They advised that they had seen

 6   Mr. Everett's vehicle, the white Chevy Silverado, exited the complex

 7   and plastic Saran Wrap had flown out of the back -- the bed of the

 8   pickup truck.

 9              The maintenance worker had went to -- had gone to pick it

10   up, but as they described, as Mr. Everett stopped very quickly to

11   jump out -- stopped the vehicle, get out and pick it up and take it

12   with him.

13        Q.    And did those workers note anything about the odor of the

14   Saran Wrap?

15        A.    Yes.  They identified the odor of marijuana with the

16   Saran Wrap.

17        Q.    And were agents able to determine who was leasing

18   Apartment 5?

19        A.    Reshod Jamar Everett and Alvin Davis.

20        Q.    Okay.  And did agents decide to further investigate

21   Reshod Everett and Addison Ridge?

22        A.    Yes.

23        Q.    All right.  So let's talk about a few of the types of

24   investigations that were used throughout this case.

25              So were there three different locations that were
```

## BUDDEN - DIRECT

```
 1    eventually searched?
 2        A.    Yes.
 3        Q.    And were search warrants obtained for the searches?
 4        A.    Yes.
 5              MR. LEMMON:  So if we can show Exhibit 57.
 6        Q.    (By Mr. Lemmon)  So we've seen this.  This is the Addison
 7    Ridge complex, correct?
 8        A.    Correct.
 9              MR. LEMMON:  And if we can show Exhibit 58.
10        Q.    (By Mr. Lemmon)  What is this?
11        A.    This is 1080 Ronald Reagan Drive in Fayetteville.
12              MR. LEMMON:  Move to admit 58.
13              THE COURT:  It'll be received and it may be published.
14        (Government's Exhibit No. 58 received into evidence)
15        Q.    (By Mr. Lemmon)  All right.  So you said this is 1080
16    Ronald Reagan Drive?
17        A.    Correct.
18        Q.    Was this photograph taken after this investigation was
19    completed?
20        A.    Yes.
21        Q.    And so these are not Mr. Everett's vehicles here,
22    correct?
23        A.    That's correct.
24              MR. LEMMON:  All right.  Now, if we can show Exhibit 59.
25        Q.    (By Mr. Lemmon)  What is this?
```

## BUDDEN - DIRECT

```
 1          A.    This is a picture of Andrews McArthur Mini Storage.  This
 2     is just taken at the exterior of the storage facility.
 3              MR. LEMMONS:  And move to admit 59.
 4              THE COURT:  It'll be received.  It may be published.
 5          (Government's Exhibit No. 59 received into evidence)
 6          Q.    (By Mr. Lemmon)  So that's that storage facility you
 7     said?
 8          A.    Yes, sir.
 9              MR. LEMMON:  And if we can show Exhibit 60.
10          Q.    (By Mr. Lemmon)  Does this fairly and accurately depict
11     the distance between 1080 Ronald Reagan and the storage facility?
12          A.    Yes, it does.
13              MR. LEMMON:  Move to admit 60.
14              THE COURT:  It'll be received.  It may be published.
15          (Government's Exhibit No. 60 received into evidence)
16          Q.    (By Mr. Lemmon)  So was it a short drive between the two?
17          A.    Yes.
18          Q.    About how far of a drive?
19          A.    Approximately two to three minutes.
20          Q.    Okay.  And did this investigation show that the storage
21     unit was in the name of an individual named Latasha Sinkler?
22          A.    Yes; that's correct.
23          Q.    And that's someone who has connections to Reshod Everett
24     and his wife, Victoria Everett?
25          A.    Correct.
```

## BUDDEN - DIRECT

1    Q.    Now, were there -- I believe you said searches were done
2    at each of those locations, correct?
3    A.    Yes.
4    Q.    Were controlled substances seized at each of those
5    locations?
6    A.    Yes.
7    Q.    Were video recordings made throughout the investigation?
8    A.    Yes.
9    Q.    Including body cameras recordings?
10    A.    Correct.
11    Q.    And were there also recordings made with a handheld video
12    camera?
13    A.    Yes.
14    Q.    And were there also photographs taken?
15    A.    Yes.
16    MR. LEMMON:  I'm going to show on your screen a series of
17    exhibits.  And we're going to start at 112.  I'm going to show you
18    112 through 121.  (Exhibits displayed).
19    Q.    (By Mr. Lemmon)  Are these still shots from body camera
20    footage?
21    A.    Yes.
22    Q.    And these still shots were all taken during the course of
23    this investigation, correct?
24    A.    That's correct.
25    MR. LEMMON:  Then 128, please.

**JA306**

## BUDDEN - DIRECT

1  Q. (By Mr. Lemmon) Do those all fairly and accurately

2 depict the events in question?

3  A. Yes.

4   MR. LEMMON: All right. Move to admit 112 through 121

5 and 128.

6   THE COURT: They'll be received and they may be

7 published.

8  **(Government's Exhibit Nos. 112 through 121 and 128 received into**

9           **evidence)**

10  Q. (By Mr. Lemmon) And as part of this investigation, did

11 officers also review recorded jail phone calls and video calls of

12 Reshod Everett?

13  A. Yes, sir.

14   MR. LEMMON: Your Honor, at this time we have a

15 stipulation between the parties to read.

16   THE COURT: Ladies and gentlemen, when the lawyers on

17 each side stipulate or agree as to the existence of certain facts,

18 you may accept those facts as proven without any further evidence.

19   And so Mr. Lemmon is now going to read a stipulation that

20 the parties have reached in this case. It'll be in the form of an

21 exhibit and you'll have a copy of the exhibit with you when it's

22 time to deliberate.

23   The stipulation is received and you may read it.

24   MR. LEMMON: Thank you, your Honor.

25  **(Government's Exhibit No. 126 received into evidence)**

## BUDDEN - DIRECT

```
 1            MR. LEMMON:  This is Exhibit 126.  And the stipulation
 2    reads as follows:
 3            The United States of America, by and through the United
 4    States Attorney for the Eastern District of North Carolina, and the
 5    defendant, by and through his attorneys, hereby stipulate and agree
 6    as follows:
 7            It is agreed and stipulated between the parties that the
 8    below-listed recorded phone calls were made from the Cumberland
 9    County Detention Center on the dates and times listed.
10            The parties further stipulate that the below-listed calls
11    were recorded at the time the phone calls were made.  The recorded
12    phone calls were kept in the course of regularly-conducted business
13    activity of the Cumberland County Detention Center and that
14    recording phone calls is a regular practice of the Cumberland County
15    Detention Center.
16            The parties agree that no testimony from a custodian of
17    records is required to authenticate the below-listed recorded phone
18    calls.
19            A.  July 18th, 2018.  A phone call at 3:21 p.m.
20    Government's Exhibits 137 and 137A.
21            B.  July 18th, 2018.  Phone call at 9:05 p.m.
22    Government's Exhibits 138 and 138A.
23            THE COURT:  Slow down just to help the court reporter.
24    When you read things, sometimes people get talking really fast.  I
25    sometimes do that.  And it's helpful to the court reporter if you
```

## BUDDEN - DIRECT

1  read it a little more slowly.

2          MR. LEMMON:  Thank you, your Honor.

3          C.  July 17th, 2018.  Phone call at 9:04 p.m.

4  Government's Exhibits 176 and 176A.

5          D.  July 18th, 2018.  Phone call at 8:23 a.m.

6  Government's Exhibits 178 and 178A.

7          3.  It is agreed and stipulated between the parties that

8  the below-listed recorded phone call was made from the Edgecombe

9  County Detention Center on the date and time listed.

10          The parties further stipulate that the below-listed call

11  was recorded at the time the phone call was made.  The recorded

12  phone call was kept in the course of regularly-conducted business

13  activity at the Edgecombe County Detention Center.  And recording

14  phone calls is a regular practice of the Edgecombe County Detention

15  Center.

16          The parties agree that no testimony from a custodian of

17  records is required to authenticate the below-listed recorded phone

18  call:

19          A.  December 17th, 2021.  Phone call at 8:38 p.m.

20  Government's Exhibit 179 and 179A.

21          4.  It is agreed and stipulated between the parties that

22  Exhibits 137A, 138A, 176A, 178A, and 179A are admissible.

23          It is agreed and stipulated between the parties that

24  Exhibits 137, 138 and 179 are recorded phone calls that were placed

25  by Reshod Jamar Everett, aka "Kool," aka "Kool-Aid."

## BUDDEN - DIRECT

```
 1              6.  It is agreed and stipulated between the parties that

 2    Exhibits 176 and 178 are recorded phone calls that were placed by

 3    Alvin Milton Davis, III.

 4              THE COURT:  Thank you.  That'll be received.

 5         (Government's Exhibit Nos. 137, 137A, 138, 138A, 176, 176A, 178,

 6                   178A, 179 and 179A received into evidence

 7              MR. LEMMON:  Thank you, your Honor.

 8         Q.   (By Mr. Lemmon)  Now, were photos -- I believe you said

 9    -- also taken during the execution of search warrants?

10         A.   Yes.

11              MR. LEMMON:  And I'm going to show you a series of

12    exhibits on your screen, starting at 61 through 80.

13         Q.   (By Mr. Lemmon)  Are these all photographs that were

14    taken at the search of the Addison Ridge apartments at,

15    specifically, Apartment 5?

16         A.   Yes.

17              MR. LEMMON:  Your Honor, move to admit 61 through 80.

18              THE COURT:  They'll be received and they may be

19    published.

20         (Government's Exhibit Nos. 61 through 80 received into evidence)

21              MR. LEMMON:  All right.  Next I'm going to go to 89

22    through 106.

23         Q.   (By Mr. Lemmon)  Are these photographs from the search at

24    Ronald Reagan?

25         A.   Yes.
```

## BUDDEN - DIRECT

```
 1              MR. LEMMON:  Your Honor, move to admit 89 through 106.
 2              THE COURT:  They'll be received and they may be
 3   published.
 4      (Government's Exhibit Nos. 89 through 106 received into evidence)
 5              MR. LEMMON:  Then if we can jump to 107 through 110.
 6       Q.    (By Mr. Lemmon)  Are these photographs from the search at
 7   the storage unit?
 8       A.    Yes.
 9              MR. LEMMON:  Move to admit 107 to 110.
10              THE COURT:  They'll be received and they may be
11   published.
12     (Government's Exhibit Nos. 107 through 110 received into evidence)
13              MR. LEMMON:  Then just a few additional -- if we can go
14   to 83 through 88.
15       Q.    (By Mr. Lemmon)  Are these photographs of Ronald Reagan
16   that were taken on a different date than the date of the search
17   warrant there?
18       A.    Yes, sir.
19              MR. LEMMON:  All right.  Move to admit 83 to 88.
20              THE COURT:  They'll be received and they may be
21   published.
22      (Government's Exhibit Nos. 83 through 88 received into evidence)
23       Q.    (By Mr. Lemmon)  Now, let's go to July 16th, 2018.  Were
24   you working on July 16th, 2018?
25       A.    Yes, sir.
```

### JA311

## BUDDEN - DIRECT

1    Q.    What were you -- or excuse me, happened that day?

2    A.    On July 16th, 2018, the police department's gang unit --

3    we had followed up on information that was provided by Mr. Austin

4    Murray.

5          We had set up a surveillance operation at the Addison

6    Ridge apartment complex to observe the activity taking place at 715

7    Middle Bridge Road, Apartment 5.

8          During the course of the surveillance, we observed Alvin

9    Davis, who is one of the lessees of the apartment.  He exited the

10   building from the direction of Apartment 5 and put a black backpack

11   on the front passenger seat floorboard of the vehicle.  It was a

12   black, four-door Cadillac sedan.  He then sat in the driver's seat

13   and went mobile and left the apartment complex.

14   Q.    All right.  And what was your role that day?

15   A.    My role that day, I was what we call a stop vehicle.  If

16   there's a violation we can observe, to conduct a stop on the vehicle

17   leaving from what we call a target residence, I would be one of the

18   detectives stopping or engaging in the traffic stop.

19   Q.    Did the vehicle exit from this portion of Addison Ridge

20   apartments?

21   A.    Yes.

22   Q.    And which direction did it go?

23   A.    The vehicle made a right turn onto Sante Fe Drive towards

24   Bragg Boulevard.

25          MR. LEMMON:  Okay.  And if we can show 124 on your

## BUDDEN - DIRECT

1    screen.

2          Q.    (By Mr. Lemmon)  Is this a map of that area?

3          A.    Yes.

4                MR. LEMMON:  Move to admit 124.

5                THE COURT:  It'll be received.  It may be published.

6          **(Government's Exhibit No. 124 received into evidence)**

7          Q.    (By Mr. Lemmon)  You can touch that screen up there and

8    make red marks.  Can you show which direction that car was going?

9          A.    So you have Addison Ridge here and the vehicle made a

10   right turn on Sante Fe Drive -- Sante Fe Drive and went this way.

11   (Annotating).

12         Q.    And was a traffic stop conducted for that vehicle?

13         A.    Yes, sir.  The traffic stop was conducted for a window

14   tint violation.  The vehicle stopped on Shaw Road at Old Shaw Road.

15               MR. LEMMON:  All right.  And if I can show 128 on your

16   screen.  This has already been admitted so we can publish this.

17         Q.    (By Mr. Lemmon)  And what is this?

18         A.    This is the black, four-door Cadillac that Alvin Davis

19   was driving.

20         Q.    And was there a window tint issue with the car?

21         A.    Yes, sir.

22         Q.    All right.  What happened once the traffic stop happens?

23         A.    When the traffic stop was conducted, Detective Bird was

24   the primary detective on the stop.  He was the -- when I say

25   primary, he was the one that made contact with the driver.  And,

## BUDDEN - DIRECT

```
 1    therefore, I was his back-up officer so I approached from the
 2    passenger side of the vehicle.
 3              Upon approach of the vehicle, you could see that Mr.
 4    Davis was the only occupant inside the vehicle.  And from the
 5    passenger side, Mr. Davis, when he saw me there he -- requested he
 6    put the front driver's side window down.  And then from there I
 7    could see the black backpack that he was observed carrying from the
 8    apartment to the vehicle.
 9        Q.    And was Mr. Davis asked to step out of the vehicle?
10        A.    He was asked to step out of the vehicle to conduct a free
11    air sniff of the vehicle using a trained police canine.
12        Q.    And did the canine alert?
13        A.    It did.
14              MR. LEMMON:  If we can publish 117.
15        Q.    (By Mr. Lemmon)  So what was found inside the vehicle?
16        A.    Inside the vehicle in the black bag, you had two
17    vacuum-sealed bags containing marijuana, a glass mason jar -- two
18    glass mason jars containing a small amount of marijuana, a digital
19    scale and a firearm.  And in addition to the firearm, there was two
20    loaded handgun magazines in the driver door pocket that matched the
21    handgun that was found.
22        Q.    So this 117 shows marijuana in that black backpack being
23    removed?
24        A.    Yes, sir.
25              MR. LEMMON:  And 118, please.
```

## BUDDEN - DIRECT

46

```
 1        Q.    (By Mr. Lemmon)  And what are we seeing here?
 2        A.    This here, this is a thermos and inside the thermos there
 3   was a small bag of white powder cocaine.
 4              MR. LEMMON:  And 113, please.
 5        Q.    (By Mr. Lemmon)  And so where are we looking here?
 6        A.    This picture is taken from Detective Bird's body camera.
 7   We're standing at the back of his patrol vehicle.  The items that --
 8   have already been seized from the black Cadillac.
 9              In his left hand here, you have the black thermos that
10   housed the cocaine and then the vacuum sealed bags of marijuana
11   inside the black bag.  (Annotating).
12              MR. LEMMON:  If we can show 116.
13        Q.    (By Mr. Lemmon)  Is this Detective Bird?
14        A.    Yes, this is Detective Bird.
15        Q.    And what's in his hand?
16        A.    The black thermos that had the cocaine.
17              MR. LEMMON:  And 114, please.
18        Q.    (By Mr. Lemmon)  All right.  What is that on the seat?
19        A.    That is an extended magazine to a handgun that came out
20   of the gun in the car.
21        Q.    And what's the purpose of an extended magazine or what is
22   an extended magazine -- how is it different than a normal magazine?
23        A.    Extended magazines just provides you with more ammunition
24   at one time before you have to -- if you were to expend all the
25   ammunition inside of it before you had to reload.
```

## BUDDEN - DIRECT

1     Q.   Is it a more dangerous type of weapon if there's an

2  extended magazine?

3     A.   It could be.  It just provides you with more ammunition.

4     MR. LEMMON:  Okay.  And 112, please.

5     Q.  (By Mr. Lemmon)  And what are these in a seat?

6     A.   These are the two handgun magazines that I mentioned.

7  The factory handgun magazines that were in the driver door pocket.

8     Q.   And was there also a handgun in that vehicle?

9     A.   Yes.

10     MR. LEMMON:  May I approach, your Honor?

11     THE COURT:  You may.

12     Q.  (By Mr. Lemmon)  Showing you what's been marked as

13  Exhibit 1.

14     MR. LEMMON:  And for the jury, these have all been

15  checked by court security officers and the U.S. Marshals and have

16  been not fired.

17     Q.  (By Mr. Lemmon) So what is that you're looking at?

18     A.   This is a Smith & Wesson Bodyguard .380 caliber handgun

19  with the extended magazine.

20     MR. LEMMON:  And if we can show 1A.

21     Q.  (By Mr. Lemmon)  Is that a photo of the gun and magazine?

22     A.   Yes.

23     MR. LEMMON:  Move to admit 1A.

24     THE COURT:  It'll be received.

25     And you want 1 in, too?

## BUDDEN - DIRECT

```
 1              Again, ladies and gentlemen, with respect to firearms and
 2   narcotics, there are photos that get admitted usually along with
 3   them because you get these photos back in the jury room, but the
 4   narcotics and guns don't go back to the jury room.
 5              So 1 and 1A will be received.
 6       (Government's Exhibit Nos. 1 and 1A received into evidence)
 7              MR. LEMMON:  Thank you.
 8       Q.   (By Mr. Lemmon)  I'm now approaching with Exhibits 2, 12
 9   and 13.  What are those?
10       A.   These are the two handgun magazines that were located in
11   the driver door pocket and then the ammunition that went along in
12   each magazine.
13              MR. LEMMON:  And, your Honor, move to admit the photos
14   for those as well.
15              THE COURT:  2, 12 and 13 and 2A, 12A and 13A will all be
16   received.
17              MR. LEMMON:  Thank you.
18   (Government's Exhibit Nos. 2, 2A, 12, 12A, 13, and 13A received into
19                              evidence)
20       Q.   (By Mr. Lemmon)  Was there also --
21              MR. LEMMON:  We can publish those briefly.  So 2A, 12A,
22   and 13A.
23       Q.   (By Mr. Lemmon)  Was there also currency in Davis'
24   possession?
25       A.   Yes.  He had U.S. currency in his pants pocket.
```

## BUDDEN - DIRECT

49

```
 1              MR. LEMMON:  I'm going to approach with Exhibit 14.
 2              THE COURT:  You may.
 3              And this goes for both counsel, if you're just
 4    approaching to show an exhibit to a witness, you don't have to ask.
 5              Ladies and gentlemen, lawyers are trained to always ask
 6    before they approach a witness so it's ingrained in them.
 7              I'm one of the few judges that, in order to save time and
 8    be a good steward of your time, they don't have to ask every time.
 9    Might save us 10 minutes during the course of the trial, but that's
10    10 minutes of your time.  So forgive them if they continue to ask
11    because it's so ingrained as a lawyer.
12              You may approach.
13         Q.   (By Mr. Lemmon)  I'll show you Exhibit 14.  What is this?
14         A.   This here, we have the two glass mason jars, the black
15    thermos, a digital scale and the black backpack.
16         Q.   And what is the purpose of a digital scale like this?
17         A.   To aid in packaging controlled substance for sale.
18              MR. LEMMON:  Your Honor, move to admit Exhibit 14.
19              THE COURT:  14 and 14A will be received.
20         (Government's Exhibit Nos. 14 and 14A received into evidence)
21              THE COURT:  And may be published.
22         Q.   (By Mr. Lemmon)  And we also have 53, 54 and 55.  Are
23    these the drugs that were seized from that car?
24         A.   Yes, sir.  Here you have marijuana, marijuana and then
25    cocaine.
```

## BUDDEN - DIRECT

```
 1              MR. LEMMON:  Move to admit 53, 54 and 55, your Honor.
 2              THE COURT:  They'll be received and they may be
 3    published.
 4       (Government's Exhibit Nos. 53, 53A, 53B, 54, 54A, 54B, 55, 55A and
 5                        55B received into evidence)
 6              MR. LEMMON:  As well as their photographs?
 7              THE COURT:  As well as the corresponding photographs at
 8    53A, 53B, 54A, 54B, 55A and 55B and they may be published.
 9       Q.    (By Mr. Lemmon)  Now, after these seizures were made from
10    this vehicle, you've testified that there was a search warrant for
11    Apartment 5 at the Addison Ridge apartments, correct?
12       A.    Yes, sir.
13       Q.    Did you take part in that search?
14       A.    No.
15       Q.    Now, did agents later identify the residence where Reshod
16    Everett was living instead of the apartment?
17       A.    Yes.
18       Q.    And what was that address?  You said 1080 Ronald Reagan,
19    correct?
20       A.    That's correct.
21              MR. LEMMON:  If we can show Exhibit 58.
22       Q.    (By Mr. Lemmon)  Did officers determine who was living
23    here?
24       A.    Mr. Everett, his wife, their children and Ms. Sinkler.
25       Q.    Was it a relatively large house?
```

### JA319

## BUDDEN - DIRECT

```
 1        A.    Yes, sir.

 2        Q.    Do you know approximately how many bedrooms, bonus rooms,

 3   et cetera?

 4        A.    There was three stories, three to four bedrooms.

 5   Appeared to be a bonus room on the third floor.  Several bathrooms,

 6   three or four.

 7        Q.    And were controlled -- excuse me.

 8              MR. LEMMON:  If I can show 115 on your screen as well.

 9   And 119, please.  119 on his screen.

10        Q.    (By Mr. Lemmon)  And so these -- as you've testified,

11   there's a search warrant -- well, strike that.  I'll step back.

12              Let's move to July 17th, 2018.  Was there an arrest

13   warrant that had been obtained for Mr. Everett?

14        A.    Yes.

15        Q.    Can you tell us what happened that day from your point of

16   view.

17        A.    So July 17th, we had sought out to locate Mr. Everett to

18   serve the arrest warrants.

19              At approximately 1 p.m. in the afternoon on July 17th, we

20   set up what we call a surveillance operation at 1080 Ronald Reagan

21   Drive where we have several detectives in the area in what we call

22   an undercover capacity or a UC capacity to watch the residence, see

23   who comes and goes to see if we can identify if Mr. Everett was, in

24   fact, home.

25              MR. LEMMON:  Can we publish 82, please -- or excuse me,
```

## BUDDEN - DIRECT

1  not publish, show on Mr. Budden's screen.  82.

2       Q.   (By Mr. Lemmon)  And what is this that we're looking at?

3       A.   So this is a picture of the back of 1080 Ronald Reagan

4  Drive from the fire station that was directly behind it.

5            MR. LEMMON:  And move to admit 82 and publish.

6            THE COURT:  It'll be received.  It may be published.

7       **(Government's Exhibit No. 82 received into evidence)**

8       Q.   (By Mr. Lemmon)  And so was an officer viewing the

9  residence from the backyard from this location?

10      A.   Yes.

11      Q.   And did the officer see Mr. Everett at the location?

12      A.   They did.

13      Q.   So what happened next?

14      A.   After we had confirmed Mr. Everett was there, we had seen

15 some activity that was questionable where we had -- observing people

16 coming and going from the residence.  They would show up

17 empty-handed and then leave with a child.

18           So we did a little research on the residence.  We were

19 able to confirm that the residence, 1080 Ronald Reagan Drive, was

20 being used as a licensed day care called Tori's Playhouse.

21           With this information in mind and already knowing that

22 Mr. Everett was present, we had planned to give plenty of time for

23 each child -- with the hopes of each child being picked up by their

24 parents before we even approached the house to try to arrest Mr.

25 Everett.

## BUDDEN - DIRECT

```
 1        Q.    And so what did you do next?
 2        A.    At approximately 7:30, we had -- we went to approach the
 3   residence.  Two detectives approached the residence, knocked on the
 4   front door in a plain clothes capacity.  They didn't have any
 5   markings identifying themselves as police until they verbally gave
 6   notification when he answered the door.  Mr. Everett answered the
 7   door and he was taken into custody.
 8        Q.    And had an arrest warrant been obtained before the arrest
 9   was made?
10        A.    Yes.
11        Q.    So a judge had given permission for that arrest?
12        A.    That's correct.
13        Q.    And do you see Mr. Everett in the courtroom today?
14        A.    Yes, sir.
15        Q.    And can you identify him?
16        A.    He's sitting over here on the table to the right with the
17   black shirt, a black-and-gold striped tie.
18              THE COURT:  The record will reflect the witness has
19   identified the defendant, Reshod Everett.
20        Q.    (By Mr. Lemmon)  Did you perform a protective sweep of
21   that house?
22        A.    Yes, we did.
23        Q.    And what is a protective sweep?
24        A.    A protective sweep is done just to render a residence or
25   a scene safe.  Make sure there's nobody else inside the residence
```

## JA322

**BUDDEN - DIRECT**

1    that could potentially pose a threat.

2         During the course of this investigation, we had seized

3    several firearms from people that are associated with Mr. Everett so

4    we knew that potentially people with firearms could be inside the

5    residence.

6         And in addition to that, the protective sweep -- with the

7    knowledge of there being a day care -- we wanted to confirm that

8    there were no children inside the residence, that, one, didn't need

9    to be there and we -- if we needed to expect anybody else showing up

10   to pick up a child, it would be good information to know prior to

11   their arrival.

12   Q.   And did it turn out there were people at the house?

13   A.   Yes.

14   Q.   Who was at the house?

15   A.   Mr. Everett's wife, Victoria Everett, their two children

16   and Ms. Sinkler.

17   Q.   And during the sweep, did you see anything that caught

18   your attention?

19   A.   I observed a bottle of Americana THC gummies on the

20   bannister on the second story of the residence as we were doing a

21   protective sweep.

22        MR. LEMMON:  If we can publish 95.

23   Q.   (By Mr. Lemmon)  Now, what is this?

24   A.   This is the bottle I just mentioned.  Brand is American

25   fruit juicy gummies.  At the bottom there's a little -- like a

## BUDDEN - DIRECT

1   hazard sign where it says THC and below that it says, contains

2   marijuana.  Keep out of reach of children.

3        Q.   And is that product containing THC, is that legal under

4   North Carolina law?

5        A.   No, sir.

6        Q.   And in July of 2018, was it legal under North Carolina

7   law?

8        A.   No.

9        Q.   Was it legal under federal law?

10       A.   No.

11       Q.   Are prescriptions for something like medical marijuana

12  from out of state, are those valid in North Carolina?

13       A.   No.

14       Q.   All right.  Did you also notice at any point security

15  cameras around the house?

16       A.   We did.  We made note of the cameras on the exterior of

17  the residence as we were doing the surveillance.  There was several

18  cameras on the exterior that appeared to cover every angle of the

19  residence.

20            MR. LEMMON:  If we can publish 119.

21       Q.   (By Mr. Lemmon)  Did a Detective Chase Robinson also walk

22  through the house?

23       A.   Yes, he did.

24       Q.   And is this a still shot from his body camera?

25       A.   It is.

## JA324

1      Q.    And what is that screen that we're seeing in the middle

2    of this photo?

3      A.    The screen you're seeing up at the top there, that's the

4    screen that displays all the security cameras at the residence.

5      Q.    And is this in the closet off the master bedroom?

6      A.    That's correct.

7      Q.    And are there also firearms in this photograph?

8      A.    Yes, sir.

9      Q.    Can you indicate where those are.

10     A.    The firearms were right here at the top of the shelf.

11   (Annotating).   There were two loaded rifles.

12           MR. LEMMON:  Okay.  And if we can publish 58.

13     Q.    (By Mr. Lemmon)  Now, what did you notice about that

14   white fence?

15     A.    This -- it was a six-foot privacy fence that went around

16   the exterior of the back of the residence which had an automated

17   electric door opener for the fence, the gates.

18     Q.    And did you or other officers determine where Mr. Everett

19   was parking his vehicles?

20     A.    He was parking his vehicles in the back of the house

21   inside the enclosed gate.

22     Q.    And why would people park in the backyard?

23     A.    Those engaged in controlled substance activity would park

24   their vehicles out of sight of law enforcement or potentially

25   anybody that could pose a threat to them, whether they be rival drug

## BUDDEN - DIRECT

1    dealers, somebody that could rob them for their supply or their
2    money.
3         Q.   So this photo, this was taken more recently, correct?
4         A.   That's correct.
5         Q.   And the current owners, they park their vehicles on the
6    driveway, correct?
7         A.   It appears so, yes, sir.
8         Q.   But Mr. Everett was parking in the backyard?
9         A.   That's correct.
10        Q.   Now, based on all of the information you and other agents
11   had gathered, did you all decide to apply for the search warrant?
12        A.   Yes.
13        Q.   And did you -- were you the person who actually applied
14   for the search warrant?
15        A.   Yes; that's correct.
16        Q.   And so what was the process of leaving the residence and
17   going to get that warrant like?
18        A.   It can be a fairly -- somewhat lengthy process.
19   Actually, I have to type a search warrant, which could take -- a lot
20   of times it takes a minimum of close to an hour or if not more.
21             So you type the search warrant.  It has to be reviewed
22   and approved by a supervisor.  Then at that point, I would have had
23   to have driven from the residence to the magistrate's office, which
24   is at the Cumberland County jail in downtown Fayetteville, which is
25   approximately a 15- to 20-minute ride.

## BUDDEN - DIRECT

```
 1              Once the search warrant was signed, I would then have to
 2     drive back to the residence to execute the search warrant.
 3         Q.    And so did you then return and help execute it?
 4         A.    Yes.
 5              MR. LEMMON:  If we can show on your screen 123.  And you
 6     can turn the sound off on that.  If we can play it on his screen.
 7         Q.    (By Mr. Lemmon)  Now, after you have the warrant, is a
 8     walk-through video typically taken at a residence?
 9         A.    Yes.
10         Q.    And is this that walk-through video?
11         A.    Yes, it appears it is.
12         Q.    Okay.
13              MR. LEMMON:  Move to admit 123.
14              THE COURT:  It'll be received and it may be published.
15         (Government's Exhibit No. 123 received into evidence)
16              MR. LEMMON:  All right.  We're not going to play the
17     whole thing.  We can publish it to show just a few -- keep the sound
18     off, please.
19         Q.    (By Mr. Lemmon)  And so what would this video have been
20     taken with, what kind of device?
21         A.    Generally a phone, cell phone, camera phone.
22         Q.    And so a walk-through video wouldn't be taken with a body
23     camera, would it?
24         A.    No.
25         Q.    And why is that?
```

## BUDDEN - DIRECT

1    A.    At the time -- it's not required by the department policy

2    to do so; to prevent excessive storage and video.

3    Q.    So it was the policy at the time that these walk-through

4    videos would be done with a different device than a body cam,

5    correct?

6    A.    That's correct.

7    MR. LEMMON:  We'll play just a few more seconds of this.

8    Q.    (By Mr. Lemmon)  So is this walking -- is this the day

9    care area?

10    A.    Yes.

11    Q.    And is this walking into the kitchen area?

12    A.    Yes, sir.

13    MR. LEMMON:  Pause it.

14    Q.    (By Mr. Lemmon)  All right.  And you said that Latasha

15    Sinkler and Victoria Everett were present this night, correct?

16    A.    That's correct.

17    Q.    Where were they in the house during that night?

18    A.    So when we made contact and took Mr. Everett into

19    custody, they were inside the residence.  And throughout the course

20    of the application for the search warrant and the execution of the

21    search warrant, they were -- they stayed at the house.

22    Q.    Now Mr. Everett, was he transported to the police station

23    based on that arrest warrant?

24    A.    Yes.

25    Q.    But Latasha Sinkler and Victoria, they stayed at the

# BUDDEN - DIRECT

```
 1    house, correct?
 2         A.    Correct.
 3         Q.    Were they placed in handcuffs?
 4         A.    Not immediately, no.
 5         Q.    Okay.  So they were allowed to stay in the house in -- as
 6    long as they were in certain areas of the house, correct?
 7         A.    That's correct.
 8         Q.    Did they stay in that kind of living room area for big
 9    portions of the night?
10         A.    For a large portion of the time, yes.
11         Q.    All right.  Now, you said you helped execute this warrant
12    after the walk-through video was completed, correct?
13         A.    That's correct.
14         Q.    Were there firearms found in the house?
15         A.    Yes.
16         Q.    Okay.  All right.
17               MR. LEMMON:  We're going to show several firearms.  These
18    are exhibits 4 through 11, so I'll start with Exhibit 4.
19     (Attorney Lemmon approaching the witness stand.  Providing exhibits
20                              to the witness)
21         Q.    (By Mr. Lemmon)  Exhibit 4 --
22         A.    Yes, sir.
23         Q.    -- was this seized from that residence?
24         A.    Yes.
25         Q.    And where was this found?
```

**JA329**

**BUDDEN - DIRECT**

```
 1        A.    This was one of the loaded firearms that was on the shelf
 2   in the master bedroom closet next to the computer or the camera
 3   receiver and monitor.
 4            MR. LEMMON:  Move to admit 4 and 4A, your Honor.
 5            THE COURT:  They'll be received and they may be
 6   published.
 7        (Government's Exhibit Nos. 4 and 4A received into evidence)
 8        Q.    (By Mr. Lemmon)  This is Exhibit 5.
 9        A.    Yes, sir.
10        Q.    Was this also seized from the residence?
11        A.    Yes, sir.  Same location.  Master bedroom closet on the
12   shelf next to the camera receiver.
13            MR. LEMMON:  Move to admit 5 and 5A, your Honor.
14            THE COURT:  They'll be received and they may be
15   published.
16        (Government's Exhibit Nos. 5 and 5A received into evidence)
17        Q.    (By Mr. Lemmon)  This is Exhibit 6?
18        A.    Yes, sir.
19        Q.    Was it seized in the residence?
20        A.    Yes, it was.  This was seized from the -- it was still in
21   the manufacturer box on the floor in the master bedroom closet.
22            MR. LEMMON:  Move to admit 6 and 6A.
23            THE COURT:  They'll be received and they may be
24   published.
25        (Government's Exhibit No. 6 and 6A received into evidence)
```

## BUDDEN - DIRECT

```
 1          Q.    (By Mr. Lemmon)  This is Exhibit 7?
 2          A.    Yes, sir, it is.
 3          Q.    Was this also seized at the residence?
 4          A.    Yes, sir, it was.
 5                MR. LEMMON:  Move to admit 7 and 7A.
 6                THE COURT:  They'll be received and they may be
 7     published.
 8          (Government's Exhibit Nos. 7 and 7A received into evidence)
 9          Q.    (By Mr. Lemmon)  Was this in that same closet?
10          A.    I believe so, yes, sir.
11          Q.    This is Exhibit 8?
12          A.    Yes, sir.  Exhibit 8.
13          Q.    Was this also seized from that residence?
14          A.    Yes.  This was in the backpack on the shelf in the master
15     bedroom closet.
16                MR. LEMMON:  Move to admit 8 and 8A.
17                THE COURT:  They'll be received and they may be
18     published.
19          (Government's Exhibit Nos. 8 and 8A received into evidence)
20          Q.    (By Mr. Lemmon)  Now, were there also several Bodyguard
21     handguns seized from different areas of the residence?
22          A.    Yes.
23          Q.    So I'm approaching with 9, 10 and 11.  Are these those
24     handguns?
25          A.    Yes, sir.
```

## BUDDEN - DIRECT

```
 1              MR. LEMMON:  Move to admit 9, 10, 11 and their
 2    photographs.
 3              THE COURT:  They'll be received and they may be
 4    published.
 5    (Government's Exhibit Nos. 9, 9A, 10, 10A, 11, and 11A received into
 6                          evidence)
 7         Q.   (By Mr. Lemmon)  We also have Exhibit 41.  Was there also
 8    various ammunition seized, either inside these weapons or other
 9    locations?
10         A.   Yes.
11              MR. LEMMON:  The case agent is retrieving those now.
12         Q.   (By Mr. Lemmon)  This is Exhibit 41.  These are the
13    corresponding magazines and ammunition that go with those firearms?
14         A.   Yes.
15         Q.   The ammunition --
16         A.   The ammunition, yes, sir.
17              MR. LEMMON:  Move to admit 41 and the photograph, your
18    Honor.
19              THE COURT:  They'll be received and they may be
20    published.
21         (Government's Exhibit No. 41 received into evidence)
22         Q.   (By Mr. Lemmon)  So that photograph 41A that shows the
23    ammunition outside of this box, correct?
24         A.   That's correct.
25              MR. LEMMON:  If we can have 36 and 37.
```

## JA332

## BUDDEN - DIRECT

```
1      (Attorney Lemmon approaching the witness stand.  Providing exhibit
2                              to the witness)
3           Q.    (By Mr. Lemmon)  This is 37 I'm approaching with.  What
4      is 37?
5           A.    The bottles of THC gummies.
6           Q.    And were these seized around the residence?
7           A.    Yes.
8                 MR. LEMMON:  Move to admit 37 -- or, excuse me, 38 and
9      the photograph, your Honor.
10                THE COURT:  It will be received --
11                MR. LEMMON:  I said 38, I meant 37.
12                THE COURT:  37 and 37A will be received and they may be
13     published.
14        (Government's Exhibit Nos. 37 and 37A received into evidence)
15          Q.    (By Mr. Lemmon)  And were these -- did these have gummies
16     inside them?
17          A.    Yes.
18          Q.    Do they still have gummies inside them?
19          A.    That's correct.
20                MR. LEMMON:  Your Honor, move to admit 37B and C as well.
21                THE COURT:  They'll be received and they may be
22     published.
23        (Government's Exhibit Nos. 37B and 37C received into evidence)
24      (Attorney Lemmon approaching the witness stand.  Providing exhibit
25                              to the witness)
```

**JA333**

## BUDDEN - DIRECT

```
 1        Q.    (By Mr. Lemmon)  I'm approaching with 36.  Are these
 2   additional THC edibles?
 3        A.    Yes sir.
 4        Q.    These were also seized at the residence?
 5        A.    That's correct.
 6              MR. LEMMON:  Move to admit 36 as well as the photographs,
 7   your Honor.
 8              THE COURT:  They'll be received.  They may be published.
 9        (Government's Exhibit Nos. 36 and 36A received into evidence)
10        Q.    (By Mr. Lemmon)  Were there also several cell phones
11   seized from the residence that day?
12        A.    Yes, sir.
13    (Attorney Lemmon approaching the witness stand.  Providing exhibit
14                          to the witness)
15        Q.    (By Mr. Lemmon)  I'm approaching with Exhibit 34.  Are
16   these the cell phones that were seized that day?
17        A.    Yes, sir.
18              MR. LEMMON:  Your Honor, move to admit 34.
19              THE COURT:  It'll be received.  It may be published.
20        (Government's Exhibit No. 34 received into evidence)
21        Q.    (By Mr. Lemmon)  All right.  And now we're going to look
22   at a few photographs now that we have those in evidence.
23              MR. LEMMON:  If we can look at 89 and publish that,
24   please.
25        Q.    (By Mr. Lemmon)  All right.  So this is now on the jury's
```

## BUDDEN - DIRECT

1    screen.  So what is the jury looking at here?

2         A.    We're looking down into a black backpack that was on the

3    shelf in the master bedroom closet.  The bag contained a loaded

4    Ruger handgun with U.S. currency.

5         Q.    And so that was the handgun that was marked as Exhibit 8?

6         A.    That's correct.

7               MR. LEMMON:  And if we can see 90, please.

8         Q.    (By Mr. Lemmon)  And is that the same Ruger handgun next

9    to that currency where it was found?

10        A.    Yes, sir.

11        Q.    And where was this found?

12        A.    In the black backpack on the shelf in the master bedroom

13   closet.

14        Q.    Okay.  The same room where that surveillance or security

15   footage screen was shown?

16        A.    Yes, sir.

17              MR. LEMMON:  Just a moment, your Honor.

18        Q.    (By Mr. Lemmon)  And you see there's currency in this

19   photograph, correct?

20        A.    Correct.

21              MR. LEMMON:  If we can go to 91, please.

22        Q.    (By Mr. Lemmon)  What is this?

23        A.    This is a manufacturer box for Smith & Wesson M&P

24   Bodyguard handgun.

25        Q.    And these were in the residence as well, correct?

## BUDDEN - DIRECT

```
 1        A.    Yes, sir.

 2              MR. LEMMON:  And 92, please.

 3        Q.    (By Mr. Lemmon)  Is that another photograph of a

 4   Bodyguard box?

 5        A.    Yes.

 6              MR. LEMMON:  All right.  93, please.

 7        Q.    (By Mr. Lemmon)  What is this?

 8        A.    This is a permit to purchase or receive a handgun from

 9   the Cumberland County Sheriff's Office to Reshod Jamar Everett.

10              MR. LEMMON:  And 94, please.

11        Q.    (By Mr. Lemmon)  What is this?

12        A.    This is the PS90 that was in the manufacturer box on the

13   floor of the master bedroom closet.

14              MR. LEMMON:  And let's see 6A, please.

15        Q.    (By Mr. Lemmon)  Is this a photograph of that same gun?

16        A.    Yes.

17              MR. LEMMON:  96, please.

18        Q.    (By Mr. Lemmon)  What is this?

19        A.    This is an aerial ticket for American Airlines and then

20   you have some scattered ammunition in the background.

21              MR. LEMMON:  And 97.

22        Q.    (By Mr. Lemmon)  And what do you see here?

23        A.    This is a box of PMC ammunition.  PMC is the

24   manufacturer.

25              MR. LEMMON:  And 98.
```

## JA336

## BUDDEN - DIRECT

```
 1        Q.    (By Mr. Lemmon)  What is this?
 2        A.    This is a handgun magazine.  Appears to be -- based on
 3   the marking on the outside, appears to be a .40 caliber and there's
 4   at least one bullet in the magazine.
 5              MR. LEMMON:  99, please.
 6        Q.    (By Mr. Lemmon)  And what is this?
 7        A.    This is U.S. currency banded in hundred dollar bands.
 8              MR. LEMMON:  Okay.  And 101 and then 102, please.
 9        Q.    (By Mr. Lemmon)  All right.  What is this?
10        A.    This is one of the Smith & Wesson Bodyguard handguns that
11   was located on the floor in the master bedroom just to the left of
12   the bed.
13        Q.    Now, was there also currency seized from the house that
14   day?
15        A.    Yes, sir.
16              MR. LEMMON:  If I can show 90 again.
17        Q.    (By Mr. Lemmon)  This is some of the currency, correct?
18        A.    That's correct.
19              MR. LEMMON:  And 100.
20        Q.    (By Mr. Lemmon)  Is this also currency that was seized?
21        A.    Yes, sir.
22        Q.    And does that appear to be a stack of $100 bills?
23        A.    Yes.
24        Q.    Or at least the top bill is $100 at least, correct?
25        A.    That's correct.
```

## BUDDEN - DIRECT

```
 1              MR. LEMMON:  If we can show on your screen 152.
 2         Q.   (By Mr. Lemmon)  And what are you looking at at 152?
 3         A.   This is the currency envelope.  When we seize money as
 4    part of an investigation, and as evidence, it gets documented on an
 5    envelope -- it's a manilla envelope -- and on the exterior you see
 6    where we have to document each bill that is inside of the envelope.
 7              MR. LEMMON:  And move to admit and publish 152.
 8              THE COURT:  It'll be received.  It may be published.
 9         (Government's Exhibit No. 152 received into evidence)
10         Q.   (By Mr. Lemmon)  All right.  So this is a currency
11    receipt, correct?
12         A.   A currency envelope.  Yes, sir.
13         Q.   And are you listed as the submitting officer?
14         A.   Yes.
15         Q.   Can you circle your name there as submitting officer.
16         A.   (Annotating).
17         Q.   Okay.  Now, going up top.  How many hundred dollar bills
18    were seized?
19         A.   446.
20         Q.   Can you circle where that is?
21         A.   (Annotating).
22         Q.   And how many twenty-dollar bills were seized?
23         A.   941.
24         Q.   And so the total currency seized was more than $65,000,
25    correct?
```

## JA338

**BUDDEN - DIRECT**

1    A.    That's correct.

2    Q.    Now, are you aware that an evidence voucher document was

3    later submitted that said that $65,000 was seized from the apartment

4    at Middle Bridge?

5    A.    Yes.

6    Q.    Now, was that correct or is this correct?

7    A.    This is correct.

8    Q.    And so you were there.  You physically saw and seized and

9    submitted the currency, correct?

10    A.    Correct.

11    Q.    And so the evidence voucher, how did that error happen?

12    A.    So when the evidence voucher -- when an investigation is

13    conducted, we draw what's called an OCA, which is our report number.

14    When you draw a report number, it automatically assigns the address

15    to the location where the investigation began.

16        When we began this investigation, it started at 715,

17    Apartment 5, Middle Bridge, which is where the report number was

18    generated.

19        As the investigation went on into the next day and then

20    eventually into the day after that, our supervisors had told us to

21    use the same report number because they considered it one long

22    sequence of events.  Just one led to another, led to another, led to

23    another.

24        So when the money was entered into evidence, you type the

25    report number into the evidence voucher on the computer.  And it's

**BUDDEN - DIRECT**

```
 1   called Record Management System -- yes, Record Management System.
 2   Call it RMS for short.
 3           When you type in the OCA, it automatically populates the
 4   address where the report was generated.  The report number was
 5   generated.
 6           In this instance, it was a clerical error where the
 7   person that physically typed it into RMS forgot to change the
 8   location of where it was seized.
 9       Q.   So the correct location, as indicated on Exhibit 152, was
10   1080 Ronald Reagan Drive, correct?
11       A.   That's correct.
12           MR. LEMMON:  If we can show 86, please.
13       Q.   (By Mr. Lemmon)  Now, what is this?
14       A.   This is the backyard of 1080 Ronald Reagan Drive.
15       Q.   And is there a detached shed over there to the right?
16       A.   Yes, sir.
17           MR. LEMMON:  And 87, please.
18       Q.   (By Mr. Lemmon)  And is this another photograph of that
19   detached shed?
20       A.   Yes.
21       Q.   And it looks like it has a garage door on the front?
22       A.   That's correct.
23       Q.   So relatively large building?
24       A.   Yep.
25       Q.   Was that searched as well as part of this search warrant?
```

**JA340**

## BUDDEN - DIRECT

```
1          A.    It was.

2          Q.    And did you -- were you present for that search?

3          A.    I was.

4          Q.    And so did you see items that were seized from that

5    building?

6          A.    Yes.

7                MR. LEMMON:  So I'm going to approach with Exhibits 33

8    and 38 and 39.

9                THE COURT:  33, 38, and 39?

10               MR. LEMMON:  That's right.  Sorry, just 33 and 38.

11   (Attorney Lemmon approaching the witness stand.  Providing exhibits

12                          to the witness).

13         Q.    (By Mr. Lemmon)  So this is 33.  What is this?

14         A.    This is a knot of a plastic bag of a tan powdered

15   substance that tested for Tramadol, which is a controlled substance

16   under the Controlled Substance Act.

17         Q.    And you were there when this was seized from that shed?

18         A.    That's correct.

19         Q.    And this is 38.  What is this?

20         A.    This is THC wax wrapped in wax paper.

21         Q.    And you were there when this was seized as well, correct?

22         A.    That's correct.

23         Q.    Do you recall where they were seized from?

24         A.    The wax was seized from a freezer in a refrigerator in

25   the garage and then the Tramadol was in a black container.
```

## JA341

## BUDDEN - DIRECT

```
 1              MR. LEMMON:  Move to admit 33 and 38, your Honor.
 2              THE COURT:  They'll be received, as well as the
 3    corresponding photographs connected with 33 and 38, and they may be
 4    published.
 5    (Government's Exhibit Nos. 33, 33A, 38, 38A received into evidence)
 6              MR. LEMON:  And Exhibit 44.
 7         Q.   (By Mr. Lemmon)  Now, this is exhibit -- now, this is
 8    Exhibit 44.  We're going to take just a moment with this.
 9              Are you familiar with Exhibit 44?
10         A.   Yes, sir.
11         Q.   Are these also items that were seized in that same shed?
12         A.   Yes.
13         Q.   So, for example, what is this?
14         A.   This is a Tupperware container that is sealed with Scotch
15    tape or packaging tape --
16         Q.   Okay.  And why would someone wrap Tupperware with
17    additional wrapping?
18         A.   To prevent an odor from leaking out from the interior of
19    the container.
20         Q.   Were there also additional Tupperware containers?
21         A.   Yes.
22         Q.   And is this one also wrapped?
23         A.   Yes.
24         Q.   And what is this wrapped in?
25         A.   U.S. Postal Service packaging tape.
```

## BUDDEN - DIRECT

74

```
1        Q.    Now, were you aware that Mr. Everett had prior
2   employment?
3        A.    With the UPS -- or USPS, yes.
4        Q.    He had previously been employed by the Postal Service?
5        A.    That's correct.
6        Q.    There were also Tupperware -- do these appear to contain
7   any residue?
8        A.    Yes, they do.
9        Q.    What kind of residue?
10       A.    Marijuana residue.
11       Q.    And how can you determine that?
12       A.    Based on training and experience.  My observations,
13   just...
14       Q.    Does the odor cling to that?
15       A.    Yes.
16             MR. YOUNG:  Objection, your Honor.
17             THE COURT:  Overruled.  Next question.
18       Q.    (By Mr. Lemmon)  Now, in addition, were these Tupperware
19   containers also found in that shed?
20       A.    Yes.
21       Q.    And was there also residue in these Tupperware
22   containers?
23       A.    Yes.
24       Q.    And do you still see that residue here today?
25       A.    Yes, sir.
```

**JA343**

**BUDDEN - DIRECT**

```
 1        Q.    And what did that residue appear to be based on your
 2   training and experience?
 3        A.    Marijuana.
 4        Q.    Now, also machines that were found or devices like these?
 5        A.    Yes.
 6        Q.    What are these?
 7        A.    It's a heat sealer or vacuum sealer that's used to suck
 8   the air out of a plastic bag.
 9        Q.    And what are these used for in the drug trafficking
10   business?
11        A.    To condense -- one, condense the package down.  And also
12   prevent the odor from leaking out.
13        Q.    And were there more than one vacuum-sealer devices
14   seized?
15        A.    Yes.
16        Q.    So is this an additional one?
17        A.    It is.
18        Q.    Is this a third one?
19              THE COURT REPORTER:  Mr. Lemmon, I didn't hear the
20   question.
21        Q.    (By Mr. Lemmon)  Is this a third one?
22        A.    Yes.
23        Q.    Now, when we were looking at those large circular
24   Tupperware containers a moment ago, did you also seize from that
25   shed tops to those Tupperware containers?
```

## BUDDEN - DIRECT

```
 1        A.    Yes.

 2        Q.    And what color is the seal around the top?

 3        A.    Red.

 4        Q.    Are there three of those?

 5        A.    Yes.

 6        Q.    And had you seen lids like this in any other parts of the

 7   investigation, if you know?

 8        A.    The matched Tupperware containers that was seized from

 9   Middle Bridge Drive.

10        Q.    And, again, you were present in that shed when these

11   items were seized, correct?

12        A.    That's correct.

13        Q.    So you saw these being seized that day, correct?

14        A.    Yes, sir.

15              MR. LEMMON:  Move to admit Exhibit 44.

16              THE COURT:  It will be received and published --

17              MR. LEMMON:  And the --

18              THE COURT:  -- as well as all the corresponding

19   photographs.

20          (Government's Exhibit No. 44 received into evidence)

21    (Attorney Lemmon approaching the witness stand.  Providing exhibit

22                          to the witness)

23        Q.    (By Mr. Lemmon)  Now, I'm also approaching you with

24   Exhibit 151.  Was this also seized from that shed?

25        A.    Yes, sir.
```

## JA345

## BUDDEN - DIRECT

1      Q.    Take a look at that.  What is that?

2      A.    This is a Ziploc package from The Smoking Gun Apothecary

3    in -- addressed at 492 South Colorado Boulevard, Unit B, in Denver,

4    Colorado.  On the right-hand side there's a little emblem, a diamond

5    with THC mark on it and it says, contains marijuana, keep away from

6    children.

7      Q.    So what did this appear to be to you?

8      A.    Marijuana or marijuana -- items that contained marijuana

9    shipped from Colorado -- Denver, Colorado.

10          MR. LEMMON:  Move to admit 151 and corresponding

11   photographs.

12          THE COURT:  It'll be received and may be published.

13          **(Government's Exhibit No. 151 received into evidence)**

14     Q.    (By Mr. Lemmon)  So, again, the label here does say THC

15   on it, correct?

16     A.    That's correct.

17     Q.    And this was also seized from that shed?

18     A.    Yes, sir.

19     Q.    Now, after all the items were seized that day, what did

20   you do next?

21     A.    After the items were seized, they were transported back

22   to the police station where they could be packaged for evidence.  Me

23   personally, I transported Mr. Everett from the residence back to the

24   police station.

25     Q.    So it was only at that point that Ms. Everett -- Ms.

## BUDDEN - DIRECT

78

1    Victoria Everett -- was transported away from the house; is that

2    correct?

3         A.    That's correct.

4         Q.    She was there through the seizure of the items, correct?

5         A.    That's correct.

6         Q.    And Latasha Sinkler, was she ever transported to the

7    jail?

8         A.    No, not that day.

9         Q.    So Ms. Sinkler, was she also present around that

10   residence the day and throughout that time of the execution of the

11   warrant?

12        A.    She absolutely was.

13        Q.    Now --

14        THE COURT:  Mr. Lemmon, it's time for the jury to have

15   their mid-afternoon break.  We're going to have a 20-minute recess.

16        Don't talk about the case.  Don't let anybody talk about

17   the case with you.  Follow my other instructions.  Enjoy your

18   20-minute recess.

19        Everyone remain seated while the ladies and gentlemen of

20   the jury leave the room for their mid-afternoon break.

21              (Jury out at 3:15 p.m.)

22        THE COURT:  We'll be in recess for 20 minutes.

23              (Recess commencing at 3:15 p.m.)

24   (The defendant, Reshod Jamar Everett, escorted out of the courtroom

25        at 3:17 p.m. and returned to the courtroom at 3:30 p.m.)

## JA347

## BUDDEN - DIRECT

```
 1        (The witness, Detective Neil Budden, returning to the witness stand

 2                          at 3:33 p.m.)

 3                   (Open Court at 3:35 p.m.)

 4                      (No Jury Present)

 5        THE COURT:  I wanted to let the lawyers know that that

 6   first alternate indicated that at one point he thinks he worked in

 7   Fayetteville with a person named Alvin Davis.  It's a common name.

 8   He doesn't know whether it's the same person, but he remembered the

 9   name.

10        What I propose -- I mean, I don't know whether the

11   Government's going to show a photo between now and 5 o'clock, but if

12   they did, I directed the clerks to tell him to just raise his hand

13   if they do.

14        If they don't, I'm content to wait until after 5 and let

15   everyone else go.

16        If we do have a photo, ask him, you know, who it was,

17   where he worked.  He's the fellow that now works for the Cary Water

18   Department during jury selection.

19        That's how I propose handling that.  And so I'm not

20   inviting, like, a picture of him, but I think we can just address it

21   at the end of the day.

22        Again, that was all he had indicated, that he thinks he

23   worked with a person with that name in Fayetteville at some point in

24   his life.

25        All right.  Let's bring the jury in.
```

## BUDDEN - DIRECT

```
 1                    (Jury in at 3:36 p.m.)

 2              THE COURT:  Welcome back, ladies and gentlemen.  I hope

 3    y'all enjoyed your recess.  I need to confirm that you followed my

 4    instructions during the recess.

 5              You may continue the direct examination.

 6         Q.   (By Mr. Lemmon)  Detective Budden, we were just

 7    discussing you transporting Victoria Everett away from Ronald Reagan

 8    Drive.  Do you recall that?

 9         A.   Yes, sir.

10         Q.   Now, in your transport of Ms. Everett, was there one

11    error or a policy violation that occurred?

12         A.   Yes, sir.

13         Q.   What was that?

14         A.   I had forgot to buckle her seat belt in the back of the

15    patrol car.

16         Q.   Okay.  But she got there safely; is that right?

17         A.   Yes.

18         Q.   All right.  Now, after the search at Ronald Reagan Drive

19    and the evidence was packaged, did you also have an opportunity to

20    go to the storage facility that we discussed earlier?

21         A.   Yes, I did.

22              MR. LEMMON:  Can we publish 59, please.

23         Q.   (By Mr. Lemmon)  And this is the storage unit facility,

24    correct?

25         A.   That's correct.
```

## BUDDEN - DIRECT

```
 1        Q.    And had a search warrant been obtained by someone?
 2        A.    Yes.
 3        Q.    Who obtained the search warrant?
 4        A.    Detective Harding.
 5        Q.    And were there particular units you were authorized to
 6   search?
 7        A.    Yes.
 8        Q.    Which units, if you recall?
 9        A.    I believe 283 and 285.
10        Q.    And were there keys that were found at Ronald Reagan
11   Drive?
12        A.    For the storage units, yes.
13        Q.    So keys to the storage unit were in Reshod and Victoria
14   Everett's house, correct?
15        A.    That's correct.
16              MR. LEMMON:  If I can publish 105, please.
17        Q.    (By Mr. Lemmon)  Is this one of the storage units?
18        A.    Yes, sir.  Number 283.
19        Q.    All right.
20              MR. LEMMON:  And 106, please.
21        Q.    (By Mr. Lemmon)  And what are we looking at here?
22        A.    This here -- this is a black tote and a black duffel bag
23   and then behind -- those are both on the right.  And then behind a
24   white folding table there's a silver or gray plastic tote.  All of
25   which contains individual vacuum-sealed packages of marijuana.
```

## BUDDEN - DIRECT

```
 1        Q.    All right.
 2              MR. LEMMON:  Can we show 107, please.
 3        Q.    (By Mr. Lemmon)  And so are these those same items pulled
 4   outside of that unit?
 5        A.    Yes.
 6        Q.    So the gray storage tote, the black storage tote and the
 7   black duffel bag?
 8        A.    That's correct.
 9              MR. LEMMON:  And 108, please.
10        Q.    (By Mr. Lemmon)  All right.  What are we seeing here?
11        A.    These are -- zipper's been opened on the duffel bag and
12   then the lids have been removed from the plastic totes.  You're
13   seeing multiple vacuum sealed or -- yeah, vacuum-sealed plastic bags
14   of marijuana.
15        Q.    And is this a relatively large amount of marijuana based
16   on your experience?
17        A.    Yes, it is.
18        Q.    And do you see any particular packaging that's noticeable
19   or matches other packaging you had seen in this case?
20        A.    You have -- up here on the top, these packages have the
21   black -- (annotating) the black backing on the packaging as well as
22   these ones here.  And then the middle container, they're just clear
23   plastic.
24        Q.    And so these bags of marijuana, were these seized and
25   packaged?
```

### JA351

## BUDDEN - DIRECT

```
 1        A.    Yes.

 2        Q.    And put into evidence?

 3        A.    Yes.

 4              MR. LEMMON:  I'm going to approach with 45, Exhibit 45.

 5     (Attorney Lemmon approaching the witness stand.  Providing exhibit

 6                          to the witness)

 7        Q.    (By Mr. Lemmon)  Are these bags that were seized from

 8     that storage unit?

 9        A.    Yes, sir.

10              MR. LEMMON:  Move to admit 45, your Honor.

11              THE COURT:  It'll be received.  It may be published.

12        (Government's Exhibit No. 45 received into evidence)

13        Q.    (By Mr. Lemmon)  I'm going to pull a couple out so that

14     members of the jury can see.  So are these those bags outside the

15     box?

16        A.    Yes.

17        Q.    So this is the bag -- or one of the bags that has the

18     black backing, correct?

19        A.    That's correct.

20              MR. LEMMON:  Your Honor, move to admit the photograph of

21     45 as well.  45A and 45B.

22              THE COURT:  They'll be received and they may be

23     published.

24        (Government's Exhibit Nos. 45A and 45B received into evidence)

25              MR. LEMMON:  We can publish 45B.
```

# BUDDEN - DIRECT

1      Q.    (By Mr. Lemmon)  So is this a photograph so that you can

2  see some of those bags individually?

3      A.    Yes.

4            MR. LEMMON:  46.

5      Q.    (By Mr. Lemmon)  Are these additional bags that were

6  seized from the storage unit?

7      A.    Yes, sir.

8            MR. LEMMON:  Move to admit 46, your Honor.

9            THE COURT:  It'll be received.  It may be published.

10        **(Government's Exhibit No. 46 received into evidence)**

11           MR. LEMMON:  We'll admit 46A and 46B, your Honor.

12           THE COURT:  They'll be received and they may be

13  published.

14      **(Government's Exhibit Nos. 46A and 46B received into evidence)**

15           MR. LEMMON:  If we can put 46B on the screen and 47,

16  please.

17      Q.    (By Mr. Lemmon)  Are these additional bags that were

18  seized from the storage unit?

19      A.    Yes.

20           MR. LEMMON:  Move to admit 47, your Honor.

21           THE COURT:  It'll be received.  It may be published.

22         **(Government's Exhibit No. 47 received into evidence)**

23          (Attorney Lemmon displaying exhibit to the jury)

24           MR. LEMMON:  Move to admit 47A and B, your Honor.

25           THE COURT:  It'll be received.  It may be published.

## BUDDEN - DIRECT

```
 1        (Government's Exhibit Nos. 47A and 47B received into evidence)

 2             MR. LEMMON:  If we can show 47B.  48.

 3        Q.   (By Mr. Lemmon)  These additional bags seized from that

 4   storage unit?

 5        A.   Yes, sir.

 6             MR. LEMMON:  Move to admit 48, your Honor.

 7             THE COURT:  It'll be received.  It may be published.

 8          (Government's Exhibit No. 48 received into evidence)

 9          (Attorney Lemmon displaying exhibit to the jury)

10             MR. LEMMON:  Move to admit 48A and 48B.

11             THE COURT:  They'll be received and they may be

12   published.

13      (Government's Exhibit Nos. 48A and 48B received into evidence)

14             MR. LEMMON:  Publish 48B, please.

15             THE COURT REPORTER:  Excuse me.  What number?

16             MR. LEMMON:  48B.  49.

17        Q.   (By Mr. Lemmon)  These also bags seized from the storage

18   unit?

19        A.   Yes, sir.

20             MR. LEMMON:  Move to admit 49.

21             THE COURT:  It'll be received.  It may be published.

22          (Government's Exhibit No. 49 received into evidence)

23          (Attorney Lemmon displaying exhibit to the jury)

24        Q.   (By Mr. Lemmon)  So some of these have been tested and so

25   bags have been removed, correct?
```

# BUDDEN - DIRECT

```
 1        A.    Correct.

 2        Q.    So there's samples for lab testing, correct?

 3        A.    That's correct.

 4              MR. LEMMON:  Move to admit 49A and B, your Honor.

 5              THE COURT:  They'll be received.  They may be published.

 6     (Government's Exhibit Nos. 49A and 49B received into evidence)

 7              MR. LEMMON:  Publish 49B and 50.

 8        Q.    (By Mr. Lemmon)  These additional bags?

 9        A.    Yes, sir.

10              MR. LEMMON:  Move to admit 50, your Honor.

11              THE COURT:  It'll be received.  It may be published.

12        (Government's Exhibit No. 50 received into evidence)

13          (Attorney Lemmon displaying exhibits to the jury)

14              MR. LEMMON:  Move to admit 50A and 50B.

15              THE COURT:  They'll be received and they may be

16     published.

17      (Government's Exhibit Nos. 50A and 50B received into evidence)

18              MR. LEMMON:  And 52.

19        Q.    (By Mr. Lemmon)  This is one more box of marijuana seized

20     from the storage unit?

21        A.    Yes, sir.

22              MR. LEMMON:  Move to admit 52, your Honor.

23              THE COURT:  It'll be received.  It may be published.

24        (Government's Exhibit No. 52 received into evidence)

25          (Attorney Lemmon displaying exhibits to the jury)
```

**JA355**

## BUDDEN - DIRECT

```
1              MR. LEMMON:  And 52A and 52B, your Honor.
2              THE COURT:  They'll be received and they may be
3    published.
4       (Government's Exhibit Nos. 52A and 52B received into evidence)
5              MR. LEMMON:  We can show 52B.
6              Your Honor, at this time we have a controlled substance
7    stipulation to read into the record.
8              THE COURT:  All right.  Ladies and gentlemen, again, I
9    remind you that when the lawyers on each side stipulate or agree as
10   to the existence of certain facts, they can enter a stipulation.
11   You can accept and should accept those facts as proven without
12   further evidence.
13             Mr. Lemmon will now read a stipulation to you.  It will
14   be marked as an exhibit and you'll have it with you when it's time
15   to deliberate.
16             You may proceed.  And what's the exhibit number?
17             MR. LEMMON:  127.
18             THE COURT:  It will be received and you may read it.
19       (Government's Exhibit No. 127 received into evidence)
20             MR. LEMMON:  The United States of America, by and through
21   the United States Attorney for the Eastern District of North
22   Carolina, and the defendant, by and through his attorneys, hereby
23   stipulate and agree as follows:
24             The materials obtained by law enforcement officers on the
25   below-listed dates were analyzed by forensic chemists at the North
```

## JA356

## BUDDEN - DIRECT

1    Carolina State Crime Laboratory, the Drug Enforcement Agency

2    laboratory or NMS Labs.

3              The items that were tested were determined to contain the

4    following substances:

5              And there is a chart indicating date seized and analysis.

6              July 16th, 2018.  Cadillac.  Analysis:  Two plastic bags

7    containing powder.  2.99 grams of cocaine.  Exhibit 55.

8              Two plastic bags containing plant material.  135 grams of

9    marijuana.  Exhibit 54.

10             Three plastic bags containing plant material.

11   61.14 grams of marijuana.  Exhibit 53.

12             July 16th, 2018.  715-5 Middle Bridge Drive.  Analysis:

13   One folded plastic bag containing compressed white powder.

14   346 grams -- excuse me, 346.08 grams of cocaine.  Exhibit 26.

15             One plastic bag containing plant material.  434 grams of

16   marijuana.  Exhibit 56.

17             Eleven heat-sealed bags containing plant material.

18   4,682.56 grams of marijuana.  Exhibit 31.

19             July 17th, 2018.  1080 Ronald Reagan Drive.  Plastic bag

20   containing tan powder.  25.32 grams of Tramadol.  Exhibit 33.

21             Seven folded pieces of white paper containing brown solid

22   material.  288 grams delta-9 THC.  Exhibit 38.

23             Three red plastic containers with red lids containing 30

24   multi-colored, plant-shaped gummy candies.  277.03 grams delta-8

25   THC.  Exhibit 37.

# BUDDEN - DIRECT

1        One blue plastic container with a blue lid containing ten
2   multi-colored, plant-shaped gummy candies.  99.11 grams.  9R
3   delta-6A, 10A THC.  Exhibit 37.
4        One white plastic container with a white lid containing
5   one yellow and red plant-shaped gummy candy.  6.39 grams.  Delta-8
6   THC.  Exhibit 37.
7        July 18th, 2018.  1630 McArthur Road.  Six heat-sealed
8   plastic bags containing plant-like material.  2,626 grams of
9   marijuana.  Exhibit 46.
10       Five heat-sealed plastic bags, plant-like material.
11   2,216 grams of marijuana.  Exhibit 49.
12       Ten heat-sealed plastic bags containing plant-like
13   material.  4,389 grams of marijuana.  Exhibit 51.
14       The above-referenced marijuana is a Schedule I controlled
15   substance.  The above-referenced cocaine is a Schedule II controlled
16   substance.  The above-referenced Tramadol is a Schedule IV
17   controlled substance.  The above-referenced substances are
18   tetrahydrocannabinols, or THC, which are Schedule I controlled
19   substances.  Including delta-8 THC, delta-9 THC and 9R delta-6A, 10A
20   THC.
21       This is Exhibit 127, your Honor.
22       THE COURT:  It's received.
23   Q.   (By Mr. Lemmon)  Now, as part of this investigation, you
24   testified before that there were cell phones found at Ronald Reagan
25   Drive, correct?

## BUDDEN - DIRECT

```
 1        A.    That's correct.

 2        Q.    And was a search warrant obtained to examine the contents

 3    of cell phones?

 4        A.    Yes.

 5             MR. LEMMON:  All right.  Your Honor, at this time I have

 6    Exhibit 129, which is a stipulation.

 7             THE COURT:  All right.  Again, ladies and gentlemen, I've

 8    already told you twice what a stipulation is -- and I know you're

 9    paying attention so I'm not going to tell you again -- but remember

10    my instructions.

11             MR. LEMMON:  United States of America, by and through the

12    United States Attorney for the Eastern District of North Carolina,

13    and the defendant, by and through his attorneys, hereby stipulate

14    and agree as follows:

15             It is agreed and stipulated between the parties that in

16    August, 2018, Fayetteville Police Detective Chad Smith downloaded

17    data from a cell phone that was seized on July 17th, 2018.

18             Exhibit 34A is a disc containing a full set of data that

19    Detective Smith downloaded.  Exhibits 34B through 34Z are relevant

20    portions of the data from that cell phone.

21             The parties agree and stipulate that Exhibits 34B through

22    34Z are admissible.

23             And this is 129, your Honor.

24             THE COURT:  It's received.  Thank you.

25        **(Government's Exhibit No. 129 received into evidence)**
```

## BUDDEN - DIRECT

1      Q.    (By Mr. Lemmon)  Now, did investigators also obtain

2  various documents in the course of this investigation?

3      A.    Yes.

4            MR. LEMMON:  Your Honor, we have a stipulation.  130.

5            THE COURT:  Remember my instruction, ladies and

6  gentlemen.

7            You may proceed.

8            It will be received.

9      **(Government's Exhibit No. 130 received into evidence)**

10            MR. LEMMON:  The parties hereby stipulate and agree as

11  follows:

12            The following documents are authentic and admissible.

13  The parties agree no testimony from a custodian of records is

14  required to authenticate the below documents.

15            Lease for 715 Middle Bridge Drive, Apartment 5,

16  Fayetteville, NC.  Government's Exhibit 131.

17            Historical cell roster for May 13th, 2021.  Government's

18  Exhibit 132.

19            Andrews McArthur Mini Storage documents.  Government's

20  Exhibit 133.

21            This was 130, your Honor.

22            THE COURT:  It will be received.

23      Q.    (By Mr. Lemmon)  And finally, did investigators also

24  obtain tax records for Reshod and Victoria Everett?

25      A.    Yes.

## BUDDEN - DIRECT

```
 1              MR. LEMMON:  Your Honor, our final stipulation is Exhibit
 2    141.
 3              THE COURT:  It will be received.
 4         (Government's Exhibit No. 141 received into evidence)
 5              THE COURT:  Remember my instruction, ladies and
 6    gentlemen.
 7              MR. LEMMON:  The parties stipulate and agree as follows:
 8              The following federal tax records are authentic and
 9    admissible:
10              Government Exhibit 142.  2015 Form 1040 for Reshod
11    Everett and Victoria Everett.
12              Government Exhibit 143.  2016 Form 1040 for Reshod
13    Everett and Victoria Everett.
14              Government Exhibit 144.  2017 Form 1040 for Reshod
15    Everett and Victoria Everett.
16              And Government Exhibit 145.  2018 certification of lack
17    of records for Reshod Everett and Victoria Everett.
18              And that is 141, your Honor.
19              THE COURT:  Thank you.  It's received.
20              MR. LEMMON:  So pursuant to the stipulation, the
21    Government would move items 142 through 145 into evidence.
22              THE COURT:  They'll be received and they may be
23    published.
24       (Government's Exhibit Nos. 142 through 145 received into evidence)
25              MR. LEMMON:  As well as 131, 132 and 133.
```

## BUDDEN - DIRECT

93

```
 1              THE COURT:  They'll be received.  They may be published.
 2      (Government's Exhibit Nos. 131 through 133 received into evidence)
 3              MR. LEMMON:  As well as 34B through 34Z.
 4              THE COURT:  They'll be received and they may be
 5      published.
 6      (Government's Exhibit Nos. 34B through 34Z received into evidence)
 7      Q.    (By Mr. Lemmon)  Okay.  Now, Detective Budden, are you
 8      aware that after his arrest, Reshod Everett began making various
 9      claims regarding his case?
10      A.    Yes.
11      Q.    For example, are you aware that he alleged that members
12      of law enforcement planted evidence at his house?
13      A.    I am aware.
14      Q.    Are you aware that he made various complaints to the
15      police department, including claims that evidence was planted?
16      A.    Yes.
17      Q.    Did the police department, to your knowledge, conduct an
18      investigation into those claims?
19      A.    Yes, they did.
20      Q.    Did the police department conclude that any evidence had
21      been planted?
22      A.    Can you repeat the question?
23      Q.    Did the police department, as far as you know, conclude
24      that any evidence was planted by police officers?
25      A.    No.
```

## JA362

## BUDDEN - DIRECT

1       Q.    Now, let's talk about these claims of evidence being

2   planted as it pertains to you.

3             Did you plant any evidence, including any drugs,

4   firearms, ammunition, packaging materials or any other evidentiary

5   items at any of the locations that were searched?

6       A.    No.  Absolutely not.

7       Q.    Did you plant items of evidence at Alvin Davis' car?

8       A.    No.  Absolutely not.

9       Q.    Or the Ronald Reagan house?

10      A.    No.

11      Q.    Or the shed behind that house?

12      A.    No.

13      Q.    Or the storage unit?

14      A.    No.

15      Q.    Did you bring any drugs or drug paraphernalia or other

16  items like that into 1080 Ronald Reagan Drive or the shed behind

17  Ronald Reagan Drive?

18      A.    No.

19      Q.    What about the storage unit?

20      A.    No.

21      Q.    Did any other law enforcement officer -- based on what

22  you observed and your experience that day, did they bring any drugs,

23  drug paraphernalia or any other evidentiary items into 1080 Ronald

24  Reagan Drive or that shed?

25      A.    No.  Absolutely not.

# BUDDEN - DIRECT

1        Q.    What about the storage unit?

2        A.    No.

3        Q.    Are you aware of whether the defendant had a Ring

4    doorbell video camera?

5        A.    He did.

6        Q.    And in his claims about evidence being brought into the

7    house by police, has the defendant cited this video from his Ring

8    doorbell camera?

9        A.    He has.

10       Q.    And did he provide clips from his Ring camera to the

11   police department?

12       A.    He did.

13       Q.    And were those clips that he selected or he provided?

14       A.    Yes.

15       Q.    All right.  I'm going to show you Exhibit 180 on your

16   screen.  Is this that video?

17       A.    Yes.  This is the beginning of the video.

18             MR. LEMMON:  And move to admit 180, your Honor.

19             THE COURT:  It'll be received.  It may be published.

20        **(Government's Exhibit No. 180 received into evidence)**

21             MR. LEMMON:  And keep the sound off for this part.  And

22   we can play that for the jury.

23     (Video without audio played in open court commencing at 3:54 p.m.)

24                         (Video paused)

25       Q.    (By Mr. Lemmon)  Now, is this -- what is happening here?

# BUDDEN - DIRECT

1       A.    So there was Mr. Everett's arm that you see in the left

2  side of the screen and two plain-clothes detectives have identified

3  themselves and attempting to take him into custody.

4       Q.    And so this was the arrest pursuant to that arrest

5  warrant, correct?

6       A.    That is correct.

7       Q.    And have you participated in numerous arrests pursuant to

8  arrest warrants before?

9       A.    Yes, I have.

10       Q.    Was this relatively normal for an arrest warrant

11  execution?

12       A.    Yes.

13       Q.    Did anything happen out of the ordinary just for that

14  arrest portion?

15       A.    No.

16       Q.    Okay.  Now, are these -- who are we looking at now if you

17  recognize any of them?

18       A.    On the left that just stepped out, that's Detective Corey

19  Bird.  Past him is Detective Harding.  In the back where his face is

20  kind of blinded by the light, I believe that's Detective Chris Kemp

21  and in the right in the blue shirt is Sergeant Durham.

22       Q.    And again, based on your experience, does a Ring doorbell

23  camera -- does it start recording based on motion activation?

24       A.    Yes, sir.

25       Q.    So it's not recording continuously, is it?

## BUDDEN - DIRECT

1      A.    No.

2      Q.    And even if it were recording continuously, these are

3  just the clips the police department received from Mr. Everett,

4  correct?

5      A.    That is correct.

6            MR. LEMMON:  Okay.  Now I'm going to jump to 3:49 -- the

7  three minute and 49 second mark.

8         (Video without audio resumed in open court at 3:56 p.m.)

9            MR. LEMMON:  All right.  Now pause here.

10                        (Video paused at 3:56 p.m.)

11     Q.    (By Mr. Lemmon)  Now, have you seen this clip before?

12     A.    Yes.

13     Q.    Has Mr. Everett reviewed or cited this portion of the

14 clip in his complaints about police conduct?

15     A.    He absolutely has.

16     Q.    And what were his claims, if you know, about this

17 portion?

18     A.    Specifically to the Monster energy drink in the

19 detective's left hand as he's walking past the camera.  He accused

20 us of using the can to sneak evidence into his house.

21     Q.    Was that a fake can used to sneak evidence into his

22 house?

23     A.    No, absolutely not.

24     Q.    Was it just a Monster energy drink?

25     A.    It absolutely was.

## BUDDEN - DIRECT

1      Q.    And do you know who this is?  Can you tell who it is?

2      A.    This is Detective Chase Robinson.

3            MR. LEMMON:  You can hit play again.

4       (Video without audio resumed in open court at 3:57 p.m.)

5            MR. LEMMON:  And pause here.

6                      (Video paused at 3:57 p.m.)

7      Q.    (By Mr. Lemmon)  Does an officer have something in his

8  hand here?

9      A.    Yes.  That would be his ballistic vest.

10     Q.    His ballistic vest?

11     A.    That's correct.

12     Q.    Has Mr. Everett also claimed that that was some kind of

13  evidence being brought in?

14     A.    Yes, I believe so.

15           MR. LEMMON:  Okay.  Play.

16      (Video without audio resumed in open court at 3:57 p.m.)

17           MR. LEMMON:  All right.  Pause here.

18                      (Video paused at 3:57 p.m.)

19     Q.    (By Mr. Lemmon)  Now, is there an officer who has a bag

20  in his hand?

21     A.    Yes.

22     Q.    And what is in that bag, if you know?

23     A.    To my knowledge, it was food.

24     Q.    It was food?

25     A.    Yes.

**BUDDEN - DIRECT**

99

```
 1        Q.    Had you and other officers been involved in a long day on
 2    July 17th, 2018?
 3        A.    Yes.
 4        Q.    What hours did you start conducting surveillance on
 5    Ronald Reagan Drive?
 6        A.    We began at approximately 1 o'clock in the afternoon.
 7        Q.    And then when did you actually execute the arrest warrant
 8    and then do the protective sweep?
 9        A.    The arrest warrant was conducted at approximately
10    7:30 p.m. and then the protective sweep followed.
11        Q.    Did officers have a chance to leave and go take a lunch
12    break during the surveillance period?
13        A.    No.
14        Q.    And so was this the first chance officers had to get some
15    food?
16        A.    Yes.
17              MR. LEMMON:  All right.  Hit play, please.
18         (Video without audio resumed in open court at 3:58 p.m.)
19              MR. LEMMON:  We're going to watch to the four minute and
20    25 second mark.
21                    (Video paused at 3:58 p.m.)
22        Q.    (By Mr. Lemmon)  Did that officer just kind of shiver?  I
23    don't know if you could tell.
24        A.    He did.
25        Q.    Do you know why?
```

## BUDDEN - DIRECT

```
 1        A.    It was raining.

 2              MR. LEMMON:  Okay.  And you can hit play.

 3         (Video without audio resumed in open court at 3:38 p.m.)

 4              MR. LEMMON:  All right.  Pause.

 5                          (Video paused at 3:58 p.m.)

 6        Q.    (By Mr. Lemmon)  And is there another drink can there?

 7        A.    Yes.

 8        Q.    Now, was that a secret drink can that was used to smuggle

 9   evidence in?

10        A.    No, sir.  It was an energy drink.

11              MR. LEMMON:  Okay.  And play one more time.  We're going

12   to go to the four minute 55 second mark here.  Keep playing through.

13          (Video without audio played in open court at 3:59 p.m.)

14              MR. LEMMON:  All right.

15                          (Video paused at 3:59 p.m.)

16        Q.    (By Mr. Lemmon)  All right.  Is there another officer

17   here?

18        A.    Yes, sir.

19              MR. LEMMON:  And you can play.

20         (Video without audio played in open court at 3:59 p.m.)

21        Q.    (By Mr. Lemmon)  And does he have additional food in his

22   hand?

23        A.    Yes.

24        Q.    And, in fact, did the Ring camera capture him saying, I

25   have snacks for everybody?
```

## BUDDEN - DIRECT

```
1        A.    It did.

2        Q.    And did he bring the food inside the house?

3        A.    He did.

4              MR. LEMMON:  Okay.  We can take that down.

5                   (Video concluding at 3:59 p.m.)

6        Q.    (By Mr. Lemmon)  Now, we previously went through earlier

7   today Exhibit 44, the big black box.  Do you recall that?  Well, let

8   me show you a photograph.

9              MR. LEMMON:  Can we show 44A on the screen, please.

10       Q.    (By Mr. Lemmon)  Are these photographs that we went

11  through that were from Exhibit 44?

12       A.    Yes, sir.

13       Q.    Even if you had wanted to smuggle in evidence, could you

14  have fit all of these items into those bags that we just saw?

15       A.    There is not a chance.

16       Q.    And, again, you testified these were seized from that

17  shed behind Ronald Reagan Drive, correct?

18       A.    That is correct.

19       Q.    And you physically saw them being seized, correct?

20       A.    Yes.

21       Q.    Now, did the police department conduct an investigation

22  into the various complaints by Reshod Everett?

23       A.    Yes.

24       Q.    Did the department review all of your actions in this

25  investigation?
```

**JA370**

**BUDDEN - DIRECT**

```
 1        A.    They did.

 2        Q.    And what was the result of that investigation as to you?

 3        A.    I was given -- issued a, what we call, corrective action

 4   because I failed to seat belt Ms. Victoria Everett in the back of

 5   the car.

 6        Q.    Okay.  And did you -- let's also talk about the body

 7   camera policy, as you understand it, that was in effect back in July

 8   of 2018.  Did the body camera policy require you to have the body

 9   camera on throughout the entire period of surveillance in a case?

10        A.    No.

11        Q.    What about during the entire period when an -- excuse me,

12   when a search warrant is being executed?

13        A.    No.

14        Q.    And why is that?

15        A.    To -- if you record long periods of time like that, it

16   would require storage and money spent.  And the department doesn't

17   require us to do that to eliminate those issues of -- regarding

18   something that's not relevant.

19        Q.    So did you use things like that walk-through video and

20   photographs to document the seizure of evidence?

21        A.    Yes.

22        Q.    Okay.  Now, was there any finding at all that you

23   violated the department's body camera policy in any way?

24        A.    No.

25        Q.    Are you aware of levels of punishment that can result
```

## BUDDEN - DIRECT

```
 1   from an Internal Affairs investigation?
 2        A.    Yes, sir.
 3        Q.    Could you be suspended?
 4        A.    Yes.
 5        Q.    Could you be terminated?
 6        A.    Absolutely.
 7        Q.    Could you lose vacation days?
 8        A.    You sure can.
 9        Q.    Now, were you suspended or fired?
10        A.    No, sir.
11        Q.    Did you lose any vacation days or lose any pay?
12        A.    I did not.
13        Q.    Was your law enforcement certification impacted in any
14   way?
15        A.    It was absolutely not.
16        Q.    Now, you currently work at a different police department,
17   correct?
18        A.    That's correct.
19        Q.    You work at the Clayton Police Department?
20        A.    Correct.
21        Q.    Can you explain why you decided to switch police
22   departments?
23        A.    My wife and I were -- my wife was pregnant at the time
24   and we were looking to move out of Fayetteville and move closer to
25   family that she had in Johnston County.  And I applied with Clayton
```

**JA372**

# BUDDEN - CROSS

 1   and got hired.

 2        Q.    And so you still have an active North Carolina law

 3   enforcement certification today?

 4        A.    That is correct.

 5        Q.    Prior to this investigation, had you had any dealings at

 6   all with Reshod Everett?

 7        A.    No.

 8        Q.    What about Victoria Everett?

 9        A.    No.

10        Q.    Did you hear any rumors or hear anything about who he

11   was?

12        A.    No.

13        Q.    So if an officer did plant evidence, based on your

14   knowledge, your understanding, what would happen to that officer?

15        A.    They'd be fired and lose their certification and

16   potentially charged criminally.

17        Q.    They could be charged criminally?

18        A.    Yes.

19        Q.    Would you risk your career and your freedom to create a

20   case against Reshod Everett?

21        A.    No.

22              MR. LEMMON:  Nothing further, your Honor.

23              THE COURT:  Cross-examination.

24                        **CROSS-EXAMINATION**

25   BY MR. YOUNG:

## BUDDEN - CROSS

1        Q.    Good afternoon, Officer Budden.

2        A.    Good afternoon.

3        Q.    So you stated you were involved in the Medway Court

4    investigation?

5        A.    I was not involved.  I was aware of it.

6        Q.    Okay.  And because you stated that there were two people,

7    right?

8        A.    That's correct.

9        Q.    Okay.  So you weren't aware that there were one, two,

10    three, four, five, six people charged in that Medway Court

11    investigation?

12        A.    I had direct knowledge of Austin Murray and Christopher

13    Godfrey.

14        Q.    I'm sorry?

15        A.    I had direct knowledge of Austin Murray and Christopher

16    Godfrey and them being charged.

17        Q.    Okay.  So being a part of that investigation, you did not

18    understand that there were six people charged?

19        A.    I was not present during that investigation.

20        Q.    Okay, but -- okay.  And so -- but you were also involved

21    in the Back Street investigation.  Were you involved in that

22    investigation directly?

23        A.    Yes, sir.

24        Q.    Okay.  And there was an intervening event in between

25    Medway and Back Street, correct?

## BUDDEN - CROSS

1      A.    I'm not sure of what you speak of.

2      Q.    Someone told you guys about Austin and that's how you

3  ended up at Back Street, correct?

4      A.    Correct.

5      Q.    Okay.  Well, going back to Medway, when you talk about an

6  investigation, is that -- you're saying that that's where the Reshod

7  Everett investigation started, at Medway?

8      A.    The investigation -- it's a large investigation of a drug

9  trafficking organization and it began at Medway Court with

10 Christopher Godfrey and Austin Murray and then eventually progressed

11 into several more and ended with Mr. Everett.

12     Q.    Okay.  So you guys did not go to Medway Court because

13 Christopher Godfrey was off of his ankle monitor; is that not

14 correct?

15     A.    I can't speak to that investigation.  I wasn't present

16 when it occurred.  I wasn't --

17     Q.    But were you aware that there were opiates found and he

18 was charged with selling opiates?  You're aware of that, correct?

19     A.    Aware, yes.

20     Q.    Okay.  And several people were arrested for opiates and

21 marijuana, correct?

22     A.    I know of Austin Murray and Christopher Godfrey I can say

23 for sure, yes.

24     Q.    So you were not aware -- have you ever heard the name

25 Edmund Grant?

## BUDDEN - CROSS

```
 1        A.    I've heard the name.

 2        Q.    Okay.  Were you aware that he was arrested during that

 3   investigation?

 4        A.    To my knowledge, he was charged.  I don't know if he was

 5   ever arrested on those.

 6        Q.    Okay.  But you know he was charged with trafficking

 7   marijuana times two?

 8        A.    Correct.

 9        Q.    Maintaining a dwelling and possession with intent to sell

10   and deliver?

11        A.    Yes, sir.

12        Q.    Okay.  Okay.  And how about a Jamie Ray Barefoot?

13        A.    Doesn't sound familiar.

14        Q.    Okay.  And a Christian Durhart?

15        A.    I've heard the name.

16        Q.    Okay.  But you were definitely aware of Austin Murray and

17   Christopher Godfrey?

18        A.    Yes.

19        Q.    And were you aware that Christopher Godfrey was on an

20   ankle monitor from home invasions?

21        A.    I am aware of that, yes.

22        Q.    Okay.  And that's what initially led to you guys going to

23   Medway, correct?

24        A.    To my knowledge, yes.

25        Q.    Okay.  And did you say that you knew -- if you know --
```

## BUDDEN - CROSS

 1   what was seized at Medway Court?

 2        A.    Approximately 275 pounds of marijuana, prescription

 3   pills, as you had mentioned, firearms and money, U.S. currency.

 4        Q.    Okay.  So you're aware of what was seized, you just

 5   weren't aware of the investigation?

 6        A.    I wasn't present when it occurred, correct.

 7        Q.    Okay.  And so -- and you said at that time that was one

 8   of the larger seizures that you had been involved with?

 9        A.    I had seen.

10        Q.    Okay.  Okay.  So then someone else gets arrested,

11   correct?  And they tell you guys about Austin Murray, correct?

12        A.    I'm not sure of the -- how the information was received,

13   but we did receive information that he continued to sell marijuana.

14   I don't know if it came from an arrest or how it came in.

15        Q.    Okay.  Now, the Government put up a picture of a lot of

16   money and a lot of drugs from Medway Court, correct?

17        A.    Correct.

18        Q.    And you had never heard the name Reshod Everett at the

19   time, had you?

20        A.    No, sir.

21        Q.    He was not associated with those guys at all that you

22   knew of, correct?

23        A.    I wasn't aware of it at the time.  I wasn't part of the

24   -- that part of the investigation.

25        Q.    So didn't know anything about a Reshod Everett at that

## BUDDEN - CROSS

1   point.  And we're in March of 2018, correct?

2         A.    That was when Medway Court took place, yes.

3         Q.    Okay.  So after Medway Court and somebody tells you guys

4   that Austin Murray -- who was arrested at Medway Court and was

5   charged with a gun and drug violations, correct?

6         A.    That's correct.

7         Q.    And Austin Murray continues to sell lots of marijuana,

8   correct?

9         A.    Yes, sir.

10        Q.    Okay.  So once you guys get to talk to Austin Murray, he

11  now tells you about Reshod Everett, correct?

12        A.    He identified him as "Kool" and a location where he would

13  be at.

14        Q.    Okay.  And that was June 12th of 2018, correct?

15        A.    Yes, sir.

16        Q.    And what investigation procedures did your department use

17  to investigate Mr. Reshod Everett from June 12th until July 16th of

18  2018?

19        A.    The kind of -- there was a lull in the investigation and

20  we had picked it back up on July 16th.

21        Q.    There was a lull in the investigation?

22        A.    Yes.

23        Q.    Okay.  Before the lull, what did you guys do to

24  investigate Mr. Reshod Everett?

25        A.    Me, personally, I didn't have any involvement between

```
 1    that time frame.
 2         Q.    Your department, your then department, Officer Budden.
 3         A.    I can speak for myself, sir.  What I have involvement in.
 4         Q.    So this -- the biggest drug bust that you've ever seen
 5    happens in March and it's rolling up and now you've testified that
 6    Mr. Everett here was the top.  You stopped getting information about
 7    that -- the drug bust and what was going on?
 8         A.    Me, personally, I didn't receive any information.
 9         Q.    Did you do any surveillance of Mr. Everett?
10         A.    On July 17th, yes.
11         Q.    No.  From March 12th -- before July 17th, did you do any
12    surveillance of Mr. Everett?
13         A.    No.
14         Q.    Did you find out where Mr. Everett lived?
15         A.    No.
16         Q.    Did you pull Mr. Everett's criminal record?
17         A.    I personally did not.
18         Q.    Did you ask for a wiretap for Mr. Everett's phone?
19         A.    No.
20         Q.    Did you go through Mr. Murray's phone to find out if him
21    and Mr. Everett had been talking?
22         A.    Me, personally, I did not.
23         Q.    So would it be safe to say that you took the word of a
24    gentleman that had been arrested three months prior, and had just
25    been arrested again, that Mr. Everett was his supplier of marijuana?
```

## BUDDEN - CROSS

1          A.    He did say that, yes.

2          Q.    And -- but you continued to talk about investigation.

3    You swore out an affidavit in this case, right?

4          A.    Yes.

5          Q.    And in that affidavit, when you were swearing out a

6    warrant, you stated on Monday, July 16, the Fayetteville Police

7    Department Gang Unit executed a search warrant at 715-5 Middle

8    Bridge Road, Fayetteville, North Carolina, 28303, as a result of a

9    two-month long controlled substance investigation.  You swore this

10   out, didn't you, Officer Budden?

11         A.    That was the culmination of the investigation, yes.

12         Q.    But when did the investigation start, Officer Budden?

13   That's what I'm asking you.  Did you ever investigate Reshod

14   Everett?

15         A.    7000 Medway Court was the beginning of an investigation

16   which led to Mr. Everett.

17         Q.    7000 Medway Court was -- you went there because of a tip.

18         A.    I didn't go there.

19         Q.    Who investigated Mr. Reshod -- I'm sorry, let me go back.

20               You've stated that you have over -- let's see here --

21   (reviewing documents) -- 750 hours of certified police instruction.

22         A.    Correct.

23         Q.    Did they teach you how to investigate?

24         A.    Yes.

25         Q.    What are some of the things that they taught you about

## BUDDEN - CROSS

1  investigation?

2       A.    We used surveillance as a primary source of

3  investigation.  Physical observations.

4       Q.    Did you physically observe Mr. Everett at any time

5  between June 12th and July 17th?

6       A.    I've already said I did not.

7       Q.    You did not?

8       A.    No.

9       Q.    Did you physically surveil him coming out of 715-5 Middle

10  Bridge?

11       A.    No, I did not.

12       Q.    Did you see him driving that big souped-up white truck

13  that the Government told you about?

14       A.    I did not.

15       Q.    Did you even know that Mr. Everett was married with

16  children?

17       A.    I'm not sure at what time I learned of that information,

18  but eventually I did know that.

19       Q.    When exactly did you learn Mr. Reshod Everett -- when did

20  you learn that he had a home with his wife and children and he

21  didn't actually live nor had visited 715-5 Middle Bridge?

22       A.    We were able to confirm that information on the 16th into

23  the 17th when we tried to locate him.

24       Q.    So not until you pull over Mr. Alvin Davis, right?  You

25  pulled over Mr. Alvin Davis on July 16th, correct?

## JA381

## BUDDEN - CROSS

1    A.    That's correct.

2    Q.    Okay.  Now, you had the opportunity to speak to Mr. Davis

3    on that day, didn't you?

4    A.    Yes.

5    Q.    And did you ask Mr. Davis, is Reshod Everett your

6    roommate?

7    A.    I personally did not.

8    Q.    But you guys went and got a warrant to search 715-5

9    Middle Bridge, correct?

10   A.    Correct.  And Mr. Reshod Everett and Alvin Davis were the

11   two subjects on the lease for the apartment.

12   Q.    Okay.  And Mr. Reshod Everett was actually on the lease

13   and Mr. Davis was an occupied -- an authorized occupant, correct?

14   A.    He was on the lease for the apartment.

15   Q.    Okay.  As an authorized occupant, correct?

16   A.    I can't recall.

17   Q.    Had you -- had anybody seen Mr. Everett at the apartment

18   complex?

19   A.    Yes.  He had been seen at the apartment complex.

20   Q.    Okay.  Who saw him at the apartment complex?

21   A.    We had Detective Darren Wilson and then the complaints

22   that came in from the management office.

23   Q.    Okay.  Now, Detective Darren Wilson, had he taken

24   pictures of Mr. Everett at the apartment complex?

25   A.    I believe there was a picture of his truck.

## BUDDEN - CROSS

114

```
 1        Q.    He took a picture of Mr. Everett's truck at the apartment
 2   complex?
 3        A.    There was one that was shown to us, yes.
 4        Q.    Was it shown to you from the apartment complex?
 5        A.    In the apartment complex, yes.
 6        Q.    Okay.  And did you guys get the lease prior to the
 7   warrant?
 8        A.    Yes.
 9        Q.    Okay.  And how did you get that lease?
10        A.    From the management office.
11        Q.    Okay.  And who was the apartment manager at the time?
12        A.    Sir, I don't recall.  I don't know.
13        Q.    You don't know who the apartment manager was?
14        A.    I don't.
15        Q.    But Detective Wilson, was he also working at the
16   apartment complex?
17        A.    He was a courtesy officer for the apartment complex.
18        Q.    Okay.  Now, was he kind of like you were in Medway, he
19   wasn't really in the investigation, but he was in the investigation?
20   Would that be accurate?
21        A.    I'm not sure what you mean by that.
22        Q.    Well, he didn't write a report.  So was he in the
23   investigation or was he not in the investigation?
24              MR. LEMMON:  Objection.
25        A.    He provided some information, yes.
```

## BUDDEN - CROSS

1    Q.    (By Mr. Young)  He provided some information?

2    A.    Yes.

3    Q.    Okay.  So you go to the traffic stop and -- were you at

4    the traffic stop the entire time?

5    A.    Yes.

6    Q.    Okay.  So you saw Mr. Davis pulled over?

7    A.    Yes.

8    Q.    Okay.  And you saw the drugs and the guns that he was

9    carrying?

10    A.    That's correct.

11    Q.    Okay.  And at that point, you guys knew that he was

12    coming from 715-5 Middle Bridge?

13    A.    He was observed coming -- leaving the building 715 from

14    the direction of apartment 5, yes.

15    Q.    Okay.  And you didn't ask him if he lived with Reshod

16    Everett, did you?

17    A.    Not specifically, no.

18    Q.    You never said the name Reshod Everett, did you?

19    A.    No.

20    Q.    But you guys were investigating Reshod Everett and Alvin

21    Davis, correct?

22    A.    We were investigating the activities that were taking

23    place at that apartment.

24    Q.    Okay.  And the complaints that you were getting, weren't

25    they from Darren Wilson?  Didn't he say he saw two black males

## BUDDEN - CROSS

```
 1   carrying duffle bags?

 2       A.    I believe so.

 3       Q.    And that was enough to spark your interest?

 4       A.    Along with the odor of marijuana.  That's where our

 5   interest gets piqued.

 6       Q.    Did Officer Darren Wilson testify to the odor of

 7   marijuana?

 8       A.    The odor came from complaints from the management and the

 9   residents at the complex.

10       Q.    Anonymous complaints?

11       A.    Right.

12       Q.    Okay.  So then you guys go to the apartment.  Were you a

13   part of the apartment?

14       A.    No, sir.

15       Q.    You weren't there?

16       A.    No, I was not there.

17       Q.    Okay.  But after the apartment, you did provide -- you

18   provided the currency envelope, correct?

19       A.    For the apartment?

20       Q.    The currency envelope for 1080 Ronald Reagan Drive.

21       A.    Yes.

22       Q.    Okay.  And you were aware -- and that's handwritten,

23   correct?

24       A.    Yep.  Yes.

25       Q.    And submitted by you, Officer N. Budden, and verified by
```

## BUDDEN - CROSS

```
 1    Officer Chase Robeson and your supervisor has signed, correct?
 2         A.    Yes, sir.
 3         Q.    Because at this point, if Medway Court was the biggest
 4    drug bust you've seen, this would have been even larger with
 5    $65,000, correct?
 6         A.    Currency wise, yes.
 7         Q.    Right.   Okay.   Now, the Government asked about making a
 8    mistake, correct?
 9         A.    A mistake was made, yes.
10         Q.    A $65,689 mistake, correct?
11         A.    I wouldn't put a dollar amount on it.   The dollar amount
12    has nothing to do with what was typed in the -- or automatically
13    populated into the computer.
14         Q.    Dollar amounts matter, Officer Budden.   We're in court --
15               MR. LEMONS:   Objection, your Honor.
16               THE COURT:   Sustained.   Argumentative.
17               Next question, Mr. Young.
18               MR. YOUNG:   So if I may approach the witness, your Honor?
19               THE COURT:   You may.
20     (Attorney Young approaching the witness stand.   Providing document
21                             to the witness)
22         Q.    (By Mr. Young)  So I'm going to show you a document --
23    and this document is typed.   Now, can you read the top of it?
24               MR. LEMMON:   Your Honor, if this is for refreshing
25    recollection, I'd ask the witness have a chance to review it.   I
```

## BUDDEN - CROSS

```
 1   can't tell if this is entered into evidence.

 2             THE COURT:  That's fine.

 3             MR. YOUNG:  I'm just showing him now.

 4             THE COURT:  That's fine.  Just review it to refresh your

 5   recollection.

 6             THE WITNESS:  Okay.

 7        A.   What is it that you wanted me to read, sir?

 8        Q.   (By Mr. Young)  Could you read what the top of that one

 9   says.

10        A.   User --

11             THE COURT:  Just read it quietly to yourself.

12        A.   (Witness complying).  Dustin -- D. Harding property --

13             MR. LEMMON:  Your Honor, objection.

14             THE COURT:  No, no, just read it quietly to yourself.

15   And then when somebody wants to refresh recollection, they can hand

16   the document to you and then you review it and then the question is:

17   Does this refresh your recollection about such and such.

18             THE WITNESS:  Understood.

19             THE COURT:  And then there will inevitably be another

20   question.  Okay.

21             All right.  So after you've reviewed it, say -- if you

22   have -- say, I've reviewed it --

23             THE WITNESS:  I've reviewed it.

24             THE COURT:  -- and Mr. Young will go back to his table

25   and he will have another question.
```

## BUDDEN - CROSS

1     Q.    (By Mr. Young)  So does this form look like the standard

2  form that was used in -- at the Fayetteville Police Department when

3  you guys made seizures?

4     A.    Yes, it is.

5     Q.    Okay.  And this form was typed up, correct?

6     A.    Yes.

7     Q.    And your supervisor's name is on it, correct?  Your old

8  supervisor.

9     A.    I don't recall seeing it on there.  I saw D. Harding.

10     Q.    Okay.  There's an S. B. Cook --

11          MR. LEMMON:  Objection, your Honor.

12     Q.    (By Mr. Young)  -- is that familiar to you?

13     A.    Yes, sir.

14     Q.    And a T. Z. Durham.  Would that be your supervisor?

15     A.    Yes.

16     Q.    Okay.  So their names are on here?

17     A.    Okay.

18     Q.    And on line one, which you just read, it says U.S.

19  currency green cash.

20          MR. LEMMON:  Objection, your Honor.

21          THE COURT:  Sustained as to the form.

22          The document is not in evidence.  You can ask him

23  questions, but you can't read from the document, Mr. Young, in

24  accordance with the Rules of Evidence.

25          MR. YOUNG:  All right.  Thank you, your Honor.

**JA388**

## BUDDEN - CROSS

1      Q.    (By Mr. Young)  Did you see that the same amount of cash

2  that was seized from 1080 Ronald Reagan Drive was seized from 715

3  Middle Bridge Drive, Apartment 5?

4      A.    It was not seized at both locations.

5      Q.    But according to this document it was seized, correct?

6      A.    As I've testified already, it was seized from 1080 Ronald

7  Reagan Drive and there was an error on the form.

8      Q.    Yes or no, Officer Budden.  According to this document,

9  it was seized from 715 Middle Bridge, correct?

10          MR. LEMMON:  Objection.  Asked and answered.

11          THE COURT:  Sustained.  He's already explained it.

12          Next question.

13          MR. YOUNG:  Your Honor, I'm asking a yes or no question.

14          THE COURT:  Mr. Young, I have ruled.

15          Next question.

16      Q.    (By Mr. Young)  All right.  So we'll go to 1080 Ronald

17  Reagan Drive.  So you were a part of the arrest team at 1080 Ronald

18  Reagan Drive?

19      A.    Yes, sir.

20      Q.    Okay.  Now, the Government showed videos of Mr. Everett

21  being arrested.  Approximately how many officers were in the house

22  at that time?

23      A.    At the time of the video, four or five.

24      Q.    Okay.  And the Government talked about you working an

25  extremely long shift, from 1 p.m. to 7:30 p.m., and you guys got

## BUDDEN - CROSS

1    hungry.  Throughout that time, how many officers came and went from

2    the crime scene?

3        A.    Total for both units -- the Gang Unit and the Violent

4    Criminal Apprehension Team that was assisting us -- total of maybe

5    ten.  I don't recall how many were present that day.

6        Q.    Okay.  And you were a part of the group that did the

7    safety sweep of the home?

8        A.    Yes, sir.

9        Q.    Okay.  Now, it's not common for you guys to bring in two

10   bags of food into a home, is it?

11       A.    We -- no.

12       Q.    Before this, you had never done that before, had you,

13   brought in two bags of food?

14       A.    I didn't bring anything in the house.

15       Q.    Had anybody on a crime scene with you brought in two bags

16   of food prior to this?

17       A.    We've eaten, like we said -- described as snacks, on a

18   crime scene before, yes.

19       Q.    Okay.  And can you tell me what was -- what kind of food

20   was in those bags?  Was it fast food?

21       A.    No.  They were -- it was like chips and crackers and I

22   believe -- I think Gatorades.

23       Q.    Okay.  And the crime scene was active at that time,

24   correct?

25       A.    That's correct.

# BUDDEN - CROSS

```
 1        Q.    And you guys brought in bags in an active crime scene?
 2        A.    Containing snacks.
 3        Q.    Where did you eat the snacks?
 4        A.    I ate them in the kitchen at the island.
 5        Q.    Okay.  And this is prior to your warrant, correct?
 6        A.    No.
 7        Q.    You had already had the warrant --
 8        A.    Yes.
 9        Q.    -- issued?
10        A.    Yes; that's correct.
11        Q.    Okay.  So the warrant was issued and then you guys came
12   in and you ate?
13        A.    During the search, Sergeant Durham had gathered some
14   snacks for us to eat so we wouldn't get hungry and we could continue
15   doing our work.
16        Q.    And there were two females in the house, correct?
17        A.    Yes.
18        Q.    And Mr. Everett had already been transported?
19        A.    That's correct.
20        Q.    Okay.  Were there any female officers there at that time?
21        A.    I don't -- I don't believe so.
22        Q.    Okay.  And how long did you guys eat in the home before
23   you finished?
24        A.    Can you rephrase the question?  How long --
25        Q.    How long did it take you guys to eat and finish your
```

## BUDDEN - CROSS

```
 1    search warrant?
 2          A.   It took us several hours to search the house.  It was a
 3    three-level home -- multiple bedrooms, multiple rooms -- so we were
 4    there for several hours.
 5          Q.   Okay.  Okay.  So then you guys leave 1080 and you go to
 6    the storage room, correct?
 7          A.   Prior to that, I went and transported Ms. Everett to the
 8    police station and then to the Cumberland County jail.  And then I
 9    was requested to meet Detective Harding at the storage facility,
10    yes.
11          Q.   Now, when you say, transported, was she under arrest?
12          A.   Yes.
13          Q.   Okay.  So -- and then you got a warrant for the storage
14    room, correct?
15          A.   Detective Harding did, yes.
16          Q.   Okay.  And were you a part of that search?
17          A.   Yes.
18          Q.   Okay.  And what did you guys find at the storage room?
19          A.   As stated before, there was two large plastic totes and a
20    black duffel bag that contained several individual, vacuum-sealed
21    bags of marijuana.
22          Q.   Okay.  And did you fingerprint the totes that were in the
23    storage room?
24          A.   We don't fingerprint.  It's not common practice to
25    fingerprint totes, plastic materials or anything during such an
```

**JA392**

## BUDDEN - CROSS

```
 1    investigation.
 2         Q.    How about the gate to raise the storage room.  Did you
 3    fingerprint that?
 4         A.    No.  We didn't fingerprint anything.
 5         Q.    Okay.  Did you ask if anybody else had access to the
 6    storage room before -- did you ask if anybody else had access to the
 7    storage room?
 8         A.    I didn't have anything to do with the -- how that
 9    information was obtained.  That was Detective Harding who eventually
10    applied for the search warrant.  Because like I said, I was at the
11    police station and then the jail while that information was
12    obtained.
13         Q.    Okay.  And the Government talked about the body-worn
14    camera policy, right?
15         A.    Yes, sir.
16         Q.    And you were familiar with that from 2018, correct?
17         A.    Yes, sir.
18         Q.    Now, there are certain times where the camera has to be
19    on, right?
20         A.    Yes.
21         Q.    Okay.  And one of those times is during transport.  Once
22    your body camera goes off, your in-car camera should come on,
23    correct?
24         A.    The in-car camera records transportation, yes.
25               MR. YOUNG:  One second, your Honor.  I'm sorry.
```

**JA393**

## BUDDEN - CROSS

```
 1    (Reviewing documents).

 2         Q.    (By Mr. Young)  So one of those situations says, any

 3    other situation --

 4              MR. LEMMON:  Objection --

 5         Q.    -- which could result in potential adversarial --

 6              MR. LEMMON:  Objection to reading the document that's not

 7    in evidence.

 8              THE COURT:  I'll sustain as to the form.

 9         Q.    (By Mr. Young)  Do you know any of the times when you

10    should -- it's mandatory to have your body camera on?

11         A.    Some examples would be a traffic stop, entering into a

12    structure or vehicle to make an arrest.  Those are two examples.

13         Q.    Okay.  Are those the only examples?

14         A.    They're not the only ones.  I don't know them all off the

15    top of my head right now.

16         Q.    Okay.

17              MR. YOUNG:  One second, your Honor.

18     (Attorneys Young and Pryor conferring at counsel table briefly off

19                               the record)

20         Q.    (By Mr. Young)  Now, going back to the Ronald Reagan

21    Drive address.  The Government has pulled out several guns.  Are any

22    of those guns, on their face, illegal?

23         A.    Not if you're in furtherance of a drug crime.

24         Q.    Without the drug crime, are any of those guns, on their

25    face, illegal?
```

## BUDDEN - CROSS

1    A.    Without the drug crime, no.

2    Q.    Okay.  So were those guns registered?

3    A.    I don't know how he kept his guns, but North Carolina

4  doesn't specifically require a registration for firearms.

5    Q.    Okay.  So you don't have to have a firearm registered in

6  North Carolina?

7    A.    You have to show proof of purchase to -- when you

8  purchase it, but there's no, like, registry that I can go and run a

9  gun to see who it was -- who owns it.

10    Q.    So the Government produced a document saying that Mr.

11  Everett, he had a permit to purchase guns so, therefore, he's able

12  to purchase guns, correct?

13    A.    Yes.

14    Q.    Which means he wouldn't be a felon, correct?

15    A.    Correct.

16    Q.    Okay.  And did you ever get around to checking Mr.

17  Everett's record or doing any kind of investigation on Mr. Everett?

18    A.    Yes.  We did look at his record.

19    Q.    Okay.  And what did you find out?

20    A.    He had little to no criminal history.

21    Q.    Okay.  So no criminal history at all?

22    A.    Not that I recall.

23    Q.    Okay.  And the other people that were a part of this

24  investigation -- Mr. Christopher Godfrey, Mr. Austin Murray -- how

25  about their records?  What were they like?

# BUDDEN - CROSS

```
 1         A.    They -- off the top of my head, I don't recall.  I don't

 2    know exactly what -- I know they had some drug violations.  Mr.

 3    Godfrey, I think, had a robbery charge; but that's the extent of

 4    what I can recall.

 5         Q.    Okay.

 6     (Attorneys Young and Pryor conferring at counsel table briefly off

 7                          the record)

 8         Q.    (By Mr. Young)  And still at 1080.  Is it illegal to have

 9    a surveillance camera outside of your home?

10         A.    It's not illegal to have one.

11         Q.    Okay.

12         A.    It could be used to record -- or document what's coming.

13    In drug investigations, it can be found to be used to alert somebody

14    when somebody that they don't want at their house coming to their

15    house.

16         Q.    Now, you guys -- you said you guys did a surveillance at

17    Ronald Reagan from about 1 to 7:30, correct?

18         A.    That's correct.

19         Q.    Did you guys see people coming to pick up their children

20    during that time?

21         A.    Yes.  I testified to that earlier.

22         Q.    Were they parking on the street or were they parking in

23    the driveway?

24         A.    That I don't know.  I wasn't -- I didn't have the visual

25    on the front of the house.
```

**JA396**

**BUDDEN - REDIRECT**

```
 1        Q.    Okay.  Okay.
 2        A.    I don't know.
 3              MR. YOUNG:  Okay.  No further questions, your Honor.
 4              THE COURT:  Thank you, Mr. Young.
 5              Mr. Lemmon.
 6              MR. LEMMON:  Thank you, your Honor.
 7                       REDIRECT EXAMINATION
 8  BY MR. LEMMON:
 9        Q.    Detective Budden, is it common for an investigation like
10  this to start with one target and then progress to other targets?
11        A.    Yes.  Absolutely.
12        Q.    And so here you started, as you testified, in March of
13  2018, you and other agents at this Medway Court portion of the
14  investigation, correct?
15        A.    I was not present for that one.  I'm aware of it.
16        Q.    You and other officers -- strike that.
17              So other officers who were involved in this investigation
18  began in March of 2018 at that Medway Court residence, correct?
19        A.    That is correct.
20        Q.    And then there was another seizure, as we discussed, at
21  Back Street, correct?
22        A.    That's correct.
23        Q.    And then agents learned information that led you in the
24  direction of Addison Ridge, correct?
25        A.    That's correct.
```

## BUDDEN - REDIRECT

1     Q.    And then was surveillance conducted at Addison Ridge that

2     led to the seizure of drugs and a firearm from Alvin Davis' vehicle?

3     A.    Yes.

4     Q.    And the reason that surveillance was done at Addison

5     Ridge was based in part on additional information, including

6     information from Detective Darren Wilson and from the management

7     office at the Addison Ridge, correct?

8     A.    Correct.

9     Q.    So did you all work to corroborate information you had

10    received?

11    A.    Yes.

12    Q.    And did it actually lead to evidence?

13    A.    Yes.

14    Q.    And so did it appear that information was correct?

15    A.    It did.

16    Q.    And then did you -- as you've testified, did

17    investigators apply for a search warrant and receive one to search

18    Apartment 5 at Addison Ridge?

19    A.    Yes, they did.

20    Q.    And drug evidence was seized from there as well?

21    A.    That is correct.

22    MR. LEMMON:  Just one moment, your Honor.  (Reviewing

23    documents).

24    Nothing further, your Honor.

25    THE COURT:  Thank you.

## BUDDEN - RECROSS

```
 1          Anything else, Mr. Young?

 2          MR. YOUNG:  Just a couple of questions.

 3                      RECROSS-EXAMINATION

 4   BY MR. YOUNG:

 5      Q.   At 715 Middle Bridge, did you find anything other than

 6   the document and the lease that said Reshod Everett had been there?

 7      A.   I wasn't present at the search, sir.  I don't have any

 8   recollection --

 9      Q.   During your investigation, Officer Budden.

10      A.   I don't recall.

11      Q.   Okay.

12          MR. YOUNG:  Nothing further, your Honor.

13          THE COURT:  Thank you, Mr. Young.

14          Thank you.  Please watch your step stepping down.

15   There's a step up as you come off the witness stand and a step down

16   through the gate.

17          THE WITNESS:  Thank you.

18          THE COURT:  Thank you.

19                      (Witness Excused)

20          THE COURT:  United States may call its next witness.

21          MS. WEBB:  The Government calls Darren Wilson.

22          MR. LEMMON:  Your Honor, may I clear the exhibits from

23   the stand?

24          THE COURT:  You may.

25          THE CLERK:  Put your left hand on the Bible and raise
```

# WILSON - DIRECT

```
 1    your right hand.  State your name for the Court.
 2              THE WITNESS:  Darren Wilson.
 3                        DARREN WILSON
 4              having been duly sworn, testified as follows:
 5              THE WITNESS:  I swear.
 6              THE COURT:  Would you like some water?
 7              THE WITNESS:  I'm good, sir.  Thank you.
 8              THE COURT:  All right.  Ms. Webb at this table is going
 9    to have some questions for you, then one of the lawyers over here is
10    going to have some questions for you.
11              If the lawyer who's not asking you questions objects to
12    the other lawyer's question, don't say anything until I rule on the
13    objection.
14              Please try and keep your voice up so the ladies and
15    gentlemen of the jury can hear what you have to say.
16              The black device between the Bible and the computer
17    screen is a microphone.  It will help the jury hear you.
18              You may examine the witness.
19              MS. WEBB:  Thank you, your Honor.
20                        DIRECT EXAMINATION
21    BY MS. WEBB:
22        Q.    Please introduce yourself.
23        A.    Yes, ma'am.  My name's Darren Wilson.
24        Q.    And where are you employed?
25        A.    I'm currently employed by the United States Marshal
```

# WILSON - DIRECT

```
1   Service.  I'm in the Law Enforcement Training Academy in Glynco,

2   Georgia.

3           Q.    How long have you been attending that Academy?

4           A.    Since January 11th of 2022.

5           Q.    And prior to taking a job with the U.S. Marshal Service,

6   did you work at a law enforcement agency previously?

7           A.    Yes, ma'am, I did.  I was with the Fayetteville Police

8   Department in North Carolina for nine and a half years.

9           Q.    Okay.  And at any point in time, were you sworn as an FBI

10  Task Force Officer at the Fayetteville Police Department?

11          A.    Yes, ma'am.  Prior to leaving the Fayetteville Police

12  Department, I was sworn in as an FBI Narcotics Task Force Officer

13  assigned to the narcotics unit of the Fayetteville Police Department

14  since March of 2021.

15          Q.    Okay.  Now, I guess would it be Deputy Marshal Wilson?

16          A.    Not yet, ma'am.

17          Q.    Trainee Wilson?

18          A.    Yes, ma'am.

19          Q.    Okay.  Are you familiar with the Addison Ridge apartment

20  complex in Fayetteville, North Carolina?

21          A.    Yes, ma'am, I am.

22          Q.    And how are you familiar with it?

23          A.    I lived there from February 2014 until December 1st 2020.

24          Q.    Okay.  And in addition to being just a resident at the

25  Addison Ridge apartment complex, did you have any police-related
```

## WILSON - DIRECT

1  duties there?

2      A.    Yes, ma'am.  The entire time I was a resident, I was

3  assigned as the courtesy officer.

4      Q.    What does the courtesy officer at an apartment complex

5  do?

6      A.    The courtesy officer is an on-site location police

7  officer.  I handle calls for service from the residents.  Normally

8  this helps out in the law enforcement function.  It helps reduce the

9  amount of times that a marked police officer has to be called away

10  from patrol.  I could usually handle those small issues while I was

11  a resident there.

12      Q.    Okay.  And so would you be handling the calls for help

13  from the complex when you were off duty from your regular police

14  assignment?

15      A.    Yes, ma'am.

16      Q.    All right.  Now, as the courtesy officer, would you also

17  be on the look out for things that are indicators of criminal

18  activity?

19      A.    Yes, ma'am.  I was in charge of patrolling the apartment

20  complex at different hours of the day and night.

21      Q.    Would you maintain regular contact with management at the

22  apartment complex regarding things that they had observed?

23      A.    Yes, ma'am.

24      Q.    And would you also be responsible for helping the

25  management of the complex enforce the rules and regulations and the

## WILSON - DIRECT

1    laws of the State of North Carolina?

2        A.    Yes, ma'am, I did.

3        Q.    Now, while you were the courtesy officer there, did you

4    become familiar with the defendant, Reshod Everett?

5        A.    Yes, ma'am.

6        Q.    And do you see him in court today?

7        A.    Yes, ma'am.

8        Q.    Can you please identify him for us?

9        A.    Yes, ma'am.  He's the gentleman sitting over here.

10           THE COURT:  Identify an article of clothing, please.

11           THE WITNESS:  The black button-up with the gold and black

12   tie.

13           THE COURT:  The record will reflect the witness has

14   identified the defendant, Reshod Everett.

15       Q.    (By Ms. Webb)  How did you become familiar with Mr.

16   Everett?

17       A.    While I was a detective with the Fayetteville Police

18   Department, during the time that this investigation started with the

19   Gang Unit, I was currently assigned to the Violent Criminal

20   Apprehension Team.  I was a plain-clothes detective.  My job was to

21   track down fugitives that were on the run.

22           My unit shared an office with the Gang Unit, so 10 to 12

23   detectives at a time were working in one location.  Every now and

24   then we would work investigations where if they had someone that was

25   on the run, they would reach out to us to try to find them.  If we

## WILSON - DIRECT

1    came across someone that we thought would be a part of one of their

2    investigations, we would share information.

3            One day while I was sitting in the office, they began

4    talking about an investigation they were working.  The investigation

5    included information about an individual who possibly lived at

6    Addison Ridge apartments, which is the location I lived at and I was

7    a courtesy officer at.

8        Q.   Okay.  And do you remember any specific details about

9    that discussion that stuck out in your mind as you heard them

10   talking about the investigation?

11       A.   Yes, ma'am.  They were trying to identify an individual

12   who drove a specific vehicle.  During their conversation they

13   described a very large white pickup truck.  It had chrome rims,

14   off-road tires.  It was lifted above your normal kind of ride

15   height.

16       Q.   Okay.  Now, when they described the vehicle like that

17   that was supposed to be at the Addison Ridge apartment complex, did

18   that ring a bell with you?

19       A.   Yes, it did.  For me, I actually lived in an apartment.

20   I was on the third floor.  My apartment balcony overlooked the only

21   entrance in and out of the apartment complex.  I could see the

22   vehicles that came and went every day if I was outside on my

23   balcony.

24       Q.   And so based on your observations from your apartment and

25   living at the complex full time, had you seen a custom, lifted white

## WILSON - DIRECT

1    truck like the Gang Unit described?

2        A.    Yes, ma'am, I had.

3        Q.    And did you see who was coming and going from that truck

4    into any particular apartment buildings?

5        A.    Yes, ma'am, I did.

6        Q.    And who was that?

7        A.    The defendant.

8        Q.    Okay.  Now, had you seen him and this truck before the

9    Gang Unit described that to you?

10        A.    Yes, ma'am.

11        Q.    And about how often at that point in time would you say

12    that you had seen that truck and/or Mr. Everett at the apartment

13    complex?

14        A.    Sporadically, but maybe a few times a week.

15        Q.    Okay.  And were you able to actually see which apartment

16    that was associated with?

17        A.    I observed the white pickup truck parked in front of

18    building 715 Middle Bridge Road.

19        Q.    Okay.  Now, Detective Wilson, I'm going to pull up for

20    you what's already been entered into evidence, Government's

21    Exhibit 115.

22            Do you recognize any of the vehicles in that photograph?

23        A.    Yes, ma'am.

24        Q.    Can you please circle for us which vehicle you recognize?

25        A.    (Annotating).

**JA405**

## WILSON - DIRECT

1    Q.    And is that the same white truck that you saw Mr. Everett

2  driving to and from the Addison Ridge apartments?

3    A.    It does appear to be, ma'am.

4    Q.    Okay.  And does it appear to be a late model truck or a

5  newer truck?

6    A.    Newer model.

7    Q.    Did it appear to have custom modifications to it?

8    A.    Yes, ma'am.

9    Q.    And based on your recollection at the time, were there

10  any other vehicles like that at the Addison Ridge apartment complex?

11    A.    Not that I observed, ma'am.

12    Q.    Okay.  Now, Detective Wilson, you said that you were able

13  to tell which building that truck was parking at and where Mr.

14  Everett was going to and from; is that right?

15    A.    Yes, ma'am.

16    Q.    And that was building 715?

17    A.    Yes, ma'am.

18    Q.    Okay.  Now, Detective Wilson, I'm going to show you a

19  series of photographs that are Exhibits 159 through 162.  And if

20  you'll look at these as they cycle through.

21        Do you recognize these photographs?

22    A.    Yes, ma'am.  The first was the parking lot in front of

23  building 715 where I observed the truck to normally park at.

24        The second, I believe, was the door to Apartment 5

25  followed by the walkway that led up to Apartment 5.

# WILSON - DIRECT

```
 1            And this picture observed is -- 715 is to the right and
 2    the building to the left is the leasing office to Addison Ridge
 3    apartments.
 4        Q.   So are Exhibits 159 through 162 fair and accurate
 5    photographs of the Addison Ridge apartment complex?
 6        A.   Yes, ma'am.
 7            MS. WEBB:  Your Honor, the Government would move Exhibits
 8    159 through 162 into evidence.
 9            THE COURT:  They'll be received and they may be
10    published.
11    (Government's Exhibit Nos. 159 through 162 received into evidence)
12            THE COURT:  Are they consistent with your memory of how
13    it looked in July of 2018?
14            THE WITNESS:  Yes, your Honor.
15            THE COURT:  Next question.
16            MS. WEBB:  Now, if we can publish 159 to the jury.
17        Q.   (By Ms. Webb) Detective Wilson, tell the jury what we're
18    seeing in this photograph.
19        A.   Picture currently displayed?
20        Q.   Yes.
21        A.   Yes, ma'am.  There's two parking spots here in the
22    immediate bottom, right corner that are empty.  That's normally
23    where I saw the vehicle parked at.
24        Q.   Okay.  And those parking spaces are within walking
25    distance of building 715, are they not?
```

## WILSON - DIRECT

```
 1        A.    Yes, ma'am.
 2              MS. WEBB:  All right.  Let's turn to 160.
 3        Q.    (By Ms. Webb)  And is that Apartment No. 5 in building
 4   715?
 5        A.    Yes, ma'am, it is.
 6              MS. WEBB:  All right.  Let's turn to 161.
 7        Q.    (By Ms. Webb)  And what is this?
 8        A.    This would be the walkway or the breezeway from the
 9   parking lot to Apartment 5, which would be located on the right of
10   this picture.
11        Q.    Okay.  So Apartment 5 is just to the right where the
12   picture cuts off; is that correct?
13        A.    Yes, ma'am, it is.
14        Q.    Okay.  And so would it be fair to say that Apartment 5 is
15   directly accessible from that parking space that you showed us
16   earlier?
17        A.    Yes, ma'am.
18              MS. WEBB:  Okay.  And finally let's see 162.
19        Q.    (By Ms. Webb)  All right.  And is this another angle of
20   building 715?
21        A.    Yes, ma'am, it is.
22        Q.    Can you tell us what the building we see to the left of
23   apartment building 715 is?
24        A.    Yes, ma'am.  The building just behind the white Jeep
25   Cherokee, I believe, there's windows that are kind of facing it.
```

**JA408**

## WILSON - DIRECT

```
 1    These are actually the management office, leasing office or property

 2    managers.  Their offices sit back -- they can actually look back

 3    towards that building.

 4        Q.   Okay.  So would the -- did you ever go in this building

 5    to speak with management and the employees of the complex?

 6        A.   Yes, ma'am, on multiple occasions.

 7        Q.   And were you able to see building 715 from inside the

 8    leasing office?

 9        A.   Yes, ma'am.

10        Q.   Okay.  Now, when you saw Mr. Everett walk through the

11    parking lot towards Apartment 5, did you ever see him carry

12    anything?

13        A.   Yes, ma'am.  On one or two occasions I did observe him to

14    carry a black duffel bag.

15             MS. WEBB:  Okay.  Let's pull up 108.

16        Q.   (By Ms. Webb)  And we've got Government's Exhibit 108

17    pulled up in front of you.

18             Are the duffle bags in this photograph or is the duffel

19    bag in this photograph consistent in appearance to the one you saw

20    Mr. Everett carry at the apartment complex?

21        A.   Yes, ma'am.

22        Q.   When you saw Mr. Everett carrying those bags, did they

23    appear to be empty or did they appear to contain something?

24        A.   Yes, ma'am.  They appeared to be very full.  They were

25    not empty.
```

**JA409**

## WILSON - DIRECT

```
 1        Q.   Okay.  Now, when you became the courtesy officer at
 2   Addison Ridge, when you personally moved in there, did you have to
 3   sign any type of lease agreement?
 4        A.   Yes, ma'am, I did.
 5        Q.   And were you familiar with the terms of the lease as the
 6   courtesy officer who helped enforce those rules?
 7        A.   Yes, ma'am, I was.
 8        Q.   Would you have had access to lease agreements on occasion
 9   to verify whether or not someone lived at the complex or was
10   supposed to be there?
11        A.   Yes, ma'am.
12        Q.   And so you're familiar with what those look like?
13        A.   Yes, ma'am.
14             MS. WEBB:  Can we pull up 131.
15        Q.   (By Ms. Webb)  All right.  Now, Government's Exhibit 131
16   is on your screen.  Can you tell us who the lessee for this
17   particular apartment at Addison Ridge is?
18        A.   Reshod Everett.
19        Q.   Is this the lease for 715 Middle Bridge Drive,
20   Apartment 5?
21        A.   Yes, ma'am, it is.
22        Q.   And is there any other authorized occupant of that
23   particular apartment?
24        A.   Yes, ma'am.  Alvin Davis.
25        Q.   All right.  How much money were Mr. Everett and Mr. Davis
```

# WILSON - DIRECT

```
 1    paying per month to lease that apartment?
 2         A.    It was a base monthly rent of $1,240 with a short-term
 3    premium fee of $50 for a total of 1,290.
 4              MS. WEBB:  Okay.  And if we can turn to the last page of
 5    that exhibit.
 6         Q.    (By Ms. Webb)  Can you tell whose signature is on this
 7    lease agreement as the lessee?
 8         A.    It appears to be Reshod Everett's.
 9         Q.    And can you tell what date that was signed?
10         A.    Yes, ma'am.  March 27th, 2018.
11         Q.    All right.  Now, is this lease the same or substantially
12    similar to the lease that you personally signed when you leased your
13    own apartment?
14         A.    Yes, ma'am.
15         Q.    And do these lease agreements contain provisions in there
16    about whether or not somebody is allowed to reside that's not
17    registered with management of the complex?
18         A.    Yes, ma'am.  To live in the apartment, you have to be
19    pre-approved and be on the lease agreement.
20         Q.    Okay.  And so does Addison Ridge authorize Airbnbs?
21         A.    No, ma'am.  They do not allow any subleases at all.
22         Q.    Okay.  So no short-term rentals of a unit would be
23    allowed at all?
24         A.    No, ma'am.
25         Q.    Okay.  And so would anyone moving into the complex,
```

**JA411**

# WILSON - CROSS

1  including Mr. Everett, be made aware of that?

2      A.    Yes, ma'am.

3      Q.    Okay.  Now, during your time observing Mr. Everett go to

4  and from the 715 apartment building, did you ever see any foot

5  traffic go in there that looked like Airbnb customers?

6      A.    No, ma'am.

7      Q.    Did it appear that visitors that were not associated with

8  that residence were coming and going frequently?

9      A.    Not that I recall, ma'am.

10     Q.    Did you see any other people with luggage or overnight

11 bags going to and from that residence?

12     A.    No, ma'am.

13         MS. WEBB:  Nothing further, your Honor.

14         THE COURT:  Cross-examination.

15                    <u>**CROSS-EXAMINATION**</u>

16 BY MR. YOUNG:

17     Q.    Good afternoon, Mr. Wilson.

18     A.    Good afternoon, sir.

19     Q.    Now, you testified that your apartment sat up so you

20 could see what was coming in and going?

21     A.    Yes, sir.

22     Q.    But you couldn't actually see the door of 715-5, could

23 you?

24     A.    Not the physical door, no, sir.

25     Q.    So you don't know who was coming and going to that unit,

## WILSON - CROSS

1    do you?

2         A.    No, sir.

3         Q.    Okay.  About how many units are in each hallway?

4         A.    In that hallway -- it could depend based on the building.

5    Sometimes two, sometimes five depending on if there's one bedroom,

6    two bedroom or three bedroom.

7         Q.    Now, you were made aware of Mr. Everett in June 2018.  Is

8    that when you had the conversation with the Violent Crimes Unit?

9         A.    I believe it was in the -- just around that time frame.

10   Late spring, early summer time frame.

11        Q.    Okay.  And they were just talking about Addison Ridge,

12   correct?

13        A.    They were talking about an investigation they were

14   conducting and as they were working their case, other information

15   came up regarding that investigation.  And when they mentioned the

16   white truck that they believed to come and go from Addison Ridge, I

17   just let them know in the office that I had a truck that I believe

18   matched that description coming and going from Addison Ridge.

19        Q.    And after you had the conversation, you never saw Mr.

20   Everett again, did you?

21        A.    I do not recall, sir.

22        Q.    You never saw that truck again, did you?

23        A.    I don't recall, sir.

24        Q.    Did you take any pictures of that truck?

25        A.    No, sir.

# WILSON - CROSS

1      Q.    Okay.  Who was the manager of the leasing office at that

2   time?

3      A.    Heather Gonzales, I believe.

4      Q.    Okay.  And were there any associates in the leasing

5   office?

6      A.    I mean, sir, they have had multiple employees.

7      Q.    Were you -- you became privy to the lease during that

8   time -- Mr. Everett's lease during that time, didn't you?

9      A.    I did not physically look at the lease, no, sir, during

10  their investigation.

11     Q.    How about before the investigation?

12     A.    No, sir.

13     Q.    So you never looked at Mr. Everett's lease?

14     A.    No, sir.  I was not the one that looked at his physical

15  lease, no, sir.

16     Q.    Okay.  Did you ever talk to management about Mr. Everett?

17     A.    No, sir.

18     Q.    Okay.  So once you saw -- you were -- once you were made

19  aware of the situation, you can't remember if you saw Mr. Everett

20  again, correct?

21     A.    Correct.

22     Q.    And you didn't talk to management about Mr. Everett,

23  correct?

24     A.    No, sir.

25     Q.    And so you were just thinking about the times where you

# WILSON - CROSS

```
 1    saw that white truck, correct?
 2         A.    Correct.
 3         Q.    And you gave a statement to your fellow officers that you
 4    saw two black males carrying duffle bags, correct?
 5         A.    I observed Mr. Everett carry the duffle bags before.
 6    Yes, sir.
 7         Q.    Okay.  One time or several times or --
 8         A.    One or two times.  Yes, sir.
 9         Q.    And you never wrote a report for this, did you?
10         A.    No.
11         Q.    Were you a part of the Internal Affairs investigation for
12    this case?
13         A.    No, sir, I was not.  So I had politely asked that because
14    I lived at Addison Ridge, that I wanted to stay away after they
15    started their investigation.  And that's when I believe the Gang
16    Unit followed through and they conducted their investigation, I
17    stayed out of it, sir.
18         Q.    Based on your knowledge, how long did that investigation
19    last?
20         A.    I don't know, sir.
21         Q.    Would you be shocked if I said it was a month?
22         A.    I would be, sir.
23         Q.    Okay.  The investigation was a month.
24               MS. WEBB:  Objection.
25               THE COURT:  Sustained.
```

## JA415

# WILSON - CROSS

1    Q.    (By Mr. Young)  So you never saw Mr. Everett after you

2    spoke to the Violent Crimes Unit?

3    A.    After I spoke to the Gang Unit, sir.

4    Q.    To the Gang Unit.  You never saw him again?

5    A.    Correct, sir.

6    Q.    Did you ever have the opportunity to walk down to

7    Apartment 715 [sic] to see if you could smell the reeking odor of

8    marijuana?

9          THE COURT:  Building 715?

10         MR. YOUNG:  Building 715.  I'm sorry, your Honor.

11   A.    Sir, did you ask if I had the opportunity or if I did?

12   Q.    (By Mr. Young)  Did you do it?

13   A.    No, sir.

14   Q.    Okay.  So when you were made aware that there was

15   marijuana -- there was alleged marijuana sales going on in building

16   715, you never followed up, did you?

17   A.    I was not alleged that there was -- I was not aware of

18   drug sales going on at the apartment, sir.

19   Q.    You weren't aware that there were drug sales going on at

20   the apartment?

21   A.    That was not part of my investigation, sir.

22   Q.    What was your investigation, Mr. Wilson?

23   A.    The Gang Unit conducted this investigation, sir.

24   Q.    But you were assisting, weren't you?

25   A.    No, sir.  I just shared information that I obtained.

# WILSON - CROSS

```
1        Q.    But you continued to watch and look for Mr. Everett,
2    didn't you?
3        A.    I did not continue to look for him specifically, sir.  I
4    would just observe different activities sitting on my balcony, sir.
5        Q.    What could you observe if you never saw him again, Mr.
6    Wilson?
7        A.    I observed nothing after I didn't see him again.
8        Q.    Okay.
9              MR. YOUNG:  No further questions, your Honor.
10             THE COURT:  Thank you.
11             Ms. Webb.
12             MS. WEBB:  Nothing further, your Honor.
13             THE COURT:  Thank you.
14             THE WITNESS:  Thank you, your Honor.
15             THE COURT:  Watch your step stepping down.  There's a
16   step up after you come off the witness stand.
17                         (Witness Excused)
18             THE COURT:  The lawyers know this, the jury doesn't know
19   this.  All the witnesses get subpoenaed to show up.
20             Is there any objection to the witnesses being released
21   from their subpoena?  And if there is, my typical practice is to
22   release them unless y'all tell me you want to keep one potentially
23   for your case.
24             Do you have any objection to that?
25             MR. LEMMON:  No objection to releasing them.
```

1           MR. YOUNG:  No, your Honor.

2           THE COURT:  Okay.  And again, ladies and gentlemen, it's

3    just people get -- if I don't release them from the subpoena, they

4    actually have to stay at the courthouse throughout the whole trial

5    instead of going on to do other work they have.

6           Now, I could have the Government call another witness and

7    have that person be sworn, but I'm not going to do that.

8           Tonight is going to be the hardest night.  There is going

9    to be somebody in your life who is going to want to talk to you

10   about what you've been doing all day.  And you cannot talk to them

11   about it.  You are a judge.  A judge of the facts of this case.

12          You can't communicate with anybody, let anybody

13   communicate with you, no matter how hard -- and tonight will be the

14   hardest night because somebody -- well, if anybody in your life like

15   I have in my life, they'll try and see how vigilant you are about

16   not talking about it.  Maybe initially take it and bring it up a

17   couple hours later.  Well, just tell me a little bit about it.  And

18   you can't.  No independent research.

19          If you're a note taker, just leave your notebooks in the

20   jury room.  Just leave it here and they'll be secure overnight.

21          Tomorrow morning, you're going to come to where y'all had

22   your lunch.  We'll have some coffee on and donuts and make sure

23   there's sufficient sustenance to get you through the first

24   90 minutes of the morning.

25          What will happen is Ms. Herrmann and Ms. Jennings will

1    come down a little before 9 to make sure everybody is here and then

2    we'll come up.

3            And I thank you today for being such good stewards of

4    each other's time and I thank you in advance for being good stewards

5    of each other's time tomorrow.

6            We'll start promptly at 9 o'clock.  We'll work to no

7    later than 5.

8            Be safe getting home.  Be safe getting back.  Follow all

9    my instructions.

10           Everyone remain seated while the ladies and gentlemen of

11   the jury leave the room, except I would ask that Mr. Cooney remain

12   here with us for a couple minutes.

13           So everyone is excused except for Mr. Cooney.

14           Everyone remain seated while the ladies and gentlemen of

15   the jury leave the room, except for Mr. Cooney.

16                        (Jury out at 4:56 p.m.)

17           THE COURT:  Hello, Mr. Cooney.  As I understand it, you

18   had thought about and you had a recollection of working with

19   somebody named Alvin Davis in Fayetteville at some point in your

20   life?

21           THE JUROR:  Yes, sir.

22           THE COURT:  Do you know, how long -- how long ago was

23   that that you worked with an Alvin Davis?

24           THE JUROR:  I was with PWC, Public Works Commission of

25   Fayetteville, for 12 and a half years and I left in '97.

1              THE COURT:  Okay.

2              THE JUROR:  So prior to that I had worked in a similar

3     department and I met Mr. Davis.

4              THE COURT:  So you met a person named -- so in 1997?

5              THE JUROR:  Well, that's when I left.

6              THE COURT:  That's when you -- but the time that you

7     would have worked with him, would have been in the time period of

8     1997?

9              THE JUROR:  In the '90s.  Not directly with him, but he

10    was with another department and we had interchanging --

11             THE COURT:  Right.

12             THE JUROR:  -- abilities and --

13             THE COURT:  And so if the Mr. Davis, who's mentioned in

14    this case, was born in 1990 and would have been seven years old by

15    the time you left, it wouldn't be the same Mr. Davis, would it?

16             THE JUROR:  That's right.

17             THE COURT:  I appreciate your thinking about that and I'm

18    satisfied with that inquiry.

19             And, again, be safe getting home, be safe getting back

20    and we'll see you tomorrow.  And follow my instructions.

21             THE JUROR:  Yes, sir.

22             THE COURT:  Thank you.

23                        (Juror out at 4:57 p.m.)

24             THE COURT:  All right.  I'm obviously familiar with Mr.

25    Davis' birth date.  And so -- and part of that inquiry -- I didn't

```
 1    ask for any follow up from y'all because it's so self-evident to me
 2    that it's not the same Alvin Davis who would have been seven years
 3    old when he left Fayetteville and that job.
 4              Again, I thank y'all for being good stewards of the time
 5    today.  If there's something that comes up during the overnight
 6    recess that you want to talk about in the way of a legal issue, I'm
 7    happy to start early, but -- and just let Ms. Herrmann or Ms.
 8    Jennings know and we can do that.  Otherwise, we'll begin at
 9    9 o'clock.
10              MR. LEMMON:  Your Honor, could we raise one brief issue?
11              THE COURT:  Sure.
12              MR. LEMMON:  This is not something I've dealt with before
13    in a trial so I wanted to raise it just to see what your Honor
14    thought.
15              We have seen that on the defense witness list, one of the
16    witnesses is Kareem Haley.  And we think that in this case there is
17    evidence and testimony that would potentially put Mr. Haley as being
18    involved in -- again, just based on the testimony we anticipate -- a
19    potential conspiracy to intimidate witnesses or have perjury
20    committed.  Things like that.
21              And the reason I bring it up is I just wanted to know
22    what your Honor's thoughts were regarding whether he needed to be
23    advised of any Fifth Amendment rights or rights to an attorney
24    before he testifies, away from the jury or anything like that.
25              And he's also on supervised release currently, your
```

1    Honor, and so --

2            THE COURT:  Federal supervised release in the Eastern

3    District?

4            MR. LEMMON:  Yes, your Honor.  So we have found that the

5    conditions of his supervised release are also potentially implicated

6    and it could also be found to be -- his testimony could lead him to

7    be found to be in violation of the terms of his supervised release.

8            And so we thought that having an attorney appointed for

9    him or at least advising him of his right to have an attorney

10   appointed might be best so that there's not a delay in the case when

11   he's called, if he is called.

12           THE COURT:  Mr. Young, do you have any objection to me

13   directing the FPD to appoint one of our panel attorneys to speak

14   with him?

15           MR. YOUNG:  No, your Honor, I don't.

16           THE COURT:  Okay.  All right.  We will enter an order

17   then just directing the Federal Public Defender's Office to appoint

18   counsel off the appointed list, off of our CJA panel.  And of

19   course, all those lawyers are trained, as everyone here knows.  And

20   that lawyer will be appointed and be made available to Mr. Haley

21   promptly so that -- and the defense case isn't going to be tomorrow,

22   I know -- so that there would be time for a lawyer to consult.

23           So with that, I again thank y'all for being good stewards

24   of the time today and we will see you at 9 o'clock tomorrow.

25                   (Jury Trial adjourning at 5:00 p.m.)

```
 1                    UNITED STATES DISTRICT COURT

 2                   EASTERN DISTRICT OF NORTH CAROLINA

 3

 4                   CERTIFICATE OF OFFICIAL REPORTER

 5

 6           I, Michelle A. McGirr, RMR, CRR, CRC, Federal

 7  Official Court Reporter, in and for the United States District Court

 8  for the Eastern District of North Carolina, do hereby certify that

 9  pursuant to Section 753, Title 28, United States Code, that the

10  foregoing is a true and accurate transcript of my stenographically

11  reported proceedings held in the above-entitled matter and that the

12  transcript page format is in conformance with the regulations of the

13  Judicial Conference of the United States.

14

15  Dated this 19th day of December, 2022

16

17                             /s/ Michelle A. McGirr
                               MICHELLE A. McGIRR
18                             RMR, CRR, CRC
                               U.S. Official Court Reporter
19

20

21

22

23

24

25
```